IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NAOMI GONZALES,

                Plaintiff,

v.

AGWAY ENERGY SERVICES, LLC,

                Defendant.

C.A. No.

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiff Naomi Gonzales, by her attorneys, Bailey & Glasser, LLP and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, as and for her class action complaint, alleges, with personal knowledge as to her own actions, and upon information and belief as to those of others, as follows:

## NATURE OF THIS CASE

1.      This action seeks to redress the deceptive and bad faith pricing practices of Agway Energy Services, LLC ("Agway" or "Defendant") that has caused thousands of New York and Pennsylvania consumers to pay considerably more for their electricity than they should otherwise have paid.

2.      Agway has taken advantage of the deregulation of the retail electricity market in New York and Pennsylvania by luring consumers into switching electricity suppliers using a bait-and-switch scheme designed to deceive reasonable consumers. Agway lures its customers into switching to its electricity supply service by offering teaser rates that are fixed for a limited period of time and initially lower than the local utilities' rates for electricity. Once the initial rate expires, Agway switches its customers over to its market variable rate, which is invariably higher

than the initial teaser rate. Agway's market variable rate is likewise substantially higher than the competing local utilities' and independent energy companies' ("ESCOs") rates, and is disconnected from true market-based rates.

3.      As a result, New York and Pennsylvania consumers are being fleeced millions of dollars in exorbitant charges for electricity.

4.      This suit is brought pursuant to the N.Y. GEN. BUS. LAW § 349, N.Y. GEN. BUS. LAW § 349-d, and New York and Pennsylvania common law of on behalf of a class of New York and Pennsylvania consumers who were charged a variable rate for electricity by Agway from November 2011 to the present (the "Class" or "Class Members"). It seeks, *inter alia*, injunctive relief, actual damages and refunds, treble damages, punitive damages, attorneys' fees, and the costs of this suit.

## PARTIES

5.      Plaintiff Naomi Gonzales is a citizen of New York residing in Cornwall, New York. Ms. Gonzales was a customer of Agway from February 2016 through October 2017, and as a result of Agway's deceptive conduct, she incurred excessive charges for electricity.

6.      Defendant Agway is a limited liability company organized under the laws of Delaware. Agway's principal place of business or corporate headquarters is in Syracuse, New York.

7.      Pursuant to the Class Action Fairness Act ("CAFA"), Agway's status as a limited liability company renders it an "unincorporated association" and, under CAFA, an

unincorporated association is a citizen of the state where it has its principal place of business and under whose laws it is organized.  *See* 28 U.S.C. § 1332(d)(10).[1]

8.      Agway provides natural gas and electricity services to approximately 80,000 customers in New York and Pennsylvania.[2]

## JURISDICTION

9.      The Court has personal jurisdiction over Defendant Agway because it is a Delaware business entity.

10.      Subject matter jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(d)(2), as the amount in controversy is in excess of $5 million and many members of the Class are citizens of Pennsylvania.

11.      Furthermore, the U.S. Census Bureau estimates that New York had a net migration loss of nearly 73,000 New Yorkers between July 2015 and July 2016, and that the state had a net migration loss of approximately 847,000 between April 2010 and July 2016.[3]

---

[1] *See also Ferrell v. Express Check Advance of SC LLC*, 591 F.3d 698 (4th Cir. 2010) ("In this appeal, we hold that, for purposes of determining subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109–2, 119 Stat. 4 (codified in scattered sections of Title 28, United States Code), a limited liability company is an 'unincorporated association' as that term is used in 28 U.S.C. § 1332(d)(10) and therefore is a citizen of the State under whose laws it is organized and the State where it has its principal place of business."); *Morano v. BMW of North America, LLC*, 928 F. Supp. 2d 826 (D.N.J. 2013) (the Court held that it had subject matter jurisdiction pursuant to CAFA because BMW of North America, LLC is a citizen of the state in which it has its principal place of business and the state under whose law it is organized (New Jersey and Delaware) and Plaintiff's citizenship was Florida); *Heckemeyer v. NRT Missouri, LLC*, No. 12-01532, 2013 WL 2250429, at *5 (E.D. Mo. May 22, 2013), appeal dismissed (June 21, 2013) ("Congress chose to treat LLCs like corporations for purposes of determining citizenship under CAFA.").

