### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

NAOMI GONZALES,

       Plaintiff,

      v.

AGWAY ENERGY SERVICES, LLC,

       Defendant.

C.A. No.: 1:17-cv-01754 (MWB)

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Thomas E. Hanson, Jr. (No. 4102)
BARNES & THORNBURG LLP
1000 N. West Street, Suite 1500
Wilmington, DE 19801
(302) 300-3474

William K. Mosca, Jr.
Kenneth J. Sheehan
John D. Coyle
BEVAN, MOSCA & GIUDITTA, P.C.
A Professional Corporation
222 Mount Airy Road, Suite 200
Basking Ridge, New Jersey 07920
(908) 753-8300

*Attorneys for Defendant*

Dated:  January 29, 2018

# <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY .................................... 6

    A.    HISTORY OF ENERGY SERVICES COMPANIES ............................ 6

    B.    AGWAY COMPANY HISTORY AND SERVICE OFFERING ......... 7

    C.    PLAINTIFF'S AGREEMENT WITH AGWAY ................................ 8

LEGAL STANDARD FOR 12(B)(6) MOTIONS TO DISMISS ............................... 10

ARGUMENT .......................................................................................................... 11

    I.    THIS MATTER SHOULD BE DISMISSED PURSUANT TO FED R. CIV. P. 12(b)(1) FOR LACK OF SUBJECT MATTER JURISDICTION .......... 11

    II.    THIS ACTION SHOULD BE TRANSFERRED PURSUANT TO FORUM NON CONVENIENS PRINCIPLES UNDER THE ATLANTIC MARINE DECISION ......................................................................... 12

    III.    PLAINTIFF'S CLAIMS ARE BARRED IN THEIR ENTIRETY BY THE VOLUNTARY PAYMENT DOCTRINE ........................................ 15

    IV.    PLAINTIFF'S CLAIMS ARE BARRED IN THEIR ENTIRETY BY THE NEW YORK UNIFORM COMMERCIAL CODE, ARTICLE 2, § 2-607(3), FOR PLAINTIFF'S UNTIMELY NOTICE OF BREACH OF THE AGREEMENT ....................................................................... 17

    V.    PLAINTIFF FAILS TO ALLEGE A PLAUSIBLE AND SUSTAINABLE CLAIM PURSUANT TO THE REQUIREMENTS OF NEW YORK GENERAL BUSINESS LAW §§ 349 AND 349-D(3) ....................................... 23

        A.    Agway's Description of its Rate Structure is Undisguised and Truthful, and at No Time Claims or Implies a Component of Savings When Compared to the Incumbent Utility Rates ...................... 26

        B.    Agway Has No Material Omissions in its Disclosures Regarding the Terms of Service .............................................................. 27

        C.    Agway Discloses the Terms of its Service and does not "Bait and Switch" its Customers ........................................................ 30

    VI.    PLAINTIFF FAILS TO ALLEGE FACTS SUPPORTING A CLAIM FOR BREACH OF CONTRACT SUFFICIENT TO SURVIVE A MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6) .................. 31

        1.    Agway has Performed Its Obligations under the Contract ...................... 31

        2.    Plaintiff Suffered No Cognizable Contract Damages .............................. 33

VII.    PLAINTIFF'S CLAIM OF BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING MUST BE DISMISSED BECAUSE IT DUPLICATES THE BREACH OF CONTRACT CLAIM...........34

VIII.   PLAINTIFF'S CLAIM FOR UNJUST ENRICHMENT MUST BE DISMISSED BECAUSE A VALID CONTRACT EXISTS BETWEEN THE PARTIES.......................................................................................................34

CONCLUSION....................................................................................................................... 35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Air & Power Transmission, Inc. v. Weingast*,
120 A.D. 3d 524, 992 N.Y.S. 2d 46 (App. Div. 2014) ...........................................................35

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................................10, 29, 30

*Atkins v. Apollo Real Estate Advisors, L.P.*,
No. CV-05-4365, 2008 U.S. Dist. LEXIS 35514 (E.D.N.Y. Apr. 30, 2008) .........................11

*Atlantic Marine Construction Co., Inc. v. United States District Court for the
Western District of Texas et al.*,
*571 U.S. _*, 134 S. Ct. 568 (U.S. Dec. 3, 2013) ...............................................................13, 14

*Bailey v. Fish & Neave*,
8 N.Y.3d 523, 868 N.E.2d 956 (2007)....................................................................................28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................................1, 6, 10

*Biro v. Conde Nast*,
807 F.3d 541 (2d Cir. 2015), *cert. denied,* 136 S. Ct. 2015 (2016) .......................................10

*Bowen v. Niagara Mohawk Power Corp*,
183 A.D.2d 293, 590 N.Y.S.2d 628 (App. Div. 1992) ...........................................................22

*Bryant v. Ciminelli*,
267 F. Supp. 3d 468 (W.D.N.Y. July 26, 2017) .....................................................................10

*Buczek v. HSBC N.A.*,
No. 15-CV-830S, 2017 U.S. Dist. LEXIS 44348 (W.D.N.Y. Mar. 26, 2017)
*reconsideration den.,* No. 15-CV-779S, 2017 U.S. Dist. LEXIS 72961
(W.D.N.Y. May 12, 2017)(Skretny, J.) ..................................................................................11

*Buermeyer v. Suburban Propane, L.P.*,
Index No. 5367 (N.Y. Supreme Ct. 2011) ..................................................................16, 17, 25

*In re Burlington Coat Factory Sec. Litigation*,
114 F.3d 1410 (3d Cir. 1997)....................................................................................................3

*Chen v. Hiko Energy, LLC*,
No. 14-cv 1771 (VB), 2014 U.S. Dist. LEXIS 181846 (S.D.N.Y. Dec. 29,
2014) .............................................................................................................1, 23, 26, 34

*Christou v. Koureli Rest. Group, Inc.*
(Sup. Ct.) 2013 NY Slip Op 33217(U) (Sup.Ct.).................................................34

*City of N.Y. v. Smokes-Spirits Com., Inc.*,
12 N.Y.3d 616, 911 N.E.2d 834 (2009)..............................................................23

*Claridge v. N. Am. Power & Gas, LLC*,
No. 15-cv-1261 (PKC), 2015 U.S. Dist. LEXIS 117693 (S.D.N.Y. Sep. 2,
2015) .........................................................................................................................26

*Corsello v. Verizon N.Y. Inc.*
18 N.Y. 3d 777, 967 N.E.2d 1177, 944 N.Y.S.2d 732 (2012)................................35

*Cortazar v. Tomasino*,
150 A.D. 3d 668, 54 N.Y.S. 3d 89 (App. Div. 2017) ............................................35

*Cruz v. FXDIRECT DEALER, LLC*,
720 F.3d 115 (2d Cir. 2013)...................................................................................34

*CSI Group, LLP v. Harper*,
61 N.Y.S. 3d 592, 153 A.D. 3d 1314 (App. Div. 2017) ........................................34

*Dillon v. U-A Columbia Cablevision of Westchester Inc.*,
100 N.Y. 2d 525, 790 N.E. 2d 1155, 760 N.Y.S. 2d 726 (2003)............................15

*DRMAK Realty LLC v. Progressive Credit Union*,
2015 NY Slip Op 08044, 133 A.D.3d 401, 18 N.Y.S.3d 618 (App. Div.) .............16

*Encogen Four Partners L.P. v. Niagara Mohawk Power Corp.*,
914 F. Supp. 57 (S.D.N.Y. 1996) ...........................................................................21

*Erie Railroad Co. v. Tompkins*,
304 U.S. 64 (1938)..............................................................................18, 21, 22

*In re Erving Indus. Inc.*
432 B.R. 354,363 (Bankr. D. Mass. 2010) ............................................................22

*In re Escalera Res. Co.*,
563 B.R. 336, 2017 Bankr. LEXIS 391 (Dist. Colorado 2017)...................... *passim*

*Farina v. Niagara Mohawk Power Corp.*,
81 A.D.2d 700, 438 N.Y.S.2d 645 (App. Div. 1981) .................................20, 22, 23

*Feld v. Apple Bank for Sav.*,
2014 NY Slip Op 2662, 116 A.D.3d 549, 984 N.Y.S. 2d 319 (App. Div.) .............23

*Fischer & Mandell LLP v. Citibank, N.A.*,
632 F.3d 793 (2d Cir. 2011)...................................................................................31

*Flood v. Just Energy Mktg. Corp.*,
 No. 7:15-cv-2012 (KBF), 2017 U.S. Dist. LEXIS 60337 (S.D.N.Y. Jan. 20,
 2017) ........................................................................................................................22

*Frederico v. Home Depot*,
 607 F.3d 188 (3d Cir. 2007)....................................................................................12

*Gershon v. Hertz Corp.*,
 215 A.D.2d 202, 626 N.Y.S.2d 80 (App. Div. 1995) ............................................24

*Gimbel Bros., Inc. v. Brook Shopping Centers, Inc.*,
 118 A.D.2d 532, 499 N.Y.S.2d 435 (App. Div. 1986) ..........................................15

*Go Green Realty Corp. v. Liberty Petroleum Realty, LLC*, *No. 11cv5360 (DF)*,
 *2015 U.S. Dist. LEXIS 43816 (S.D.N.Y. Mar. 30, 2015)* ......................................34

*Gold v. N.Y. Life Ins. Co.*,
 730 F.3d 137 (2d Cir. 2013).....................................................................................11

*Hamlen v. Gateway Energy Servs. Corp.*,
 16-cv-3526 (S.D.N.Y. 2016)......................................................................................1

*Hudson Energy Services, LLC v. Great Atl. & Pac. Tea Co. (In re Great Atl. &*
 *Pac. Tea Co.)*,
 538 B.R. 666, 2015 U.S. Dist. LEXIS 129049 (S.D.N.Y. 2015)............................21

*Komoda v. Palmco Energy NJ, LLC*,
 14-cv-1679 (E.D.N.Y. 2014) ......................................................................................1

*Lawton v. Town of Orchard Park*,
 No. 14-CV-867S, 2017 U.S. Dist. LEXIS 132588 (W.D.N.Y. Aug. 18, 2017) .....10

*Lewis v. Hertz Corp.*,
 181 A.D.2d 493, 581 N.Y.S.2d 305 (App. Div. 1992) ..........................................24

*Malcolm v. Astrue*,
 735 F. Supp. 118 (D. Del. 2010)..............................................................................12

*Mirkin v. Viridian Energy, Inc.*,
 No. 3:15-cv-1057 (SRU), 2016 U.S. Dist. LEXIS 86616 (D. Conn. July 5,
 2016) ........................................................................................................................26

*Morrison v. Nat'l Australia Bank Ltd.*,
 547 F.3d 167 (2d Cir. 2008), aff'd 130 S. Ct. 2869 (2010) ....................................12

*Nieves v. Just Energy New York, Corp.*,
 1:17-cv-561 (W.D.N.Y. 2017)....................................................................................1

