# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

NAOMI GONZALES,

     Plaintiff,

  v.

AGWAY ENERGY SERVICES, LLC,

     Defendant.

No. 5:18-cv-235 (MAD/ATB)

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

{00291188 }

## **TABLE OF CONTENTS**

Table of Authorities ..................................................................................................... iii

Introduction .................................................................................................................... 1

Argument ......................................................................................................................... 6

    I.     Plaintiff Adequately Alleges Subject Matter Jurisdiction. ..................................... 6

          A.    Because Defendant Is A New York Citizen
              And The Proposed Class  Contains Pennsylvania
              Citizens, This Court Has Jurisdiction Under CAFA. ................................... 6

          B.    Even Without Considering Pennsylvania
               Customers, Plaintiff Adequately Alleges Diversity. .................................... 9

    II.    Defendant's Transfer Argument Is Moot. ............................................................. 11

    III.   The Voluntary Payment Doctrine Is Inapplicable. ............................................... 11

    IV.   The New York Uniform Commercial Code Does Not Bar Plaintiff's Claims. .... 15

    V.    Plaintiff's Claims Are Plausible. .......................................................................... 17

          A.    Plaintiff Need Only Allege  Facts That Render Her Claims Plausible. ..... 17

          B.    Plaintiff Plausibly Alleges Claims Under GBL § 349 And § 349-d. ........ 17

               1.    Plaintiff Plausibly Alleges That Agway's
                     Representations And Omissions Concerning
                     Its Variable  Rate Are Materially Misleading
                     In Violation Of GBL § 349 And § 349-d. ..................................... 18

               2.    Agway's Gratuitous EnergyGuard Offering
                     Does Not Affect The Fact That Agway's
                     Rates Are Not Based On The Factors It Represents. .................... 26

               3.    The Cases Upon Which Defendant Relies Are Inapposite. .......... 27

          C.    Plaintiff Plausibly Alleges a Claim for Breach of Contract. .................... 28

                1.    Plaintiff Plausibly Alleges That
                     Agway Breached its Contractual Obligations. ............................. 29

                2.    Plaintiff Plausibly Alleges Cognizable Damages. ....................... 33

D.      Plaintiff Plausibly Alleges A Claim For
        Breach Of The Covenant Of Good Faith And Fair Dealing. ................... 33

E.      Plaintiff Plausibly Alleges A Claim For Unjust Enrichment. ................... 35

Conclusion ..................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*1000 N. of New York Co. v. Great Neck Med. Associates*,
    775 N.Y.S.2d 884 (2d Dep't. 2004).................................................................... 24, 32

*Abdale v. N. Shore-Long Island Jewish Health Sys., Inc.*, No.,
    No. 13-1238, 2014 WL 2945741 (E.D.N.Y. June 30, 2014) ............................. 9, 10

*Aks v. IDT Energy*,
    No. L-4936-14 (N.J. Super. Ct. Civ. Div. Nov. 6, 2014)…………………………………………2

*Alvarado v. Westchester Cty.*,
    22 F. Supp. 3d 208 (S.D.N.Y. 2014)....................................................................... 17

*Am. Airlines v. Wolens*,
    513 U.S. 219 (1995).................................................................................................. 8

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)................................................................................... 32

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................... 17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................... 17

*Bridgeway Corp. v. Citibank, N.A.*,
    132 F. Supp. 2d 297 (S.D.N.Y. 2001).................................................................... 35

*Buermeyer v. Suburban Propone, L.P.*,
    No. 5367 (N.Y. Sup. Ct. Jan. 3, 2011)…………………………………………………………...14

*Carter v. HealthPort Techs., LLC*,
    822 F.3d 47 (2d Cir. 2016)...................................................................................... 6

*Cassese v. Washington Mut., Inc.*,
    255 F.R.D. 89 (E.D.N.Y. 2008) .............................................................................. 8

*Chen v. Hiko Energy, LLC*,
    No. 14-1771, 2014 WL 7389011 (S.D.N.Y. Dec. 29, 2014) .................... 1, 20, 21, 30

*Claridge v. N. Am. Power & Gas, LLC*, No.,
    No. 15-1261, 2015 WL 5155934 (S.D.N.Y. Sept. 2, 2015) ............................. passim

*Commisso v. PricewaterhouseCoopers LLP*,
   No. 11-5713 NRB, 2012 WL 3070217 (S.D.N.Y. July 27, 2012)........................................... 10

*Dalton v. Educ. Testing Serv.*,
   663 N.E.2d 289 (N.Y. 1995).................................................................................................... 33

*Dillon v. U–A Columbia Cablevision of Westchester, Inc.*,
   740 N.Y.S.2d 396 (App. Div. 2002) ....................................................................................... 14

*DRMAK Realty LLC v. Progressive Credit Union*,
   18 N.Y.S.3d 618 (App. Div. 2015) .......................................................................................... 14

*Edwards v. N. Am. Power & Gas, LLC*,
   120 F. Supp. 3d 132 (D. Conn. 2015)........................................................................................ 1

*F5 Capital v. Pappas*,
   856 F.3d 61 (2d Cir. 2017)........................................................................................................ 7

*Farina v. Niagara Mohawk Power Corp.*,
   438 N.Y.S.2d 645 (App. Div. 1981) ........................................................................................ 15

*Farinella v. Paypal, Inc.*,
   611 F. Supp. 2d 250 (E.D.N.Y. 2009) ....................................................................................... 8

*Fink v. Time Warner Cable*,
   810 F. Supp. 2d 633 (S.D.N.Y. 2011)................................................................................. 13, 14

*First Niagara Bank N.A. v. Mortg. Builder Software, Inc.*,
   No. 13-592S, 2016 WL 2962817 (W.D.N.Y. May 23, 2016) ................................................. 34

*Fritz v. North American Power & Gas, LLC*,
   No. 14-634, ECF No. 42 (D. Conn. Jan. 29, 2015)……………………………………………1

*Flood v. Just Energy Mktg. Corp.*,
   No. 15-2012, 2017 WL 280820 (S.D.N.Y. Jan. 20, 2017) ................................................. 14, 15

*Fountain v. Karim*,
   838 F.3d 129 (2d Cir. 2016)....................................................................................................... 6

*Gimbel Bros. v. Brook Shopping Centers, Inc.*,
   499 N.Y.S.2d 435 (1986) ......................................................................................................... 14

*Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*,
   8 F. Supp. 3d 467 (S.D.N.Y. 2014) .................................................................................... 18, 25

*Goshen v. Mutual Life Ins. Co. of N.Y.*,
 98 N.Y.2d 314 (2002) ............................................................................................ 21

*Gruber v. Starion Energy, Inc.*,
 No. 14-01828, ECF No. 46-1 (D. Conn. Apr. 7, 2015)................................................ 2

*Hamlen v. Gateway Energy Services Corp.*,
 No. 16-3526, 2017 WL 892399 (S.D.N.Y. Mar. 6, 2017).................................... 1, 23

*Hamlen v. Gateway Energy Servs. Corp.*,
 No. 16-3526, 2017 WL 6398729 (S.D.N.Y. Dec. 8, 2017) ...................................... 25

*In re Ford Motor Co. E-350 Van Products Liab. Litig.* No.,
 No. 03-4558, 2010 WL 2813788 (D.N.J. July 9, 2010) .......................................... 16

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
 962 F. Supp. 2d 606 (S.D.N.Y. 2013)........................................................................ 7

*In re Nigeria Charter Flights Contract Litig.*,
 233 F.R.D. 297 (E.D.N.Y. 2006) ............................................................................... 8

*In re Propranolol Antitrust Litigation.*,
 249 F. Supp. 3d 712 (S.D.N.Y. 2017) ........................................................................ 8

*In re U.S. Foodservice Inc. Pricing Litigation*,
 729 F.3d 108 (2d Cir. 2013)........................................................................................ 8

*John v. Whole Foods Mkt. Grp., Inc.*,
 858 F.3d 732 (2d Cir. 2017)........................................................................................ 6

*Just Film, Inc. v. Buono*,
 847 F.3d 1108 (9th Cir. 2017) .................................................................................... 8

*Karlin v. IVF Am., Inc.*,
 93 N.Y.2d 282 (1999) ............................................................................................... 17

*Koch v. Acker, Merrall & Condit Co.*,
 18 N.Y.3d 940 (2012) ............................................................................................... 22

*Komoda v. Palmco Energy*,
 No. L-3263-14 (N.J. Super. Ct. Civ. Div. Sept. 19, 2014)......................................... 2

*Landau v. Viridian Energy PA LLC*,
 223 F. Supp. 3d 401 (E.D. Pa. 2016) ......................................................................... 2

*Langan v. Johnson & Johnson Consumer Co., Inc.*,
 No. 13-1470, 2017 WL 985640 (D. Conn. Mar. 13, 2017) ........................................ 8

*Larsen v. Pioneer Hi-Bred Int'l, Inc.*,
 No. 06-0077, 2007 WL 3341698 (S.D. Iowa 2007) ............................... 10

*Majid v. Federal Bureau Of Investigation*,
 245 F. Supp. 3d 63 (D.D.C. 2017) ...................................................... 10

*Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*,
 375 F.3d 168 (2d Cir. 2004) .............................................................. 29

*Mattera v. Clear Channel Commc'ns, Inc.*,
 239 F.R.D. 70 (S.D.N.Y. 2006). ......................................................... 11

*Mazzei v. Money Store*,
 288 F.R.D. 45 (S.D.N.Y. 2012) ............................................................ 8

*McCracken v. Verisma Sys., Inc.*,
 131 F. Supp. 3d 38 (W.D.N.Y. 2015) ................................................. 12

*McMorris v. TJX Companies, Inc.*,
 493 F. Supp. 2d 158 (D. Mass. 2007) ............................................... 10

*Melville v. Spark Energy, Inc.*,
 No. 15-8706, 2016 WL 6775635 (D.N.J. Nov. 15, 2016) .............. 2, 23, 31

*Mirkin v. Viridian Energy, Inc.*,
 No. 15-1057, 2016 WL 3661106 ..................................................... 2, 22, 31

*Needham & Co., LLC v. Access Staffing, LLC*,
 No. 15-2487, 2016 WL 4399288 (S.D.N.Y. Aug. 12, 2016) ................. 13

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,
 163 F.3d 153 (2d Cir. 1998) .............................................................. 15

*Oladapo v. Smart One Energy, LLC*,
 No. 14-7117, 2016 WL 344976 (S.D.N.Y. Jan. 27, 2016) ............. 2, 23, 31

*Pacholec v. Home Depot USA, Inc.*,
 No. 06-827, 2006 WL 2792788 (D.N.J. Sept. 26, 2006) ...................... 12

