# Exhibit 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

LORI SANBORN                    :  No. 3:14CV-1731 (SRU)
                                :  915 Lafayette Boulevard
          vs.                   :  Bridgeport, Connecticut
                                :
                                :  April 1, 2015
VIRIDIAN ENERGY, INC.           :

- - - - - - - - - - - - - - - x

MOTION HEARING


B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

     FOR THE PLAINTIFF:

          IZARD NOBEL, LLP
               29 South Main Street, Suit 215
               West Hartford, Connecticut  06107
          BY:  ROBERT A. IZARD, ESQ.
               SETH KLEIN, ESQ.

     FOR THE DEFENDANT:

          VENABLE LLP
               575 7TH Street, NW
               Washington, D. C.  20004
          BY:  DANIEL S. BLYNN, ESQ.
               SHAHIN ROTHERMEL, ESQ.



               Susan E. Catucci, RMR
               Official Court Reporter
               915 Lafayette Boulevard
          Bridgeport, Connecticut  06604
               Tel: (917)703-0761

Case 3:14-cv-01714-VAB   Document 26-7   Filed 04/13/18   Page 3 of 45

```
 1                    (2:15 O'CLOCK, P. M.)

 2              THE COURT:  Good afternoon.  We're here in the

 3      matter of Sanborn v. Viridian Energy, Inc.  Could I have

 4      appearances, please?

 5              MR. IZARD:  Good afternoon, Your Honor.  Robert

 6      Izard and Seth Klein for the plaintiffs.

 7              THE COURT:  Thank you.

 8              MR. BLYNN:  Dan Blynn and Shahin Rothermel from

 9      Venable on behalf of Viridian Energy.  And with us is Adam

10      Burns, In-house Counsel for Viridian.

11              THE COURT:  Very good.  Okay.  We're here on the

12      motion to dismiss, which I've reviewed, and perhaps I'll

13      just let you do a traditional argument.  Sometimes I start

14      with questions but feel free to get started, if you like.

15      Mr. Blynn.

16              MR. BLYNN:  Thank you, Your Honor.

17              May it please the Court, Your Honor, this case

18      is the quintessential square peg, round hole.  Plaintiff

19      tries to jam Viridian's express claims about its variable

20      rate into a fourth complaint that's been filed in three

21      other cases pending before this Court, which alleges that

22      Viridian represents that its rate is exclusively and

23      rigidly tied to the wholesale market rate for electricity.

24              Plaintiff plays fast and loose with Viridian's

25      actual statements.  None of the documents that form the
```

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 4 of 45
Case 3:14-cv-01374-VAB   Document 26-7   Filed 04/23/18   Page 4 of 45

3

```
1    basis for this case even reference a wholesale market

2    rate; rather, they clearly explain that Viridian's rate

3    can change from month month for any number of reasons,

4    including market conditions, Viridian's operating costs

5    and there is a catch-all of other factors, and that that

6    rate can be higher or lower than the utilities in any

7    given month.  Just --

8              THE COURT:  Let me press you a little bit on

9    that.

10             MR. BLYNN:  Sure.

11             THE COURT:  It seems to me there are two

12   statements that you're referring to now.  One is found in

13   the terms and conditions sheet, which says, quote, "Your

14   price may fluctuate from month to month based on wholesale

15   market conditions applicable to the DC's service

16   territory."  So, based on wholesale market conditions.

17             The other statement is a little more broad and

18   it basically says a variety of factors, including the

19   wholesale market.

20             So, you're not suggesting that the second

21   statement somehow cures the first?

22             MR. BLYNN:  I think it elaborates the first,

23   Your Honor.  Both documents, the first statement comes

24   from a contract -- well, what's called, what's referred to

25   by the parties as a contract.  The second comes from the
```

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 5 of 45
Case 3:14-cv-03414-AET   Document 26-3   Filed 04/13/18   Page 5 of 45

4

1      Massachusetts terms and conditions of service, which is
2      really a disclosure statement.  Both documents are
3      provided to you -- to the plaintiff and every other
4      Viridian customer.
5              THE COURT:  Right.  So I'm looking at the terms
6      and conditions sheet.  What I've got is a statement that
7      says, that says the product is going to be based on
8      wholesale market conditions, so I have an allegation that
9      that's not in fact what happened and it was known that
10     that wasn't going to happen.  Why isn't that unfair?
11             MR. BLYNN:  That allegation, Your Honor, to be
12     very clear, is the wholesale market rate, and it's an
13     important distinction because that is why this case is
14     different than Chen, and similar to the Slack case, which
15     has been briefed extensively in the papers.
16             In Chen, Your Honor, the contractual term, the
17     representation at issue was that the variable rate would
18     reflect the wholesale cost of electricity.  And in that
19     complaint, the plaintiff said, in fact, the defendant is
20     not -- its variable rate is not based on the wholesale
21     cost of electricity.
22             Here, Viridian says our rate is based on
23     wholesale market conditions, a very broad topic that
24     includes, possibly includes market rates, prices in the
25     wholesale market and any number of other, other items.

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 6 of 45
Case 3:14-cv-01714-VAB   Document 26-3   Filed 04/23/18   Page 6 of 45

5

1              THE COURT:  What else could it -- I mean what

2    else would a reasonable consumer understand the term

3    "wholesale market conditions" means other than the

4    wholesale market rate?

5              MR. BLYNN:  Well, I think it means, you know,

6    any number of conditions in the marketplace.  It means

7    what's going on with the extreme weather, what's going on

8    --

9              THE COURT:  But how would that affect -- you

10   mention that a couple times in your brief.  I didn't

11   understand how extreme weather has any bearing on

12   wholesale market conditions or rate.

13             MR. BLYNN:  Well, Your Honor, the reason it has

14   a bearing is because when, during the -- let's take the

15   polar vortex back in the beginning of 2014 -- that forced

16   a number of generators offline, generators shut down,

17   there was a constraint on the ability to get electricity.

18             THE COURT:  And so the price goes up.

19             MR. BLYNN:  The price goes up and there's a host

20   of other costs that go into Viridian's rate.  This isn't

21   simply a pass-through.  There are renewable energy

22   credits, there are ancillary costs, operating costs,

23   capacity costs and so on and so forth.

24             THE COURT:  But your typical residential

25   electric consumer reads this -- it's plausible, isn't it,

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 7 of 45
Case 3:14-cv-01314-VAB   Document 26-3   Filed 04/23/18   Page 7 of 45

6

1    that they read "based on wholesale market conditions" to

2    mean based upon wholesale market price, that is, the price

3    that Viridian's having to pay to get the energy that it's

4    been supplying?

5              MR. BLYNN:  But, respectfully, Your Honor, I

6    don't think it is plausible.  I think that that is a

7    somewhat -- it's not a tortured reading but it's not a

8    straight understanding of what the market condition is.

9    "Condition" is a very broad idea.  A market rate is a very

10   specific component of an overall price.