[2] Suburban Propane Partners, L.P., Annual Report (Form 10-K) (Nov. 23, 2016).

[3] *Census: More People Leaving New York State*, Associated Press (March 24, 2017), https://www.usnews.com/news/best-states/new-york/articles/2017-03-24/census-more-people-leaving-new-york-state; Dan Clark, *New York is losing more people to other states than it's*

3

Moreover, many citizens of other states own second or vacation homes in New York.  It is therefore more than plausible that at least one current or former Agway customer is not a New York citizen.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a Delaware business entity.

## OPERATIVE FACTS

### The History Of New York's Energy Industry

13.     In 1996, New York's Public Service Commission ("NYPSC") made the decision to deregulate the market for retail electricity and electricity supply, a major break with past policy.  Similarly, Pennsylvania's state legislature deregulated Pennsylvania's electric power industry in 1997.  Before deregulation in both states, retail residential consumers had to purchase both the supply and the delivery of electricity from the local utility.  The public policy motivation for allowing consumers a choice of electricity suppliers is to enable retail customers to obtain lower costs compared to the heavily regulated utility.  The premise behind this policy is that competition would result in ESCOs being more aggressive than the monopoly utility in reducing wholesale purchasing costs and thereby lower prices and costs for retail customers.

14.     ESCOs such as Agway have various options to buy electricity at wholesale for resale to retail customers, including: owning electricity production facilities; purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and by purchasing electricity in advance of the time it is used by consumers, either by purchasing physical gas to be used in the future or by purchasing futures contracts for the delivery of electricity in the future at a predetermined price.  The purpose of

---

*gaining*, POLITIFACT (Jan. 20, 2017), http://www.politifact.com/new-york/statements/2017/jan/20/edward-cox/new-york-losing-more-people-other-states-its-gaini/.

4

deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce electricity costs, and pass those savings on to consumers.

15.    Consumers who do not choose to switch to an ESCO for their energy supply continue to receive their supply from their local utility.  However, if a customer switches to an ESCO, the customer will have his or her energy "supplied" by the ESCO, but still "delivered" by their existing utility.  The customer's existing utility continues to bill the customer for both the energy supply and delivery costs.  The only difference to the customer is which company sets the price for the customer's energy supply.

16.    As part of the deregulation plan, ESCOs (like Agway) do not have to file or seek approval for the electricity rates they charge with the state public services commissions or the method by which they set their rates.

17.    Agway exploits the deregulation and the lack of regulatory oversight in the energy market by luring customers with enticing teaser rates and false promises that it will offer market-based variable rates when, in fact, Agway's rates are substantially higher than rates charged by other ESCOs and the local utilities, and are untethered from changes in wholesale rates.

**Ms. Gonzales's Experience**

18.    Agway solicited Ms. Gonzales in or around December 2015, representing that it would charge a rate lower than the local utility, Central Hudson.  Expecting to save money on her electricity bills, Ms. Gonzales expressed interest in Agway's offer.

19.    Pursuant to § 349-d of New York's General Business Law, Agway was required to mail Ms. Gonzales its standard and uniform residential electricity customer agreement (the "Agreement") that would govern their relationship.  Agway was also required to provide Ms. Gonzales with a rescissionary period during which she could rescind the Agreement prior to its

commencement should she not agree to its terms.  During that rescissionary period, the

Agreement served as a solicitation in which Agway identified the basis upon which the promised

market-based variable rate would be determined.

20.     According to the Agreement, customers are initially charged a fixed introductory

rate (the "Introductory Rate") for a set number of months.  Once the Introductory Rate expires,

Agway automatically converts customers to its monthly variable rate.