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,
   92 N.Y.2d 458, 705 N.E.2d 656 (1998)...........................................................................21

*Old Homestead Golf Club v. Electronic Transaction Corp.*,
   2017 WL 5899920 (3d Cir. 2017)...................................................................................13

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
   85 N.Y.2d 20, 647 N.E. 2d 741 (1995)......................................................................23, 24

*Otte v. Dayton Power & Light Co.*,
   37 Ohio St. 3d 33, 523 N.E.2d 835 (Ohio 1988) ...........................................................22

*Paneccasio v. Unisource Worldwide, Inc.*,
   532 F.3d 101 (2d Cir. 2008)............................................................................................28

*Penades v. Republic of Ecuador*,
   No. 15-cv-725 (RJS), 2016 U.S. Dist. LEXIS 136904 (S.D.N.Y. Sep. 30,
   2016), aff'd, No. 16-3617-CV, 690 F. App'x 733 (2d Cir. 2017) ...................................29

*In re Propanolol Antitrust Litigation*,
   249 F. Supp. 712 (S.D.N.Y. 2017) .................................................................................11

*Puget Sound Gas & Elec. Co. v. Pac. Gas & Elec. Co. (In re Pac. Gas & Elec.
   Co.)*,
   271 B.R. 626 (N.D. Cal. 2002) ......................................................................................19

*Richards v. Direct Energy Servs.*,
   246 F. Supp. 3d 538 (D. Conn. 2017).............................................................................25

*Sands v. Ticketmaster-New York*,
   207 A.D.2d 687, 616 N.Y.S.2d 362 (App. Div. 1994) ...................................................24

*Schorr v. Dopico*,
   205 F. Supp. 3d 359 (S.D.N.Y. Sept. 7, 2016) ........................................................10, 32

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
   549 U. S. 422 ..................................................................................................................13

*Slack v. Suburban Propane Partners, L.P.*,
   Civil Action No. 10-2548 (JLL), 2010 U.S. Dist. LEXIS 135530 (D.N.J. Dec.
   22, 2010) ........................................................................................................................26

*Solutia Inc. v. FMC Corp.*,
   385 F. Supp. 2d 324 (S.D.N.Y. 2005).............................................................................29

*Stewart v. Ocean State Jobbers, Inc.*,
   No. 3:17-CV-1266 (JCH), 2018 U.S. Dist. LEXIS 5716 (D. Conn. Jan. 10,
   2018) ..............................................................................................................................11

*Super Glue Corp. v. Avis Rent A Car System, Inc.*,
   159 A.D.2d 68, 557 N.Y.S.2d 959 (App. Div. 1990) .............................................24

*Tully v. North American Power*,
   15-cv-469 (D.CT.) .............................................................................................1

*United States v. Consolidated Edison Co.*,
   590 F. Supp. 266 (S.D.N.Y. 1984) ......................................................................21

*Urbino v. Ambit Energy Holdings, LLC*,
   Civil Action No. 14-5184 (MAS) (DEA), 2015 U.S. Dist. LEXIS 96972
   (D.N.J. 2015)......................................................................................................25

*West v. American Telephone and Telegraph Co.*,
   311 U.S. 223 (1940).............................................................................................18

*Westfall v. Chase Lincoln First Bank, N.A.*,
   258 A.D.2d 299, 685 N.Y.S.2d 181 (App. Div. 1999) ........................................15

*Windley v. Starion Energy, Inc.*,
   No. 14cv9053, 2016 U.S. Dist. LEXIS 5504 (S.D.N.Y. Jan. 8, 2016)..................25

*Wise v. Energy Plus Holdings, LLC*,
   11-cv-07345 (S.D.N.Y. 2011)...............................................................................1

*Zuckerman v. BMG Direct Mktg.*,
   290 A.D.2d 330, 737 N.Y.S.2d 14 (App. Div. 2002) ......................................24, 25

**Statutes**

15 U.S.C. § 1632(c) ...........................................................................................................4

28 U.S.C. 1332(d) ............................................................................................................11

28 U.S.C. § 1404(a) .........................................................................................................13

Class Action Fairness Act ................................................................................................11

FLSA..................................................................................................................................22

NEW YORK GENERAL BUSINESS LAW §§ 349 AND 349-D(3).................................. *passim*

NEW YORK UNIFORM COMMERCIAL CODE, ARTICLE 2, § 2-607(3)..................... *passim*

**Other Authorities**

FED R. CIV. P. 12(b)(1) .........................................................................................11, 12, 31

54 SMU L. Rev. 1051, 1065 (2001) ................................................................................22

Rule 12(b) ........................................................................................................................3

Rule 56 ............................................................................................................................3

Defendant Agway Energy Services, LLC ("Defendant" or "Agway"), respectfully submits this Memorandum of Law in support of its Motion to Dismiss Plaintiff's Complaint dated December 6, 2017 (the "Complaint").

## PRELIMINARY STATEMENT

This case is yet another example of lawyer-driven class action litigation that continues unnecessarily to burden businesses and the courts.  Following a cookie-cutter approach taken in other lawsuits it has filed against competitive energy service companies (commonly known as "ESCOs") in several other jurisdictions, the Plaintiff's firm in this action liberally cuts and pastes from other complaints while ignoring important distinctions between those matters and the pertinent facts in the instant case.[1]  When stripped of its gross exaggerations and evaluated for its factual basis, the Complaint cannot come close to satisfying the exacting *Twombly* standard required to survive a motion to dismiss.[2]

Additionally, the Court lacks subject matter jurisdiction as seen from the four corners of the Complaint.  Venue is also improper.  As to jurisdiction, the Complaint fails to name a Pennsylvania plaintiff and therefore lacks even basic diversity of citizenship.  As to venue, the Agreement between Plaintiff and Defendant contains an explicit forum selection clause choosing the New York courts for litigated disputes.

Furthermore, the Complaint is barred by the voluntary payment doctrine, and fails to state any claims for deceptive practices; breach of contract; breach of implied warranty of good faith

---

[1] The principal law firm for Plaintiff in this matter is the Blankenship firm.  This firm has filed several other suits against ESCOs, including *Nieves v. Just Energy New York, Corp.*, 1:17-cv-561 (W.D.N.Y. 2017); *Chen v. Hiko Energy, LLC*, No. 14-cv 1771 (VB), 2014 U.S. Dist. LEXIS 181846 (S.D.N.Y. Dec. 29, 2014)(which ultimately consolidated five cases, including two brought in Pennsylvania federal courts (Middle and Eastern Districts), two in the Southern District of New York and one in New York Supreme Court (state trial court)); *Tully v. North American Power*, 15-cv-469 (D.CT.); *Komoda v. Palmco Energy NJ, LLC*, 14-cv-1679 (E.D.N.Y. 2014); *Wise v. Energy Plus Holdings, LLC*, 11-cv-07345 (S.D.N.Y. 2011); *Hamlen v. Gateway Energy Servs. Corp.*, 16-cv-3526 (S.D.N.Y. 2016).

[2] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

and fair dealing; or unjust enrichment.   Finally, the Complaint is fatally deficient because electricity is a "good" under the Uniform Commercial Code ("UCC"), and Plaintiff failed to give proper and timely notice of any deficiency in Defendant's delivery of these goods.   For each and every one of these reasons, the underlying action should be dismissed with prejudice.

Plaintiff in this matter alleges:

1. She is and was a citizen of New York during the time of her voluntary contractual relationship with Agway.  Par. 5.

2. She was enrolled as an Agway customer from February of 2016 through October of 2017, during which time she purchased electricity.  Par. 5.

3. Agway is an LLC organized under the laws of Delaware, with its principal place of business in New York.  Par. 6.

4. She switched her services from Central Hudson (an incumbent electric company) to Agway (Par. 23), and entered into an Agreement that established a fixed introductory monthly rate, followed by a variable monthly rate.  Par. 20.

5. The Agreement explicitly set forth that the variable rate "shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins."  Par. 21.

6. Despite the exact wording of the Agreement, she nevertheless understood that "Agway's variable rate would reflect Agway's costs for purchasing electricity at wholesale, and that the variable rate would be competitive with the rate offered by the local utility (Central Hudson) and other ESCOs."  Par. 22.

7. She believes that "Central Hudson's rates serve as an ideal indicator of market conditions" while explicitly noting that Central Hudson does not include any "profits" or other costs in their pricing structure.  Par. 27.

8. She alleges that once she was charged a variable rate, "Agway's rate was higher than Central Hudson's rate every single month." Par. 26.  In support of this allegation, Plaintiff attaches a chart, without any source information, which

purports to compare Agway's variable rate with only the local utility's rate for some period of time that Plaintiff was an Agway customer.  Par. 23.

Notably, Plaintiff does not attach the Agreement that she references so liberally in her Complaint.  This is no accident.  Defendant attaches the Agreement to this motion.[3]  The Agreement describes exactly what Plaintiff purchased:  Agway's electric energy service, which, in addition to the electricity commodity, includes Agway's *EnergyGuard*™ Repair Program as an integrated aspect of the service.  Unlike Central Hudson and similar incumbent utilities, and unlike any other ESCOs, Agway's offering for residential electric customers includes within its price *EnergyGuard*, a unique insurance-like service that provides up to $1,000 every calendar year (in covered parts and labor) for home central air conditioning units, and up to $1,000 every calendar year for in-home electric line repair or replacement.[4]  These guarantees include emergency service available 24 hours per day, 7 days per week, 365 days each year. The pricing of which Plaintiff complains includes the integrated *EnergyGuard* program, a fact that Plaintiff conveniently omits in her Complaint.

Thus, Plaintiff's continuous comparisons in the Complaint of Central Hudson's pricing and Defendant's pricing are without merit:  she compares apples and oranges.  Central Hudson is an incumbent utility that does not offer an integrated electricity product and repair/replacement service;  Agway's integrated product offers both the electricity product and the specific repair/replacement service guarantees at an integrated price.  Plaintiff's Complaint repeatedly

---

[3] The general rule for Rule 12(b) motions is that the Court should consider only the allegations contained in the four corners of the Complaint.  If a defendant attaches new information, the motion is converted to a Rule 56 motion for summary judgment because of the risk of prejudice to a plaintiff.  However, in a 12(b)(6) setting, "a court may consider extraneous documents if the complaint references the documents or if the documents are integral to the plaintiff's claims."  *In re Burlington Coat Factory Sec. Litigation*, 114 F.3d 1410, 1426 (3d Cir. 1997).  Here, the Plaintiff has quoted from, but failed to attach the Agreement.  Defendant attaches the Agreement and the welcome letter for completeness at Exhibits A and B to the Affidavit of Michael Schueler.  The Agreement, which became effective on January 22, 2016, sets forth the governing terms of the relationship.

[4] By ordering electricity with Agway, Plaintiff was entitled to receive $2,000 per year in total repair coverage services.  Agway offers a similar $1,000 per year for covered parts and labor for the home heating system for residential natural gas customers.

cites to Central Hudson rates that reflect only the price of its electricity product.  It is irrelevant and legally impermissible to compare those rates to the Defendant's rates for a distinctly different value-added product.