*Panda Capital Corp. v. Kopo Int'l, Inc.*,
 662 N.Y.S.2d 584 (App. Div. 1997) ................................................... 16

*Quinn v. Walgreen Co.*,
 958 F. Supp. 2d 533 (S.D.N.Y. 2013) ............................................ 17, 25

*Richards v. Direct Energy Services, LLC*,
  246 F. Supp. 3d 538 (D. Conn. 2017)...................................................................... 28

*Richards v. Direct Energy Servs., LLC*,
  120 F. Supp. 3d 148 (D. Conn. 2015)...................................................................... 28

*Rolland v. Spark Energy, LLC*,
  No. 17-02680, ECF No. 28 (D.N.J. Dec. 7, 2017)........................................................1

*Ryder Energy Distrib. v. Merrill Lynch Commodities, Inc.*,
  748 F.2d 774 (2d Cir. 1984)..................................................................................... 17

*Samuel v. Time Warner Inc.*,
  809 N.Y.S.2d 408 (N.Y. Sup. Ct. 2005) ................................................................. 12

*Sanborn v. Viridian Energy, Inc.*,
  No. 14-1731, ECF No. 26-1 (D. Conn. Apr. 1, 2015)..................................................2

*Silverstein v. R. H. Macy & Co Inc.,,*
  40 N.Y.S.2d 916 (App. Div. 1943) ......................................................................... 16

*Silvis v. Ambit Energy L.P.*,
  674 F. App'x 164 (3d Cir. 2017) ............................................................................. 32

*Steketee v. Viridian Energy, Inc.*,
  No. 15-585, ECF No. 46 (D. Conn. Apr. 14, 2016)....................................................2

*Slack v. Suburban Propane Partners, L.P.*,
  No. 10-2548, 2010 WL 3810870 (D.N.J. Sept. 21, 2010) ......................................... 28

*Sobiech v. U.S. Gas & Electric, Inc*,
  No. 14-04464, ECF No. 24 (E.D. Pa. Feb. 4, 2015)...................................................2

*Spagnola v. Chubb Corp.*,
  574 F.3d 64 (2d Cir. 2009)................................................................................. 12, 13

*Stewart v. Ocean State Jobbers, Inc*
  No. 17-1266, 2018 WL 379011 (D. Conn. Jan. 10, 2018)........................................... 9

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*,
  752 F.3d 239 (2d Cir. 2014)...................................................................................... 6

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001)..................................................................................... 32

*Todd v. XOOM Energy Maryland, LLC*,
  No. 15-0154, 2017 WL 667198 (D. Md. Feb. 16, 2017) ........................................ 2

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
  487 F.3d 89 (2d Cir. 2007) ................................................................. 34

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*,
  41 F.3d 1570 (2d Cir. 1994) ................................................................ 34

*Tully v. N. Am. Power & Gas, LLC*,
  No. 14-634, ECF No. 68 (D. Conn. Oct. 29, 2015) ..................................................... 1

*United States v. Consol. Edison Co. of N.Y., Inc.*,
  590 F. Supp. 266 (S.D.N.Y. 1984) ........................................................... 15

*Urbino v. Ambit Energy Holdings, LLC*,
  No. 14-5184, 2015 WL 4510201 (D.N.J. July 24, 2015) ................................... 2, 27

*Vitale v. U.S. Gas & Elec.*, Inc.,
  No. 14-4464, 2016 WL 1060807 (D.N.J. Mar. 16, 2016) ......................................... 2

*Westfall v. Chase Lincoln First Bank, N.A.*,
  685 N.Y.S.2d 181 (1999) ................................................................... 14

*Windley v. Starion Energy, Inc.*,
  No. 14-9053, 2016 WL 197503 (S.D.N.Y. Jan. 8, 2016) ................................... 2, 28

*Buermeyer v. Suburban Propone, L.P.*,
  No. 5367 (N.Y. Sup. Ct. Jan. 3, 2011) ............................................................ 2

*Zahn v. N. Am. Power & Gas, LLC*
  No. 14-8370, 2015 WL 2455125 (N.D. Ill. May 22, 2015) .............................. 2, 3, 4

*Zink v. First Niagara Bank, N.A.*,
  206 F. Supp. 3d 810 (W.D.N.Y. 2016) ...................................................... 11

**Statutes**

28 U.S.C. § 1332 ............................................................................. 6, 7

N.Y. Gen. Bus. Law § 349 .............................................................. passim

N.Y. U.C.C. .................................................................................. 15

**Rules**

Fed. R. Civ. P. 8 ................................................................................................................... 35

Plaintiff Naomi Gonzales ("Plaintiff" or "Ms. Gonzales"), by and through her attorneys, respectfully submits this Memorandum of Law in opposition to Defendant Agway Energy Services, LLC's ("Defendant" or "Agway") Motion to Dismiss.

## INTRODUCTION

Defendant points out that Plaintiff's counsel has brought many similar actions with similar complaints.  Def. Mem. 10 n.1.  Defendant is correct.  In fact, the complaints Plaintiff's counsel has filed in nine federal courts are largely the same because they reflect a widespread deceptive practice amongst certain unscrupulous private energy services companies ("ESCOs") like Agway.  These ESCOs bait consumers into using their electricity service by offering a teaser rate at a low fixed rate, followed by what they promise will be a "competitive" rate that reflects market costs and factors such as the wholesale price of electricity.  However, in reality, their variable rates are not competitive and they do not reflect changes in the market.  To the contrary, ESCOs acting in bad faith raise their rates as high as possible without triggering excessive customer attrition.  In other words, certain ESCOs engage in price gouging in direct contravention of the promise they made to provide competitive market rates.  In nine cases brought in U.S. District Courts by plaintiffs represented by Finkelstein, Blankinship, Frei-Pearson & Garber, LLP against ESCOs for the same deceptive conduct, district courts have denied the motion to dismiss eight times.[1]  Only the court in *Zahn v. N. Am. Power & Gas, LLC*

---

[1] *See Rolland v. Spark Energy, LLC*, No. 17-02680, ECF No. 28 and Hearing Transcript (D.N.J. Dec. 7, 2017) (Declaration of D. Greg Blankinship ("Blankinship Dec.") Ex. 1); *Hamlen v. Gateway Energy Services Corp.*, No. 16-3526, 2017 WL 892399 (S.D.N.Y. Mar. 6, 2017) (*Hamlen I*); *Claridge v. N. Am. Power & Gas, LLC*, No. 15-1261, 2015 WL 5155934 (S.D.N.Y. Sept. 2, 2015); *Tully v. N. Am. Power & Gas, LLC,* No. 14-634, ECF No. 68 (D. Conn. Oct. 29, 2015) (Blankinship Dec. Ex. 2); *Fritz v. North American Power & Gas, LLC*, No. 14-634, ECF No. 42 (D. Conn. Jan. 29, 2015) (Blankinship Dec. Ex. 3); *Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132 (D. Conn. 2015); *Chen v. Hiko Energy, LLC*, No. 14-1771, 2014 WL

dismissed the plaintiff's complaint, and that decision was reversed by the Seventh Circuit following a certified question to the Illinois Supreme Court.  No. 14-8370, 2015 WL 2455125 (N.D. Ill. May 22, 2015), *rev'd and vacated*, 847 F.3d 875 (7th Cir. 2017).

This lawsuit is no different.  Agway baits consumers with an initial competitive teaser rate and a representation that the subsequent variable rate will be competitive and based on the costs Agway incurs to purchase electricity on the wholesale market to sell to consumers, along with other market-related factors.  Agway initially makes these representations in a letter to potential customers, which states the bold and explicit promise that "you will receive a competitive monthly variable price."  Affidavit of Michael Schueler, ECF No. 14 ("Schueler Aff."), Ex. B ("Enrollment Letter").  Agway also presented Ms. Gonzales and every other Agway customer with a uniform customer agreement ("Agreement"), which acts as a solicitation during the recessionary period during which the customer can reject Agway's electricity service

---

7389011 (S.D.N.Y. Dec. 29, 2014); *Wise v. Energy Plus Holdings, LLC*, No. 11-7345, Hearing Transcript (S.D.N.Y. March 23, 2012) (Blankinship Dec. Ex. 4).  At least a dozen other courts have denied motions to dismiss in substantially similar cases.  *See Mirkin v. Viridian Energy, Inc.*, No. 15-1057, 2016 WL 3661106 (D. Conn. July 5, 2016); *Todd v. XOOM Energy Maryland, LLC*, No. 15-0154, 2017 WL 667198 (D. Md. Feb. 16, 2017); *Melville v. Spark Energy, Inc.*, No. 15-8706, 2016 WL 6775635 (D.N.J. Nov. 15, 2016); *Vitale v. U.S. Gas & Elec.*, Inc., No. 14-4464, 2016 WL 1060807 (D.N.J. Mar. 16, 2016); *Landau v. Viridian Energy PA LLC*, 223 F. Supp. 3d 401 (E.D. Pa. 2016); *Oladapo v. Smart One Energy, LLC*, No. 14-7117, 2016 WL 344976 (S.D.N.Y. Jan. 27, 2016); *Gruber v. Starion Energy, Inc.*, No. 14-01828, ECF No. 46-1 (D. Conn. Apr. 7, 2015) (Blankinship Dec. Ex. 5); *Sobiech v. U.S. Gas & Electric, Inc.*, No. 14-04464, ECF No. 24 (E.D. Pa. Feb. 4, 2015) (Blankinship Dec. Ex. 6); *Sanborn v. Viridian Energy, Inc.*, No. 14-1731, ECF No. 26-1 (D. Conn. Apr. 1, 2015) (Blankinship Dec. Ex. 7); *Steketee v. Viridian Energy, Inc.*, No. 15-585, ECF No. 46 (D. Conn. Apr. 14, 2016) (Blankinship Dec. Ex. 8); *Komoda v. Palmco Energy*, No. L-3263-14 (N.J. Super. Ct. Civ. Div. Sept. 19, 2014) (Blankinship Dec. Ex. 9); *Aks v. IDT Energy*, No. L-4936-14 (N.J. Super. Ct. Civ. Div. Nov. 6, 2014) (Blankinship Dec. Ex. 10).

In contrast, Defendant identifies two (easily distinguishable) cases.  *See* Def. Mem. 34 n.29 (citing *Windley v. Starion Energy, Inc.*, No. 14-9053, 2016 WL 197503 (S.D.N.Y. Jan. 8, 2016) and *Urbino v. Ambit Energy Holdings, LLC*, No. 14-5184, 2015 WL 4510201 (D.N.J. July 24, 2015)).

{00291188 }

before it begins.  The Agreement represents that the variable rate "shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins."  Compl. ¶ 21; Schueler Aff., Ex. A ("Agreement").