11             THE COURT:  Well, I have to look at it in a

12   light most favorable to the plaintiff and draw all

13   reasonable inferences.  Isn't it -- you're saying it's an

14   unreasonable inference to say that wholesale market

15   conditions means principally wholesale market rate.

16             MR. BLYNN:  I think it's unreasonable and I

17   think that the Court in Clouston found it unreasonable.

18   When you have a written document --

19             THE COURT:  Right.

20             MR. BLYNN:  Plaintiff can't take that document

21   and claim that it says something other than what it says.

22   In that case, that would be an unreasonable

23   interpretation.

24             THE COURT:  So, in your reading it's impossible

25   for Viridian to violate this contract, regardless of what

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 8 of 45
Case 3:14-cv-03714-PAC   Document 26-3   Filed 04/23/18   Page 9 of 45

7

1    its price is, because no one can figure out what is meant

2    by "wholesale market conditions."  That could include

3    anything they decide it means.

4         MR. BLYNN:  Your Honor, the District of New

5    Jersey in a strikingly similar case involving very similar

6    language, has said yes, it is unreasonable.  There's no

7    unfairness claim when you say based upon market

8    fluctuations and other factors.  That gives discretion to

9    a propane supplier to set the price as it pleases.

10        And the facts in that case, this is the Slack

11   case, were very egregious, Your Honor.  There, the

12   contract did not explain how a price was set, the

13   methodology, and in fact, the defendant wouldn't even

14   provide that price to consumers until after they already

15   received their propane supply.

16        So, in both Slack and Faistl, the Court, the

17   Court in the District of New Jersey, found no unfairness

18   claim and no deception claim; indeed, no claim under the

19   consumer protection statute of that state, which was New

20   Jersey, could lie.  This case squares with both of those

21   cases.  Where it doesn't -- go.

22        THE COURT:  Well, the question is whether those

23   cases are persuasive; they are not controlling.

24        MR. BLYNN:  They are not controlling, Your

25   Honor, but the reasoning is very detailed and in my

Case 5:18-cv-00235-MAD-ATB  Document 33-7  Filed 03/19/18  Page 9 of 45
Case 3:14-cv-01714-FAB  Document 26-3  Filed 04/18/18  Page 9 of 45

8

1   opinion, very persuasive.  And especially when you look at

2   the contractual language involved in those cases, this is

3   why this case is incredibly different from <u>Chen</u>.

4          In <u>Chen</u>, it really tied the allegations in the

5   complaint, matched the contractual language.  There's no

6   implied claim here, Your Honor.  They haven't alleged that

7   Viridian implied by saying wholesale market conditions,

8   there's a replied representation of wholesale market

9   rates.  In fact, "implied" only comes up twice in the

10  complaint and that's in the breach of the implied covenant

11  claim.

12         THE COURT:  Well, they don't have to come out

13  and say it's alleged.  They can make an allegation about

14  what the representation was and say that it was false.  In

15  other words, it all comes down to whether, based on

16  wholesale market conditions, there's a reasonable

17  inference that that means based on wholesale market rate

18  or price, and I guess, you know, we disagree about that

19  one.

20         MR. BLYNN:  I suppose, Your Honor, and

21  unfortunately I think I'm going to be on the losing side

22  of that disagreement -- but, Your Honor, I will say that

23  these very similar facts have been evaluated in very

24  detailed decisions by the District of New Jersey, not

25  binding but very persuasive in my opinion.

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 10 of 45
Case 3:14-cv-00035-MPS-ATB   Document 26-3   Filed 04/23/15   Page 10 of 45

9

1          But, regardless, there are other problems with

2     their CUTPA and MCPA claims.  Let's deal with some of the

3     low hanging fruit, I guess, immediately and hopefully this

4     can help explain why neither claim should survive

5     dismissal.

6          The CUTPA claim, one of the essential elements

7     that the deceptive or unfair conduct had occurred in this

8     case, within Connecticut.

9          THE COURT:  That is alleged.

10          MR. BLYNN:  I'm sorry?

11          THE COURT:  That's been alleged.

12          MR. BLYNN:  I haven't seen it, Your Honor.  We

13     have a Massachusetts plaintiff.

14          THE COURT:  Right.

15          MR. BLYNN:  And she brings a CUTPA claim on her

16     own behalf and on behalf of a class.

17          THE COURT:  Well, she's bringing it on behalf of

18     the class of folks who have Connecticut residence, who are

19     serviced by Viridian in Connecticut.

20          MR. BLYNN:  I think it would be a different

21     story if there was a plaintiff from Connecticut who

22     receive service here.

23          THE COURT:  Well, it would be a different story,

24     we wouldn't have this argument, but the question is

25     whether the case gets dismissed because of that, and it

1    seems to me there's a couple of approaches.

2           One is she's making, she's making a claim as a

3    class representative to represent those people who are

4    Viridian customers who are subject to this in both

5    Massachusetts and in Connecticut.  And the law that would

6    apply to the folks in Massachusetts and the law that would

7    apply to the folks in Connecticut may well be different.

8    And so you'd have two subclasses, a Connecticut subclass

9    and a Massachusetts subclass.

10          But why would I dismiss this claim?  I mean,

11   worst case scenario would be tell the plaintiff, maybe you

12   should come up with a Connecticut named plaintiff, but in

13   the meantime, it doesn't seem appropriate to dismiss just

14   because she individually can't bring a CUTPA claim.

15          MR. BLYNN:  Well, actually this issue has

16   squarely been addressed by the Connecticut Court of

17   Appeals in Western Dermatology.  In that case -- which was

18   cited in both our moving brief and ur reply brief but not

19   addressed in the opposition brief -- in that case you had

20   a New Mexico plaintiff who alleged that a Delaware

21   corporation with its principal place of business in

22   Connecticut, misrepresented certain attributes of its

23   software product, and the Connecticut Court of Appeals

24   said, no, you can't have a CUTPA claim in that situation.

25   It just doesn't lie.

 1              And the <u>Country Club v. Shaw's Supermarket</u> case

 2     is similar.

 3              THE COURT:  Class actions.

 4              MR. BLYNN:  I can't recall, Your Honor.

 5              THE COURT:  I can't recall either but I doubt

 6     it.  In other words, sure, somebody from New Mexico sues

 7     under CUTPA, I get that, but here we have a suit brought

 8     on behalf of thousands of people.

 9              MR. BLYNN:  The <u>Hydroxycut litigation</u>, the MDL

10     that I handled at my former firm, in that case, Your

11     Honor, it was cited, it was cited by the plaintiffs in

12     their opposition brief and addressed an earl decision from

13     that same MDL was addressed in our reply brief.

14              In the decision we cite, Judge Moskowitz said

15     you can't state a claim -- in that case, the New York

16     general business law -- you can't state, a plaintiff can't

17     state a claim under the New York general business law on

18     behalf of, on the behalf of a theoretical class of New

19     York consumers without there being a named plaintiff in

20     that case.