21.     The Agreement also represents that the variable rate, which is set by Agway,

"shall each month reflect the cost of electricity acquired by Agway from all sources (including

energy, capacity, settlement, ancillaries), related transmission and distribution charges and other

market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's

costs, expenses and margins."[4]

22.     Any reasonable consumer, including Ms. Gonzales, would understand based on

these representations that Agway's variable rate would reflect Agway's costs for purchasing

electricity at wholesale, and that the variable rate would be competitive with the rate offered by

the local utility and other ESCOs.

23.     Ms. Gonzales switched from Central Hudson to Agway for her electricity services

in February 2016, and will continue to pay Agway's variable rate through approximately

November or December 2017 (as she cancelled her agreement in October 2017, and it may take

up to two billing cycles for her utility to process the cancellation).  The following table identifies

each billing period during this time, the variable rate Agway charged Ms. Gonzales, the

corresponding rate Central Hudson would have charged (which, as discussed below, is a

---

[4] Agway's Pennsylvania standard and uniform residential customer agreement is materially
similar.  *See Pennsylvania Residential Electric Generation Supplier Contract*, AGWAY ENERGY
SERVICES, LLC, https://www.agwayenergy.com/services/terms/resi-pa-electricity-agreement-04-
20-17.pdf (last visited Nov. 8, 2017).

reasonable representation of a market-based rate), and the differences between Agway's and

Central Hudson's contemporaneous rates:

| Billing Period | Agway Rate Per kWh[5] | Central Hudson Rate Per kwH | Difference | Percent Difference |
|---|---|---|---|---|
| 2/11/16-4/13/16 | $0.0440 | $0.07138 | -$0.02738 | -38.3581% |
| 2/11/16-4/13/16 | $0.0440 | $0.07471 | -$0.03071 | -41.1056% |
| 4/13/16-6/10/16 | $0.08605 | $0.06924 | $0.01681 | 24.2779% |
| 4/13/16-6/10/16 | $0.08605 | $0.06018 | $0.02587 | 42.9877% |
| 6/10/16-7/15/16 | $0.09078 | $0.05734 | $0.03344 | 58.3188% |
| 7/15/16-8/11/16 | $0.0966 | $0.04116 | $0.05544 | 134.6939% |
| 8/11/16-9/14/16 | $0.09704 | $0.08166 | $0.01538 | 18.8342% |
| 9/14/16-10/11/16 | $0.08909 | $0.04863 | $0.04046 | 83.1997% |
| 10/11/16-12/13/16 | $0.08788 | $0.05031 | $0.03757 | 74.6770% |
| 10/11/16-12/13/16 | $0.08788 | $0.0699 | $0.01798 | 25.7225% |
| 12/13/16-1/17/17 | $0.09904 | $0.04294 | $0.0561 | 130.6474% |
| 1/17/17-2/13/2017 | $0.08992 | $0.07308 | $0.01684 | 23.0432% |
| 2/13/17-3/16/2017 | $0.08358 | $0.06572 | $0.01786 | 27.1759% |
| 3/16/17-4/12/2017 | $0.09072 | $0.04343 | $0.04729 | 108.8879% |
| 4/12/17-5/15/2017 | $0.09250 | $0.09221 | $0.00029 | 0.3145% |
| 5/15/17-6/13/2017 | $0.10127 | $0.07581 | $0.02546 | 33.5840% |
| 6/13/17-7/14/2017 | $0.10133 | $0.04528 | $0.05605 | 123.7853% |

---

[5] Quantities of electricity are usually measured in terms of energy transmitted over time.  One kilowatt hour or "kWh" is the equivalent of 3.6 megajoules of electricity.

| Billing Period | Agway Rate Per kWh[5] | Central Hudson Rate Per kwH | Difference | Percent Difference |
|---|---|---|---|---|
| 7/14/17-8/10/2017 | $0.09968 | $0.07723 | $0.02245 | 29.0690% |
| 8/10/17-9/13/2017 | $0.08916 | $0.05827 | $0.03089 | 53.0118% |
| 9/13/17-10/11/2017 | $0.09493 | $0.04611 | $0.04882 | 105.8773% |

24.     Ms. Gonzales' Introductory Rate lasted for the first two months of her services. These first two months are notably the *only* months when Agway's rate was lower than her utility's contemporaneous rate.