Plaintiff also neglects to include any information concerning the pricing and value propositions that other ESCOs offer.  She states that a reasonable consumer would conclude that Agway's variable rate would be competitive with the rate of other ESCOs (Par. 22), but she then fails to set forth in her Complaint the rates that other ESCOs charge, or whether other ESCOs bundle into their offerings and rates a product similar or identical to Agway's *EnergyGuard*. This information was and is available to her, at least in part, through the New York Public Service Commission's website.[5]  In short, Plaintiff's Complaint lacks any facts that plausibly would support her claims that Agway charges higher rates than those that would correspond to the rates that Central Hudson (as the incumbent) would charge, or that other ESCOs would charge for offering a substantially similar or identical product.

Moreover, Plaintiff's claim that she understood that her variable rates would be "competitive with the rate offered by the local utility and other ESCOs" is totally devoid of merit in light of her Agreement with Agway.  That Agreement invests Agway with broad discretion in establishing its rates, plainly sets forth that Price is Variable, and lays out in detail "How price is determined" in its Residential Customer Disclosure Statement (a/k/a, the "Schumer Box")[6]:

> Variable Rate Service; The first month of the Initial Term will be at an Introductory Rate of $N/A per ccf for natural gas and/or $.044 per kWh for electricity; thereafter a monthly variable rate, determined at Agway's discretion, will apply…

---

[5] See www.newyorkpowertochoose.com, which provides residents with a comparison of different ESCO offerings as well as historical information on ESCO and local utility pricing.

[6] Under 15 U.S.C. § 1632(c), the so-called "Schumer Box" was developed and became a required disclosure for the issuance of consumer debt and credit cards.  The concept has been adopted by New York, and codified by order of the Public Utility Commission into the required disclosure statement seen in the Agway agreement.  New York Public Service Commission's Uniform Business Practices, Case 98-M-1343, § 5(B)(4)(b).

> The Electric Variable Rate shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins.

In the box section entitled "Conditions under which savings to the customer are guaranteed," the Agreement plainly states that "Savings are NOT guaranteed." (emphasis in original).

Far from concluding (as Plaintiff claims she did) that Defendant's rates would be competitive with those of the incumbent carrier and other ESCOs, any reasonable person would conclude that Agway reserved substantial discretion in how to price its product based on a number of factors, including the very important factor that Agway was providing a bundled *EnergyGuard* protection service. Plaintiff's interpretation of the Agreement, in fact, is so divorced from reality that Plaintiff makes the demonstrably false allegation that:

> "In fact, all that Agway offers customers is electricity supplied by other ESCOs or local utilities. Other than potential price savings, there is nothing to differentiate Agway from other ESCOs or local utilities. Accordingly, the potential for price savings is the only reason any reasonable consumer would enter into a contract for electricity supply with Agway." Par. 40.

When examined carefully, including in light of its ill-considered comparisons and plainly incorrect and contradictory allegations, Plaintiff's Complaint fails to provide any support for the premise that Agway's rates were not set precisely as disclosed in the Agreement, including pricing elements that would reflect the valuable *EnergyGuard* service. Even if Plaintiff was unable to understand the plain language of the Agreement, as clearly (and additionally) set forth at the top of the Agreement in the Schumer Box, that failure does not provide any foundation for these allegations of wrongdoing. An irrational misunderstanding does not establish a valid claim, not even at the pleadings stages.

Plaintiff's claims for deceptive practices; breach of contract; breach of the implied covenant of good faith and fair dealing; and unjust enrichment all fail for the same reasons, as

well as for other, additional legal deficiencies discussed below.  Additionally, Plaintiff's claims are barred under both the voluntary payment doctrine and under the notice of claim requirements of the UCC, Article 2.  In short, Plaintiff's naked and contradictory allegations cannot survive this motion to dismiss under the *Twombly* standard, and therefore must be dismissed.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.      History of Energy Services Companies

Agway is an energy service company ("ESCO") that provides competitive electricity and gas supply to residential, commercial and industrial customers.  Until the late 1990s, this business would have been impossible: energy production, transmission and delivery were unified within vertical monopolies.  About twenty years ago, riding a wave of energy deregulation popular throughout the nation, New York authorized the opening of energy supply sales to companies offering competing services.[7]  A customer who elects to purchase electricity from an ESCO (such as Agway) enters into an arms-length contract.  When a customer selects Agway, Agway agrees to provide electricity (and/or natural gas) at specified terms (including a variable monthly rate) for a period of time, along with its value-added *EnergyGuard* service.  The actual physical delivery of that energy commodity, along with the reading of customers' meters and determining usage amounts for billing purposes, remain the local utility's responsibility.[8]

Agway and other ESCOs provide an important alternative to the incumbent monopoly providers' (regulated local utilities) services.  ESCOs compete with the incumbent carrier (in its territory) and with each other to provide customers with alternatives for the supply of energy commodities, which in turn provides attendant opportunities for creative and innovative service

---

[7] This development allowed customers to seek out energy service companies (like Agway) in order to purchase electricity and natural gas commodities independent of the local utility.  Today, there are more than two hundred ESCOs competing for customers in New York.

[8] These are services over which the local utility holds monopoly power, and for which the customer continues to pay the local utility.

options.  For example, some ESCOs provide mostly renewable or "green" energy to appeal to environmentally conscious consumers; some ESCOs compete entirely on price, offering long-term fixed price contracts that enable risk-averse customers to lock in energy prices and remove market uncertainty; some ESCOs offer different rebate and affinity programs, enabling customers to earn points toward the purchase of goods and services (including discounts at popular restaurants and on other services and merchandise that participating companies provide); while other ESCOs provide energy-related, value added services, which happens to be Agway's business model.  This is exactly what a competitive "market" is designed to do -- provide customers with competitive choice; better customer service; and substantially more options for service providers and value than would exist in a monopoly market.

### B.    Agway Company History and Service Offering

Agway is a licensed ESCO, and has been a subsidiary of Suburban Propane, L.P. since 2004.  It currently operates in both New York and Pennsylvania.  A truly innovative company, Agway provides a unique offering within the confines of the ESCO market in both states. *EnergyGuard* is included as a "value added" service to all residential customers, and is bundled with commodity electricity into a single price.  Similar to a pre-paid maintenance contract, *EnergyGuard* provides those customers who choose the Agway offering with essential peace of mind.[9]  Commercial customers receive similar benefits.  These offerings have proven to be popular with residential and commercial customers alike.

---

[9] The *EnergyGuard* program has been successful in the competitive ESCO market for a very important reason – customers find it valuable. As mentioned above, customers currently have significant choices in energy providers, ranging from the incumbent utility to and including ESCOs that compete on various value propositions (e.g, fixed prices, affinity goods and services). This broad range of options has been one of the hallmarks of the New York ESCO market, and with 20% of residential customers choosing to engage with an ESCO, it has been a successful approach.

To support its *EnergyGuard* program, and to ensure a high quality customer service experience for its customers, Agway has developed an infrastructure to back its commitments. Agway has expended a great deal of time and effort to create a network of HVAC-trained and other tradespeople. Agway staffs a call center around the clock, and its representatives are always available to dispatch a technician to handle emergency calls. As with any service or repair program, the costs of honoring the service commitment to the customer can be highly unpredictable, and there is always the risk that, in any given period, the total repair costs incurred by Agway will exceed the amounts collected through customer billings for that period. Agway also assumes the risk that a customer who requires extensive repair service signs up with Agway, taking advantage of the *EnergyGuard* program, and then immediately thereafter cancels his or her contract.[10]

### C.     Plaintiff's Agreement with Agway

Each of Agway's customers, including Plaintiff, affirmatively elected not to receive their energy supply from the default provider (i.e., the local utility company, in Plaintiff's case, Central Hudson), and instead entered into agreements with Agway for energy supply. Plaintiff enrolled in Agway's bundled electricity with *EnergyGuard* service, and received a fulfillment package that included the introductory correspondence, with an Agreement that included a required disclosure statement.

In addition to the disclosures made in the introductory letter, the Agreement sets forth all key elements clearly and concisely. It displays most prominently the "RESIDENTIAL CUSTOMER DISCLOSURE STATEMENT" that appears first and foremost, and takes up a

---

[10] In this manner, the *EnergyGuard* program works essentially like an insurance product in which premiums are collected and losses can occur at any time. The costs certainly can outweigh the premiums collected. Agway must balance these risks across the full year, for every contract year and across its entire customer base; this risk must be addressed, and certainly must be accounted for, in its pricing, along with the many other factors that drive pricing for the commodity energy product.

good portion of the first page.  This element of the Agreement is modeled on the "Schumer Box"

for credit cards, and is designed to provide consumers with immediate and clear articulations of

the underlying contractual language as it relates to key terms and conditions (e.g., price, which is

the first subject addressed).  For ease of reference, the box is reproduced in its entirety below:

RESIDENTIAL CUSTOMER DISCLOSURE STATEMENT

| Price | Variable |
|---|---|
| How price is determined | Variable Rate Service;<br>The first month of the Initial Term will be at an Introductory Rate of $ N/A per ccf for natural gas and/or $ .044 per kWh for electricity; thereafter a monthly variable rate, to be determined at Agway's discretion, will apply.<br>The Gas Variable Rate shall reflect each month the wholesale cost of natural gas acquired by Agway from all sources (including commodity, capacity, storage and balancing), transportation to the Delivery Point, and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins.<br>The Electric Variable Rate shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins. |
| Length of the agreement and end date | For Variable Rate service the Initial Term is one month and continues on a month to month basis until cancelled |
| Process customer may use to rescind the agreement without penalty | A residential Customer may rescind by calling the toll free number within 3 business days of receipt of the sales agreement. |
| Amount of Early Termination Fee and method of calculation | No early termination fee for Variable Rate service. |
| Amount of Late Payment Fee and method of calculation | 1.5% per month on overdue balances |
| Provisions for renewal of the agreement | After Initial Term, unless otherwise agreed to, renews on a month to month basis at a variable rate methodology until terminated by either party. For more details see Section 2 - Term. |
| Conditions under which savings to the customer are guaranteed | Savings are NOT guaranteed |

The Agreement sets forth in plain and simple language several key aspects. As to the
question of "How price is determined," the chart notes:

> "The Electric Variable Rate shall each month reflect the cost of electricity
> acquired by Agway from all sources (including energy, capacity, settlement,
> ancillaries), related transmission and distribution charges and other market-related
> factors, plus all applicable taxes, fees, charges, or other assessments and Agway's
> costs, expenses and margins."

Under "conditions where savings to the customer are guaranteed," the chart explicitly notes that

"Savings are NOT guaranteed."  Additionally, the chart makes clear another important issue –

there is no early termination fee imposed for cancellation of the contract; no customer need stay

9

with Agway unless he or she is completely satisfied with the service.  As required by law, and as also stated in the document, Plaintiff had three days to terminate the Agreement prior to it becoming effective.