Plaintiff plausibly alleges that reasonable consumer would understand from the Enrollment Letter and the Agreement that Agway's variable rate would be competitive; that is, commensurate with the rates of its competitors like other ESCOs and the local utilities (who are Agway's primary competitors and the entity from which Plaintiff and most customers receive electricity service before switching to Agway).  Compl. ¶ 22.  Any reasonable consumer would also expect that a variable rate based on Agway's costs for purchasing electricity and other market-related factors would in fact vary based on changes to the wholesale market.  *Id.*

Plaintiff also plausibly alleges that Agway's promise to charge a competitive variable rate based on market costs and factors is deceptive and false in part based on a comparison to Central Hudson's rates.  Defendant does not contest that Central Hudson's rates serve as an ideal indicator of electricity market conditions.  Nor can it.  Central Hudson's rates are based on the New York Independent System Operator's ("NYISO") competitive short-term market (commonly referred to as the "spot market") for wholesale electricity and the associated market costs (*i.e.*, ancillary services, installed capacity, and transmission -- the same costs ESCOs such as Agway incur).  *Id.* at ¶ 27.  Central Hudson and other New York utilities purchase energy, ancillary services, and transmission from NYISO's wholesale market on a daily basis, and installed capacity on a monthly basis, based on customer consumption, and pass actual costs on to their customers -- without any markups or profit.  *Id.*  ESCOs like Agway can also purchase

wholesale electricity from NYISO's short-term market, at the same price as the utilities. *Id.* Because New York utility rates do not include any profits, they serve as pure reflections of the monthly average market costs of wholesale electricity and associated costs, transmission, and distribution. *Id.*

Nor does Defendant contest that its rates do not rise and fall with changes in wholesale costs (as reflected in Central Hudson's variable rate). Nor could it. For example, after Ms. Gonzales' Introductory Rate expired and she was switched to Agway's variable rate, Agway's rate immediately jumped a remarkable 96% from $0.0440 to $0.08605 per kWh. *Id.* at ¶ 30. In contrast, the local utility rate, *i.e.*, the rate Central Hudson would have charged Ms. Gonzales had she not switched to Agway, declined by 7%. *Id.* Similarly, when Central Hudson's rate declined from $0.05734 to $0.04116 per kWh (a decline of 28%) from July to August 2016, Agway increased its already exorbitant prices from $0.09078 to $0.0966 (an increase of 6%). *Id.* The discrepancies between Agway's rate and variations in its costs remain evident through Ms. Gonzales' most recent billing cycle. Whereas Central Hudson's rate decreased from $0.05827 to $0.04611 per kWh (declining by 21%) from September to October 2017, Agway's rate increased from $0.08916 to $0.09493 per kWh (increasing by 6%). *Id.* at ¶ 31.

The discordance in rates is similarly apparent with respect to pricing trends. While Central Hudson's rate steadily declined from $0.06924 to $0.04116 per kWh (declining 41%) from May to August 2016, Agway's rate steadily rose from $0.08605 to $0.0966 per kWh (increasing by 12%). *Id.* at ¶ 32. Likewise, between February and April 2016, Central Hudson's rate steadily decreased from $0.07308 to $0.04343 per kWh (decreasing 41%), and Agway's rate rose from $0.08992 to $0.09072 per kWh (increasing 1%). *Id.* Central Hudson's rate steadily

decreased from $0.09221 to $0.04528 per kWh (decreasing 51%) from May to July 2017, while Agway's rate steadily increased from $0.09250 to $0.10133 per kWh (increasing 10%). *Id.*

Defendant contends that it can charge exorbitant rates untethered to changes in market costs and factors because it provides the so-called EnergyGuard service to its customers. This argument is akin to a bank accused of stealing from customer accounts seeking an offset because it gave new customers toasters. Agway promises that its variable rate will be based on specified factors (namely, market factors like wholesale costs and competitor pricing), and none of those factors include the value or cost of EnergyGuard. Indeed, the Agreement does not even mention EnergyGuard. Moreover, to the extent that the Agreement incorporates the Enrollment Letter by reference, any reasonable consumer would understand that EnergyGuard was being offered as a bonus or incentive, just like banks used to offer toasters to new customers or cable companies offer gift cards: "For being an Agway customer, we also include the peace of mind and added value of Agway Energy Services EnergyGuard Repair Program." *See* Enrollment Letter.

Moreover, Defendant's argument is precluded by GBL § 349-d(7), which requires that Agway and other ESCOs "clearly and conspicuously" identity all of its variable rate pricing components, and the NYPSC's Uniform Business Practices Code ("UBP"), Case 98-M-1343, § 5(B)(4)(b), which requires that Agway's Customer Disclosure Statement set forth the price term of the agreement "in plain language." Given that the Agreement does not even mention EnergyGuard, Defendant should not be heard to contend that it was justified in gouging its customers because it offered that service.

For these and additional reasons discussed below, Defendant's Motion to Dismiss should be denied entirely.

## ARGUMENT

## I.   PLAINTIFF ADEQUATELY ALLEGES SUBJECT MATTER JURISDICTION.

Defendant's contention that "since both Plaintiff and Defendant are New York citizens, no diversity exists," Def. Mem. 12, is belied by the plain language of 28 U.S.C. 1332(d)(2) ("CAFA") and the face of Plaintiff's Complaint.   "When the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it (collectively the 'Pleading'), the plaintiff has no evidentiary burden.  The task of the district court is to determine whether the Pleading 'allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue.'"  *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (citing *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016)).  "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction."  *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (quoting *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)).  Here, Defendant presents a facial attack on this Court's subject matter jurisdiction and asserts that Plaintiff's Complaint does not adequately plead minimal diversity for the purposes of CAFA.

## A.   Because Defendant Is A New York Citizen And The Proposed Class Contains Pennsylvania Citizens, This Court Has Jurisdiction Under CAFA.

Pursuant to CAFA, a district court has original jurisdiction over civil class actions in which the matter in controversy exceeds $5 million[2] and in which "any member of a class of plaintiffs is a citizen of a State different from any defendant[.]"  28 U.S.C. § 1332(d)(2)(A).  "CAFA embodies Congress's judgment that complete diversity is not essential in class actions

---

[2] Defendant does not dispute that the amount in controversy exceeds $5 million.

that meet its requirements." *F5 Capital v. Pappas*, 856 F.3d 61, 81 (2d Cir.), *cert. denied*, 138 S.

Ct. 473 (2017).  Plaintiff alleges that Agway has customers in both New York and Pennsylvania,

Compl. ¶¶ 2-3, and proposes a class comprised of Defendant's New York and Pennsylvania

customers.[3]  *Id.* at ¶ 42.  Therefore, Plaintiff has sufficiently pleaded diversity under CAFA.

Defendant has one argument (appropriately relegated a footnote) in support of its

contention that diversity is lacking, notwithstanding that the proposed class on its face includes

Pennsylvania customers the majority of whom are certainly Pennsylvania citizens.  Defendant

points out that Plaintiff does not name a Pennsylvania customer as a named plaintiff, "which

certain courts have required."  Def. Mem. 11 n.13.  But CAFA diversity is determined, at least at

this stage, by the class proposed in the complaint.  Indeed, CAFA defines "class members" as

"persons (named or unnamed) who fall within the definition of the *proposed* or certified class in

a class action."  28 U.S.C. 1332(d)(1)(D) (emphasis added); *accord In re LIBOR-Based Fin.*

*Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 628 (S.D.N.Y. 2013) (explaining that minimal

diversity is satisfied where "at least one member of the putative class is diverse from at least one

defendant").  Because the proposed class includes Pennsylvania customers (at least one of whom

is a Pennsylvania citizen), CAFA diversity is satisfied.  Defendant cites no authority for the

proposition that CAFA diversity at the outset of a case hinges on whether a plaintiff can

ultimately certify the entirety of the proposed class.  Nor can it.  *F5 Capital*, 856 F.3d at 77

(holding that "the fact that the court subsequently determined that the case could not proceed as a

---

[3] Indeed, per the Energy Information Administration, Agway had 2,861 electricity customers in
Pennsylvania in 2016.  *See 2016 Retail Power Marketers Sales -- Residential*, U.S. ENERGY
INFORMATION ADMINISTRATION, http://bit.ly/2pgWXpO (last visited Mar. 19, 2018).

class action under CAFA did not deprive it of subject matter jurisdiction" and that Circuit Courts

uniformly hold that "federal jurisdiction under [CAFA] does not depend on certification.").

Defendant contends that "certain courts" require a named plaintiff for every state in a

class. Most do not, particularly when contract claims based on uniform agreements are at issue.[4]

*See, e.g., In re U.S. Foodservice Inc. Pricing Litigation*, 729 F.3d 108, 127 (2d Cir. 2013)

(affirming certification of multi-state class based on state contract law).[5] Cases cited by

Defendant do not counteract this great weight of authority. While Judge Rakoff did dismiss state

statutory claims in *In re Propranolol Antitrust Litigation* where there was no corresponding

plaintiff, he did so only on the theory that state statutory claims required a plaintiff injured under

---

[4] Certifying a class of New York and Pennsylvania customers is especially appropriate here, as Agway's Pennsylvania customer agreement is the same as its New York agreement. *See Pennsylvania Residential Electric Generation Supplier Contract*, AGWAY, http://bit.ly/2FFeDGK (providing that "The Electric Variable Rate shall be set each month at Agway's discretion and reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges, renewable energy compliance charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins.") (last visited Mar. 19, 2018).

[5] *See also Langan v. Johnson & Johnson Consumer Co., Inc.*, No. 13-1470, 2017 WL 985640, at *13-14 (D. Conn. Mar. 13, 2017) (certifying class across 17 states where single plaintiff was a Connecticut citizen and the court found that the consumer protection laws of the 17 states did not materially differ from Connecticut's statute); *Mazzei v. Money Store*, 288 F.R.D. 45, 68 (S.D.N.Y. 2012) (in action against lender for breaches of form mortgage agreements, "the settled law in the Second Circuit is that contract law is sufficiently uniform for class treatment"); *Farinella v. Paypal, Inc.*, 611 F. Supp. 2d 250, 263 (E.D.N.Y. 2009) ("[D]ifferences in state contract law do not defeat the predominance prong."); *Cassese v. Washington Mut., Inc.*, 255 F.R.D. 89, 96-97 (E.D.N.Y. 2008) (certifying class against lender because "common questions of law exist, for example, as to whether these fees violated [lender's] contractual obligations to mortgage borrowers" and any "variations present in state common laws of contracts . . . do not preclude certification"); *In re Nigeria Charter Flights Contract Litig.*, 233 F.R.D. 297, 306 (E.D.N.Y. 2006) (certifying national contract class, holding that "the possibility that differences, much less conflicts, between relevant state laws might arise should not deter certification of a class"); *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1122-23 (9th Cir. 2017) (affirming certification of nationwide breach of contract class); *cf. Am. Airlines v. Wolens*, 513 U.S. 219, 233 n.8 (1995) ("[C]ontract law is not at its core diverse, nonuniform, and confusing.").

those statutes in those states. 249 F. Supp. 3d 712, 726-28 (S.D.N.Y. 2017). However, Judge Rakoff refused to dismiss the multi-state common law claims "at the pleading stage because the elements of unjust enrichment are similar in every state . . ." *Id.* at 729 (citation omitted). The court in *Stewart v. Ocean State Jobbers, Inc.* likewise dismissed only state statutory claims; there were no common law claims at issue. No. 17-1266, 2018 WL 379011, at *4-7 (D. Conn. Jan. 10, 2018). Here, Plaintiff seeks to certify only common law claims on behalf of the New York and Pennsylvania class; she pleads a New York subclass only for the New York statutory claims.