21              Now, in the <u>Hydroxycut</u> decision the next year,

22     that's cited by the plaintiff, Judge Moskowitz didn't --

23     simply noted that there is a disagreement among the courts

24     whether or not you can in fact do that.  In case the judge

25     said, yeah, I'm going to let this get through a motion to

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 13 of 45
Case 3:14-cv-035-MAD-ATB   Document 26-3   Filed 04/23/15   Page 13 of 45

12

1    dismiss, but that was in 2011, I believe.

2         Since then the Western Dermatology case came

3    out, 2013, where the Connecticut Court of Appeals squarely

4    addressed this issue.

5         THE COURT:  Right, but why is the remedy for any

6    problem here not a direction to the plaintiff, you have 45

7    days within which to move to amend to add a Connecticut

8    plaintiff?

9         MR. BLYNN:  And maybe that is the remedy, Your

10   Honor, but that, that deals with a, with a theoretical

11   complaint that could be alleged later.  It's not the

12   complaint that we're dealing with now.

13        THE COURT:  Well, it is the complaint, it's not

14   the same plaintiff.

15        MR. BLYNN:  Okay.

16        THE COURT:  In other words, if another plaintiff

17   gets added, it's exactly the same operative document and

18   that would cure the problem, right?

19        MR. BLYNN:  It might, Your Honor.

20        THE COURT:  All right.  I'll ask Mr. Izard about

21   that.

22        MR. BLYNN:  And I suspect they have a

23   Connecticut plaintiff or two already lined up.

24        THE COURT:  I wouldn't be surprised.

25        MR. BLYNN:  The MCPA claim also is easily

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 14 of 45
Case 3:17-cv-00235-MAD-ATB   Document 26-3   Filed 04/23/18   Page 14 of 45

13

1    dismissible because the pre-suit notification that is a

2    required element to state an MCPA claim wasn't made.

3              THE COURT:  Now, the opposition to that says the

4    statute only requires it when there's no -- when there's a

5    Massachusetts corporation or there's assets in

6    Massachusetts.

7              MR. BLYNN:  That's right.

8              THE COURT:  Okay.

9              MR. BLYNN:  And they haven't alleged that, they

10   aren't alleged that there's -- what they try and do is

11   they try to shift the burden to Viridian to say that, to

12   prove that they are not, that, that the plaintiff is not

13   exempt from this notice requirement.  They could have

14   alleged upon information and belief.

15             And, in fact, Your Honor, having a governmental

16   license is an asset within the state.  Viridian operates

17   within Connecticut.  It has a license to operate so it

18   clearly has some asset.  Doesn't excuse the failure to

19   provide a pre-suit notice.  And the pre-suit notice is --

20             THE COURT:  So, your argument is any corporation

21   that is authorized to do business in Massachusetts has an

22   asset in the state?  I don't think that's the plain

23   reading of the statute.

24             MR. BLYNN:  Your Honor, I think --

25             THE COURT:  Otherwise, they would just say that

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 15 of 45
Case 3:14-cv-0635-MAD-ATB   Document 26-3   Filed 04/23/15   Page 15 of 45

14

1    requirement applies to any corporation authorized to do

2    business in the state.

3            MR. BLYNN:  Your Honor, I think the -- first of

4    all, I think the Supreme Court in Lambert Timber v.

5    Lambert (ph), a 1985 case, did find that a license is an

6    asset.

7            But, regardless, you know, the pre-suit notice,

8    even if they were confused or questioned whether it was

9    even required, it's easy to send and it's an important,

10   it's an important step in an MCPA litigation.  It allows

11   the defendant to investigate that individual plaintiff's

12   claim and settle without being forced into a class action.

13           It's an important step that wasn't followed

14   here, Your Honor, and it's an essential element that must

15   be pled and proved.  They haven't pled it and they haven't

16   pled that they are exempt.  It was raised in an opposition

17   brief which isn't in the complaint.

18           THE COURT:  So you want the complaint amended to

19   indicate specifically that they are exempt from your

20   requirement?

21           MR. BLYNN:  I think, I think they either need to

22   provide the pre-suit notice or, yeah, amend the complaint.

23           But there are a host of other reasons to dismiss

24   the CUTPA and MCPA claims, and they've been detailed

25   extensively.  The unfairness claim, they are missing an

Case 3:14-cv-00235-MAD-ATB  Document 26-33-7  Filed 04/23/19/18  Page 16 of 45

15

1    essential element in their complaint.  There are three

2    levels to an unfairness claim:  Immoral, oppressive,

3    unethical conduct, substantial injury, as well as, as well

4    as that the challenged practice offends public policy.

5    There's no allegation of offensive public -- that the

6    challenged practice offends public policy.  That's raised

7    in their opposition brief which, again, is not the

8    complaint.

9         But beyond that, again, the <u>Faistl</u> and <u>Slack</u>

10   courts found no unfairness claim can lie when you have a

11   contract that's very similar to Viridian's, which provides

12   the supplier discretion to set its price based on market

13   conditions or other factors.

14        And, Your Honor, as we noted in our reply brief,

15   when you parse through and read the unfairness allegation

16   carefully, it's really one rooted in deception and

17   falsity.  Indeed, in the reply brief they even say, the

18   plaintiff even argues that it's defendant's

19   misrepresentations which caused the unfairness.

20        That's not an unfairness claim, that's a

21   deception claim.  And deception claims have to satisfy

22   Rule 9(b) which hasn't even remotely been satisfied here.

23        THE COURT:  Well, help me understand that

24   argument, because not only do you know the precise

25   statement that is claimed to be deceptive, you provided it

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 17 of 45
Case 3:14-cv-00235-MAD-ATB   Document 26-3   Filed 04/23/15   Page 17 of 45

16

1   as an attachment to your brief.

2          This is not a situation where there's a vague

3   "they made false statements to us and we relied upon

4   them," you attached the terms and conditions to your brief

5   and we've been talking about the statement that's at

6   issue, so what more do you need under Rule 9(b)?

7          MR. BLYNN:  I think we need to know Ms. Sanborn

8   saw those statements.  If she didn't see them before she

9   enrolled with Viridian, then she couldn't have relied upon

10  them and the deception claims fail.

11         THE COURT:  Right, but that's not a 9(b) issue.

12  That is an issue on the merits, that she didn't rely on

13  them and she doesn't have a claim.

14         MR. BLYNN:  But it is a Rule 9(b) argument

15  because the "when" is important here.  And also, Your

16  Honor, besides those two contracts, the two documents we

17  attach to our motion to dismiss, she's also alleged some

18  sort of phantom marketing materials that she's -- that

19  where these representations were made as well, and there's

20  nothing in the complaint addressing any marketing

21  materials other than one reference to marketing materials.

22  That's also a real problem.  It puts us -- we're, Viridian

23  is charged with defending this case and responding to

24  these allegations and it has no direction.