25.     That Agway's variable rate is not in fact a competitive market rate based on the wholesale cost of electricity is demonstrated by the fact that Agway's variable rate was consistently significantly higher than Central Hudson's rates.

26.     Indeed, from April 2016 (the first month Ms. Gonzales was charged a variable rate) through October 2017 (her most recent bill), Agway's rate was higher than Central Hudson's rate *every single month*.  In fact, there are numerous months when Agway's variable rate was *more than double* Central Hudson's rate.

27.     Central Hudson's rates serve as an ideal indicator of market conditions because they are based on the New York Independent System Operator's ("NYISO") competitive short-term market (commonly referred to as "real-time" pricing or the "spot market") for wholesale electricity and the associated market costs (*i.e.*, ancillary services, installed capacity, and transmission -- the same costs ESCOs such as Agway incur).[6]  Central Hudson and other New York utilities purchase energy, ancillary services, and capacity from NYISO's wholesale market

---

[6] All but installed capacity are sold on an hourly basis; installed capacity is sold on a monthly basis.

on a daily basis based on customer consumption, and pass actual costs on to their customers --

without any markups or profit.  ESCOs like Agway can also purchase wholesale electricity from

NYISO's short-term market, at the same price as the utilities.  Because New York utility rates do

not include any profits, they serve as pure reflections of the monthly average market costs of

wholesale electricity, associated costs, transmission, and distribution.

28.     While Central Hudson and Agway may not purchase electricity and associated

costs in precisely the same manner, over time the wholesale costs they incur should be

commensurate.  In fact, Agway has a tactical advantage over the utility as it can purchase

electricity from a highly competitive electricity market for future use, and therefore its cost for

purchasing electricity should at the very least reflect (if not undercut) market prices, albeit over a

longer term than daily spot rates.  Therefore, while Central Hudson's rates may not precisely

match Agway's rates, they should be commensurate.

29.     That Agway's variable rate does not reflect market costs for wholesale electricity

is also demonstrated by the disconnect between fluctuations in wholesale electricity prices and

costs (as demonstrated by Central Hudson's rates, which are a pure reflection of actual wholesale

market rates because they are based on the daily spot market) and Agway's rates.

30.     For example, after Ms. Gonzales' Introductory Rate expired and she was switched

to Agway's variable rate, Agway's rate immediately jumped a remarkable 96% from $0.0440 per

kWh to $0.08605 per kWh.  In contrast, the local utility (Central Hudson) rate, *i.e.*, the rate

Central Hudson would have charged Ms. Gonzales had she not switched to Agway, declined by

7%.  This trend continued throughout Ms. Gonzales' time with Agway.  When Central Hudson's

rate declined from $0.05734 to $0.04116 (a decline of 28%) from July to August 2016, Agway

increased its already exorbitant prices from $0.09078 per kWh to $0.0966 (an increase of 6%).

9

Likewise, when Central Hudson's rate declined from $0.07581 per kWh to $0.04528 per kWh (decreasing by 40%) between June and July 2017, Agway's rate rose from $0.10127 per kWh to $0.10133 per kWh.

31.     The discrepancies between Agway's rate and variations in its costs remain evident through Ms. Gonzales' most recent billing cycle.  Whereas Central Hudson's rate decreased from $0.05827 per kWh to $0.04611 per kWh (declining by 21%) from September to October 2017, Agway's rate increased from $0.08916 per kWh to $0.09493 per kWh (increasing by 6%).