## LEGAL STANDARD FOR 12(b)(6) MOTIONS TO DISMISS

Plaintiff cannot assert unsupportable or inconsistent statements in her Complaint and expect to survive a motion to dismiss.  To avoid dismissal, a plaintiff must plead facts sufficient "to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). "'[N]aked assertions' or 'conclusory statements' are not enough" to survive a motion to dismiss. *Biro v. Conde Nast,* 807 F.3d 541, 544 (2d Cir. 2015), *cert. denied,* 136 S. Ct. 2015 (2016), and *cert. denied,* 136 S. Ct. 2015 (2016).  Instead, "the plain statement must 'possess enough heft to show that the pleader is entitled to relief.'" *Lawton v. Town of Orchard Park*, No. 14-CV-867S, 2017 U.S. Dist. LEXIS 132588 at *11 (W.D.N.Y. Aug. 18, 2017)(citing *Twombly,* 550 U.S. at 557).[11]

Where a complaint alleges facts "merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitle[ment] to relief.'" *Twombly, 550* U.S. at 557 (quoting Fed. R. Civ. P. 8(a)(2))(alteration in original). "While allegations in a complaint are deemed to be true for the purposes of a motion to dismiss, this Court need not credit such allegations where they are wholly conclusory or rely on unreasonable inferences and unwarranted deductions." *Schorr v. Dopico*, 205 F. Supp. 3d 359, at *363 (S.D.N.Y. Sept. 7, 2016)(citing *Furlong v. Long Island Coil. Hosp.,* 710 F.2d 922,927 (2d Cir. *1983)); Bryant v. Ciminelli*, 267 F. Supp. 3d 468 (W.D.N.Y. July 26, 2017)(citing *Ashcroft,* 556 U.S. at 678, for

---

[11] Such "heft" requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  Indeed, "[t]he plausibility standard is not ... a probability requirement: the pleading must show, not merely allege, that the pleader is entitled to relief." *Lawton, supra*, at *12.

the proposition that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to an assumption of truth). [12]

## ARGUMENT

### I.    THIS MATTER SHOULD BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(b)(1) FOR LACK OF SUBJECT MATTER JURISDICTION

Plaintiff attempts to invoke original federal jurisdiction through the Class Action Fairness Act ("CAFA")(Complaint at Par. 10), which provides for a relaxed form of diversity jurisdiction. CAFA confers federal subject matter jurisdiction over alleged class actions if plaintiffs meet two requirements: (i) the matter in controversy must exceed $5,000,000; and (ii) any class member must be a citizen of a state different from any defendant. 28 U.S.C. §§1332(d)(2), (d)(2)(A), (d)(2)(B). Relevant to this motion, CAFA has replaced the traditional requirement of complete diversity of citizenship with "minimal" diversity, maintaining federal jurisdiction where at least one member of the putative class is a citizen of a state other than the defendant's state of incorporation, or of the state where it maintains its principal place of business. 28 U.S.C. 1332(d)(2)(A). *See Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137 (2d Cir. 2013).

The sole named Plaintiff here, Naomi Gonzales, is a citizen of New York.[13] The sole Defendant, Agway, is also a citizen of New York (Complaint at Pars. 5 and 6). Thus, even under

---

[12] Instead, when evaluating a complaint, "statements that are not entitled to the presumption of truth, such as conclusory allegations, labels, and legal conclusions, are identified and stripped away." *Buczek v. HSBC N.A.*, No. 15-CV-830S, 2017 U.S. Dist. LEXIS 44348 at *4 (W.D.N.Y. Mar. 26, 2017) *reconsideration den.*, No. 15-CV-779S, 2017 U.S. Dist. LEXIS 72961 (W.D.N.Y. May 12, 2017)(Skretny, J.). In addition, "allegations contradicted by documents submitted with the complaint or incorporated by reference in the pleadings are not accepted as true." *Atkins v. Apollo Real Estate Advisors, L.P.*, No. CV-05-4365, 2008 U.S. Dist. LEXIS 35514, at *23 (E.D.N.Y. Apr. 30, 2008).

[13] Plaintiff cleverly attempts to circumvent the diversity of citizenship requirement by alleging that (i) New York suffered a "net migration loss" during the relevant time period; and (ii) citizens of other states own vacation homes in New York. Par. 11. This raises a hypothetical possibility of CAFA-compliant diversity, but not a concrete, actual showing of diverse citizenship on the part of a named plaintiff. Plaintiff also purports to bring this matter on behalf of affected Pennsylvania customers, but does not name a class representative, which certain courts have required. *In re Propanolol Antitrust Litigation*, 249 F. Supp. 712 (S.D.N.Y. 2017); *Stewart v. Ocean State Jobbers, Inc.*, No. 3:17-CV-1266 (JCH), 2018 U.S. Dist. LEXIS 5716 (D. Conn. Jan. 10, 2018). Since there is no named plaintiff that would satisfy the requirement of minimal diversity, the Court should dismiss for lack of subject matter jurisdiction.

CAFA's liberalized diversity requirements, there is no minimal diversity, and this matter must be dismissed for lack of subject matter jurisdiction.  Put succinctly, since both Plaintiff and Defendant are New York citizens, no diversity exists.  Federal jurisdiction is therefore improper.

When a defendant challenges subject matter jurisdiction on a motion under Rule 12(b)(1), "the plaintiff must bear the burden of persuasion" to establish federal jurisdiction.  *Frederico v. Home Depot*, 607 F.3d 188, 194 (3d Cir. 2007)(when CAFA jurisdiction is challenged, the party asserting proper jurisdiction bears the burden of satisfying CAFA's requirements by a preponderance of the evidence); *Malcolm v. Astrue*, 735 F. Supp. 118 (D. Del. 2010).  This is not simply an esoteric or picayune distinction; as the Court is well aware, jurisdiction is a necessary and fundamental requirement for adjudication by an Article III court, and its absence (as here) is fatal to the case continuing in federal court.[14]  This matter must be dismissed.

## II.   THIS ACTION SHOULD BE TRANSFERRED PURSUANT TO FORUM NON CONVENIENS PRINCIPLES UNDER THE ATLANTIC MARINE DECISION

Plaintiff asserts various claims against Agway regarding the price Agway charged her for the bundled electricity and *EnergyGuard* offering.  She alleges that the terms of the Agreement were misleading, and violate applicable New York law.  The Agreement contains a forum selection clause that requires Plaintiff to bring this matter in a New York court:

> "13. Choice of Laws.  Venue for any lawsuit brought to enforce any term or condition of this Agreement or to construe the terms hereof shall lie exclusively in the State of New York.  This Agreement shall be construed under and shall be governed by the laws of the State of New York without regard to application of its conflicts of laws and principles."

---

[14] U.S. Const. art. III, § 2 provides that "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;–… to Controversies… –between Citizens of different States…; *See Morrison v. Nat'l Australia Bank Ltd.,* 547 F.3d 167 (2d Cir. 2008), aff'd 130 S. Ct. 2869 (2010) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir.2008)) ("'Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.'").

Plaintiff's decision to ignore that venue selection clause and bring the matter in the Delaware Federal District Court is, accordingly, a failure to abide by that unambiguous contractual language.  The proper method to challenge venue in this circumstance is to move this Court for a transfer under     28 U.S.C. § 1404(a), under the doctrine of *forum non conveniens*.  *Atlantic Marine Construction Co., Inc. v. United States District Court for the Western District of Texas et al.,   571 U.S. _, 134 S. Ct. 568 (U.S. Dec. 3, 2013).*[15]  *Accord*, *Old Homestead Golf Club v. Electronic Transaction Corp.*, 2017 WL 5899920 (3d Cir. 2017).

In *Atlantic Marine*, the Supreme Court reasoned that when parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' expectations, and the parties' choice of forum presumptively should be enforced.  The Court specified that a valid forum selection clause requires courts to adjust the 28 U.S.C. § 1404(a) analysis in three ways:

(1)     The plaintiff, as the party breaching the forum selection clause, bears the burden of establishing why the court should not transfer the case to the forum the parties bargained for in the underlying contract;

(2)     Only public interest factors should be considered.  The parties' private interests should not be considered; by entering into a forum selection clause, the parties have waived the right to challenge the selected forum as inconvenient.[16]  Private interest factors include:

---

[15] The Court specified that the doctrine of *forum non conveniens* is the appropriate enforcement method for a forum selection clause that points to a state or foreign forum.  The Supreme Court noted that § 1404(a) is merely a codification of that doctrine.  § 1404(a) on its face governs transfers only within the federal court system.  The Court extended that doctrine to cases that could call for a non-federal forum – thus, the doctrine of *forum non conveniens* still applies in federal courts to cases that may lie more properly in a state court.  The *Atlantic Marine* decision requires the courts to evaluate a forum selection clause pointing to a non-federal forum the same way they evaluate a forum selection clause pointing to a federal forum.  § 1404(a) is a codification of that doctrine for the subset of cases in which the transferee forum is another federal court.  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U. S. 422.  For all other cases, parties may still invoke the residual federal *forum non conveniens* doctrine.  In the instant case, transfer of this matter to a New York Federal District Court likely, but not necessarily, would result ultimately in the case being brought in state court.

[16] Thus, Plaintiff cannot argue (and the Court cannot consider) whether any private interest factors would weigh in favor of choosing a forum outside of New York.  Public interest factors may include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law."

      (i)      ease of access to sources of proof;

      (ii)     availability of compulsory process for the attendance of unwilling witnesses; and

      (iii)    any other practical problems that make trial of a case easy, expeditious and inexpensive; and

(3)     The original venue's choice-of-law rules do not follow the case to the forum contractually selected by the parties.  Allowing the plaintiff, who has breached the forum selection clause, to anchor its choice of law to the venue transfer would be inequitable and encourage gamesmanship.  *Atlantic Marine Construction, supra.*

Applying the Supreme Court's analysis, this case properly should be litigated in a New York court.  Plaintiff agreed to the venue provision in the Agreement, and it is presumptively valid and enforceable.  Plaintiff cannot dispute the private interests that the Court must require as conceded:  Plaintiff is a citizen of New York.  She seeks to be appointed as class representative for all other New York residents who were Agway customers.  Agway is also a citizen of New York, with its corporate headquarters and principal place of business in New York.  The Complaint alleges violations of New York law (which the Agreement also specifies as controlling law).  The Complaint further alleges that the deregulated energy market (which provides the foundation for her Agreement and lawsuit) is a creature of the New York Public Service Commission's policy deregulating the markets for electricity and electrical supply. (Par. 13).[17]

In short, New York is the locus of all relevant and significant contacts public (and private) with this litigation.  Plaintiff agreed to the venue provision.  Consistent with *Atlantic Marine Construction,* the Court should transfer this matter to a New York court.