**B.      Even Without Considering Pennsylvania
      Customers, Plaintiff Adequately Alleges Diversity.**

Even leaving aside class members from Pennsylvania, Plaintiff adequately alleges diversity. Plaintiff plausibly alleges that at least one of Agway's thousands of New York customers[6] is a citizen of a state other than New York, either because at least one non-New York citizen owned a vacation home in New York and received electricity services from Agway, or because at least one New York customer has left New York to reside elsewhere since December 2011. Compl. ¶¶ 11, 42. In particular, Plaintiff alleges that New York had a net migration loss of nearly 73,000 New Yorkers just between July 2015 and July 2016, and that the state had a net migration loss of approximately 847,000 between April 2010 and July 2016. *Id.* at ¶ 11.

Defendant contends that Plaintiff's Complaint "raises a hypothetical possibility of CAFA-compliant diversity, but not a concrete, actual showing of diverse citizenship on the part of a named plaintiff." Def. Mem. 20 n.13. Of course, no court has adopted "concrete, actual showing" as the standard for pleading diversity at the pleading stage, and Defendant cites none.

---

[6] According to the U.S. Energy Information Administration, Agway had more than 37,000 customers in 2016. *2016 Retail Power Marketers Sales -- Residential*, U.S. ENERGY INFORMATION ADMINISTRATION, http://bit.ly/2pgWXpO.

Instead, the question is whether Plaintiff plausibly alleges that one member of the class is a citizen of a state other than New York, and in resolving that question the Court must draw reasonable inferences in Plaintiff's favor.  Plaintiff's allegation that many New York customers no longer reside in New York is grounded in the U.S. Census Bureau's data, *see* Compl. ¶ 11 n.3, as well as common sense, and that renders her claim that one member of the class is diverse from Defendant more than plausible.

*Abdale v. N. Shore-Long Island Jewish Health Sys., Inc.*, No. 13-1238, 2014 WL 2945741 (E.D.N.Y. June 30, 2014) is instructive.  In *Abdale,* the plaintiffs were all New York residents suing New York defendants.  Nevertheless, the court found that minimal diversity existed where the complaint did not limit the proposed class to New York citizens.  *Id.* at *6.  In light of the size of the proposed class, which consisted of "thousands" of people, the Court reasonably concluded that diversity of citizenship existed as "there is a reasonable probability that at least one class member is not a citizen of New York."  *Id.*[7]  The same is true here.

Moreover, in cases where information relating to the citizenship of the class is more readily available to the defendant, courts agree that the defendant should bear a greater burden of proof.  *See Majid v. FBI*, 245 F. Supp. 3d 63, 73 n.6 (D.D.C. 2017) ("To the extent that the John

---

[7] *See also Commisso v. PricewaterhouseCoopers LLP*, No. 11-5713 NRB, 2012 WL 3070217, at *4 (S.D.N.Y. July 27, 2012) (holding, "[w]e may also, however, simply make reasonable assumptions about the makeup of the putative class" in the context of class members' citizenships for CAFA diversity purposes); *Larsen v. Pioneer Hi-Bred Int'l, Inc.*, No. 06-0077, 2007 WL 3341698 at *5 (S.D. Iowa 2007) (finding class of "[a]ll persons and entities in the state of Iowa" who purchased certain seed products was not limited to citizens of Iowa); *McMorris v. TJX Companies, Inc.*, 493 F. Supp. 2d 158, 164 (D. Mass. 2007) (holding that "TJX has sufficiently alleged a 'reasonable probability' that at least one member of the McMorris class is domiciled in a state other than Massachusetts or Delaware, the two states in which TJX is domiciled[,]" where the putative class was composed entirely of residents of Massachusetts because residency "does not . . . foreclose the inclusion of non-citizens[.]").

Doe Agents exist and are residents of California, that information is entirely within the possession of the FBI and it may introduce such information at any time.").[8] Agway is in possession of information that could, if it exists, rebut the reasonable inference that at least one member of the class is not a New York citizen, and Agway may present such information at any time.  Until then, the Complaint's plausible allegations control.

## II.     **DEFENDANT'S TRANSFER ARGUMENT IS MOOT.**

On February 12, 2018, the parties stipulated to transfer to the Northern District of New York, ECF No. 19, rendering Defendant's contentions concerning transfer moot.

## III.    **THE VOLUNTARY PAYMENT DOCTRINE IS INAPPLICABLE.**

Defendant's argument that the voluntary payment doctrine bars Plaintiff's claims because she knew the specific amounts she paid, Def. Mem. 24-25, is unpersuasive.  Indeed, no court has dismissed a claim against an ESCO like Agway who deceptively promises that its rates will reflect its wholesale costs and other market factors based on the voluntary payment doctrine.  A reasonable consumer like Plaintiff cannot be expected, at least without the assistance of counsel, to know that Agway's rates were not in fact commensurate with Agway's costs and other market-related factors.  True, Plaintiff knew the rate Agway charged her each month, but she expected that rate to vary; she did not have full possession of the facts, namely that Agway was not charging her a rate commensurate with its wholesale costs and market factors but was instead

---

[8] *See also Mattera v. Clear Channel Commc'ns, Inc.*, 239 F.R.D. 70, 80 (S.D.N.Y. 2006) ("Furthermore, in many cases information relating to the membership of the putative class is more readily available to the employer.  The Court believes that this is the case here."); *cf. Zink v. First Niagara Bank, N.A.*, 206 F. Supp. 3d 810, 813 (W.D.N.Y. 2016) (allowing the plaintiff to use New York corporations business records to demonstrate that a number of members of the proposed class no longer resided in New York, and holding that diversity under 28 U.S.C. § 1332(d) was satisfied).

simply engaging in price gouging.  The reason Plaintiff was not in full possession of the facts was not a lack of diligence, but was instead Agway's deceptive conduct.

The voluntary payment doctrine only "precludes a plaintiff from recovering payments 'made with full knowledge of the facts' and with a 'lack of diligence' in determining his contractual rights and obligations."  *Spagnola v. Chubb Corp.*, 574 F.3d 64, 72-73 (2d Cir. 2009) (citations omitted). "The doctrine does not apply, however, when a plaintiff made payments under a mistake of fact or law regarding the plaintiff's contractual duty to pay," as is the case here.  *See id.* (citations omitted).  In particular, the voluntary payment doctrine is inapplicable where, as here, "a plaintiff's claim is predicated on a lack of full disclosure by defendant." *McCracken v. Verisma Sys., Inc.*, 131 F. Supp. 3d 38, 50 (W.D.N.Y. 2015) (denying motion to dismiss under voluntary payment doctrine).

Indeed, it is black letter law that the voluntary payment doctrine is inapplicable to claims predicated on deceptive conduct.  Put another way, if Plaintiff plausibly alleges that she was deceived, she also plausibly alleges that she did not voluntarily make a payment with full knowledge of facts.  *See Samuel v. Time Warner Inc.*, 809 N.Y.S.2d 408, 418 (N.Y. Sup. Ct. 2005) (voluntary payment doctrine not applicable when a claim is predicated on lack of full disclosure) (*citing Spagnola*, 574 F.3d at 73); *Pacholec v. Home Depot USA, Inc.*, No. 06-827, 2006 WL 2792788, at *3 (D.N.J. Sept. 26, 2006) (holding that where "a plaintiff alleges fraud in connection with the payment, the volunteer rule would have no applicability.  The allegations of fraud in the Complaint trump application of the volunteer rule.") (citation omitted).

Defendant's contention that the voluntary payment doctrine is applicable here is foreclosed by *Spagnola*.  There, the contract at issue provided that the plaintiff's insurance premiums would be based on "current costs and values," *Spagnola*, 574 F.3d at 71, and the

plaintiff alleged that the insurer charged premium rates that were higher than a rate based on

"current costs and values."  Because the plaintiff did not have full knowledge of the facts

(namely, current costs and values, and how those would translate into premium rates), the

Second Circuit reversed dismissal of the contact claims.  The Second Circuit reasoned in part

that whether and when the plaintiff should have discovered the defendant's deceptive behavior

are questions of fact not germane to a Rule 12(b)(6) motion:

> The voluntary payment doctrine . . . does not apply . . . when a plaintiff made
> payments under a mistake of fact or law regarding the plaintiff's contractual duty
> to pay.  Spagnola claims that the voluntary payment doctrine does not apply
> because he did not have full knowledge of the facts relevant to his claim until he
> filed suit in 2006, and that his lack of full knowledge was not due to a lack of
> diligence, but instead due to being misled by Chubb as to the basis upon which his
> coverage was increased . . . . . . it is too early in this case to conclusively answer
> that question . . . The pleadings before the district court do not establish whether
> Spagnola knew or should have known that the increased amounts were not based
> on current costs and values, and Spagnola was not required to preemptively plead
> facts refuting the voluntary payment doctrine . . .

*Spagnola*, 574 F.3d at 72-73.[9]

McCracken is also directly on point.  There, a plaintiff alleged that a medical records

provider deceptively charged excessive.  The *McCracken* plaintiff alleged that the defendant

charged more for records than the cost to copy them, notwithstanding a statute that forbade

charges over actual costs.   *Id.* at 48, 50.  Relying on the rule that the voluntary payment doctrine

is inapplicable where "a plaintiff's claim is predicated on a lack of full disclosure by defendant,"

*Id.* at 50 (quoting *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 649 (S.D.N.Y. 2011), the

---

[9] *See also Needham & Co., LLC v. Access Staffing, LLC*, No. 15-2487, 2016 WL 4399288, at
*12 (S.D.N.Y. Aug. 12, 2016) (holding that whether the plaintiff discovered or should have
discovered fraud is an issue of fact for the jury).

court concluded that "application of the voluntary payment doctrine to dismiss Plaintiffs' claims would be premature." *Id.*[10]

The voluntary payment doctrine does not apply here because Ms. Gonzales and class members did not make payments with full knowledge of the facts, including that Agway's rate was not in fact based on Agway's actual wholesale costs and market factors. Rather, her payments were predicted on Agway's deceptive and false representations concerning the basis for setting its variable rate. Thus, this is not a situation where a plaintiff made payments as a matter of convenience with full disclosure. Accordingly, the authorities on which Defendant relies are inapposite.[11]

Therefore, the voluntary payment doctrine is not a basis to dismiss the Complaint.