25         THE COURT:  Okay, well, there's two different

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 18 of 45
Case 3:14-cv-00235-MAD-ATB   Document 26   Filed 04/23/15   Page 18 of 45

17

1    issues here.  One is whether the complaint gets dismissed,

2    and the second is whether the complaint is perfect.

3          And it seems to me that you're saying we need

4    more detail on the marketing effort to actually make this

5    claim, and I think that it's a fair argument.  But the

6    question whether the complaint gets dismissed is does it

7    satisfy 9(b) and it's pretty hard to say it doesn't

8    satisfy 9(b) when you provided the very statement they are

9    relying on, or at least some of them.

10         MR. BLYNN:  Right, but there's more to it than

11   the when and where they occurred, it's the explanation of

12   how these statements are deceptive.  As I said, the

13   complaint focuses on this concept of this wholesale market

14   rate or this allegation of wholesale market rate, but

15   that's not what Viridian represented.

16         THE COURT:  Well, it says -- again, we're going

17   back to the same argument --

18         MR. BLYNN:  Right.

19         THE COURT:  Wholesale market conditions.  I

20   think a reasonable consumer is going to read that and

21   think, oh, if the wholesale market goes down, my rate is

22   going to go down, too.  And it it doesn't, and it's been

23   clearly alleged that it didn't, that seems deceptive and

24   unfair.

25         MR. BLYNN:  Again, Your Honor, I point to

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 19 of 45
Case 3:14-cv-00235-MAD-ATB   Document 26-3   Filed 04/23/18   Page 19 of 45

18

1    Clouston where this Court says where you have an expressed

2    written statement, it's unreasonable for a consumer to

3    interpret that beyond the specific terms of that

4    statement.

5            And so, when you have market conditions,

6    wholesale market conditions, and then another document

7    that elaborates wholesale market conditions, operating

8    costs and other factors, you can't, you can't construe

9    it -- it's patently unreasonable to say wholesale market

10   rate.

11           THE COURT:  Well, we just disagree about that.

12   I think that's the crux of the case or crux of this

13   motion.  I think we just disagree about that.

14           MR. BLYNN:  Turning quickly to the unjust

15   enrichment claim, there's not been a single variable rate

16   case where one of these, an unjust enrichment claim has

17   not been dismissed with prejudice or without prejudice.

18           The problem here is there's clearly a valid

19   contract.  Plaintiff has alleged a valid contract.  When

20   you have a valid contract, you can't have unjust

21   enrichment.  It can only be pled in the alternative when

22   the question of the validity of the contract is at issue

23   and that's clearly not here.

24           And so, Your Honor -- and not to mention for

25   unjust enrichment, Viridian must have been unjustly

1    enriched.  The plaintiff received the electricity service

2    she contracted for.  There's no enrichment.  She paid the

3    money and received the electricity, so --

4         THE COURT:  Well, I think your first argument is

5    better than your second, because if you take her

6    allegations as true, she was overcharged and an overcharge

7    is an unjust enrichment, so it seems to me the plaintiff

8    probably has a problem with the first argument.

9         MR. BLYNN:  And then, Your Honor, the final

10   cause of action alleged in this case is the breach of the

11   implied Covenant of Good Faith and Fair Dealing and, Your

12   Honor, there are two elements really to that claim.

13        The first is that the plaintiff must show or

14   allege that she had a right to receive benefits that was

15   impeded by the defendant and that Viridian acted in bad

16   faith.  And this is really important.  Bad faith, Your

17   Honor, is a very high standard, it's a sinister motive or

18   dishonest purpose.  And both the Court in Hoffnagle, the

19   Connecticut Superior Court, that's the case cited by the

20   plaintiff in her opposition brief, and the Faistl Court,

21   both warn that courts should not construe breach of

22   implied covenant claims too broadly or bad faith too

23   broadly.  And in Hoffnagle, the Court even made clear that

24   beach of implied covenant should not be a catch-all cause

25   of action.

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 21 of 45
Case 3:14-cv-035-MAD-ATB   Document 33-7   Filed 04/23/15   Page 21 of 45

20

```
1            "The mere disagreement in contractual
2       interpretation isn't bad faith," and that comes from the
3       19 Perry Street case.  It's a Connecticut Supreme Court
4       case, also cited in the opposition brief.
5            Here, the plaintiff received the benefits, she
6       got the 100 percent green energy, this premium product she
7       selected.  She's claimed that the bad faith, the bad faith
8       is Viridian's goal of maximizing its profits or allegedly
9       overcharging.  But maximizing profit is not, as a matter
10      of law, is not bad faith.  And the Hoffnagle Court and
11      Faistl all have said that.
12           And finally, Your Honor, the Connecticut Supreme
13      Court just in two years in the Capstone case, Capstone
14      Building Corporation v. American Motorist Insurance, held
15      that "Where a contract vests discretion in a party, that
16      party exercises its discretion, it can't be bad faith."
17           THE COURT:  Right.  The problem is it vests it
18      in one place and not in another, and so the question is do
19      you indefinitely win under those circumstances.
20           MR. BLYNN:  We do.  It squares completely with
21      Capstone where the contract vested 100 percent discretion
22      in the insurance company to investigate whether or not --
23           THE COURT:  Right.
24           MR. BLYNN:  -- an insurance claim could be made.
25      And they decided not to.
```

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 22 of 45
Case 3:17-cv-00135-MAD-ATB   Document 26-3   Filed 04/23/18   Page 22 of 45

21

1          THE COURT:  So you're saying the Viridian

2    contract says Viridian can charge whatever it wants to

3    charge.  It has 100 percent discretion to charge as much

4    as it wants to for its energy.

5          MR. BLYNN:  Well, as long as its tied to market

6    conditions, as long as there's some bearing on market and

7    wholesale market conditions in its operating costs or in

8    some other factors.  I mean that's exactly where Faistl

9    and Slack came out.

10          THE COURT:  Okay.  All right, thank you.

11          MR. BLYNN:  Thank you, Your Honor.

12          THE COURT:  Mr. Izard?

13          MR. IZARD:  Yes, thank you, Your Honor.

14          Your Honor, if I might just hand up two

15    documents, I've already provided to counsel.  One is just

16    a copy of the chart in the complaint regarding the

17    movement of price, and the second is the document -- this

18    is the report of independent system operator of New

19    England; it's cited in footnote four of defendant's reply

20    brief.  They have a web cite to it, and I just printed it

21    out.  So if I might approach Your Honor?

22          THE COURT:  Sure.

23          (Hands Court.)

24          THE COURT:  So, why don't you have a Connecticut

25    plaintiff here?

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 23 of 45
Case 8:14-cv-00635-MAD-ATB   Document 26-3   Filed 04/23/15   Page 23 of 45

22

1          MR. IZARD:  We actually have retainer agreements

2     signed with three and we are prepared to amend.  We didn't

3     want to amend right now before this hearing, but we can

4     very quickly after today.  And we thought to the extent

5     that the Court had other issues that it thought we should

6     address, we would do that simultaneously.