32.     The discordance in rates is similarly apparent with respect to pricing trends over time.  While Central Hudson's rate steadily declined from $0.06924 per kWh to $0.04116 per kWh (a decline of 41%) from May 2016 to August 2016, Agway's rate steadily rose from $0.08605 per kWh to $0.0966 per kWh (increasing by 12%).  Likewise, between February and April 2016, Central Hudson's rate steadily decreased from $0.07308 per kWh to $0.04343 per kWh (decreasing 41%), Agway's rate rose from $0.08992 per kWh to $0.09072 per kWh (increasing 1%).  Between May and July 2017, Central Hudson's rate steadily decreased from $0.09221 per kWh to $0.04528 per kWh (decreasing 51%), while Agway's rate steadily increased from $0.09250 per kWh to $0.10133 per kWh (increasing 10%).

33.     Even when the rates trended in the same direction, the differences remain glaring: between August and October 2017, Central Hudson's rates steadily decreased from $0.07723 per kWh to $0.04611 per kWh (decreasing 40%), whereas Agway's rate merely decreased from $0.09968 per kWh to $0.09493 per kWh (decreasing 5%).

34.     Agway's stark rate disparities with those of the local utility, wherein Agway's rates were higher 100% of the eighteen months that Ms. Gonzales was charged a variable rate, considered together with the fact that Agway's rates do not reflect market fluctuations,

demonstrate that Agway does not charge a market rate as it states in its Agreement, but rather gouges its customers by charging outrageously high rates.

35.     The cost of wholesale electricity is the primary component of the non-overhead costs Agway incurs.  Indeed, Agway concedes and represents as much, listing "the cost of electricity" as the first factor in its definitive list of pricing components.

36.     The other factors Agway identified in the Agreement (other than cost of electricity, capacity, ancillaries, transmission, and distribution) that affect its variable rate (*i.e.*, "applicable taxes, fees, charges or other assessments and Agway's costs, expenses") are relatively insignificant in terms of the overall costs Agway incurs to provide retail electricity, and do not fluctuate over time.  Therefore, these other cost factors cannot explain the drastic increases in Agway's variable rate or the reason its rates are disconnected from changes in wholesale costs.

37.     Agway's identification of "margin" among the factors it considers likewise does not justify its outrageously high rates.  A reasonable consumer might understand that an ESCO will attempt to make a reasonable margin on the commodity it sells to consumers.  However, such a consumer would also expect that such profits would be consistent with profit margins obtained by other suppliers of electricity in the market, and also that Agway's profiteering at the expense of its customers would not be so extreme that its rate bears no relation to market prices but is instead outrageously higher.  That other ESCOs' rates are lower, even though they purchase electricity from the wholesale market, demonstrates that Agway sets its profit margins in bad faith.  Similarly, Central Hudson's rate reflects a rate that Agway could charge (because Agway could purchase electricity in the same way and at the same cost as Central Hudson) plus

a reasonable margin.  No reasonable consumer would consider a margin that is often over 100% to be fair or commercially reasonable.

38.     Thus, Agway's statements with respect to the electricity rates it will charge are materially misleading because consumers do not receive a price based on the specified factors like wholesale costs and competitor pricing.  Instead, consumers are charged rates that are substantially higher (often double) those of competitors and untethered from the specified market factors.  Agway intentionally fails to disclose this material fact to its customers because no reasonable consumer -- including Ms. Gonzales -- who knows the truth about Agway's exorbitant rates would choose Agway as an electricity supplier.

39.     Agway's statements and omissions regarding its electricity rates are materially misleading because the most important consideration for any reasonable consumer when choosing an energy supplier is price.

40.     In fact, all that Agway offers customers is electricity delivered by local utilities, a commodity that has the exact same qualities as electricity supplied by other ESCOs or local utilities.  Other than potential price savings, there is nothing to differentiate Agway from other ESCOs or local utilities.  Accordingly, the potential for price savings is the only reason any reasonable consumer would enter into a contract for electricity supply with Agway.