---

[17] Plaintiff further claims that Agway's allegedly improper conduct is shown by a comparison of the price Agway charged her to the default rate she would have been charged by her regional New York electrical utility, with market pricing set by the New York Independent System Operator market (Par. 27).  Most if not all potential witnesses and documents are located in New York.  Many of these articulated interests also support a public interest analysis (e.g., court congestion in Delaware; application of New York law and policy).

### III.   PLAINTIFF'S CLAIMS ARE BARRED IN THEIR ENTIRETY BY THE VOLUNTARY PAYMENT DOCTRINE

Plaintiff's Complaint should be dismissed in its entirety through application of the voluntary payment doctrine.  Quite simply, Plaintiff received her monthly bills and paid them each month on a timely basis and without raising any issues as to the correctness or adequacy of the bills.  She did so with full knowledge of the per kWh pricing and the overall price set forth on her bill.  She also knew the fundamental nature of the service and the factors that Agway used in its pricing decisions.  She has never claimed, and does not claim in this Complaint, that the pricing was a mistake, or that she paid through some mistake or misunderstanding.  Plaintiff fully accepted the bills and the billing process, at all times without complaint, and cannot be heard now to complain about the process or the resulting bills.

New York law is quite straightforward on this issue: the voluntary payment doctrine "bars recovery of payments made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law." *Dillon v. U-A Columbia Cablevision of Westchester Inc.,* 100 N.Y. 2d 525, 526, 790 N.E. 2d 1155, 760 N.Y.S. 2d 726 (2003).  The courts ground the doctrine's basis in the very reasonable observation that a party objecting to payment – knowing the amount of that payment – should object immediately, and not at some later date long after making payment.  *Gimbel Bros., Inc. v. Brook Shopping Centers, Inc.,* 118 A.D.2d 532, 535-536, 499 N.Y.S.2d 435 (App. Div. 1986).  Courts are unsympathetic to arguments that it was more "convenient" to submit payment rather than to investigate the correctness of the financial obligation – parties cannot pay and then hope to create a jackpot later on. *Id.*[18]  In essence, the

---

[18] For example, the doctrine bars recovery of disclosed late payment fees made with full knowledge, because once a party knows of the late fee, and subsequently pay the late fee, the opportunity to object has been effectively waived. *Dillon, supra.*  Payment without protest or even inquiry, in the absence of material mistakes of fact, will not be refunded because a party has discovered a possible cause of action well after payment has been made. *Westfall v. Chase Lincoln First Bank, N.A.,* 258 A.D.2d 299, 685 N.Y.S.2d 181 (App. Div. 1999).

"onus is on a party that receives what it perceives as an improper demand for money to take its position at the time of the demand and litigate the issue before, rather than after, payment." *DRMAK Realty LLC v. Progressive Credit Union,* 2015 NY Slip Op 08044, ¶ 2, 133 A.D.3d 401, 403, 18 N.Y.S.3d 618, 621 (App. Div.); *Buermeyer v. Suburban Propane, L.P.*, Index No. 5367 (N.Y. Supreme Ct. 2011)(voluntary payment doctrine barred recovery for plaintiff who had paid all bills without raising any issues until the time of suit).

Here, Plaintiff paid Agway each month for the *EnergyGuard* program and the electricity that she received – she does not plead otherwise.  She paid voluntarily, with full knowledge of goods and services she had agreed to receive.  Plaintiff received the disclosure statements that set forth the foundation of the charges, and she does not allege otherwise.  She received an itemized bill that set forth the variable rate that Agway charged, with the total amount due and owing, and she does not allege otherwise.  Plaintiff received a copy of Agway's Agreement that specified that she would be charged a variable rate to be set in Agway's discretion, reflecting various factors.  She received the statement that "Savings are NOT guaranteed."  Plaintiff never contacted Agway to discuss her rates, and made no complaints about her rates or her service during the nearly twenty months that Agway was her electricity provider, and she does not allege otherwise.  She made no payments under any claim of duress or under protest, and she does not allege otherwise.  Through her entire customer experience, Plaintiff was charged exactly what Agway said it would charge her, and Plaintiff paid these charges in full – she does not allege otherwise.  In short, Plaintiff's conduct fits the textbook definition of "voluntary payment."  She paid her bill each month without dispute or inquiry.  The Court should dismiss her complaint in its entirety.

IV.   **PLAINTIFF'S CLAIMS ARE BARRED IN THEIR ENTIRETY BY THE NEW YORK UNIFORM COMMERCIAL CODE, ARTICLE 2, § 2-607(3), FOR PLAINTIFF'S UNTIMELY NOTICE OF BREACH OF THE AGREEMENT**

For reasons similar to those underlying the voluntary payment doctrine, UCC § 2-607(3)(a) bars claims where a buyer accepts the seller's goods and then fails to notify the seller within a reasonable time of any breach.  In such circumstances, the buyer is barred from seeking any remedy:

> **§ 2-607. Effect of Acceptance; Notice of Breach; Burden of Establishing Breach After Acceptance; Notice of Claim or Litigation to Person Answerable Over.**
>
> (1)   The buyer must pay at the contract rate for any goods accepted.
>
> (2)   Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a non-conformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this Article for non-conformity.
>
> (3)   Where a tender has been accepted:
>
> (a)   the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy…

See *Buermeyer v. Suburban Propane, L.P.*, *supra* (both the voluntary payment doctrine and UCC § 2-607(3)(b) barred recovery for plaintiff who had paid all bills for delivered propane without raising any issues until the time of suit).

The key issue in the instant matter is the categorization of electricity as a "good" and therefore subject to the UCC.  Whereas propane has been found to be a "good" subject to the UCC (*Buermeyer*), the status of electricity as a "good" in New York remains uncertain and undecided in the context Plaintiff raises in the current Complaint.  If Agway's sale of electricity is the sale of a "good" within the UCC, then Plaintiff is additionally barred from seeking relief in this matter under the notice provisions referenced above.  If, however, electricity is a "service,"

then the UCC would not apply. Plaintiff would still be barred from any recovery by the voluntary payment doctrine, but the notification failure would not trigger a UCC defense.

Since New York's highest court – the Court of Appeals – has not squarely addressed this issue, and New York's intermediate appellate courts have only spoken to the issue either in dicta and/or without the benefit of a full record and careful consideration of the authoritative trend in favor of categorizing electric energy as UCC "goods," this Court should make "an educated *Erie* prediction,"[19] and find that New York's highest court would now follow the trend of other jurisdictions on this important issue.

The categorization of electricity as a "good" or a "service" has been decided many times by different courts in a multitude of contexts: bankruptcy; taxation; tort; antitrust; labor and employment; and consumer sales. In what is likely the most recent and scholarly decision considering this issue, the Bankruptcy Court for the District of Colorado conducted a sweeping review of the decisional authorities in federal and state court, and established an excellent framework to settle this issue definitively. Citing the recent and authoritative trend in many jurisdictions across the various contexts, and buttressed by competent expert testimony as to the nature of electrical energy, the Court in *In re Escalera Res. Co.,* 563 B.R. 336, 2017 Bankr. LEXIS 391 (Dist. Colorado 2017), held that electric power was a "good" under the Bankruptcy Code.[20]

---

[19] *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) specifies that the federal courts should apply state law when sitting in diversity jurisdiction. A federal court should accept as a "datum for ascertaining state law" the "considered judgment" of a state's intermediate appellate court, which is not to be disregarded unless "it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. American Telephone and Telegraph Co.,* 311 U.S. 223 (1940).

[20] The *Escalera* court proceedings involved extensive expert testimony on the nature of electrical energy and the exceptional speed at which it moves to and through the meter at the customer's premises. The court agreed with the expert who proved that electrical energy is moving and movable when it is identified at the customer's meter, and therefore meets the UCC definition of "goods."

The *Escalera* Court paid special attention to state jurisdictions (and federal courts sitting in diversity jurisdiction) that have defined electrical energy as "goods" under the UCC.  The Court cites and discusses the many decisions finding in favor of the "goods" interpretation, and characterizes these as the "majority view."  *Id.* at 351-354.  The Court discusses how electricity, once metered and delivered, meets the UCC § 2-105 definition of "goods" in that it is: (i) a thing; (ii) existing; and (iii) movable.[21]  That Court also gave special consideration to another scholarly decision on the issue, *Puget Sound Gas & Elec. Co. v. Pac. Gas & Elec. Co. (In re Pac. Gas & Elec. Co.)*, 271 B.R. 626 (N.D. Cal. 2002).  There, in deciding a breach of contract for failure to deliver supply, the court stated:

> The court here finds that the U.C.C. does apply.  Many of the cases tackling this question stem from the products liability realm, but California courts have consistently found that electricity is a product or good.  Courts in other states have similarly found that electricity is a good for purposes of the U.C.C.  Simply put, electricity in this instance is a thing movable at the time of the identification to the contract for sale.  That is clearly demonstrated by the fact that the Agreement calls for the shipment of specific quantities of electricity.  The electricity is moved through power lines and the amounts are metered and therefore identifiable.  The court will apply the U.C.C. *Puget Sound* at 639, 640.

The *Escalera* Court discusses in detail the minority view that electricity is a service.  Seizing on the *Puget Sound* Court's observation about cases in the "product liability" realm, the *Escalera* court notes that the "suggested disarray" in the goods vs. services UCC decisions is "overstated and can be explained by a careful and more nuanced analysis:"

> Virtually all of the cases characterized as supporting the minority UCC approach can be distinguished because they involved personal injury caused by contact with high voltage wires prior to metering and delivery of electrical energy [citations omitted].  One prominent treatise calls this 'the common refusal to treat as goods the sale of electricity

---

[21] The court cites decisions to this effect from California, Michigan, Ohio, Pennsylvania, Texas and Utah.  The court found quite persuasive the expert testimony before it, which established scientifically that electrical energy identified at the customer's meter is moving, and therefore constitutes "goods" under the UCC definition.  *Id.* at 344, 345.

that has not yet passed through a customer's meter.'  Patricia F. Fonseca and John R. Fonseca, 1 Williston on Sales at 158, n. 6…"  Id. at 352.[22]

The *Escalera* Court then addresses the matter that is the crux of this aspect of Agway's motion: New York at first blush appears to be an outlier on this distinction (high voltage wire contact vs. metered and delivered electrical energy determining UCC application).  There are several New York cases that find electrical power not to meet the definition of UCC "goods."  As *Escalera* presciently notes, the current state of decisional law on this issue in New York has been heavily influenced by an old tort case that pre-dates the modern trend of analysis.  In *Farina v. Niagara Mohawk Power Corp.*, 81 A.D.2d 700, 438 N.Y.S.2d 645 (App. Div. 1981), a New York court first addressed whether electrical energy was "goods" under the UCC.  That case involved a plaintiff injured by contact with high tension wires before the electricity was metered and delivered.  That court first determined that the UCC did not apply because there was no "sale," but then, in what *Escalera* terms "almost an after-thought" in a one-sentence "analysis," the *Farina* court stated that it was "unable to conclude that it was intended that electricity be included within the definition of 'goods'" within the meaning of UCC § 2-105.  *Escalera* at 353, citing *Farina*.