---

[10] *See also Fink*, 810 F. Supp. 2d at 649 (denying summary judgment to internet provider and finding voluntary payment doctrine inapplicable where "[i]ssues of disclosure, notice, and authorization [we]re very much contested", customers alleged defendant made misrepresentations about its high-speed internet service to increase its profits, and customers alleged that defendant's policy was to misrepresent to customers the reasons for slow service).

[11] In those cases, the plaintiffs were not misled about the basis for the defendants' charges or fees. *See DRMAK Realty LLC v. Progressive Credit Union*, 18 N.Y.S.3d 618 (App. Div. 2015) ("Here, there is no claim of fraud or mistake."); *Buermeyer v. Suburban Propone, L.P.*, No. 5367 (N.Y. Sup. Ct. Jan. 3, 2011) (unpublished) (finding that the defendant explicitly disclosed in the contract the nature of the contested fee, such that the plaintiffs had full knowledge) (Blankinship Dec. Ex. 11); *Dillon v. U–A Columbia Cablevision of Westchester, Inc.*, 740 N.Y.S.2d 396, 397-98 (App. Div. 2002) (finding that the plaintiff had "full knowledge of the late fee and the circumstances under which it would be imposed" where "she was advised that a late fee of $5 would be charged when payments were not received by the due date.."); *Westfall v. Chase Lincoln First Bank, N.A.*, 685 N.Y.S.2d 181, 182 (1999) (granting summary judgment where "Plaintiffs admit that they never actually gave any thought to the recording fee, or to defendants' basis for charging it, prior to paying off their mortgage, and they therefore cannot claim to have been misled by any implicit representation . . . the facsimile fee charge itself was neither false nor misleading."); *Gimbel Bros. v. Brook Shopping Centers, Inc.*, 499 N.Y.S.2d 435, 438 (1986) (holding on appeal that "the payments of $825 per Sunday for 24 Sundays were made voluntarily, without protest, and that no mistake of fact was involved.").

## IV.    THE NEW YORK UNIFORM COMMERCIAL
## CODE DOES NOT BAR PLAINTIFF'S CLAIMS.

As Defendant concedes, Article 2 of the NYUCC only governs the sale of "goods," and under binding New York law, electricity is a "service," not a "good."  Def. Mem. 13-14; *see also* NYUCC § 2-102.[12]  Defendant's attempt to disregard binding and clear New York law is foreclosed by Second Circuit and New York Appellate Division precedent.  *See Flood v. Just Energy Mktg. Corp.*, No. 15-2012, 2017 WL 280820, at *6 (S.D.N.Y. Jan. 20, 2017) ("The law in New York . . . is clear that the sale of electricity is a service, not a good.")  (quoting *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 163 F.3d 153, 155 (2d Cir. 1998) ("[T]he UCC does not apply to sale of electricity which is a service under New York law.")); *United States v. Consol. Edison Co. of N.Y., Inc.*, 590 F. Supp. 266, 269 (S.D.N.Y. 1984) ("In New York, electricity is not considered 'goods' and the U.C.C. therefore is not directly applicable to contracts involving the provision of electricity.") (citing *Farina v. Niagara Mohawk Power Corp.*, 438 N.Y.S.2d 645, 647 (App. Div. 1981))).  Indeed, the Court of Appeals decision incorporated in *Norcon* reflects that the Court of Appeals also concludes that electricity is not a good and therefore its sale is not governed by the UCC: "A useful analogy can be drawn between the contract at issue and a contract for the sale of goods.  If the contract here was in all respects the same, except that it was for the sale of oil *or some other tangible commodity instead of the sale of electricity*, the parties would unquestionably be governed by the demand for adequate assurance of performance factors in UCC 2-609."  *Norcon*, 163 F.3d at 160 (citing Court of Appeals opinion on the certified question) (emphasis added).

---

[12] Even if *arguendo* electricity were a good (it is not), Article 2 specifies that it does not "impair or repeat any statute regulating sales to consumers," NYUCC § 2-102, meaning that Article 2 cannot be used as a defense against Plaintiff's GBL claims.

In addition to longstanding precedent in state and federal courts, New York's Public Service Commission ("NYPSC") reinforces the conclusion that electricity is a service and not a good. As the Southern District of New York recently explained, in rejecting the contention that electricity is not a service under New York law, NYPSC's ESCO Consumers Bill of Rights -- which was codified into law and was effective as of 2011 -- evinces New York's unequivocal stance on the nature of electricity:

> The Energy Services Company Consumers Bill of Rights, a consumer-protection law targeting abuses in the energy services market, further supports this interpretation. *See* N.Y. Gen. Bus. Law § 349-d. That law defines "energy *services*" to mean "electricity and/or natural gas"; an "energy services company" to mean "an entity eligible to sell energy *services* to end-use customers using the transmission or distribution system of a utility"; a "customer" to mean "any person who is sold or offered an energy *services* contract"; and "door-to-door sales" to mean "the sale of energy *services* in which the [company or company's representative] personally solicits the sale." *Id.* § 349-d(1) (emphases added). Accordingly, plaintiff's argument to the contrary does not withstand scrutiny.

*Flood*, 2017 WL 280820, at *6. Indeed, the Agreement is by its own plain terms provides for the provision of a "service" (not a good); the Agreement repeatedly refers to Agway as an "energy service" (again, not a good) provider. *See* Agreement. Indeed, the Agreement explicitly enrolls Agway customers in its "energy service" and, more specifically, its "Variable Rate Service." *See* Agreement, Section "1. Service" and Disclosure Statement.

No court has ever held that electricity is a good under New York law, and this Court should not disregard precedent to be the first.[13]

---

[13] In any event, the filing of the Complaint in this action constitutes adequate notice. *In re Ford Motor Co. E-350 Van Products Liab. Litig.* No. 03-4558, 2010 WL 2813788, at *72 (D.N.J. July 9, 2010) ("[T]his Court agrees that under New York law, the filing of a complaint could constitute sufficient notice.") (citing *Panda Capital Corp. v. Kopo Int'l, Inc.,* 662 N.Y.S.2d 584, 586 (App. Div. 1997); *Silverstein,* 40 N.Y.S.2d 916, 920 (App. Div. 1943) ("[T]he commencement of this action would seem to afford sufficient notice of breach of warranty.")).

**V.      PLAINTIFF'S CLAIMS ARE PLAUSIBLE.**

**A.      Plaintiff Need Only Allege**
**Facts That Render Her Claims Plausible.**

In considering a motion to dismiss, all allegations in the complaint must be accepted as

true and construed in the light most favorable to the Plaintiff.  *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009).  "The function of a motion to dismiss is 'merely to assess the legal feasibility of the

complaint, not to assay the weight of the evidence which might be offered in support thereof.'"

*Alvarado v. Westchester Cty.*, 22 F. Supp. 3d 208, 212-13 (S.D.N.Y. 2014) (quoting *Ryder*

*Energy Distrib. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984).  In

considering Defendant's motion to dismiss for failure to state a claim, the court must accept the

veracity of all well-pleaded factual allegations and draw all reasonable inferences in the

plaintiff's favor.  *Chen*, 2014 WL 7389011, at *2 (citing *Iqbal*, 556 U.S. at 679).  In order to

survive a motion to dismiss, a party need only plead just "enough facts to state a claim to relief

that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Chen*, 2014

WL 7389011, at *2 ("[t]he plausibility standard is not akin to a 'probability requirement'")

(quoting *Iqbal*, 556 U.S. at 678).

**B.      Plaintiff Plausibly Alleges Claims Under GBL § 349 And § 349-d.**

"In order to ensure an honest marketplace," GBL § 349 declares unlawful "[d]eceptive

acts or practices in the conduct of any business, trade or commerce or in the furnishing of any

service[.]" *Karlin v. IVF Am., Inc.*, 93 N.Y.2d 282, 287 (1999); GBL § 349(a).  As with most

remedial legislation, courts applying GBL § 349 agree that it should be construed liberally in

favor of consumers.  *See, e.g.*, *Karlin*, 93 N.Y.2d at 290 (describing the GBL § 349(a)'s broad

scope and application); *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 543 (S.D.N.Y. 2013) ("The

scope of Section 349 is notably broad").  To bring a Section 349 claim, a plaintiff must simply

plead that "a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." [14] *Claridge*, 2015 WL 5155934, at *3 (denying motion to dismiss GBL § 349 claim) (citation omitted).  A practice is misleading or deceptive if a reasonable consumer would have been misled by the defendant's conduct.  *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 8 F. Supp. 3d 467, 478 (S.D.N.Y. 2014) (denying motion to dismiss GBL § 349 claim).  The New York Court of Appeals has established an objective standard for determining whether acts or practices are materially deceptive or misleading "to a reasonable consumer acting reasonably under the circumstances."  *Id.*  "Whether a particular act or practice is deceptive is usually a question of fact."  *Quinn*, 958 F. Supp. 2d at 543 (citation omitted).

Plaintiff also alleges violations of Section 349-d, commonly referred to as the Energy Services Company Consumers Bill of Rights, which was enacted in 2011 to target widespread abuses in the energy services market.  *See, e.g.*, *Chen*, 2014 WL 7389011, at *6 (citation omitted).  Akin to the language in Section 349(a), it states: "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."  GBL § 349-d(3).  Section 349-d(3) claims have the same elements as section 349(a) claims.  *See Chen*, 2014 WL 7389011, at *6.

1.    **Plaintiff Plausibly Alleges That Agway's Representations And Omissions Concerning Its Variable <u>Rate Are Materially Misleading In Violation Of GBL § 349 And § 349-d.</u>**

The representations that Agway made to Ms. Gonzales in the Enrollment Letter and the Agreement before it became effective constitute unlawful misrepresentations under GBL § 349.

---

[14] Defendant only challenges the second prong of GBL § 349.