7          THE COURT:  Okay.

8          MR. IZARD:  Your Honor, I'd like to talk briefly

9     about the market condition issue, because that's, as you

10    pointed out, Your Honor, the question is the contract ties

11    the rate to either wholesale market conditions or market

12    conditions.  And really this case is on all fours with the

13    Yang Chen case, because if you look at the contract in

14    Chen, it talks about the rate reflecting the wholesale

15    costs of electricity, and then it lists a lot of related

16    costs and then it talks about other transmission and

17    distribution charges, and then it says "other

18    market-related factors."  That, to me, sounds a lot like

19    market conditions.

20         And I think the real question here is when

21    you're looking at variable rate contract, what market

22    conditions could change which could affect the price of

23    retail power, and the only material factor that could

24    change is the wholesale cost of electricity.  And the

25    independent system operator report clarifies that, at

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 24 of 45
Case 3:14-cv-00035-MAD-ATB   Document 26   Filed 04/23/15   Page 24 of 45

23

1    least with respect to the power side of the equation.

2             And just to give you a little background, this

3    is described in the report, but ISO New England is

4    basically the nonprofit entity that both operates the grid

5    and it operates the market and the market is reviewed by

6    FERC, the Federal Energy Regulatory Commission, to make

7    sure it's competitive and fair, and that's discussed a

8    little bit more on page one.

9             But if you go to page 16 of the report, you can

10   see the price structure in Connecticut.  There's a chart

11   up there, and that's in megawatt hours so to convert to

12   kilowatt hours, you would have to divide it by a thousand.

13   But the top line is the total wholesale rates.  That would

14   include capacity and the ancillary costs that the

15   defendant referenced in the reply brief.

16            The second next line is the pure energy costs,

17   and we didn't actually have this document when we filed

18   our complaint so we could tweak it.  The second is the

19   energy cost, and that's the at graph and the information

20   related to in our complaint, and then the last items are

21   the types of costs that the defendant references in their

22   reply.

23            For example, capacity.  The capacity charges

24   that it's allocated among all market participants to make

25   sure that the grid is built up, that there's transmission

1     wires and all that sort of stuff going into the future.

2            The ancillary charges that defendant references

3     is basically the charge to keep a plant running when it

4     was not operating full capacity.

5            And then if you look across this grid, you'll

6     see that the, by far the biggest charge is the energy

7     cost, and more importantly, it's really the only variable

8     charged, so that's the only thing that could effect

9     changes in prices.

10            You look at February 2014, the total cost is --

11    this would be in megawatt hours -- is 158-dollars.  The

12    energy charge is 150-dollars.  All the other charges are

13    only $7.33.

14            If you go to this lowest charge, which is in

15    August 2014, the total charge is 37.55.  The energy charge

16    is 30.44 and all the other charges are only 7.11.  So

17    basically the only thing that can cause variability is the

18    wholesale cost of electricity.

19            And so, when we look at what a reasonable person

20    would expect, even if they know a lot about the

21    electricity market, their expectation is that the thing

22    that can drive their rate up and down would be the

23    wholesale price of electricity, because that's the only

24    thing that really varies.

25            And if you look at the orange line on the chart,

Case 3:14-cv-00035-MAD-ATB   Document 26-33-7   Filed 04/23/18   Page 26 of 45

1    that is also a market-based rate.  We have that listed as

2    the CL&P rate, but the way that the CL&P rate is worked

3    out is it's a fixed rate for either six or twelve months,

4    so basically the utility bears all of the risk of

5    variability in the price, but the way that price is

6    determined is by the market.

7            So, an entity like CL&P will get bids from the

8    market as to what is the cost for delivery of power over

9    six or twelve months.  That price structure is approved by

10   the regulators but that's a no risk rate to a consumer.

11           So basically if the consumer wants to bear the

12   risk of price variability, they get something like the

13   orange line.  If they want to transfer the risk to the

14   supplier of electricity, they get something like the

15   yellow line.

16           What's fraud about this case is Viridian is the

17   green line, so with Viridian they are transferring all the

18   risk to the consumer, yet their rate is sky high relevant

19   to the no risk rate, relevant to the wholesale rate,

20   relevant to any reasonable metric existing anywhere.

21           So that's really the basis of our claim that

22   their rate is not tied to wholesale market conditions or

23   anything else.

24           And if you look at paragraph 33 of our

25   complaint, you know, we talk about what their other costs

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 27 of 45
Case 3:17-cv-00535-MAD-ATB   Document 26-3   Filed 04/23/18   Page 27 of 45

26

1    could be.  They've got to pay for rent.  They've got to

2    pay for computers.  There's nothing in there that could

3    vary significantly.  So we think at least for purposes,

4    especially for purposes of reasonable inferences under

5    12(b)6, we've met the standard we need to meet.

6          As to the unfairness issue on a CUTPA claim,

7    now -- and this really ties to the 9(b) argument, too --

8    as we noted in our brief under Connecticut law there must

9    be disclosure in the contract in advance as to the

10   circumstances under which the contract will change, and

11   that has to be provided to the customer.

12         So, if the customer never got the contract,

13   there's an admission of an unfair trade practice.  So I

14   doubt that argument is going to hold up for very long.

15   And the same is true in Massachusetts.  And we cited in

16   our brief 220 CMR 11.064a, which talks about the terms of

17   service have to be given to the customer before the

18   service begins.

19         We didn't cite another CMR to the Court but I

20   would like to reference it now.  It's 220 CMR 11.063a and

21   that says the terms of service referenced in 4a must state

22   an explanation of price variability and price level

23   adjustments that can cause price to vary.

24         So we think that these contracts fail to do

25   that, which is by definition an unfair trade practice.

Case 5:18-cv-00235-MAD-ATB Document 33-7 Filed 03/19/18 Page 28 of 45
Case 3:14-cv-03142-PAB Document 26-3 Filed 04/23/15 Page 28 of 45

27

1   THE COURT:  So what you're really saying is this

2   is what amounts to a fraudulent inducement situation, that

3   Viridian customers were wrongfully induced to sign up with

4   Viridian based upon representations based upon how the

5   rate would be calculated.

6   MR. IZARD:  I think that's one aspect of it, but

7   I think there's much more because we have a contract term

8   here, and in our view it's also a breach of a contract.

9   We're viewing the contract to be determined under an

10  implied covenant analysis, but when a contract says you've

11  got to calculate your rate based upon wholesale market

12  conditions, and you're not calculating your rate based on

13  wholesale market conditions, that's a contract problem.

14  It's not just a misrepresentation problem.

15  THE COURT:  Well, but you haven't made a breach

16  of contract claim.

17  MR. IZARD:  Well, our view -- from our

18  perspective, the implied covenant is actually part of the

19  contract, and our view is that the contract gives Viridian

20  some discretion within the parameters of the allegations,

21  within the parameters of the terms of their contract, and

22  that they failed to do that.