41.     Agway knows full well that it charges a rate that is unconscionably high, and the misrepresentations it makes with regard to the rate being market-based were made for the sole purpose of inducing consumers to sign up for Agway's electricity supply so that it can reap outrageous profits to the direct detriment of its consumers without regard to the consequences high utility bills cause such consumers.  As such, Agway's actions were actuated by actual malice or accompanied by wanton and willful disregard for consumers' well-being.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action on her own behalf and additionally, pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all Agway New York and Pennsylvania customers charged a variable rate for residential electricity services by Agway from November 2011 to the present (the "Class" or "Class Members").

43.     Plaintiff also brings this action on behalf of a sub-class of Agway's New York customers charged a variable rate for residential electricity services by Agway from November 2011 to the present (the "New York Sub-Class").

44.     Excluded from the Class and New York Sub-Class (collectively, the "Classes") are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, legal representative, predecessor, successor, or assignee of Defendant.

45.     This action is brought as a class action for the following reasons:

a.     The Classes each consist of thousands of persons and are therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b.     There are questions of law or fact common to the Classes that predominate over any questions affecting only individual members, including:

i.     whether Defendant violated N.Y. Gen. Bus. Law § 349;

ii.     whether Defendant violated N.Y. Gen. Bus. Law § 349-d;

iii.     whether Defendant breached its contract with its consumers by charging variable rates not based on the factors specified in the customer agreements;

iv.     whether Defendant breached the covenant of good faith and fair dealing by exercising its unilateral price-setting discretion in bad faith, *i.e.*, to price gouge;

v.      whether Plaintiff and the Class have sustained damages and, if so, the proper measure thereof; and

vi.      whether Defendant should be enjoined from continuing to charge variable rates not based on market conditions;

c.      The claims asserted by Plaintiff are typical of the claims of Class Members;

d.      Plaintiff will fairly and adequately protect the interests of the Classes, and Plaintiff has retained attorneys experienced in class and complex litigation, including class litigation involving consumer protection and ESCOs;

e.      Prosecuting separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant;

f.      Defendant has acted on grounds that apply generally to the Class, namely representing that its variable rates are based on market conditions, *i.e.*, competitive and reflective of the wholesale market, when Defendant's rates are in fact substantially higher, such that final injunctive relief prohibiting Defendant from continuing its deceptive practices is appropriate with respect to the Classes as a whole;

g.      A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

i.      Absent a class action, as a practical matter Class Members will be unable to obtain redress, Defendant's violations of its legal obligations will continue without remedy, additional consumers and purchasers will be harmed, and Defendant will continue to retain its ill-gotten gains;

ii.      It would be a substantial hardship for most individual Class Members if they were forced to prosecute individual actions;

iii.      When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all Class Members;

iv.      A class action will permit an orderly and expeditious administration of Classes claims, foster economies of time, effort, and expense and ensure uniformity of decisions;

v.      The lawsuit presents no difficulties that would impede its management by the Court as a class action; and

vi.      Defendant has acted on grounds generally applicable to Class Members, making class-wide monetary and injunctive relief appropriate.

46.    Defendant's violations New York and Pennsylvania common law are applicable to all Class Members, its violations of N.Y. GEN. BUS. LAW § 349, N.Y. GEN. BUS. LAW § 349-d are applicable to all members of the New York Sub-Class, and Plaintiff is entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

## FIRST CAUSE OF ACTION
### Violation of N.Y. GEN. BUS. LAW § 349
### (On Behalf of the New York Sub-Class)

47.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

48.    Defendant has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. GEN. BUS. LAW § 349.

49.    Defendant's acts are willful, unfair, unconscionable, deceptive, and contrary to the public policy of New York, which aims to protect consumers.