Escalera continues with the observation that Farina's "inauspicious and analysis-free dicta appears to be the sole basis why subsequent New York courts have determined that electricity is not a good under the UCC," and notes further that from "humble beginnings," *Farina's* "dicta somehow metastasized into a precedential holding referenced in many subsequent New York cases as controlling." *Id.*  *Escalera* concludes its New York analysis tellingly:

---

[22] The cases considering tort/products liability as the determining factor in whether electric power is a good under the UCC have almost uniformly decided that electric power, at least in this application, is not a "good" under the UCC and therefore plaintiffs will not have strict tort liability as an available recovery mechanism.

"In fact, other than in New York, the Court has been unable to locate any other state precedent suggesting that electrical energy actually metered and delivered to a customer is anything other than 'goods' under UCC section 2-105." *Id.*

The *Escalera* Court's observation is precisely on point and compels Agway's instant motion.  Subsequent New York cases, both federal and state, cite back to *Farina's* unfortunate dicta as controlling, and have decided cases consistent with that holding.  *See United States v. Consolidated Edison Co.,* 590 F. Supp. 266 (S.D.N.Y. 1984)(electricity not considered UCC goods in New York in context of recovering interest for refunded overcharges); *Encogen Four Partners L.P. v. Niagara Mohawk Power Corp.,* 914 F. Supp. 57 (S.D.N.Y. 1996)(plaintiff cannot demand UCC-required adequate assurances to deliver on power purchase agreements); *but see Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 705 N.E.2d 656 (1998)(New York Court of Appeals in narrow fashion decided (on a certified question from the Second Circuit federal court) that UCC § 2-609 adequate assurances would apply in long-term commercial contracts for power purchase; the Court of Appeals did not analyze or consider in any depth the issue of whether electrical power was indeed "goods")); *Hudson Energy Services, LLC v. Great Atl. & Pac. Tea Co. (In re Great Atl. & Pac. Tea Co.),* 538 B.R. 666, 2015 U.S. Dist. LEXIS 129049 (S.D.N.Y. 2015)(without citing to New York law – which was not controlling in bankruptcy proceedings – the court upheld the Bankruptcy Court determination that electricity was not movable and therefore not a good for UCC purposes, but noting that the ultimate determination of whether electricity is a good is "far from clear" and "the confounding questions of physical science at the heart of the dispute indicate that the question of whether electricity is a good is not clearly answered in the affirmative.");[23] *Flood v. Just Energy*

---

[23] *Hudson* was decided in the bankruptcy context and did not purport to predict how New York's highest court would decide the question.  The *Escalera* court subsequently and clearly sets forth the physical science that supports the "goods" definition, and this Court is well within its *Erie* powers to predict that New York's highest court would

*Mktg. Corp.*, No. 7:15-cv-2012 (KBF), 2017 U.S. Dist. LEXIS 60337 (S.D.N.Y. Jan. 20, 2017)(in an FLSA case involving wage payments, the court cites to *Farina* dicta to establish that the agreement at issue is not for the sale of goods); *Bowen v. Niagara Mohawk Power Corp,* 183 A.D.2d 293, 590 N.Y.S.2d 628 (App. Div. 1992)(in a tort action for property damage, the court followed an Ohio Supreme Court ruling that electricity was a service; both decisions have been criticized over the intervening years).[24]

This court, sitting in diversity jurisdiction and applying New York law, has no recent, settled New York precedent to apply. The *Farina* "rule" in New York was mere dicta, but has been cited in other cases as if it were an essential holding. It is no such thing, and in fact, contains limiting language.[25] No New York appellate decision has given thoughtful, careful consideration to the strong, authoritative and recent trend in many state courts (as well as in federal appellate, district and bankruptcy courts, several of which cite expert scientific evidence on the commodity-like nature and behavior of electric power) that have declared electric power to be UCC "goods." This provides further reason to invite this Court to re-visit the state of New York law, and to make an educated *Erie* prediction as to how the New York Court of Appeals

---

agree with the *Escalera* reasoning and adopt and follow this reasoning, which also is the authoritative and modern trend.

[24] *See, e.g., In re Erving Indus. Inc.* 432 B.R. 354,363, n.13 (Bankr. D. Mass. 2010)("The Court is not persuaded by the reasoning in *Otte v. Dayton Power & Light Co.,* 37 Ohio St. 3d 33, 523 N.E.2d 835 (Ohio 1988) and the line of cases from the state of New York relying on *Otte*, see, e.g., *Bowen v. Niagara Mohawk Power Corp.,* 183 A.D.2d 293, 590 N.Y.S.2d 628 (App. Div. 1992), wherein the courts held that electricity is not a product for the purpose of imposing strict liability and, by extension, is not a good under the UCC." *Accord,* Jason B. Myers, *The Sale of Electricity in a Deregulated Industry: Should Article 2 of the Uniform Commercial Code Govern,* 54 SMU L. Rev. 1051, 1065 (2001)("Both the *Otte* and *Bowen* courts regarded the kilowatt-hour as a time measurement. Consumers paid the utility based on the length of time that they used electricity; thus, they effectively were paying for an hourly service. This understanding of the kilowatt-hour, however, is incorrect… [N]one other than Thomas Edison, the father of the electrical distribution system, understood this fact: 'I had to devise a system of metering electricity ... so that I could measure the amount of electricity used by each consumer.' This proper view corrects the *Otte/Bowen* courts' misunderstanding of the kilowatt-hour and works to negate their argument that electricity is a service. Moreover, it actually supports the view that electricity is a good. Because electricity can be described in quantified amounts, it can be more easily identified to a contract as required under Code section 2-105.").

[25] As *Escalera* points out, *Farina* noted in discussing the tort claim that "until actually delivered, the electricity has not been placed in the stream of commerce," and while in overhead power lines, was "not in a marketable state." *Escalera* at 353, fn. 14, *citing Farina* at 646.

likely would decide this issue if given the opportunity to do so in an on-point context (the sale between a merchant and a consumer),[26] with a full record and in light of the changing state of the law over the 38 years since *Farina* was decided.

## V.   PLAINTIFF FAILS TO ALLEGE A PLAUSIBLE AND SUSTAINABLE CLAIM PURSUANT TO THE REQUIREMENTS OF NEW YORK GENERAL BUSINESS LAW §§ 349 AND 349-D(3)

Plaintiff's allegations in this Complaint, even if accepted as true, are insufficient to allow for the prosecution of a complaint under New York General Business Law (N.Y. Gen. Bus. L.) §§ 349 and 349-d(3), and this count should be dismissed.  N.Y. Gen. Bus. L. § 349 prohibits "[D]eceptive acts or practices in the conduct of any business, trade or commerce."  To state a claim under N.Y. Gen. Bus. L. § 349, a plaintiff must allege that a defendant has engaged in consumer-oriented conduct that (i) was materially misleading; and (ii) caused plaintiff injury as a result of the deceptive act or practice.  *City of N.Y. v. Smokes-Spirits Com., Inc.,* 12 N.Y.3d 616, 911 N.E.2d 834 (2009).  The law requires an objective standard to measure a deceptive act or practice:  an offending act or practice must contain a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances.  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 647 N.E. 2d 741 (1995); *Feld v. Apple Bank for Sav.*, 2014 NY Slip Op 2662, 116 A.D.3d 549, 984 N.Y.S. 2d 319 (App. Div.).[27]

---

[26] The instant matter is the essence of conduct that the drafters designed the UCC to govern: the sale of goods (here, commodity electric power) from a merchant to consumers, which consumers have accepted, used and paid for in the ordinary course.  The *EnergyGuard* component of the product does not change the commodity/goods nature of the electric power aspect -- it is quite common for vendors to make a mixed offering consisting of both a product and an associated service.  Whether UCC Article 2 applies to such an offering depends on whether the product or service component pre-dominates.  Thus, a consumer's purchase of an automobile or a television together with an extended warranty is still a sale of goods governed by UCC Article 2.  The issue squarely presented here has not been decided in New York, and it needs to be decided in the proper context, and not as a side issue to a labor dispute, a wholesale arrangement, a tort case or in a bankruptcy proceeding under a different (but related) body of decisional law.

[27] § 349-d(3) was enacted in 2011 and is directed specifically to abuses in the energy services market.  It provides that "No person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."  Actions under this section have the same elements as actions under § 349(a).  *See generally Chen v. Hiko Energy, LLC, supra.*

The ultimate issue of whether a defendant's conduct was deceptive can be determined as a matter of law. *Oswego, supra.* The courts have not hesitated to grant motions to dismiss (even in purported class action suits) where, as here, the terms of the challenged practice have been fully disclosed in customer agreements, or otherwise should have been obvious to the consumer (who was in a better position to comparison shop than was the company). *Super Glue Corp. v. Avis Rent A Car System, Inc.,* 159 A.D.2d 68, 557 N.Y.S.2d 959 (App. Div. 1990)(rental car agency's method of calculating refueling charges was set forth in agreement and was optional to the customer, and even though the charges were substantial, there was no § 349 violation; also, agency's failure to advise customer that he or she may already be covered for collision damage waiver before selling that aspect of service could have been known to consumer and was not a deceptive practice; purported class action dismissed);[28] *Sands v. Ticketmaster-New York,* 207 A.D.2d 687, 616 N.Y.S.2d 362 (App. Div. 1994)(defendant's allegedly excessive fees were disclosed in the customer agreement, negating the deceptive practices claim); *Zuckerman v. BMG Direct Mktg.,* 290 A.D.2d 330, 737 N.Y.S.2d 14 (App. Div. 2002)(as a matter of law, a reasonable consumer cannot conclude that shipping and handling costs advertised and charged by defendant would necessarily be equal to or lower than defendant's actual costs; the question whether the amount charged is unreasonable or excessive is not an issue for the courts to address under § 349).

---

[28] *Accord, Gershon v. Hertz Corp.,* 215 A.D.2d 202, 626 N.Y.S.2d 80 (App. Div. 1995)(dismissed § 349 claim because rental agents had no duty to advise of available lower rates under various reservation conditions)); *Lewis v. Hertz Corp.,* 181 A.D.2d 493, 581 N.Y.S.2d 305 (App. Div. 1992)(allegedly deceptive practices relating to collision damage waiver purchase, gasoline refueling charges and hourly late fees were disclosed in customer agreement and therefore compliant with law; also, consumer was in a better position than rental company to comparison shop the collision damage waiver with other insurance options, thus negating a § 349 claim). Here, Plaintiff was in a position to use the available state website and other sources to seek out competitive alternatives to Agway's product and prices, and also had the added advantage of having been an incumbent utility customer, and therefore was conversant with the services her utility offered (and did not offer), and the prices for those services.