Under the Agreement, Agway initially charges customers a fixed introductory rate for a set number of months.[15]  Once the introductory rate expires, Agway automatically converts customers to its monthly variable rate.  The Enrollment Letter further represents that "you will receive a *competitive* monthly variable price starting with your next scheduled meter reading." *See* Enrollment Letter (emphasis added).  The Agreement in turn represents that the variable rate Agway sets "shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins."  Compl. ¶ 21.  Like Ms. Gonzales, any reasonable consumer would understand based on these representations that Agway's variable rate would reflect changes in the wholesale market for electricity (*i.e.*, Agway's electricity costs), and competitive with the rates offered by the local utility and other ESCOs.  *Id*. at ¶ 22.

However, as alleged with great specificity, such a consumer would be wrong because Agway's rates are indisputably untethered from the wholesale electricity market from which it purchases electricity for resale to its customers, and its rates are not remotely competitive.  *Id.* at ¶¶ 23-34.  That Agway's variable rate is not a competitive rate based on the wholesale cost of electricity and other market related factors is demonstrated by the fact that Agway's variable rate was higher than Central Hudson's *every single month* that Ms. Gonzales was enrolled in Agway's service.  *Id.* at ¶¶ 23, 26.  Central Hudson's rate represents a rate based on the costs of purchasing electricity to sell to New York retail customers, because Central Hudson buys

---

[15] The Agreement provides a three-day recessionary period during which a prospective customer is under no obligation to accept Agway's services.  *See* Agreement.  During that time, the Agreement was a solicitation containing a promise that the variable rate would be based on Agway's wholesale costs and the other specified factors.  Compl. ¶ 19.

electricity every day on the open market.  *Id*. at ¶ 27.  In fact, there are numerous months when Agway's variable rate was *more than double* Central Hudson's rate.  *Id.* at ¶ 26.  Defendant does not, and cannot, offer any justification based on events in the market to justify the steep increase in its prices.  Had Ms. Gonzales and other consumers been informed that Agway's rates are consistently substantially higher (often double) those of its competitors and untethered from the specified market factors, they would have never switched.  *Id.* at ¶ 38.  Thus, Agway's affirmative misrepresentation concerning the pricing of its variable rate was designed to induce Ms. Gonzales into entering into the contract, and was false because Agway's variable rate is not based on market pricing or the other market-related factors specified in the Agreement.

*Chen v. Hiko Energy*, which also involved a New York ESCO, is particularly instructive.  2014 WL 7389011, at *4.  Nearly indistinguishable from Agway's Agreement, the Hiko contract provided that the variable rate would "reflect the wholesale cost of electricity (including capacity, energy, balancing, settlement, ancillaries), transmission and distribution charges, and other market-related factors, plus all sales and other applicable taxes, fees, charges or other assessments and HIKO's costs, expenses and margins."  *Id.* at *1.  The *Chen* plaintiffs, as here, alleged that "defendant billed them more for electricity and gas than it represented it would bill them, and thereby engaged in 'deceptive' conduct."  *Id.*  Contrary to Defendant's assertions otherwise, Def. Mem. 13-14, that the Agreement provides Defendant with discretion to alter rates in accordance with "the cost of electricity . . . and other market-related factors" does <u>not</u> mean that Defendant has *carte blanche* to set rates as it pleases.  The *Chen* court further held:

> Plaintiffs' contracts provided that defendant would charge variable monthly rates reflecting the wholesale cost of electricity or gas, as well as various "market-related factors, plus all sales and other applicable taxes, fees, charges or other assessments and HIKO's costs, expenses and margins." . . . Given the dramatic differences in pricing between defendant and PSE&G, it is plausible defendant's rates were not,

> in fact, reflective of the wholesale cost of electricity or gas, market-related factors, and defendant's "costs, expenses and margins."

*Chen*, 2014 WL 7389011, at *4.[16]  The same result should follow here.

*Claridge v. N. Am. Power & Gas* is also on point.  The customer contract in *Claridge*, which is also substantially the same as the Agreement here, stated that the ESCO would provide a "variable market based rate" reflecting "market prices for commodity, transportation, balancing fees, storage charges, NORTH AMERICAN POWER fees, profit, line losses plus applicable taxes, and any other charges or fees imposed by the utility or other entity having such authority to impose such charges."  2015 WL 5155934, at *4.  In denying the motion to dismiss the GBL § 349 and § 349-d claims, the court held that "[a] reasonable consumer acting reasonably could be deceived into believing that the [variable market] rates he or she would be charged under the Agreement would approximate the market price, *i.e.*, what other ESCOs charged their customers."  *Id.* at *5.

Similarly instructive is *Wise v. Energy Plus*, wherein nearly identical claims to those alleged here were sustained by the Honorable Judge William H. Pauley III.  *Wise*, No. 11-7345 (S.D.N.Y. March 23, 2012).  As with this case, the *Wise* plaintiff alleged that Energy Plus made material misstatements about its rates, including similar misstatements regarding variable market rates.  In his decision denying the motion to dismiss, the court held that the alleged material misrepresentations and omissions sufficiently stated a claim for violations GBL § 349:

> Viewed together the allegedly deceptive statements plausibly may be read by a reasonable consumer as a representation that Energy Plus' prices are at least

---

[16] Defendant contends that the *Chen* court's decision was premised on "that Defendant['s] fail[ure] to provide 'guaranteed savings for the first six months of service,' which would be '1% to 7% lower than the utility's price.'"  Def. Mem. 35 n.30.  However, as excerpted above, the essence of the *Chen* plaintiffs' claims, which covered more than the first six months of service, was that the defendant falsely represented the rates would reflect the market factors listed in the agreement.  *See* 2014 WL 7389011, at *4.

relatively comparable both to competitors' prices and to prevailing market rates. Given that the plaintiffs have alleged Energy Plus' rates in fact are two to three times greater and that Energy Plus' rates rise or remain steady during some periods when market prices decline, the plaintiffs have stated a plausible claim that the challenged statements are deceptive.  Further, Energy Plus' failure to disclose the alleged truth about its prices plausibly renders its other statements misleading. Accordingly, the plaintiffs have stated a claim based on Energy Plus' omissions.

*See Wise*, No. 11-7345, Tr. at 14-16.

That Defendant disclaimed guaranteed savings, Def. Mem. 13-14, 36, does not inoculate its price gouging practices.  Plaintiff is not claiming she was promised any guaranteed savings; rather, she is contending that Agway charged her a rate that was higher than it should have been under the terms of the Agreement, which promised a rate based on Agway's wholesale costs and specified market related factors.  Additionally, as the court held in response to the defendant's identical argument in *Claridge*, "New York courts have concluded that disclaimers alone are insufficient to dismiss a section 349 claim at the pleading stage."   2015 WL 5155934, at *5 (citing *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012); *Goshen v. Mutual Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 326-27 (2002) (disclaimers "do not establish a defense as a matter of law.")); *accord Mirkin*, 2016 WL 3661106, at *7 (holding that Viridian's "no guaranteed savings" disclosure does not "correct its alleged misstatement that the variable rate will be based on market conditions").

Defendant further argues that "[Ms. Gonzales] could not reasonably expect that [Agway's] prices would necessarily be equal to or lower than defendant's actual costs."  Def. Mem. 33-34 (citation and quotation marks omitted).  Again, Plaintiff makes no such contention. Plaintiff's claims are based on Agway's practice of setting its rates without considering whether its wholesale costs increase or decrease or whether it is in fact offering a competitive rate, despite its explicit promises to the contrary.  *See, e.g.*, Compl. ¶¶ 21-34, 38.

Defendant also contends that Plaintiff's interpretation of "market-related factors" as reflecting Agway's wholesale costs for electricity and competitors' rates is "confus[ed]," "fanciful," and unreasonable.  Def. Mem. 34-36.  While the term "market-related factors" is undefined in the Agreement, virtually every court that has opined on this issue in this precise context has held that reasonable consumers would understand that term to mean the basic components of the electricity market, namely the wholesale costs ESCOs incur and its competitors' rates.  *See, e.g.*, *Hamlen I*, 2017 WL 892399, at *5 (holding that, where Gateway represented that the variable rate would be based on "market conditions," "[t]hat defendant's rates varied from the competition [the local utility] so significantly and did not react to other indicators of market conditions [wholesale natural gas rates] suggests that defendant exercised its discretion in bad faith or with improper motive").[17]

Defendant also argues that it need not set its rates based on its wholesale costs because there are other factors identified in the Agreement.  But Plaintiff alleges that those other factors ("related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins.")

---

[17] *See also Melville*, 2016 WL 6775635, at *3 (holding that competitor's rates, such as PES&G's, are indicators of market conditions); *Claridge*, 2015 WL 5155934, at *4 ("This incomplete and confusing explanation for calculating variable market-based rates could lead a reasonable consumer to believe that he or she would receive a 'variable market rate,' *i.e.*, one that was competitive with those charged by other ESCOs."); *Oladapo*, 2016 WL 344976, at *4 ("[T]he fact that Smart One's rates consistently rose over time, while those set by Washington Gas fluctuated, indicates that Smart One was not setting its rates in response to 'changing gas market conditions.'"); *Sanborn*, No. 14-1731, ECF No. 26-1, at 37:16-23 ("'Your rate may fluctuate month to month based on wholesale market conditions,' . . . That I think gives rise to a reasonable understanding in the ordinary consumer that the price that the consumers [are] charged for electric supply will in fact be based upon the wholesale market price for electricity.").

are relatively insignificant compared to the cost Agway incurs for purchasing electricity for its customers and that they do not fluctuate significantly over time.  Compl. ¶¶ 35-36.

Defendant points out that, for Agway, "market-related factors" include "supply constraints; the number of competitors in a particular market; customer demographics; overhead costs; and desired profit margins."  Def. Mem. 35.  None of these variables justify Agway's excessive prices, and it is a question of fact whether a reasonable consumer would understand that these undisclosed factors are factors Agway considers.  *Cf. Claridge*, 2015 WL 5155934 at *4-6  (holding that where the agreement's language was plausibly ambiguous, the court could not resolve plaintiffs' claims as a matter of law) (citing *1000 N. of New York Co. v. Great Neck Med. Associates*, 775 N.Y.S.2d 884 (2d Dep't. 2004)).  If by "supply constraints" Defendant means the availability of wholesale electricity, then Plaintiff has plausibly alleged that such constraints would be reflected in Central Hudson's rates, as Agway can buy electricity from the same open market that Central Hudson and other ESCOs use.  As for Agway's competitors, Plaintiff agrees that a reasonable consumer would expect that the rates competitors charge should be considered under the terms of the Enrollment Letter and Agreement, and she plausibly alleges that Agway's rates are not competitive.  And "overhead costs" are relatively non-fluctuating costs also borne by Central Hudson and other ESCOs that do not justify the changes in Agway's rates that do not reflect changes in the market.  Compl. ¶¶ 35-36.