23  Now, Yang Chen analyzed it as a breach of

24  express contract issue.  Frankly, you know, courts could

25  go either way.  We can amend to add an express contract

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 29 of 45
Case 3:14-cv-01947-MAT-AB   Document 26-3   Filed 04/23/18   Page 29 of 45

28

1   claim as well, but however you want to look at it, whether

2   it's the implied covenant term built into the contract or

3   the words themselves, we have a scenario where the rating

4   is meant to be determined based on wholesale market

5   conditions and it wasn't and that violates the contract.

6         And so we think there is definitely a contract

7   theory here, but obviously under our CUTPA, Massachusetts

8   unfair trade practice claim, we have two problems.  We

9   have the unfairness prong because they failed to meet the

10  statutory requirements for explaining how the rates work,

11  and then we have the deceptive prong because we think, as

12  the Court mentioned, they basically lured people into

13  these arrangements by misstating how they were calculating

14  their rates.

15        THE COURT:  So, to the extent that you're

16  relying on a wrongful inducement theory, are you relying

17  only on the contract language as being the inducement or

18  are you relying on marketing materials, solicitations done

19  by mail, et cetera?  Because if you're doing the latter,

20  then there is a 9(b) issue because nobody knows what

21  you're relying on, so --

22        MR. IZARD:  Right.  Well, we're for purposes of

23  that, we are -- for purposes of this complaint right now,

24  we're relying on the contract terms.  Terms and conditions

25  do need to be provided in advance of providing service.

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 30 of 45
Case 3:14-cv-035-MAD-ATB   Document 26-3   Filed 04/23/15   Page 30 of 45

29

1     Terms and conditions are on the websites of Viridian.  So,

2     as I understand the way that Viridian --

3            THE COURT:  Well, let me push you, because we

4     need to understand whether you're relying on marketing

5     materials or not, because if you are, there's a 9(b)

6     problem.  If you're not, then you shouldn't be -- you

7     should make it clear what you're relying --

8            MR. IZARD:  Right.  Our complaint is not relying

9     on marketing materials.  We allege that -- we have one

10    sentence in there that's more of a background thing, but

11    we have not alleged any specific marketing material that

12    we believe class members are relying on.  So we are

13    relying on contracts, but we do believe that the contracts

14    are a representation because they have to be provided to

15    customers.

16            THE COURT:  I understand.

17            MR. IZARD:  Okay.  As to the -- the other point

18    I'd like to make out is when we look at the implied

19    covenant issue, there are a couple cases -- for example,

20    the Faistl case cited in defendant's brief, I mean the

21    real question and the standard to articulate there is

22    that, was the defendant using its discretion for a reason

23    either inside or outside the contemplated range of

24    activities based on what the parties expected, or was the

25    discretion being used in a way to transfer a risk to the

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 31 of 45
Case 5:14-cv-00235-MAD-ATB   Document 26   Filed 04/23/15   Page 31 of 45

30

1    plaintiff that was beyond the risks assumed by the

2    plaintiff.  And that really is governed by the language of

3    the contract.

4          Here, we view that the risk and the obligation

5    that a plaintiff is reasonably expected to be assumed is

6    that the risk would be a based on market conditions and

7    that limits the scope of the discretion.  When you start

8    to impose rates for reasons beyond market conditions and

9    transfer to the plaintiff a price risk beyond that

10   contemplated by market conditions, that violates the

11   implied covenant.

12         And we really disagree with the defendant's

13   reading of the Capstone case.  The Capstone case, that was

14   a bad faith insurance claim case, and the Court said, you

15   know, when you're looking at an insurance claim the issue

16   is whether did the defendant pay or not.  You know, the

17   claim there was that, oh, the defendant insurance company

18   didn't do an adequate investigation.  And the Court was

19   saying that's not really the issue.  I mean, for example,

20   if the insurance company paid 100 percent of the claim, it

21   wouldn't matter whether the insurance company did an

22   investigation or not.

23         Here, the discussion, in our case the discussion

24   is tied to a specific contract term which is setting the

25   market rate.  And in that scenario, I think Capstone would

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 32 of 45
Case 3:14-cv-00635-MAP-ATB   Document 26-3   Filed 04/23/15   Page 32 of 45

31

1    say that the discretion -- the implied covenant applies.

2    I mean Capstone says at 308, the implied covenant concerns

3    discretionary application of a contract term.

4            Here, we have a contract term setting the rate

5    based upon marketing conditions, and our argument relates

6    to discretionary application of that term.

7            On the 93(a) issue, you know, we did a search

8    for assets.  The license issue was a new one, that we just

9    heard today, but we couldn't find any assets in

10   Massachusetts, we couldn't find a location in

11   Massachusetts, and so we would believe --

12           THE COURT:  So are you going to plead the

13   exemption?

14           MR. IZARD:  We could plead the exemption.

15   Again, we heard about this license issue today, and a

16   month ago we asked the defendants for any information on

17   assets and received nothing.  And if we can't plead the

18   license exemption, the notice exemption, there's case law

19   in Massachusetts that says you can withdraw the claim,

20   serve the notice and refile it a month later.

21           So to me, this kind of seems like a lot to do

22   about nothing.  I'm not -- I guess I'll talk to the

23   defendant afterwards and see kind of how big a deal this

24   is, but -- I'm not sure this is moving the case forward,

25   this whole issue.

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 33 of 45
Case 3:17-cv-00335-MAD-ATB   Document 26-3   Filed 04/23/19   Page 33 of 45

32

1          So, if we can't plead the exemption in good

2     faith, we can withdraw and refile if that's what everybody

3     wants to do, but it's not going to effect the case going

4     forward.

5          However, on the unjust enrichment, you know,

6     that's obviously an alternative claim.  We believe the

7     other claims are strong.

8          THE COURT:  Help me understand how that

9     alternative could possibly ever arise.  In other words,

10    for you to have an unjust enrichment claim, you cannot

11    have a contract.

12         MR. IZARD:  Right.

13         THE COURT:  You haven't alleged that the

14    contract is void or voidable, so how do you get there?

15         MR. IZARD:  If the contract is illusory, and we

16    believe the contract would be illusory if there were no

17    parameters at all on defendant's discretion concerning

18    determination of the market rate.  If the contract is

19    illusory, then there is no contract and then we would move

20    to an unjust enrichment analysis.  That's the sole basis

21    of it.

22         And we cite to Wilson in there about how a

23    contract, if the promise is meaningless and if the

24    defendant can do whatever we want, we would argue that the

25    contract is meaningless and illusory and, therefore, there

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 34 of 45
Case 3:14-cv-00635-MAD-ATB   Document 26-3   Filed 04/23/15   Page 34 of 45

33

1   is no contract.

2          But that is not our main claim and so it's

3   strictly a fall-back and there number of cases that allow

4   this alternative pleadings, depending on how that shakes

5   out.

6          I'm not sure I answered your question.

7          THE COURT:  Well, no, I mean, I think that's

8   pretty creative.  I don't thinking it necessarily works.