50.     Defendant's misrepresentations and false, deceptive, and misleading statements and omissions with respect to the variable rates it charges for electricity, as described above, constitute deceptive practices in connection with the marketing, advertising, promotion, and sale of electricity in violation of N.Y. GEN. BUS. LAW § 349.

51.     Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to purchase electricity from Agway.

52.     Defendant knew at the time it promised prospective customers that they will be billed a variable rate based on wholesale market costs and other market factors that its promise was false because at the time of contract formation Agway knew that its variable rate was untethered from market conditions.

53.     Defendant's intentional concealments were designed to deceive current and prospective variable rate customers into believing that rates will be commensurate with market conditions and the specified factors in the Agreement.  By concealing its actual pricing strategy (presumably maximizing profits), Defendant benefits from reliance and deprive consumers from informed purchasing decisions and savings.

54.     Defendant also baits and switches potential customers by enticing them with deceptively low Introductory Rates, only to shift them on to Agway's exorbitant variable rate plan shortly thereafter.

55.     Defendant's practices are unconscionable and outside the norm of reasonable business practices.

56.     As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiff and New York Sub-Class Members entered into agreements to purchase electricity from Agway and suffered and continue to suffer an ascertainable loss of monies based

on the difference in the rate they were charged versus the rate they would have been charged had Defendant charged a rate based on market conditions and the factors specified in the Agreement or had they not switched to Defendant from their previous supplier.  By reason of the foregoing, Defendant is liable to Plaintiff and the New York Sub-Class for trebled compensatory damages, attorneys' fees, and the costs of this suit.

57.     Plaintiff and New York Sub-Class Members further seek equitable relief against Defendant.  Pursuant to N.Y. GEN. BUS. LAW § 349, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices as alleged herein to be unlawful, an Order enjoining Defendant from undertaking any further unlawful conduct, and an order directing Defendant to refund to Plaintiff and the Class all amounts wrongfully assessed, collected, or withheld.

58.     Defendant knows full well that it charges an unconscionably high rate, and the misrepresentations it makes with regard to the rate being market based were made for the purpose of inducing consumers to sign up for Defendant's electricity supply so that it can reap outrageous profits to the direct detriment of New York consumers without regard to the consequences high utility bills cause such consumers.  As such, Defendant's actions are unconscionable and actuated by bad faith, lack of fair dealing, actual malice, or accompanied by wanton and willful disregard for consumers' well-being.  Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**Violation of N.Y. GEN. BUS. LAW § 349-d**
**(On Behalf of the New York Sub-Class)**

59.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

60.     N.Y. GEN. BUS. LAW §349-d(3) provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."

61.     Defendant offers for sale energy services for and on behalf of an ESCO.

62.     Defendant engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. GEN. BUS. LAW § 349-d(3) as described above.

63.     Defendant's acts are willful, unfair, unconscionable, deceptive, and contrary to the public policy of New York, which aims to protect energy consumers.

64.     As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiff and New York Sub-Class Members have suffered injuries and monetary damages in an amount to be determined at the trial of this action but not less than $500 for each violation, such damages to be trebled, plus attorneys' fees.

**65.**     Plaintiff further seeks an Order enjoining Defendant from undertaking any further unlawful conduct, pursuant to N.Y. GEN. BUS. LAW § 349-d(10).

### THIRD CAUSE OF ACTION
### Breach of Contract
### (On Behalf of the Class)

66.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

67.     Plaintiff and the Class entered into valid contracts with Defendant for the provision of electricity.

68.     Pursuant to the Agreement, Defendant agreed to charge a variable rate for electricity based electricity costs, market-related factors, applicable taxes, fees, charges or other assessments, and costs, expenses, and margins.

69.     Pursuant to the Agreement, Plaintiff and the Class paid the variable rates charged by Defendant for electricity.

70.     However, Defendant failed to perform its obligations under the Agreement. Indeed, Defendant charged a variable rate for electricity that was untethered from the pricing components set forth in the parties' contract.