The key teaching of the cases cited *supra* is the very point that defeats Plaintiff's instant deceptive practices count: in a consumer transaction absent coercion, where the fee (or fee basis) was adequately disclosed, "the question of whether the amount charged is unreasonable or excessive is not an issue for the courts to address" under § 349. *Zuckerman, supra* at 331. *See Buermeyer v. Suburban Propane, L.P.*, *supra.* (dismissing complaint concerning excessive and undisclosed pricing of propane as not within purview of § 349 and also barred by the voluntary payment doctrine).[29]

Plaintiff's claim fails as a matter of law because the Agreement plainly states the service terms and conditions, and sets forth the basis or formula for calculating rates.   The gravamen of Plaintiff's allegations – that Defendant somehow misled her as to the terms and conditions of pricing, which she believes to have been excessive – must fail as a matter of law because the Agreement sets forth a straightforward and correct articulation of the pricing structure.   Even if the prices charged actually were higher than she claims to have expected, she could not reasonably expect that these prices "would necessarily be equal to or lower than defendant's actual costs." *Zuckerman, supra*.   This is especially true because the prices reflected the value-added *EnergyGuard* service.   While Plaintiff may attempt to claim confusion, her real complaint – that she paid too much -- is not actionable.   No reasonable reading of the Agreement's

---

[29] Courts from other jurisdictions have also dismissed deceptive practices claims in ESCO cases where the agreements specified the factors that the ESCOs would use in pricing decisions, and also where there were no explicit savings guarantees.  *E.g., Windley v. Starion Energy, Inc.,* No. 14cv9053, 2016 U.S. Dist. LEXIS 5504 (S.D.N.Y. Jan. 8, 2016)(court dismisses deceptive practices claim where agreement permitted defendant to change prices and omits any savings guarantee); *Urbino v. Ambit Energy Holdings, LLC*, Civil Action No. 14-5184 (MAS) (DEA), 2015 U.S. Dist. LEXIS 96972 (D.N.J. 2015)(claims that customers would enjoy "substantial savings" and "low, competitive rates" were puffery because they were "vague, highly subjective claims as opposed to detailed factual assertions," and the agreement's terms undercut plaintiff's claims of confusion); *Richards v. Direct Energy Servs.*, 246 F. Supp. 3d 538 (D. Conn. 2017)(court granted summary judgment where agreement provided that the rates for electricity would be variable based on defendant's discretion, and could be higher or lower based on market conditions).

language supports the proposition that a reasonable consumer would be confused as to the basis of the pricing calculations, and these deceptive practices claims must fail.

### A. Agway's Description of its Rate Structure is Undisguised and Truthful, and at No Time Claims or Implies a Component of Savings When Compared to the Incumbent Utility Rates

In the Agreement, as cited previously, Agway sets forth the foundation and structure it uses to determine its variable rate each month. This description is identical both in the Schumer Box disclosure, and in the text of the Agreement, specifically in Section 3. Agway explicitly includes "market-related factors" as only one of the several cost/pricing inputs reflected in its monthly rate. While Plaintiff's attorneys may think this claim identical to others it has sued on, the plain language makes evident that it is not even close.[30]  "Market-related factors" is not synonymous with "market rates." The prices that other market participants charge for their products and services is only one of many "market-related factors," which also include, *inter alia*, supply constraints; the number of competitors in a particular market; customer demographics; overhead costs; and desired profit margins.[31]

---

[30] The instant matter differs from other purported ESCO class action lawsuits in material respects. In *Chen v. Hiko Energy, LLC, supra,* the Plaintiff alleged that Defendant failed to provide "guaranteed savings for the first six months of service," which would be "1% to 7% lower than the utility's price." The Court denied the motion to dismiss. Similarly, the Court in *Claridge v. N. Am. Power & Gas, LLC*, No. 15-cv-1261 (PKC), 2015 U.S. Dist. LEXIS 117693 (S.D.N.Y. Sep. 2, 2015) denied a motion to dismiss where the defendant had given an "incomplete and confusing" explanation of "variable market-based rates." Likewise, the Court in *Mirkin v. Viridian Energy, Inc.*, No. 3:15-cv-1057 (SRU), 2016 U.S. Dist. LEXIS 86616 (D. Conn. July 5, 2016), denied a motion to dismiss where defendant claimed that the average customer "saves money over time" and would be charged a variable rate based on market conditions. The Agway facts are materially different from the situations in these cases. Agway fully disclosed the basis for its pricing, and also stated that there were no guaranteed savings. Agway also offered a completely different product: it bundled into its service *EnergyGuard*, an energy-related value-added insurance-like product with significant coverage for home electrical systems and wiring, with around-the-clock customer care.

[31] *See Slack v. Suburban Propane Partners, L.P.*, Civil Action No. 10-2548 (JLL), 2010 U.S. Dist. LEXIS 135530 (D.N.J. Dec. 22, 2010)(dismissing class action claims for allegedly deceptive practices based on allegations that defendant's prices for propane exceeded industry averages, contrary to plaintiffs' reasonable expectations, and notwithstanding statements on defendant's website that its prices were "competitive" and provided "the best value" because the agreement expressly allowed defendant to increase prices based on "market fluctuations and other factors." *Id.* at 11-15)(citing earlier dismissal order dated September 21, 2010, where court found that defendant's reservation of ability to increase prices and fees based on market conditions and other factors for automatic and recurring propane purchasers, without giving advance notice, was made clear in agreement, and ultimately undercut and defeated plaintiffs' consumer fraud claims. *Id.* at 8, 9).

From this misunderstanding, Plaintiff then claims that Agway violated the non-existent "market rate" component in its variable rate pricing structure by failing to match or beat the prices that the local utility (Central Hudson) charged for electric service.  The fatal flaw in this argument is apparent on the face of the Agreement: Agway never represented that it would match or beat the incumbent utility's rates.  Furthermore, Agway explicitly notes (and Plaintiff conveniently ignores) the transparent Agreement term that "Savings are NOT guaranteed." Plaintiff also neglects that the incumbent utility provides a simple electricity commodity, while Agway delivers an entirely different and expansive combined electricity commodity and *EnergyGuard* program offering.

Agway has been forthright in its disclosures regarding its variable rate and in listing the many factors that account for establishing that rate.    Even if Plaintiff somehow was left with any doubt on this point, Agway unambiguously notes that savings are NOT guaranteed.  Plaintiff grasps at a § 349 action by alleging that a reasonable consumer would understand the Agreement as she did, but the Agreement's express terms belie this assertion.  Additionally, the standard of reasonableness does not encompass contorting the explicit provisions of the Agreement's terms and conditions to conform to a fanciful expectation that rates should be tied solely to an imaginary market tether, a condition that is neither expressly nor impliedly created, and in fact is expressly denied.   In short, even if Plaintiff's beliefs about the Agreement and the pricing of her electric service are honestly held, they are not reasonably held, and for the reasons stated, must fail.

### B.       Agway Has No Material Omissions in its Disclosures Regarding the Terms of Service

Plaintiff's deceptive practices claims also fail because the plain language of the Agreement gives Agway broad discretion in the setting of its variable rates.  As has been quoted

repeatedly, Agway disclosed, in unequivocal language, that rates are set to "reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges, or other assessments and Agway's costs, expenses and margins." Plaintiff does not allege that Agway set its rates in any manner contrary to this language. The Agreement does not set forth a "market rate" or a "guaranteed savings" rate – in fact, Agway explicitly discloses that "Savings are NOT guaranteed." A reasonable consumer purchasing Agway's bundled offering, and understanding the power of the protections offered through *EnergyGuard*, would not expect to see prices the same as or lower than the incumbent's prices. Agway's Agreement language, decisively articulated and unambiguous, defeat Plaintiff's unreasonable and unsustainable allegations.

Agway does not promise savings over the utility's rates or any other ESCO's rates. Agway expressly states, instead, that there is NO promise of savings. This is not a subtle reference; it is not hidden in tiny font planted deeply in a multi-page agreement. Instead, as shown above, this admonition appears in a conspicuous Schumer Box at the very top of the Agreement and in capital letters. The interpretation that Plaintiff offers would render this statement (and the pricing formula) meaningless. In addition to defying the Agreement's plain meaning, Plaintiff's proffered interpretation also would violate basic rules of contract construction. *Riverside S. Planning Corp. v. CRP/Extell Riverside,* L.P., 13 N.Y.3d 398, 920 N.E.2d 359 (2009)("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contracts for the parties under the guise of interpreting the writing.")[32]

---

[32] *See also Bailey v. Fish & Neave*, 8 N.Y.3d 523, 868 N.E.2d 956 (2007)("[W]hen parties set down their agreement in a clear, complete document, their writing should… be enforced according to its terms."); *Paneccasio v. Unisource*

Agway explicitly describes the pricing mechanism by noting the elements that Agway will use when calculating its rates.  Plaintiff makes no assertion that Agway used different elements than those listed in the Agreement when setting prices, or that she could not understand those elements – she could not make either assertion plausibly.  Instead, Plaintiff asserts that Agway intentionally failed to disclose the material fact that it charges consumers rates higher than competitors would charge, rates that are untethered from the wholesale costs and prices that other competitors would charge (Par. 38).  The *Iqbal* standard requires Plaintiff to set forth "well-pleaded factual allegations."  This Complaint lacks any factual allegations that support these claims; there are only nuggets of conjecture, opinion, and subjective misunderstanding of plainly-written terms and conditions.

Plaintiff predicates her claims of deception on faulty premises and incorrect factual allegations (e.g., that Central Hudson should be the barometer for establishing Agway's pricing, and that Agway's offering is indistinguishable from that which other companies offer), as well as on conclusory statements (i.e., that the *only* reason a consumer would enter into a contract with Agway is the potential for price savings, as discussed *supra*).  However, these assertions do not impose any duty for Agway to disclose that its monthly rates may be higher than a competitor's rates, especially since Agway offers a different product/service combination with a different value proposition.  As to an alleged failure by Agway to disclose that its rates are "untethered from the specified market factors," Plaintiff has offered nothing more than unsubstantiated,

---

*Worldwide, Inc.,* 532 F.3d 101, 111 (2d Cir. 2008)("[R]ules of contract construction require us to adopt an interpretation which gives meaning to every provision of the contract."); *Penades v. Republic of Ecuador*, No. 15-cv-725 (RJS), 2016 U.S. Dist. LEXIS 136904 (S.D.N.Y. Sep. 30, 2016), aff'd, No. 16-3617-CV, 690 F. App'x 733 (2d Cir. 2017)(granting motion to dismiss where Plaintiff s interpretation of contract would render a term "surplusage"); *Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 337 (S.D.N.Y. 2005)(granting motion to dismiss where plaintiffs interpretation "would render ... provisions meaningless.").

conclusory statements that Agway's rates do not reflect the Agreement's listed components. Instead, Plaintiff only points to the incumbent utility's rates, a legally unsustainable comparison.

### C.   Agway Discloses the Terms of its Service and does not "Bait and Switch" its Customers

Plaintiff claims in Par. 54 that Agway "baits and switches" potential customers with low introductory rates, and then shifts them to the variable rate plan, in violation of N.Y. Gen. Bus. L. § 349.  This claim also fails as a matter of law due to the explicit language of the Agreement's terms and conditions, with key aspects fully disclosed up front.  Under New York law, the courts have held that conduct that is fully disclosed may not be materially misleading (See Discussion in Point 3, *supra*).