Agway apparently also considers "customer demographics."[18]  Demographics include "such information as income level, gender, educational level, location, ethnicity, race, and family

---

[18] In fact, in December 2016, NYPSC barred Agway from serving low-income customers in order to "protect low-income customers from unscrupulous business practices," and has since reaffirmed that holding.  Press Release, NYPSC, ESCOs Banned From Selling to Low-Income Customers in New York (Dec. 15, 2016), *available at* http://on.ny.gov/2HL3jFE (last visited

size."[19]  Plaintiff reserves the right to amend her complaint if Agway in fact discriminates in providing services on the basis of any of these factors.

Nor does "margin" justify Agway's outrageously high rates or the fact that they increase when market costs and rates decline.  *Id.* at ¶ 37.  A reasonable consumer would expect that profits would be consistent with profit margins obtained by other suppliers of electricity in the market, and also that Agway's profiteering at the expense of its customers would not be so extreme that its rate bears no relation to market prices but is instead exorbitantly higher.  *Id.*  Other courts have rejected the notion that ESCOs who otherwise promise to charge market rates can nonetheless gouge their customers in order to reap profits.  *See, e.g.*, *Hamlen v. Gateway Energy Servs. Corp.*, No. 16-3526, 2017 WL 6398729, at *8 (S.D.N.Y. Dec. 8, 2017) (*Hamlen II*) ("Here, Hamlen sufficiently alleges that Gateway acted in bad faith by exercising its discretion to charge unreasonable rates to profiteer off its customers, who reasonably expected to pay Gateway competitive prices for natural gas."); *Chen*, 2014 WL 7389011, at *4 (holding that the plaintiffs plausibly alleged GBL § 349 and § 349-d violations despite margin considerations).

At best for Defendant, determining whether an objective reasonable consumer would find Agway's representations material and misleading is a question of fact and thus not a basis to dismiss the complaint.  *See Goldemberg*, 8 F. Supp. 3d at 478; *Quinn*, 958 F. Supp. 2d at 543.

---

Mar. 19, 2018); NYPSC Case No. 12-M-0476 (Order Denying Agway Energy Services, LLC's Petition for Waiver of the Prohibition on Service to Low-Income Customers by Energy Service Companies) (Oct. 20, 2017) (Blankinship Dec. Ex. 12).

[19] *Demographic Variables*, BUSINESSDICTIONARY.COM, http://bit.ly/2IAxQan (last visited Mar. 19, 2018).

### 2.     Agway's Gratuitous EnergyGuard Offering Does Not Affect The Fact That Agway's Rates Are Not Based On The Factors It Represents.

Defendant contends that Ms. Gonzales cannot expect that Agway's rates would be the same as its wholesale costs because "the prices reflected the value-added EnergyGuard service." Def. Mem. at 25.  However, the value of EnergyGuard to a consumer remains the same from month to month, and Plaintiff pleads that Agway's costs (other than the wholesale cost of electricity) do not change significantly over time.  Compl. ¶ 36.  Plaintiff also pleads that there are substantial periods of time when Agway's rates rise when wholesale rates decline, *id.* at ¶¶ 29-33; any value-added from EnergyGuard cannot explain these fluctuations.

Moreover, pursuant to GBL § 349-d(7)), Agway (and other ESCOs) must "clearly and conspicuously" identity all of its variable rate pricing components.  The NYPSC's UBP, Case 98-M-1343, § 5(B)(4)(b),[20] which Defendant relies on, Def. Mem. 13 n.6, likewise requires that Agway's Customer Disclosure Statement set forth the price term of the agreement "in plain language."  Moreover, the UBP specifies that to the extent that "the text in the [Customer Disclosure] Statement differs from or is in conflict with a term stated elsewhere in the agreement, the term described by the text in the Statement shall constitute the agreement with the customer notwithstanding a conflicting term expressed elsewhere in the agreement."  *Id.*

The Agreement, which specifies how Agway's variable rate is determined, itself makes *no mention* of EnergyGuard.  Not in the pricing components section of the Customer Disclosure Statement, nor in the extended pricing description.  *Not once*.  Defendant should not be heard to argue that EnergyGuard is "clearly and conspicuously" disclosed "in plain language" in the Customer Disclosure Statement.

---

[20] (Feb. 2016), *available at* http://on.ny.gov/2HAfncO.

To the extent that Defendant believes that mentioning EnergyGuard in the Enrollment Letter is sufficient to satisfy its disclosure obligations under GBL § 349-d(7) and UBP § 5(B)(4)(b), Defendant is mistaken.  A reasonable consumer would not read the mention of EnergyGuard as anything more than a bonus or incentive -- and rightfully so, in light of statutory and regulatory customer disclosure requirements.  Moreover, as explained above, UBP § 5(B)(4)(b) explicitly states that the "plain language" price terms disclosed in the Customer Disclosure Statement trump different or conflicting pricing components expressed elsewhere.  Accordingly, Defendant's failure to "clearly and conspicuously" disclose its consideration of EnergyGuard "in plain language" in its Customer Disclosure Statement forecloses Defendant from suggesting that its variable rate is untethered from market-related factors because it also includes the value of EnergyGuard.

Thus, Defendant's reliance on EnergyGuard as a defense for its failure to abide by the terms of the Agreement and instead reap outrageous profits at the expense of unwitting consumers is nothing more than a red herring.

**3.      The Cases Upon Which Defendant Relies Are Inapposite.**

The cases upon which Defendant relies do not support dismissal.  In *Urbino v. Ambit Energy Holdings, LLC*, for instance, the court held that Ambit's external representations did not constitute "substantial aggravating factors" (a heightened pleading standard imposed by the New Jersey statute not applicable to a GBL § 349 claim) because the advertisements that the plaintiffs relied on concerning savings and competitive rates were explicitly undercut by the contract's integration clause.  2015 WL 4510201, at *4.  Plaintiff, on the other hand, does not rely on external guarantees other than the Letter and the Agreement.  Moreover, unlike the Agreement here, the contract in *Urbino* did not list any determinative factors and thus gave Ambit unfettered

discretion to set the variable rate. *Id.* *Urbino* is also distinguishable because the plaintiffs'

complaint was based on *one month* wherein the defendant's rate was higher than the utility's

rate, not consistent price gouging. *Urbino*, ECF No. 29, ¶ 49 (D.N.J. Dec. 1, 2014).[21]

    *Richards v. Direct Energy Services, LLC*, 246 F. Supp. 3d 538 (D. Conn. 2017) (*Richards*

*II*) is a decision rendered on summary judgment that is currently on appeal. In fact, Judge

Bolden previously denied the motion to dismiss in that case.[22] Moreover, the issue on summary

judgment was whether Direct Energy's fixed rate was impermissibly higher than its variable rate,

*Richards II*, 246 F. Supp. 3d at 549, which is not Plaintiff's theory here. To the extent *Richards*

*II* stands for the proposition that an ESCO that promises to base its rate on wholesale costs and

market conditions can in fact charge whatever rate it wants irrespective of wholesale costs or

market conditions, it is, respectfully, wrongly decided.[23]

**C.**    <u>**Plaintiff Plausibly Alleges a Claim for Breach Of Contract.**</u>

    A plaintiff bringing a claim for breach of contract under New York law need allege only:

---

[21] *Windley v. Starion Energy*, 2016 WL 197503, is similarly inapposite. There, the court dismissed the plaintiff's New Jersey consumer fraud claims because the claims were grounded in marketing materials that guaranteed savings, and reliance on those guarantees was foreclosed by the contract's integration clause. *Id.* at *2. Unlike here, the plaintiff did not dispute whether Starion Energy set its variable rates based on market conditions.

[22] *See Richards v. Direct Energy Servs., LLC*, 120 F. Supp. 3d 148, 159 (D. Conn. 2015) (*Richards I*) ("Mr. Richards has claimed that one possible and reasonable understanding of DES's contract, and in particular the term 'business and market conditions,' was that DES's energy prices would reflect the wholesale market rates to some unknown extent . . .These allegations are sufficient at the motion to dismiss stage . . .").

[23] In *Slack v. Suburban Propane Partners, L.P.*, No. 10-2548, 2010 WL 3810870 (D.N.J. Sept. 21, 2010), notably not an ESCO case, the defendant notified customers that its propane rates were "subject to future change based upon market fluctuations and other factors." *Id.* at *2. The court noted that the expansive language allowing for consideration of "other factors" granted the defendant unfettered discretion in setting its rates, and, unlike here, did not limit those considerations to market factors. *Id.* at *7.

"(1) the existence of a valid agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (reversing dismissal of contract claim; citation omitted).  Plaintiff's breach of contract claim readily meets these requirements.

### 1.  <u>Plaintiff Plausibly Alleges That Agway Breached its Contractual Obligations.</u>

Plaintiff alleges the existence of a valid contract, Compl. ¶ 67; that Plaintiff performed her obligations, *id*. at ¶ 69; that Agway breached the agreement by failing to charge rates for electricity based on its cost for purchasing electricity at wholesale, "market-related factors," and the other stated pricing components, *id.* at ¶¶ 68, 70; and that Plaintiff was damaged as a result of Agway's breach because the rates charged were higher than they should have been under the contract.  *Id*. at ¶ 72.  Nothing more is required.

Indeed, Plaintiff's breach of contract claim is as straightforward as it is compelling. Agway's contract with Plaintiff states that Agway's variable rate "shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins."  Compl. ¶ 21.  The Enrollment Letter, which also promises that Agway would charge completive rates, is incorporated into the Agreement.  *See* Agreement § 1.  Agway failed to perform its contractual obligation to provide a competitive variable rate based on factors set by the contract, and instead exercised its discretion to consistently and improperly charge extraordinarily high rates that did not reflect the pricing components set forth in the parties' contract.  *Id*. at ¶ 70-72; *see also id.* at ¶¶ 29-33 (demonstrating that Agway's prices increase when market prices decline).  As discussed above, Plaintiff plausibly alleges that Agway's rates

are not completive or based on the specified factors, the first of which is its wholesale costs. Plaintiff also pleads that other ESCO's rates are plausibly lower than Agway's because other ESCOs can buy electricity at the same price and manner as Central Hudson and other local utilities, *id.* at ¶ 27, and so they can offer rates commensurate to the local utilities, which are always substantially lower than Agway's variable rate. As Plaintiff also plausibly alleges, the wholesale cost of electricity is the primary cost Agway incurs to provide electricity service to its customers, and the other costs do not fluctuate appreciably. *Id.* at ¶¶ 35-36.