9   It seems to me you've got a contract here, it's not

10  illusory.  The question is what does it mean, and your

11  CUTPA good faith claim covers the circumstance you're

12  describing.  In other words, it violates an implied

13  covenant of the contract if they have unfettered

14  discretion to set this rate, in effect.

15         MR. IZARD:  I agree with that.  As I say, that's

16  our principal claim, but if we lose on that one, this is a

17  fall-back basically.

18         THE COURT:  Yes, but how are you going to --

19  that's what I was trying to get at.  How are you going to

20  lose that claim and still win an unjust enrichment claim?

21  How does that happen?

22         MR. IZARD:  Well, I think that if -- I don't

23  think it should happen.  I think theoretically, I think

24  that if the Court could conclude that, even with the

25  implied covenant, and even if the Court accepts the

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 35 of 45
Case 3:17-cv-01087-MPS-ATB   Document 26-3   Filed 04/23/18   Page 35 of 45

34

1    defendant's interpretation of Capstone, which I disagree

2    with, and concludes that, you know, there is no limit on

3    discretion at all, then I think the contract becomes

4    illusory.  I don't think that's a correct analysis.

5    Again, we want to make sure we cover all the bases.

6                    THE COURT:  Okay.

7                    MR. IZARD:  Thank you, Your Honor.

8                    THE COURT:  Thank you.  All right.

9              Mr. Blynn, anything further, quickly?

10                   MR. BLYNN:  Just quickly, Your Honor, sure.

11   Just a couple quick points.

12                   First of all, the Connecticut statute

13   16-245o(f)(2), and then the Massachusetts regulation 940

14   CMR Section 19.04(d), which Mr. Izard mentioned, is in

15   their opposition brief, that expressly requires an energy

16   supplier to disclose the circumstances of the rate.  I

17   believe it's the language in the statute, in the

18   regulation perhaps, but certainly in the statute.  There's

19   not been a single case decided under that statute, and in

20   another, in another case, Your Honor, involving a similar

21   New York disclosure provision, the Southern District of

22   New York found that, in fact, you just have to disclose,

23   you have to inform the consumer that they have a variable

24   rate.  You don't have to explain how the variable rate is

25   set.

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 36 of 45
Case 3:14-cv-00335-MAD-ATB   Document 26-3   Filed 04/23/15   Page 36 of 45

35

1          That is the <u>Wise v. Energy Holdings</u> case.  It

2     hasn't been briefed in this case, Your Honor, but I do

3     want to make clear that that case is out there and that

4     issue has been decided, at least under the New York

5     analogue to the Connecticut and Massachusetts regulation,

6     cited.

7          Your Honor mentioned if you have a contract, the

8     question is that, here, the issue is you have a contract

9     but the question is what does it mean.  Well, that's

10    exactly what the Connecticut Supreme Court said in <u>19</u>

11    <u>Perry Street</u>.  When you have a mere disagreement in

12    interpretation of a contract, that can't be bad faith.

13         And again, in <u>Capstone</u>, the Supreme Court in

14    2013 said where a contract that is pure discretion with

15    one party, there can't be, it can't be bad faith.

16         Finally, Your Honor, if the contract is

17    illusory, is found to be illusory, and I do think that's

18    an interesting argument, but that would gut their breach

19    of implied covenant claim which can't exist without a

20    valid contract.

21         Finally, Your Honor, just one point about, about

22    the statement Mr. Izard made about asking for discovery

23    about the assets, averting assets in Connecticut after --

24         THE COURT:  Massachusetts.

25         MR. BLYNN:  I'm sorry, Massachusetts.  After the

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 37 of 45
Case 3:14-cv-00235-MAD-ATB   Document 26-33   Filed 04/23/15   Page 37 of 45

36

1    motion to dismiss is filed, that kind of foreshadows, and

2    you see it throughout the opposition brief, plaintiffs

3    think they can just file some sort of complaint and

4    automatically get to discovery, and it's just not that

5    simple.  If it were, you would never have any cases going

6    out on a motion to dismiss.  They have to make a good

7    faith investigation before they file their complaint; it

8    can't coming afterwards.  Thank you, Your Honor.

9              THE COURT:  Okay, thank you.

10             All right.  I'm going to rule on the motion to

11   dismiss at this point.  In doing that, I have to take the

12   allegations of the claimant as true, draw all reasonable

13   inferences in favor of the plaintiff and decide, looking

14   at the complaint in that light, whether it states a

15   plausible claim for relief.

16             And I'm going to deny the motion in substantial

17   part.  I'm going to grant it with respect to the unjust

18   enrichment claim.

19             The complaint should be amended within 45 days

20   to add a Connecticut plaintiff, to allege an exemption to

21   the requirement under 93(a) that there be a pre-suit

22   notice, and make any other adjustments that the plaintiff

23   chooses to make.

24             But the, the unjust enrichment claim fails

25   because -- and I'm granting the motion without prejudice

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 38 of 45
Case 3:14-cv-00535-MAD-ATB   Document 26-3   Filed 04/23/18   Page 38 of 45

37

1    to any, to a revision of the complaint in the event that

2    there's ever a holding that the contract is illusory.

3    That's such an unlikely prospect that there's no reason to

4    think it's ever going to happen and, therefore, I think

5    the law is, is on the defense side on this one.

6            There is a contract.  It's going to be either

7    enforced or not, fair or not, violative of unfair trade

8    practice law or not, but it seems very unlikely that it's

9    going to be held to be an illusory contract and,

10   therefore, the unjust enrichment claim, I think, fails.

11           The other arguments made in the motion to

12   dismiss I think are without merit at this point.

13           The two kind of winning technical arguments

14   would be resolved by the amendment, forthcoming amendment

15   of the complaint and the other arguments fail.

16           I think there is a valid claim stated here for

17   for an unfair trade practices violation.  The sheet

18   indicates, quote, "Your rate may fluctuate month to month

19   based on wholesale market conditions," quote/unquote.

20   That I think gives rise to a reasonable understanding in

21   the ordinary consumer that the price that the consumers

22   charged for electric supply will in fact be based upon the

23   wholesale market rate for electricity.

24           And it may turn out that the claim lacks merit,

25   but I think it survives a motion to dismiss.  That will be

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 39 of 45
Case 3:14-cv-00035-MAD-ATB   Document 26-33   Filed 04/23/15   Page 39 of 45

38

1    true under either the Connecticut or the Massachusetts

2    statutes.

3          There is, I think, each of the, each of the

4    elements of a unfair trade practices claim has been

5    properly stated in the complaint.  The complaint does not

6    fail Rule 9(b), even to the extent that it pleads a

7    fraudulent inducement claim.  As I noted, the exact

8    document alleged to have fraudulently induced the named

9    plaintiff has been attached to the opposition brief.  That

10   terms and condition sheet had to be provided to the

11   plaintiff before she entered into her contract, and it has

12   language that arguably fraudulently reduced her into

13   entering into the contract.