71.     No reasonable consumer, including Ms. Gonzales, would interpret the Agreement as granting Defendant with unfettered discretion to price gouge its customers.

72.     Plaintiff and the Class were injured as a result because they were billed, and they paid, a charge for electricity that was higher than it would have been had Defendant based its rate on the agreed upon factors.

**73.**     By reason of the foregoing, Defendant is liable to Plaintiff and Class Members for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial.

### FOURTH CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith & Fair Dealing
### (On Behalf of the Class)

74.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

75.     Every contract in New York and Pennsylvania contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of a contract's express terms.

76.     Under the contract, Defendant had unilateral discretion to set the variable rate for electricity based on market conditions and other factors, such as the amount of profit

Defendant hoped to earn from the sale of electricity in a customer's utility area.

77.     Plaintiff reasonably expected that the variable rates for electricity would, notwithstanding Defendant's profit goals, reflect the market and wholesale prices for electricity and that Defendant would refrain from price gouging.  Without these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy electricity from Defendant.

78.     Defendant breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising its unilateral rate-setting discretion to price gouge and frustrate Plaintiff and other Class Members' reasonable expectations that the variable rate for electricity would be commensurate with market conditions.

**79.**     As a result of Defendant's breach, Defendant is liable to Plaintiff and Class Members for actual damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of the Class)

80.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

81.     By engaging in the conduct described above, Defendant has unjustly enriched itself and received a benefit beyond what was contemplated in the contract, at the expense of Plaintiff and the Class.

82.     It would be unjust and inequitable for Defendant to retain the payments Plaintiff and the Class made for excessive electricity charges.

83.     By reason of the foregoing, Defendant is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's

actions, the amount of which shall be determined at trial.

WHEREFORE, Plaintiff respectfully requests that the Court should enter judgment against Defendant as follows:

1.      Certifying this action as a class action, with a class and a sub-class as defined above;

2.      On Plaintiff's First Cause of Action, awarding against Defendant damages that Plaintiff and New York Sub-Class Members have suffered, trebled, and granting appropriate injunctive relief;

3.      On Plaintiff's Second Cause of Action, awarding against Defendant damages that Plaintiff and New York Sub-Class Members have suffered, trebled, and granting appropriate injunctive relief;

4.      On Plaintiff's Third Cause of Action, awarding against Defendant damages that Plaintiff and Class Members have suffered as a result of Defendant's actions;

5.      On Plaintiff's Fourth Cause of Action, awarding against Defendant damages that Plaintiff and Class Members have suffered as a result of Defendant's actions;

6.      On Plaintiff's Fifth Cause of Action, awarding against Defendant damages that Plaintiff and Class Members have suffered as a result of Defendant's actions;

7.      Awarding Plaintiff and the Class punitive damages;

8.      Awarding Plaintiff and the Class interest, costs, and attorneys' fees; and

9.      Awarding Plaintiff and the Class such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38 of the Federal Rule of Civil Procedure, Plaintiff hereby demands a

trial by jury.

Dated:  December 6, 2017

<u>/s/ David A. Felice</u>
David A. Felice (#4090)
Bailey & Glasser, LLP
2961 Centerville Road, Suite 302
Wilmington, Delaware 19808
Telephone: (302) 504-6333
Facsimile: (302) 504-6334
  *Attorneys for Plaintiff and the*
  *Putative Class*

<u>Of Counsel</u>:
John Roddy (to be admitted *pro hac vice*)
Bailey & Glasser, LLP
99 High Street, Suite 304
Boston, Massachusetts 02110
Telephone: (617) 439-6730
Facsimile: (617) 951-3954

- and -

D. Greg Blankinship (to be admitted *pro hac vice*)
Finkelstein, Blankinship, Frei-Pearson
and Garber, LLC
445 Hamilton Avenue
White Plains, New York 10601
Telephone: (914) 298-3281
Facsimile: (914) 824-1561