In its disclosure statement (and Agreement), Agway specifies the rate for the initial term of one month and explains that thereafter, a monthly rate, to be determined in Agway's discretion, will apply.  The Agreement also informs customers of the factors that Agway considers in setting the variable rate.  Agway makes no representations of capping or limiting the variable rate, and further discloses in Section 3 of the Agreement that the price a customer pays in any month may differ from the price that a customer pays in earlier or later months.  Although Plaintiff may not be satisfied with the variable rate in a particular month or months, this dissatisfaction with price cannot serve as the basis of a complaint – simply put, price dissatisfaction is not a "deceptive act or practice" within the purview of N.Y. Gen. Bus. L. § 349.

Agway disclosed to Plaintiff that she would receive an initial rate of .044 per kWh for electricity for the initial term of one month, and that subsequently, the monthly rates would vary. Pricing would be at Agway's discretion, and based upon several enumerated factors.  There were no misrepresentations, deceptive conduct or misleading omissions.  Stripped of the hyperbole, Plaintiff's allegations do not rise above the *Iqbal* standard,  and do not state a valid cause of

action.   Based on the foregoing, Agway respectfully requests that the court dismiss with prejudice Plaintiff's claims that Agway violated N.Y. Gen. Bus. L. 349 and 349-d (3).

## VI.   PLAINTIFF FAILS TO ALLEGE FACTS SUPPORTING A CLAIM FOR BREACH OF CONTRACT SUFFICIENT TO SURVIVE A MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)

Similar to the point above, the Complaint fails to allege any facts supporting its claim that Agway breached the parties' Agreement.   In fact, the allegations prove that Agway complied with the Agreement.   This claim also must fail.

This count alleges that the Agreement specifically provided that Agway would charge a variable rate that Agway determined according to the clear and unambiguous description set forth in the Agreement.   Identically to its N.Y. Gen. Bus. L. § 349 claims, Plaintiff again asserts that Agway's rates should not be greater than the incumbent utility's monthly rates.   These allegations cannot form the foundation for a breach of contract claim.

### 1.   Agway has Performed Its Obligations under the Contract

To assert a breach of contract claim that can survive a dismissal motion, Plaintiff must allege: (i) the existence of a valid agreement; (ii) that Plaintiff fully performed her obligations; (iii) that Agway failed to perform its obligations; and (iv) damages to Plaintiff that the breach caused. *Fischer & Mandell LLP v. Citibank, N.A.,* 632 F.3d 793 (2d Cir. 2011).   Plaintiff has acknowledged the existence of a contract with Agway (Par. 68), and that she paid for services under this contract (Par. 69).   Plaintiff's claim for breach of contract must fail because Agway has fully performed under the contract, and also because Plaintiff has suffered no damages.

Plaintiff bases her claim that Agway breached the Agreement on the fatally flawed premise that Agway charged her higher rates than she would have paid to the incumbent utility, Central Hudson.   Plaintiff attempts to bolster this fallacy with the untrue allegations that "all that Agway offers customers is electricity delivered by local utilities that has the same qualities as

electricity supplied by other energy services companies (ESCOs) or local utilities," and that "other than potential price savings, there is nothing to differentiate Agway from other energy services companies (ESCOs) or local utilities."   (Par. 40).   Plaintiff further alleges that "[a]ccordingly, the potential for price savings" is the only reason to enter into a contract with Agway. These conclusory statements misstate the known relationship between the parties, and are merely the types of "unreasonable inferences" and "unwarranted deductions" untethered to actual facts that should result in dismissal.  *Schorr v. Dopico, supra* at 363.

Agway provides a different offering than Central Hudson's basic electric service.  Agway combines the electricity it sells to its customers with its unique *EnergyGuard* program.  Agway does not sell a pure commodity, and thus any comparison to a simple sale of electricity, by its very nature, fails.  The Agway value-added program is integral to (and integrated with) Agway's service and pricing.  It is described in the cover letter that is part and parcel of Agway's Agreement with its customers (including Plaintiff).[33]

Agway performed under its Agreement exactly as it promised to perform: it provided electricity and its *EnergyGuard* program at a monthly variable rate that Agway could, by the terms of its Agreement, price at Agway's discretion, based on all disclosed factors set forth in the Agreement.   Agway specifically set forth that savings were not guaranteed, nor could a reasonable consumer expect such a guarantee in light of the product's value-added insurance-like aspects.

---

[33] Agway customers receive up to $1,000 each calendar year for parts and labor for problems with electrical wiring, and another $1,000 for the failure of an air conditioning unit. This program has no deductible and is available 24 hours per day, 365 days per year to provide customers with peace of mind regarding air conditioning units and electrical wiring inside their homes. While she was a customer with Agway in 2016 and 2017, Plaintiff had $4,000 in coverage for electrical wiring and air conditioning repair, a tangible benefit that contradicts Plaintiff's assertion that there is no difference between the service that Agway provides and that which other utilities and ESCOs provide.

Plaintiff's comparisons (including the chart in her Complaint) to Central Hudson's rates prove nothing.  Agway never promised to meet or beat Central Hudson's rates, and in fact delivered a different commodity/service package than did the incumbent utility.  Furthermore, Plaintiff's naked assertion (without any charts or other support) that Agway's rates were not competitive with those of other ESCOS again proves nothing – Agway offered a different service, and never promised to meet or beat any other ESCO price.

Additionally, Plaintiff's conclusory statement that Agway charged rates that were "substantially higher than they would have been had Defendant based its rates on business and market conditions" is wholly insufficient to support a claim.  Plaintiff may have been disappointed in the rates, but she does not and cannot allege that Defendant failed to perform precisely as it outlined in the Agreement.  These failures are fatal to Plaintiff's breach-of-contract claim, and the Court should dismiss this claim.

### 2.    Plaintiff Suffered No Cognizable Contract Damages

Plaintiff paid for and received precisely the product that the Agreement specified: electricity along with the *EnergyGuard* program for home repair, including 24 hour emergency service.  She does not allege that Agway failed to ensure proper and continuous electric service, or that Agway failed to provide or honor the repair guarantee.  Her Complaint amounts to nothing more than her disappointment that she did not realize savings over what she would have paid the incumbent utility (or some other ESCO) for a less-robust product offering, even though she was never promised any such savings, and in fact was advised up front that none were guaranteed.[34]  Absent a cognizable claim for damages, this count must be dismissed for this

---

[34] If Plaintiff was truly disappointed with the Agway offering she received, or the price she paid for that offering, she could have terminated her agreement with Agway at any time, without penalty.

reason as well.  *Christou v. Koureli Rest. Group, Inc.*, (Sup. Ct.) 2013 NY Slip Op 33217(U) (Sup.Ct.).

### VII.   PLAINTIFF'S CLAIM OF BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING MUST BE DISMISSED BECAUSE IT DUPLICATES THE BREACH OF CONTRACT CLAIM

New York law does not recognize a separate cause of action for breach of an implied covenant of good faith and fair dealing when a plaintiff also pleads a breach of contract claim alleging the same operative facts.   In these circumstances, the breach of implied covenant claim should be dismissed as redundant.  *Cruz v. FXDIRECT DEALER, LLC*, 720 F.3d 115 (2d Cir. 2013); *Chen v. Hiko Energy LLC., supra*(court dismissed breach of implied covenant claim in ESCO case where the claim rested on the same alleged practices as those underlying the breach of contract claim).  Plaintiff's counts alleging both breach of contract and breach of the implied covenant of good faith and fair dealing set forth the same details and claims, to wit, that Agway promised to provide Plaintiff the agreed services for a variable rate based upon components set forth in the agreement and failed to do so.  (Pars. 70, 76 and 77).  This theory underlies the entire lawsuit and all counts, and therefore should be dismissed with prejudice.[35]

### VIII.   PLAINTIFF'S CLAIM FOR UNJUST ENRICHMENT MUST BE DISMISSED BECAUSE A VALID CONTRACT EXISTS BETWEEN THE PARTIES

Under New York law, "the existence of a valid contract governing the subject matter generally precludes recovery in quasi[-]contract for events arising out of the same subject matter." *CSI Group, LLP v. Harper,* 61 N.Y.S. 3d 592, 597, 153 A.D. 3d 1314 (App. Div. 2017).

---

[35] It is not enough to allege that Agway merely set prices that were self-beneficial, as the law is equally unambiguous that the implied covenant of good faith and fair dealing "does not undermine a party's general right to act on its own interest in a way that may incidentally lessen the other party's expected benefit." *Go Green Realty Corp. v. Liberty Petroleum Realty, LLC*, No. 11cv5360 (DF), 2015 U.S. Dist. LEXIS 43816 (S.D.N.Y. Mar. 30, 2015)(citing *Security Plans, Inc. v. CUNA Mut. Ins. Soc.,* 769 F.3d 807, 817 (2d Cir. 2014)).  Plaintiff pleads no facts that would show even remotely that Agway acted malevolently or in bad faith with the intent to deprive Plaintiff of the benefit of her bargain, rather than merely setting prices consistent with its own business interest. Accordingly, the Court should dismiss this count with prejudice.

Allegations sounding in quasi-contract do not survive dismissal motions where express agreements govern the subject matter underlying the action.  *See Cortazar v. Tomasino,* 150 A.D. 3d 668, 670, 54 N.Y.S. 3d 89 (App. Div. 2017); *Air & Power Transmission, Inc. v. Weingast,* 120 A.D. 3d 524, 526, 992 N.Y.S. 2d 46 (App. Div. 2014)(string citations omitted). Plaintiff's claim for unjust enrichment fails as a matter of law because, as Plaintiff acknowledges, a valid contract exists (paragraph 67 of the complaint).  Furthermore, "[a]n unjust enrichment claim is not available where it simply duplicates or replaces a conventional contract or tort claim." *Corsello v. Verizon N.Y. Inc.* 18 N.Y. 3d 777, 790, 967 N.E.2d 1177, 944 N.Y.S.2d 732 (2012).

Plaintiff's count alleging unjust enrichment merely recites the same allegations and theories that underlie her breach of contract and deceptive practices counts.  Consistent with the legal authorities discussed *supra,* this Court should dismiss Plaintiff's unjust enrichment claim.

## **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court grant Defendant's Motion to Dismiss Plaintiff's Complaint with prejudice.

BARNES & THORNBURG LLP

/s/ *Thomas E. Hanson, Jr.*
Thomas E. Hanson, Jr. (No. 4102)
1000 N. West Street, Suite 1500
Wilmington, DE 19801
(302) 300-3447

William K. Mosca, Jr.
Kenneth J. Sheehan
John D. Coyle
BEVAN, MOSCA & GIUDITTA, P.C.
A Professional Corporation
222 Mount Airy Road, Suite 200
Basking Ridge, New Jersey 07920
(908) 753-8300

Dated:  January 29, 2018          *Attorneys for Defendant*