*Chen v. Hiko Energy* is particularly instructive. As here, the *Chen* plaintiffs claimed that the defendant "breached their contracts [under New York law] by charging them a rate that was not based on the factors upon which the parties agreed the rate would be based." The contract in *Hiko* was almost identical to the Agreement here. The *Hiko* contract provided that "rates reflecting wholesale electricity and gas costs and other market-related factors, plus all sales and other applicable taxes, fees, charges or other assessments and HIKO's costs, expenses and margins." 2014 WL 7389011, at *6 (quotation marks and citations omitted). The New York district court denied the motion to dismiss the breach of contract claim, noting the precise disconnect alleged here: that the defendant's rates were much higher and increased faster than those of the utility.

> [T]he [complaint] contains plausible factual allegations that defendant did *not* charge plaintiffs rates reflecting wholesale electricity and gas costs and "other market-related factors, plus all sales and other applicable taxes, fees, charges or other assessments and HIKO's costs, expenses and margins." Indeed, the SAC alleges (i) Chen's electricity rate in February 2014 was nearly triple PSE&G's rate; (ii) Sasso's January 2014 gas bill was more than double the amount he would have paid under PSE&G, and his February 2014 bills for electricity and gas were more than three times greater than they would have been under PSE&G; and (iii) Sasso's electric and gas bills increased significantly more between January and February 2014 under defendant than they would have under PSE&G.

*Id.* at *6.[24]  *Oladapo* is likewise instructive.  There, Smart One represented that it would set prices "in response to changing gas market conditions."  2016 WL 344976, at *3-4.  The court held that "Plaintiff's allegations that Smart One's prices bore an inverse relationship to [the local utility's] supply pricing are sufficient, at the pleading stage, to support an inference of breach of Smart One's contractual undertakings."  *Id.*[25]

Defendant makes two arguments in support of its contention that the contract claim should be dismissed.  First, Defendant argues that "Plaintiff bases her claim that Agway breached the Agreement on the fatally flawed premise that Agway charged her higher rates than she would have paid to the incumbent utility, Central Hudson."  Def. Mem. 31.  Defendant misapprehends Plaintiff's pleading.  In New York, utilities buy electricity on the wholesale market on a daily basis, and they do so using the same wholesale market available to any ESCO.  Compl. ¶ 27.  Therefore, the rate that a New York utility charges is a perfect barometer of the wholesale market because its rates rise and fall with changes in wholesale market rates.  Thus, if Agway actually based his variable rates on its actual wholesale costs, then at least over time,

---

[24] Similarly, in *Mirkin*, the plaintiffs alleged a breach of contract where the contract's terms similarly stated that the variable rate would be "based on wholesale market conditions."  2016 WL 3661106, at *3.  The plaintiffs supported their contention that Viridian did not actually base its rates on the agreed-upon conditions by demonstrating that its rates failed to track wholesale market rates.  *Id.* at *8-9.  The court found that contemporaneous wholesale prices were an appropriate indicator of market conditions and plausibly allege breach of contract.  *Id.*

[25] *Accord Melville*, 2016 WL 6775635, at *5 (sustaining contract claim where Spark's contract stated its rate was based on market conditions, Spark set rates higher than those of other energy suppliers, and the plaintiffs thus paid more for energy as a result); *Claridge*, 2015 WL 5155934, at *6 (holding that, because "variable market based rates" may be interpreted as referring to prevailing market rates charged by competing ESCOs, the fact that the defendant charged more than its competitors was sufficient to allege that  defendant "breached its promise to set its monthly variable rates according to market rates"); *Steketee*, No. 15-585, ECF No. 46, at 24-29 (holding that the plaintiff's allegation that Viridian agreed to a rate based on wholesale market conditions and then charged a rate wholly unrelated to those conditions was sufficient to survive a motion to dismiss); *Komoda,* No. 3263-14, Tr. at 1-3 (same).

those rates should actually vary with changes in the market.  Instead, Agway's rates in fact often increase when wholesale rates (as reflected by utility rates) fall.  *Id.* at ¶¶ 29-33.

Second, Defendant contends that it did not breach its promise to charge a rate based on wholesale and other market-related costs because it also provides EnergyGuard service.  Def. Mem. 32.  However, as discussed above, the Agreement provides that pricing will be based on wholesale and other market-related costs, not any value related to EnergyGuard.

Even if Defendant's interpretation of the Agreement were also plausible (it is not), this Court should nonetheless deny Defendant's motion.  *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (reversing dismissal and holding that "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion.  '[F]act-specific question[s] cannot be resolved on the pleadings.'  A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible.") (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir. 2001)).

At best, the contract is ambiguous regarding the factors that would predominate or the extent to which Agway's variable rate should be based on wholesale and competitor prices.  If so, the contract's meaning and parties' expectations cannot be determined at the pleading stage.  For example, in *Claridge*, the court found ambiguity as to how the defendant's "variable market based rates" were determined, and, as such, concluded whether the defendant breached the contract could not be resolved at the pleading stage.  2015 WL 5155934 at *4-6 (citing *1000 N. of New York Co.*, 775 N.Y.S.2d 884); *accord Silvis v. Ambit Energy L.P.*, 674 F. App'x 164 (3d Cir. 2017) (reversing summary judgment, holding pricing clause in parties' ESCO contract was ambiguous as to the discretion afforded the energy provider in setting rates); *Fritz*, No. 14-634,

ECF No. 42, at 7 (denying motion to dismiss upon finding contractual terms "ambiguous," leaving plaintiff to his proof); *Tully*, No. 14-634, ECF No. 68, at 6 (same).

        **2.**       **Plaintiff Plausibly Alleges Cognizable Damages.**

       Defendant also asserts that Plaintiff did not suffer cognizable damages and that "[h]er Complaint amounts to nothing more than her disappointment that she did not realize savings over what she would have paid the incumbent utility (or some other ESCO) . . ." Def. Mem. 42-43. To the contrary, Plausibly alleges that she was injured because Agway charged her a rate that was higher than a rate that was actually based on the factors specified in the Agreement. *See, e.g.*, *Mirkin*, 2016 WL 3661106, at *9 ("But the difference between the utility and Viridian's rate is not at issue in the breach of contract claim. Instead, the damages here would be the difference between what Viridian charged the plaintiffs and what it would have charged if its rates were actually based on "wholesale market conditions.""); *Chen*, 2014 WL 7389011, at *5 (same). Plaintiff does not allege that the contract required Agway to charges rates lower than or equal to Central Hudson's rates. Rather, Plaintiff's contract damages are the difference between Agway's actual rates and the rate Plaintiff would have been charged had Agway based its rate on the agreed upon pricing components. Compl. ¶ 72.

**D.**     **Plaintiff Plausibly Alleges A Claim For
        Breach Of The Covenant Of Good Faith And Fair Dealing.**

       In New York, "all contracts contain an implied covenant of good faith and fair dealing, under which neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Claridge*, 2015 WL 5155934, at *6. "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995). "Even when a contract confers decision-making power . . .

the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith."
*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994).[26]

Notably, Defendant does not dispute that Plaintiff plausibly alleges a claim under the implied covenant of good faith and fair dealing.  Rather, Defendant simply challenges Plaintiff's claim on technical grounds (as duplicative of her breach of contract claim).  *See* Def. Mem. 43. However, the claims are not duplicative and courts operating under New York law routinely permit both causes of action to proceed.  *See, e.g.*, *Claridge*, 2015 WL 5155934, at *6 (holding that "the Complaint plausibly alleges claims for breach of contract and breach of the implied covenant of good faith and fair dealing").

As in *Claridge*, Plaintiff plausibly alleges a breach of the implied covenant on separate facts than those underpinning her breach of contract claim.  Plaintiff and Agway entered into a valid agreement.  Plaintiff's expectations under the Agreement was that her electricity rates would vary based on the wholesale costs of electricity and competitors' rates.  Defendant has attempted to justify its price-gouging scheme and avoid its promise to provide competitive, market-based energy rates by claiming other factors affect pricing, including profits and customer demographics.  In other words, Defendant argues that it can ignore its offer of market pricing because it can factor in whatever profits it wants at its discretion.  But New York law forbids Defendant from using its discretion to frustrate the expectations of the parties, which here required Agway to charge a competitive rate commensurate with market prices and costs rather

---

[26] Moreover, whether a defendant exercised bad faith is an issue of fact for a jury to decide. *See First Niagara Bank N.A. v. Mortg. Builder Software, Inc.*, No. 13-592, 2016 WL 2962817, at *7 (W.D.N.Y. May 23, 2016) ("Thus, whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact.") (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007)).

than gouging consumers so that it could reap profits.  These allegations of price-gouging are related yet separate from allegations that Defendant failed to provide market-reflective energy rates, and it is these allegations that underpin Plaintiff's good faith and fair dealing claim.

Defendant cannot use the right to account for costs or make a profit as an excuse to gouge consumers by charging exorbitant prices, particularly when the reasonable expectations of customers was that Agway will charge a rate reflecting wholesale costs and market conditions.  If Defendant's argument is credited, it would have *carte blanche* to charge any price it so desires and the Court should reject it.[27]

## E.    Plaintiff Plausibly Alleges A Claim For Unjust Enrichment.

Defendant argues that a claim for unjust enrichment may not lie where there is a valid contract between the parties.  Def. Mem. 43-44.  However, the Federal Rules expressly permit alternative pleading at this stage.  Rule 8 states: "A party may set out 2 or more statements of a claim or defense *alternatively* or hypothetically, either in a single count or defense *or in separate ones*."  Fed. R. Civ. P. 8(d)(2) (emphasis added).  Rule 8 reflects that the Federal Rules were designed to provide Plaintiff with "wide latitude" to frame her right to recover.  *Bridgeway Corp. v. Citibank, N.A.*, 132 F. Supp. 2d 297, 305 (S.D.N.Y. 2001).

## CONCLUSION

Utility payments are one of the largest expenses that many families confront.  To prey on these consumers is unconscionable, and this Court should not accept Defendant's attempts to evade liability for its bad acts.  For all the foregoing reasons, Plaintiff respectfully requests that Defendant's Motion to Dismiss be denied.

---

[27] Notwithstanding, to the extent that the Court agrees that the breach of the implied covenant of good faith and fair dealing claim is duplicative of the breach of contract claim, Plaintiff can amend the Complaint to combine the claims into one cause of action.

Dated: March 19, 2018

Respectfully Submitted,


*D. Greg Blankinship*
D. Greg Blankinship
Todd S. Garber
Chantal Khalil
**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
445 Hamilton Avenue, Suite 605
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
gblankinship@fbfglaw.com
tgarber@fbfglaw.com
ckhalil@fbfglaw.com

*Attorneys for Plaintiff*
*and the Putative Class*