14         So, I think 9(b) has been satisfied by the fact

15   that everybody knows the precise statement in the exact

16   form it was made and the fact it had to have been made by

17   law to the plaintiff before she entered into the contract

18   with Viridian.  The date of that contract is well known to

19   both sides and need not be, in my view, expressly stated

20   in the complaint.

21         The Covenant of Good Faith and Fair Dealing I

22   think survives the motion to dismiss.  I think that the

23   principal attack on that claim is that there's not

24   sufficient allegations of bad faith here.  I disagree.  I

25   think, read as a whole and taken in the light most

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 40 of 45
Case 3:14-cv-00235-MAD-ATB   Document 26-3   Filed 04/23/15   Page 40 of 45

39

1    favorable to the plaintiff, the complaint does allege bad

2    faith on the part of Viridian with respect to the

3    establishment of electric supply rates that are a multiple

4    of the wholesale price that's prevailing in the market,

5    and that seems to be at least potentially done in bad

6    faith, i.e., in an effort to price-gouge.

7            I don't think that it's possible to argue that

8    price gouging is not something that's done in bad faith

9    and if this price gouging complaint survives summary

10   judgment and trial, then I think there's no doubt that

11   that would be, that would satisfy the bad faith

12   requirement.

13           Mr. Blynn, I don't know if there's other

14   arguments that I haven't touched upon?

15           MR. BLYNN:  No, Your Honor.

16           THE COURT:  Okay.  I don't intend to write.

17   Does anybody want me to further explain the ruling at this

18   time?

19           MR. IZARD:  No, Your Honor.

20           MR. BLYNN:  No, Your Honor.

21           THE COURT:  All right.  Mr. Izard, we're going

22   to get a new complaint within the next -- how many days?

23           MR. IZARD:  Say 15?

24           THE COURT:  That's fine.  Okay.  Is there

25   anything we can do to, any issues we can take up as long

Case 5:18-cv-00235-MAD-ATB Document 33-7 Filed 03/19/18 Page 41 of 45
Case 3:14-cv-00235-MAD-ATB Document 33-7 Filed 04/29/15 Page 41 of 45

40

1    as we're all in the same room?  Deadlines, discovery?

2         MR. IZARD:  Well, Your Honor, there's one issue

3    on the 26(f) report where the Court approved the 26(f)

4    report but there is a -- the plaintiffs and defendants

5    have different positions on the class certification issue.

6    Plaintiffs propose that they file their brief 30 days

7    following the close of expert discovery, and I think the

8    defendant wanted to bifurcate and so we just need to

9    clarify at some point whether that will work.

10        And the second is we had received an email from

11   the Clerk, I don't know if the Court's been following the

12   issue of offers of judgment and how that relates to class

13   actions, but there's some authority around the country

14   that the filing of an offer of judgment can moot a class

15   action if it's served before the motion or class

16   certification is filed.

17        THE COURT:  Yes, I've rejected that in a number

18   of cases.

19        MR. IZARD:  Okay.  So, we had filed a motion for

20   class certification just to deal with that issue.  What we

21   have proposed is we do the briefing once we have the 26(f)

22   schedule in place, and I don't get a sense that the

23   defendant has an issue with that, so I just wanted to

24   raise that with the Court, and at some point I think we

25   probably should nail down the schedule of when our class

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 42 of 45
Case 3:14-cv-00235-MAD-ATB   Document 26-3   Filed 04/23/15   Page 42 of 45

41

 1   cert motion would be due.  As I say, our proposal is 30

 2   days after expert discovery, defendants want

 3   bifurcation -- fact expert discovery.

 4         THE COURT:  All right.  I'm not sure I

 5   understand what the defendant's proposal is.  Bifurcate

 6   meaning you want the class cert motion filed after fact

 7   discovery?

 8         MR. BLYNN:  Your Honor, that was filed by, by

 9   predecessor counsel.  I need to find out exactly what

10   their intention was.

11         THE COURT:  All right, let me suggest this.  I

12   think that -- is the motion for class cert that you filed

13   as a protective matter still pending?

14         MR. IZARD:  Yes.

15         THE COURT:  I'm inclined to deny that as moot --

16   or not as moot but without prejudice.  You're going to add

17   a plaintiff.  I mean there ought to be, the motion ought

18   to reflect the reality of the case.

19         MR. IZARD:  Sure.

20         THE COURT:  As I said before, I rejected this

21   idea that comes out of the 7th Circuit that you can moot a

22   case by filing a, by a class action by filing an offer of

23   judgment to the individual plaintiff.  I don't think that

24   makes a lot sense frankly.  And so there's no need to file

25   a protective motion for class certification.  We ought to

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 43 of 45
Case 3:14-cv-00635-MAD-ATB   Document 26-3   Filed 04/23/15   Page 43 of 45

42

```
1    do it on whatever schedule makes sense for the case.

2              And in the first instant, why don't you go back

3    and renegotiate what makes sense.  I've had class motions

4    early, I've had them late.  I think in general the class

5    cert motion should come as early in the case as possible,

6    because I do think it affects the scope of discovery and

7    potentially the scope or the nature of your settlement

8    discussions.

9              MR. IZARD:  Our concern is the whole Walmart,

10   Comcast issue, how much -- what kind of factual support do

11   you need.  You know, years ago, it's a little more

12   streamlined than it is now, so that was done --

13             THE COURT:  No, you're entitled to some class

14   discovery, if that's the concern.  You can have some class

15   discovery, absolutely.  But you ought to get the class

16   discovery done as quickly as possible, even if, in fact,

17   expert discovery is continuing at the same time.

18             MR. IZARD:  And we may have an expert on damages

19   to deal with Comcast, for purposes of class cert.

20             THE COURT:  That's fine.  Again, why don't you

21   two discuss that in the first instances and submit a

22   proposal if you can agree.  If you can't, then I'll

23   resolve it.

24             MR. BLYNN:  Just a practical concern, you said

25   15 days?  Might want to take 30?
```

Case 5:18-cv-00235-MAD-ATB   Document 33-7   Filed 03/19/18   Page 44 of 45
Case 3:17-cv-00635-MPS-ATB   Document 26-3   Filed 04/23/18   Page 44 of 45

43

```
 1              MR. IZARD:  Thirty is fine.  Okay.

 2              MR. BLYNN:  I think whatever MCPA requires,

 3     that --

 4              MR. IZARD:  Well, we'll talk about that.

 5     Complaint in 30 days then.

 6              THE COURT:  All right, that's fine.

 7              Anything else?

 8              MR. BLYNN:  No, Your Honor.

 9              THE COURT:  All right, thank you all.  We'll

10     stand in recess.

11              (Whereupon the above matter was adjourned at 1:15

12     o'clock, p. m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

44

C E R T I F I C A T E


       I, Susan E. Catucci, RMR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.




       /S/ Susan E. Catucci
       _____

        Susan E. Catucci, RMR
        Official Court Reporter
        915 Lafayette Boulevard
      Bridgeport, Connecticut  06604
        Tel: (917) 703-0761