# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ANTONIO MARTINEZ,

                 Plaintiff,

        -against-

AGWAY ENERGY SERVICES, LLC,

             Defendant.

_____

:
:
:
:
:
:
:
:
:
:
:

Case No. 5:18-cv-00235-MAD-ATB

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
TO STRIKE PLAINTIFF'S PROPOSED EXPERT FRANK A. FELDER, PH.D**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ................................................................................................................1

  I.    STANDARD ...........................................................................................................3

  II.   *SKIDMORE* IS INAPPLICABLE AND
       THE PSC ORDER DOES NOT PERMIT DEFENDANT TO
       BREACH ITS CONTRACTS OR ENGAGE IN DECEPTIVE CONDUCT .....................4

    A.  *Skidmore* Is Inapplicable....................................................................................4

    B.  The PSC Order Does Not Support Defendant's Position. ..................................6

  III.   DEFENDANT CANNOT ESTABLISH AS A
        MATTER OF LAW THAT IT DID NOT BREACH ITS CONTRACTS .......................10

    A.  Defendant's Rates Were Not Based On Market Costs. ....................................12

    B.  Defendant Improperly Charged Additional Amounts For EnergyGuard. .....................13

    C.  Defendant's Rates Were Not Competitive.......................................................14

    D. Representations That Savings Are
       Not Guaranteed Do Not Cure Agway's Breaches. ...........................................18

    E. Neither EnergyGuard's Cost Nor
       Its Value Justify Agway's Exorbitant Variable Rates ......................................18

    F.  Case Law Cited By Defendant Is Inapposite. ..................................................20

  IV.   PLAINTIFF'S GBL CLAIMS SHOULD NOT BE DISMISSED. ...............................22

  V.    PLAINTIFF'S EXPERT DR. FRANK FELDER SATISFIES
       FEDERAL RULE OF EVIDENCE 702 REGARDING ADMISSIBILITY ..................25

    A.  Dr. Felder Readily Satisfies
       The Qualification Requirements To Serve As An Expert ................................27

    B.  Dr. Felder's Opinions Are Reliable. ................................................................31

    C.  Dr. Felder's Testimony Will Help The Trier Of Fact......................................39

CONCLUSION ................................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*1000 N. of N.Y. Co. v. Great Neck Med. Assocs.*,
    7 A.D.3d 592 (2d Dep't 2004) ............................................................... 11

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*,
    846 F.3d 492 (2d Cir. 2017) ................................................................... 6

*Agyin v. Razmzan*,
    986 F.3d 168 (2d Cir. 2021) ................................................................... 5

*Amorgianos v. Nat'l R.R. Passenger*,
    303 F.3d 256 (2d Cir. 2002) ...................................................... 25, 26, 27

*Aventis Envtl. Sci. USA LP v. Scotts Co.*,
    383 F. Supp. 2d 488 (S.D.N.Y. 2005) .................................................. 36

*Bell v. Gateway Energy Services Corp*,
    Index No. 31168/2018, NYSCEF Doc. No. 153 (N.Y. Sup. Ct., Rockland County Jan. 8, 2021)
    ............................................................................................................. 15, 30

*Brisman v. Volpe*,
    No. 15-00466, 2018 WL 1399197 (N.D.N.Y. Mar. 20, 2018)................... 4

*Brown v. Agway Energy Servs., LLC*,
    822 Fed. App'x 100 (3d Cir. 2020)......................................................... 22

*Canino v. HRP, Inc.*,
    105 F. Supp. 2d 21 (N.D.N.Y. 2000) ..................................................... 28

*Carias v. Monsanto Co.*,
    No. 15-3677, 2016 WL 6803780 (E.D.N.Y. Sept. 30, 2016)................... 23

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
    769 F. Supp. 2d 269 (S.D.N.Y. 2011) ............................................... 37, 38

*Chambers v. TRM Copy Ctrs. Corp.*,
    43 F.3d 29 (2d Cir. 1994)........................................................................ 4

*Chen v. Hiko Energy, LLC*,
    No. 14-1771, 2014 WL 7389011 (S.D.N.Y. Dec. 29, 2014) ........... *passim*

*Christensen v. Harris Cty.*,
    529 U.S. 576 (2000)................................................................................. 4

*Claridge v. N. Am. Power & Gas, LLC*,
    No. 15-1261, 2015 WL 5155934 (S.D.N.Y. Sept. 2, 2015) .................................................... 25

*Claridge v. N. Am. Power & Gas, LLC*, No.,
    No. 15-1261, 2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016) ................................................. 30

*Coughtry v. Tracker Marine, LLC*,
    No. 08-875, 2010 WL 11541908 (N.D.N.Y. Jan. 7, 2010) ................................................... 10

*Cruz v. Kumho Tire Co.*,
    No. 10-219, 2015 WL 2193796 (N.D.N.Y. May 11, 2015) .............................................. *passim*

*Cummings v. Standard Reg. Co.*,
    265 F.3d 56 (1st Cir. 2001) ........................................................................................ 35, 36

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ................................................................................................... 25, 26

*Donnenfeld v. Petro, Inc.*,
    333 F. Supp. 3d 208 (E.D.N.Y. 2018) ........................................................................ 21, 23

*Encompass Advisors, Ltd. v. Unapen, Inc.*,
    No. 3:09CV1949 DFM, 2013 WL 6331157 (D. Conn. Dec. 5, 2013) .................................... 33

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    74 F. Supp. 3d 639 (S.D.N.Y. 2015) ............................................................................... 36

*Forte v. Liquidnet Holdings, Inc.*,
    675 F. App'x 21 (2d Cir. 2017) .................................................................................... 36, 37

*Forte v. Liquidnet Holdings, Inc.*,
    No. 14-2185, 2015 WL 5820976 (S.D.N.Y. Sept. 30, 2015) ................................................ 36

*GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*,
    943 F. Supp. 2d 320 (N.D.N.Y. 2013) ......................................................................... 30, 37

*Gonzales v. Agway Energy Services, LLC*,
    No. 18-235, 2018 WL 5118509 (N.D.N.Y. Oct. 22, 2018) .............................................. *passim*

*Gonzales v. Agway Energy Services, LLC*,
    No. 18-235, 2019 WL 910669 (N.D.N.Y. Feb. 25, 2019) ................................................ 22, 24

*Good v American Pioneer Title Inc. Co.*,
    12 A.D.3d 401 (2d Dep't 2004) ....................................................................................... 5

*Guardino v. Alutiiq Diversified Servs., LLC*,
    457 F. Supp. 3d 158 (N.D.N.Y. 2020) .......................................................................... 25, 26

*Gussack Realty Co. v. Xerox Corp.*,
   224 F.3d 85 (2d Cir. 2000) ............................................................................................... 37

*Hartle v. FirstEnergy Generation Corp.*,
   No. 08-1019, 2014 WL 1317702 (W.D. Pa. Mar. 31, 2014) ........................................... 35

*In re Joint E. & S. Dist. Asbestos Litig.*,
   52 F.3d 1124 (2d Cir. 1995) ............................................................................................. 35

*In re Mirena IUD Prod. Liab. Litig.*,
   169 F. Supp. 3d 396 (S.D.N.Y. 2016) ............................................................................. 25

*In re Pfizer Inc. Sec. Litig.*,
   819 F.3d 642 (2d Cir. 2016) ............................................................................................. 26

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
   103 F. Supp. 2d 268 (S.D.N.Y. 2000) ............................................................................. 31

*Jordet v. Just Energy Sols., Inc.*,
   505 F. Supp. 3d 214 (W.D.N.Y. 2020) ........................................................................... 21

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ......................................................................................................... 26

*LaBarre v. Werner Enterprises, Inc.*,
   No. 12-1316, 2015 WL 4649285 (N.D.N.Y. Aug. 5, 2015) ............................................ 28

*Leon v. Lukash*,
   121 A.D.2d 693 (2d Dep't 1986) ..................................................................................... 12

*Linza v. Saul*,
   990 F.3d 243 (2d Cir. 2021) ............................................................................................... 4

*Lussoro v. Ocean Fin. Fed. Credit Unio*n,
   456 F. Supp. 3d 474 (E.D.N.Y. 2020) ............................................................................. 24

*Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*,
   441 F. Supp. 3d 745 (S.D. Iowa 2019) ...................................................................... 27, 30

*Makinen v. City of N.Y.*,
   53 F. Supp. 3d 676 (S.D.N.Y. 2014) ............................................................................... 27

*Marx & Co. v. Diners' Club Inc.*,
   550 F.2d 505 (2d Cir. 1977) ............................................................................................. 38

*McCullock v. H.B. Fuller Co.*,
   61 F.3d 1038 (2d Cir. 1995) ........................................................................... 27, 29, 31, 39

*McReynolds v. Sodexho Marriott Servs., Inc.,*
　349 F. Supp. 2d 30 (D.D.C. 2004) ........................................ 37

*Milliman v. Mitsubishi Caterpillar Forklift Am., Inc.,*
　594 F. Supp. 2d 230 (N.D.N.Y. 2009) ................................... 28

*Mirkin v. Viridian Energy, Inc.,*
　No. 15-1057, 2016 WL 3661106 (D. Conn. July 5, 2016).................... 24

*Mirkin v. XOOM Energy LLC,*
　931 F.3d 173 (2d Cir. 2019)........................................ 15, 20

*Munoz v. Orr,*
　200 F.3d 291 (5th Cir. 2000)........................................... 36

*Neumann v Wyandanch Union Free School Dist.,*
　84 A.D.3d 816 (2d Dep't 2011) ......................................... 5

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,*
　875 F.3d 107 (2d Cir. 2017)...................................... 3, 23, 24

*Nieves v. Just Energy New York Corp,*
　No. 17-561, 2020 WL 6803056 (W.D.N.Y. Nov. 19, 2020) ................. 21

*Orange v. Starion Energy PA, Inc.,*
　711 Fed. Appx. 681 (3d Cir. 2017) ..................................... 22

*Orlander v. Staples, Inc.,*
　802 F.3d 289 (2d Cir. 2015)...................................... 3, 23, 24

*Perks v. TD Bank, N.A.,*
　444 F. Supp. 3d 635 (S.D.N.Y. 2020).................................... 24

*Raskin v. Wyatt Co.,*
　125 F.3d 55 (2d Cir. 1997)............................................. 36

*Richards v. Direct Energy Services, LLC,*
　915 F.3d 88 (2d Cir. 2019)................................... 15, 20, 21, 22

*Sevugan v. Direct Energy Serv., LLC,*
　931 F.3d 610 (7th Cir. 2019).......................................... 22

*Sigmon for Hindin v. Goldman Sachs Mortg. Co.,*
　No. 12-3367, 2018 WL 1517189 (S.D.N.Y. Mar. 26, 2018) ............... 38

*Simmons v. Ambit Energy Holdings, LLC*,
 No. 503285/15, 2016 WL 6189014 (N.Y. Sup. Ct., Kings County Oct. 24, 2016) ................... 5

*Skidmore v. Swift & Co.*,
 323 U.S. 134 (1944) ................................................................................................... 2, 4

*SourceOne Dental, Inc. v. Patterson Companies, Inc.*,
 No. 15-5440, 2018 WL 2172667 (E.D.N.Y. May 10, 2018) .................................................. 35

*Spagnola v. Chubb*,
 574 F3d 64 (2d Cir. 2009) ........................................................................................... 3, 22

*Stagl v. Delta Air Lines, Inc.*,
 117 F.3d 76 (2d Cir. 1997) ................................................................................................ 28

*Stanley v. Direct Energy Servs.*, LLC,
 466 F. Supp. 3d 415 (S.D.N.Y. 2020) ............................................................... *passim*

*U.S. v. Mack*,
 No. 13-00054, 2014 WL 7404763 (D. Conn. Nov. 7, 2014) .................................................. 26

*U.S. v. Romano*,
 859 F. Supp. 2d 445 (E.D.N.Y. 2012) .................................................................................. 36

*Varga v. Rent-A-Ctr. E., Inc.*,
 No. 10-559, 2012 WL 2178866 (N.D.N.Y. June 13, 2012) .................................................... 28

**Statutes**

N.Y. Gen. Bus. Law § 349 ........................................................................................ *passim*

N.Y. Gen. Bus. Law § 349-d ..................................................................................... *passim*

N.Y. Tax Law § 1105-C ...................................................................................................... 33

**Rules**

Fed. R. Civ. P. 56 .......................................................................................................... 3, 4

Fed. R. Evid. 702 ...................................................................................................... *passim*

**Other Authorities**

23 *Williston on Contracts* § 63:22 (4th ed. 2018) ........................................................ 20

## INTRODUCTION

Plaintiff Antonio Martinez, in his capacity as the executor of the estate of Naomi Gonzalez, respectfully submits this memorandum of law in opposition to Agway Energy Services, LLC's ("Defendant" or "Agway") motion for summary judgment, or, in the alternative, to strike the expert report of Dr. Frank Felder ("Def. SJ Mem.").

Agway is an energy services company or "ESCO" that provides electricity to its customers in competition with local utilities.  Plaintiff's Statement of Additional Material Facts ("PSAMF") ¶ 1.  Pursuant to the terms of its contract (the "Customer Agreement") with Ms. Gonzalez, Defendant was obligated to charge variable rates that were "competitive" and "reflect[ed] the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins." *See* PSAMF ¶ 13. Defendant also made repeated representations that it would charge competitive rates.  PSAMF ¶¶ 6, 11.  However, Defendant charged uncompetitive rates not justified by its costs, market related factors, or its profit margin.  PSAMF ¶ 16.  Instead, it charged exorbitant rates and overcharged its customers by at least $36 million.  PSAMF ¶ 16.

Defendant also provided its customers with its "EnergyGuard" service, a limited warranty against potential damage to air conditioners and home wiring caused by electrical surges.  During the class period, Agway's cost for all of the services it provided customers under EnergyGuard was $583,900.  PSAMF ¶ 25.  Defendant represented that this service was being provided at no additional cost to its customers.  PSAMF ¶¶ 27.[1]  These are undisputed facts that preclude a finding

---

[1] Even if the arguably ambiguous reference to "Agway's costs [and] expenses" allows Defendant to include EnergyGuard costs, it most certainly does not allow Agway to base the variable rate on an inflated and fallacious EnergyGuard "value."

that Defendant did not misrepresent how much it would charge, or breach its contractual obligations, by charging non-competitive rates that were not based on electricity costs or market factors.

Nor is there merit to Defendant's argument that it is insulated from *any* liability relating to its variable rate products because of an order issued by the New York State Public Service Commission ("PSC").   The December 12, 2019 order (the "PSC Order")[2] merely permitted Defendant to sell electricity to consumers bundled with the EnergyGuard service at a rate that is greater than that of the local utility.  PSAMF ¶ 30.  The PSC does not have the authority to abrogate either New York General Business Law ("GBL") claims or common law contract claims.  Nor does the PSC Order permit Defendant to violate the terms of its contracts with customers or to market and sell its products in a deceptive manner.  PSAMF ¶¶ 41-42.  Nothing in the PSC Order precludes Plaintiff's claims.  Nor is the PSC Order entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), which is only applicable where courts consider interpretations of ambiguous statutes by implementing agencies.   Indeed, both New York Courts and the PSC expressly hold that courts owe no deference to the PSC when evaluating GBL or contract claims.

Defendant is also not otherwise entitled to summary judgment of Plaintiff's contract claims.  Defendant's strained interpretation of the contract at issue ignores the requirements that it provide competitive rates based on electricity market costs and factors.  Defendant cannot show that there is no material dispute as to whether its margins were so enormous that the rates it charged bore no resemblance to its actual market costs, or the rates of competing utilities.  Defendant also cannot show that there is no material dispute regarding whether it violated the of its duty of good faith and fair dealing when setting the variable rate.

---

[2] Attached as Exhibit 5 to the Declaration of Todd S. Garber ("Garber Decl.").

Defendant places great emphasis on the "value" it believes the EnergyGuard service provides to customers. But this Court has already rejected Defendant's assertions that the EnergyGuard service somehow negates it unlawful conduct. *See Gonzales v. Agway Energy Services, LLC*, No. 18-235, 2018 WL 5118509, at *4 (N.D.N.Y. Oct. 22, 2018) ("Defendant's contention that its EnergyGuard product in some way justifies an increase in the variable rate is plausibly inconsistent with the terms of the agreement. Plaintiff has plausibly alleged that Agway's rates were 'not in fact competitive market rates based on the wholesale cost of electricity' or the factors set forth in the agreement."). The contract required rates based on electricity market costs, not the EnergyGuard "value" Defendant claims to have provided.

Defendant's only argument regarding Plaintiff's GBL claims is that a plaintiff may not recover under GBL §§ 349 and 349-d where the loss is "duplicative of the loss alleged by a breach of contract." Def. SJ Mem. at 26. This argument is based on a misreading of *Spagnola v. Chubb*, 574 F3d 64 (2d Cir. 2009). Subsequent binding Second Circuit decisions have made clear that *Spagnola* does not stand for such a proposition and is not applicable to the types of claims at issue in this case. *See Nick's Garage, Inc. v. Progressive Cas. Ins. Co*., 875 F.3d 107, 125 (2d Cir. 2017); *Orlander v. Staples, Inc*., 802 F.3d 289, 301-02 (2d Cir. 2015). Not surprisingly, numerous courts have held that similar GBL claims may proceed against ESCOs.[3]

Defendant's alternative motion to strike Dr. Frank Felder's expert report (the "Felder Report") (Garber Decl. Ex. 2) also lacks merit. Dr. Felder, who is eminently qualified, sets forth court-endorsed reliable methodologies to determine damages on a class-wide basis.

## I.   <u>STANDARD</u>

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows

---

[3] *See* section IV, *infra*.

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Brisman v. Volpe,* No. 15-00466, 2018 WL 1399197, at *1 (N.D.N.Y. Mar. 20, 2018) (D'Agostino, J.) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)). "In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Id*.

## II.   *SKIDMORE* IS INAPPLICABLE AND THE PSC ORDER DOES NOT PERMIT DEFENDANT TO BREACH ITS CONTRACTS OR ENGAGE IN DECEPTIVE CONDUCT.

### A.   *Skidmore* Is Inapplicable.

Defendant argues that this Court should defer to the PSC's decision to allow it to sell variable rates for electricity supply above those charged by utilities, citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). But the PSC never held that Defendant could not be sued for charging variable rates in violation of its Customer Agreement and in contravention of its representations that it would charge competitive rates that reflect its actual costs. Moreover, *Skidmore* deference only applies to the interpretation of a statute the agency in question is authorized to administer. *See Christensen v. Harris Cty.*, 529 U.S. 576, 591 (2000) (*Skidmore* is "that special respect one gives to the interpretive views *of the expert agency responsible for administering the statute*.") (emphasis added)*; see also Linza v. Saul*, 990 F.3d 243, 247 (2d Cir. 2021) (deference only applies to "agency's legal determination or interpretation of a statute that it is authorized to administer).

There is no dispute here regarding the meaning of any statutes. The PSC Order does not interpret or apply GBL §§ 349 or 349-d with respect to Defendant's violation of its Customer Agreement or its deceptive claim that it charges competitive rates. Rather, the PSC Order merely

determined that, while variable rates that are higher than utility rates are of no benefit to consumers and should not be allowed in New York, so long as Defendant charges a rate for electricity and EnergyGuard that is reasonable in relation to its costs, Defendant can continue to charge such variable rates during an interim period while the PSC's investigation continues.  PSAMF ¶¶ 31; section II.B, *infra*.  The PSC did *not* find that Defendant's rates are in fact reasonable in relation to EnergyGuard's costs, but, even if it did, such a finding does not concern the interpretation of a statute the PSC administers and is thus outside the ambit of *Skidmore*.

Indeed, New York courts and the PSC itself reject the notion that courts should defer to the PSC when deciding whether an ESCO violates the common law or provisions of the GBL.  As Judge Ash held in denying a motion to dismiss a plaintiff's claim that the defendant ESCO sold electricity using deceptive claims:

> Plaintiffs' claims . . . revolve around the issue of whether or not Ambit's actions, non-action, and Terms of Service violated GBL §§ 349 and 349-d.  Such issues of contractual and statutory interpretation lie squarely within the purview of the courts and do not otherwise require the special competence of the Service Commission. Indeed, in its order implementing GBL § 349-d into the Uniform Business Practices, the Service Commission itself noted that "our understanding of such provisions as incorporated into the UBP should not preclude a court from engaging in an independent analysis of the meaning of the provisions of GBL § 349-d."

*Simmons v. Ambit Energy Holdings, LLC*, No. 503285/15, 2016 WL 6189014, at *4 (N.Y. Sup. Ct., Kings County Oct. 24, 2016) (citing *Matter of Neumann v Wyandanch Union Free School Dist.*, 84 A.D.3d 816, 818 (2d Dep't 2011) and *Good v American Pioneer Title Inc. Co.*, 12 A.D.3d 401 (2d Dep't 2004)).

In *Agyin v. Razmzan*, 986 F.3d 168 (2d Cir. 2021), the Second Circuit recently affirmed that deference does not apply when the law at issue is outside of the administration of the agency. *Agyin* involved the interpretation of the defendant's scope of employment pursuant to New York law.  The plaintiff argued on appeal that an FTCA manual required a different outcome than

reached by the lower court. *Id.* at 186.  The Second Circuit acknowledged the FTCA manual "may suggest a different conclusion" but accorded no deference.  *Id.*  The Court held that "[a] federal agency may receive deference with respect to the interpretation of a federal statute it administers. New York's law regarding the scope of employment is not such a statute, and therefore the FTCA Manual could not alter how a court applies that law even if it attempted to do so."  *Id.*

The same result applies here.  The PSC Order did not permit Defendant to violate the terms of its contracts or to market and sell its products to customers in a deceptive manner in violation of GBL § 349.  Nor could it.  *Skidmore* is simply not applicable.

**B.**      **The PSC Order Does Not Support Defendant's Position.**

Under *Skidmore* and its progeny, interpretations by agencies of ambiguous statutes are only sometimes entitled to deference, and then only to the extent the interpretation has the "power to persuade." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Protec. Agency*, 846 F.3d 492, 508-10 (2d Cir. 2017) (discussing prior Second Circuit determinations where the Court found that federal agency interpretations were entitled to *Skidmore* deference, but were unpersuasive). Even if *Skidmore* were applicable, the PSC Order is not relevant to the claims before this Court. Nor is it persuasive authority that supports Defendant's motion. The order does not preclude a material question of fact as to whether Defendant breached its contracts by charging exorbitant variable rates not justified by the Customer Agreement and in contravention of its promise to charge "competitive" market-based rates.

There are many reasons the PSC Order does not affirmatively endorse Defendant's variable rates.  First, the PSC Order contains no such endorsement.  To the contrary, it merely states that Defendant can offer rates that are higher than the utility's supply rate.  PSAMF ¶ 37.  Notably, Defendant cites no portion of the PSC Order that states that it can charge a variable rate as high as

6

it wants, or a rate that violates its customer agreements, or a rate that is not competitive in contravention of its promises to consumers.  PSAMF ¶¶ 39-42.  Rather, the PSC Order merely authorizes Defendant to charge variable rates to New York consumers even if they are not lower than the utility.  PSAMF ¶ 37.  Indeed, the PSC Order explicitly provides that "[a]ny company, ESCO or not, may currently provide such services separately from energy supply service so long as they comply with established rules for those service, including the Uniform Business Practices for Distributed Energy Resources where applicable."  PSAMF ¶ 32.  The Uniform Business Practices provisions require that Defendant must comply with its customer agreements and prohibit it from engaging in deceptive behavior.  New York Uniform Business Practices, §§ 5.B, 10.C.4, 2.D.5.h.  The PSC did not find that Defendant complied with these provisions.  And of course, the PSC would not have the statutory authority to do so.  The New York legislature clearly intended that consumers could bring civil actions when they are injured by ESCOs' deceptive conduct.  *See* N.Y. Gen. Bus. Law § 349-d ("[A]ny person who has been injured by reason of any violation of this section may bring an action in his or her own name . . . .").

Second, Defendant overstates the extent to which the PSC found that EnergyGuard justified rates that were not lower than utility rates -- much less double Defendant's teaser rate and unreasonably higher than its costs justify.  PSAMF ¶¶ 34-35.  Indeed, the PSC explicitly stated:

> It is both notable and troubling that *no ESCO party could or would produce objective evidence* regarding: the specific value-added products or services that are currently offered in New York; how many ESCO customers elect to receive those products and services; the level of premium ESCO customers are charged for the value-added product or service; and what type and level of benefit is obtained by customers who receive the products or services offered.  We recognize that the ESCO parties could have produced highly detailed information about their actual products and services, but, instead, they generally chose to present information around purported products and services that ESCOs might offer or that they do offer in unspecified numbers or circumstances.

PSC Order at 51, PSAMF ¶ 33 (emphasis added).  While the PSC says that "Agway provided

7

detailed evidence demonstrating that EnergyGuard provides a unique benefit that may be reasonably comparable to its costs," the PSC Order notably omits stating that Defendant provided any "objective" evidence; rather, it merely states that Agway provided detailed evidence that EnergyGuard "*may* be reasonably comparable to its costs." PSAMF ¶¶ 31, 34. Thus, while Defendant presented evidence to the PSC that EnergyGuard provides a unique benefit, it did not prove to the PSC that EnergyGuard's costs justify its rates. The PSC went out of its way to make clear that it was making no such finding.

Indeed, the PSC specifically noted that "[w]hile certain ESCO products may justifiably cost the customer more, it is troubling that, after the extensive process associated with this track, neither ESCOs nor any other party have shown, to any meaningful degree of certainty, that ESCO charges above utility rates were generally -- or in any specific instances -- justified." PSAMF ¶ 35. That language is not ambiguous. It states that the PSC found that *no* ESCO in *any* specific instance actually justified their high rates in relation to the cost of value-added services (like EnergyGuard). In fact, the PSC explicitly noted that the track reflected in the PSC Order did not encompass an examination of the reasonableness of Defendant or other ESCOs' rates in relation to the costs of value-added services: "Staff recommends that the potential development of appropriate energy-related, value-added products be reviewed in a collaborative process in Track II, only after more immediate measures to protect mass-market customers are implemented." PSAMF ¶ 36. And the PSC limited its authorization regarding Defendant's variable rates to "this interim period." PSAMF ¶ 38; *see also id*. (Defendant was allowed "a limited opportunity to continue to offer its EnergyGuard service . . . .").

Third, as discussed below, Dr. Felder conclusively demonstrates that EnergyGuard costs do not in fact justify Agway's exorbitant rates. PSAMF ¶ 51. Agway's costs and expenses related to providing its customers with EnergyGuard amounted to $583,900, but the total overcharges

versus utility supply charges were at least $36 million.  *Id*.

Defendant makes the circular argument that: "the NYPSC held after extensive deliberation that the only ESCO in New York that demonstrated a sound basis for selling a variable-rate product to consumers at a price above the utility is Agway. . . . Therefore, as a matter of law, Agway did not commit consumer fraud on Ms. Gonzalez through either its contractual representations of its pricing, or how it charged Ms. Gonzalez."  Def. SJ Mem. at 14.  This logic does not follow.  The fact that Defendant is permitted to offer this product to the public does not mean that it can do so in a manner inconsistent with the terms of its contracts, or in a deceptive manner.  Indeed, by Defendant's logic, no ESCOs could have ever been sued based on a claim that their variable rates were not allowed under customer agreements because, before 2019, the PSC allowed ESCOs to sell variable rate products.  In fact, numerous courts have permitted contract and GBL claims against ESCOs based on substantially similar conduct.  *See* section, IV, *infra*.

Fourth, any PSC approval of EnergyGuard and Defendant's variable rates appears to be based on Defendant's misrepresentations.  In fact, Defendant misrepresents to consumers -- *and to the PSC* -- that EnergyGuard is being provided with electricity at no additional cost.  In the course of the PSC's proceedings, Defendant produced a proposed script for its customer service representatives that states:

> [B]y purchasing your electricity from Agway Energy instead of your Utility Company you'll *automatically receive* Agway's Energy Guard Repair Program. Some companies charge up to $50 a month for the same program and *we're automatically including it when you choose Agway us your supplier*. The program covers up to $1000 each year in repairs and parts on your central air conditioning unit, as well as another $1000 each year in repairs to the electric lines inside your home.

PSAMF ¶ 27.  As Plaintiff's expert stated, the findings of the PSC are "irrelevant given the language of Agway's Customer Agreement . . . Even if EnergyGuard has value and its value were part of Agway's Variable Rate methodology per the Customer Agreement (which it is not),

it does not follow that Agway can charge whatever it wants." PSAMF ¶ 76. "The fact that the NYPSC permits Agway to sell EnergyGuard with its Variable Rate product does not permit Agway to charge whatever it wants; it is still bound by reasonableness." PSAMF ¶ 76. "The fact that the NYPSC permits Agway to sell EnergyGuard does not mean that Agway complied with its Customer Agreement. The NYPSC Order (issued on December 12, 2019), which as I pointed out in my deposition is not dispositive, does not override or supersede Agway's Customer Agreement. The Plaintiff's Customer Agreement does not use the term *value* when discussing Variable Rates; instead it uses the term *cost*. Per Agway's Customer Agreement, its Variable Rates must be based on cost not value. Moreover, even if the NYPSC overrides Agway's Customer Agreement, which it does not, it would not apply before December 12, 2019." PSAMF ¶ 76.

The PSC Order does not preclude a dispute of material fact regarding whether Defendant violated its Customer agreement or acted deceptively.

## III.     DEFENDANT CANNOT ESTABLISH AS A MATTER OF LAW THAT IT DID NOT BREACH ITS CONTRACTS.

Under New York law, a party asserting a breach of contract claim must allege the following elements: (i) the existence of a contract; (ii) adequate performance of the contract by the plaintiff; (iii) breach by the other party; and (iv) damages suffered as a result of the breach. *Coughtry v. Tracker Marine, LLC*, No. 08-875, 2010 WL 11541908, at *2 (N.D.N.Y. Jan. 7, 2010) (denying motion for summary judgment and finding questions of fact as to whether the defendant's action breached the contract).

Defendant asserts that, as a matter of law, it did not breach contracts with its customers. But the facts show that Defendant breached its contracts by charging uncompetitive rates that were untethered to electricity market costs. PSAMF ¶¶ 16. In response, Defendant sets out a strained

interpretation of the contract, including a self-serving, incomplete list of Defendant's contractual obligations.  Def. SJ Mem. at 19-20.  But Defendant ignores the requirements that Defendant's variable rates be "competitive" and that they "shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins." PSAMF ¶¶ 12-13. Defendant did not comply with either of these contractual requirements.  Defendant also charged customers for its EnergyGuard service when it was required to provide that service at no additional cost.

As this Court aptly explained in its thorough and thoughtful opinion rejecting Defendant's EnergyGuard argument in denying its motion to dismiss:

> Agway's agreement represents that the variable monthly rate "shall each month reflect the cost of electricity acquired by Agway from all sources . . . related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins."  Defendant argues that it has not been misleading because it never represented that savings were guaranteed.  But this is inapposite to whether Defendant in fact charged rates to Plaintiff and putative class members that were based only upon those factors explicitly enumerated in the contract, as required by the contract.  Defendant's contention that its EnergyGuard product in some way justifies an increase in the variable rate is plausibly inconsistent with the terms of the agreement.  Plaintiff has plausibly alleged that Agway's rates were "not in fact competitive market rates based on the wholesale cost of electricity" or the factors set forth in the agreement.

*Gonzales*, 2018 WL 5118509, at *4.

There is no dispute that Defendant inflates its variable rate owing to EnergyGuard (indeed, that is the core of its defense), but, as discussed below, a plain reading of the Customer Agreement precludes Defendant from doing so.  Accordingly, Defendant cannot show that there is no material dispute as to whether it charged a rate not allowed under the Customer Agreement.  At best, the

Customer Agreement is ambiguous on this issue, which necessarily precludes summary judgment. *See 1000 N. of N.Y. Co. v. Great Neck Med. Assocs.*, 7 A.D.3d 592, 593 (2d Dep't 2004) (affirming denial of summary judgment and holding that "[w]hen the language of a contract is ambiguous, its construction presents a question of fact which may not be resolved by the court on a motion for summary judgment.") (quoting *Leon v. Lukash,* 121 A.D.2d 693, 694 (2d Dep't 1986)).

## A.    <u>Defendant's Rates Were Not Based On Market Costs.</u>

Defendant was required to charge rates that "shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins."  PSAMF ¶ 13. Defendant did not do this.  To the contrary, Defendant's fixed margins were so large that its rates no longer resembled market costs or factors.

Agway's rates were commercially unreasonable, particularly given Defendant's representations that it would charge "competitive" rates that reflect market costs.  There can be no genuine dispute that the utility is Agway's primary competitor.  PSAMF ¶¶ 2, 65, 73.  Moreover, as Dr. Felder explains, New York utilities purchase electricity on the open market at competitive rate, and therefore utility rates are a reflection of market costs and factors.  PSAMF ¶ 17.  Yet Defendant charged consumers more than $50 million in comparison to local utility rates.  PSAMF ¶ 18. ███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

In similar cases against ESCOs, courts have found that, "[g]iven the dramatic differences in pricing between defendant and [the local utility], it is plausible defendant's rates were not, in

fact, reflective of the wholesale cost of electricity or gas, market-related factors, and defendant's 'costs, expenses and margins.'"  *Chen v. Hiko Energy, LLC*, No. 14-1771, 2014 WL 7389011, at *4 (S.D.N.Y. Dec. 29, 2014) (similar to the present case, "[p]laintiffs' contracts provided that defendant would charge variable monthly rates reflecting the wholesale cost of electricity or gas, as well as various 'market-related factors, plus all sales and other applicable taxes, fees, charges or other assessments and HIKO's costs, expenses and margins.'"); *Stanley v. Direct Energy Servs.*, *LLC*, 466 F. Supp. 3d 415, 427 (S.D.N.Y. 2020) (denying motion to dismiss where "Plaintiff's allegation regarding other ESCO rates stems from the wide gap between Defendant's variable rates and local utility rates and/or 'Market Supply Costs.'") (collecting cases).

**B.     Defendant Improperly Charged Additional Amounts For EnergyGuard.**

In violation of the terms of the contract and contrary to Defendant's representations,

████████████████████████████████████████████████████

Section 1 of Plaintiff's contract provides that the "Agreement" "includes the Cover Letter." Contract § 1.   The cover letter provides that Plaintiff will receive the EnergyGuard Service at no additional cost.  It states in bold that: "**For being an Agway electricity customer, we also include the peace of mind and *added value* of Agway Energy Services Energy Guard Repair Program.**"  PSAMF ¶ 12 (italics added).   That is consistent with the representation made to Plaintiff by Defendant's customer representative.  *See* Coyle Decl. Ex. G ("Along with this program, you will also automatically receive the Agway Energy Guard Repair Program that provides coverage for your center air conditioning unit and electric wiring in your home.").   No consumer would expect to pay an extra charge for an ancillary benefit being touted as adding "added value" that is "automatically received."   They certainly would not expect to pay more than $50 million for that service.  PSAMF ¶ 18.  Nothing in the contract permits Defendant to charge

extra for the EnergyGuard service.  PSAMF ¶ 26.  Beyond the representation in the cover letter, the contract does not even mention EnergyGuard.  PSAMF ¶ 14.[4]  The additional charges for the EnergyGuard service constitute further breaches of the contract.

**C.**   **Defendant's Rates Were Not Competitive.**

The cover letter also provides that "you will receive a competitive monthly variable price." PSAMF ¶ 11.  Defendant cannot meet its burden to show there is no genuine dispute as to whether Defendant's rates were competitive.  In submissions to the PSC, Defendant admits they are not. In a post-hearing brief submitted in connection with the PSC's review of ESCO variable rates, Defendant conceded that "[i]f a customer wants that absolute lowest price, then Agway is the wrong provider for that customer."  PSAMF ¶ 23.

It is indisputable that Defendant's rates are not competitive with those of the local utilities. PSAMF ¶ 18.  To suggest that utilities are not competitors of ESCOs, such as Defendant, ignores reality.  Customers buy the same electricity from ESCOs that they could buy from utilities. PSAMF ¶ 3.  Therefore, ESCOs are necessarily competitors with utilities.  Indeed, when the energy market was deregulated, ESCOs were expected to compete with utilities by taking advantage of opportunities that utilities could not.  As the PSC noted, "[o]ne of the purposes of allowing ESCOs to participate in the retail energy market was to offer customers the option to choose among energy providers, with the understanding that '[c]ustomers acting in their own self-interest, when presented with a variety of market choices, will arrange their consumption to maximize their welfare and save costs.'"  PSAMF ¶ 4 (citations omitted).  ████████████████████

---

[4] Defendant's EnergyGuard brochures also do not disclose that customers will be changed extra for EnergyGuard.  PSAMF ¶ 15.  Defendant erroneously asserts that the EnergyGuard brochure is incorporated into the contract.  Def. SJ. Mem. at 18.  It is not.  The contract provides that: "The Agreement also includes the Cover letter and any approved addenda."  PSAMF ¶ 10.  It does not reference the brochure and no class member has ever approved it as an addendum.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

        In numerous other cases against New York ESCOs, courts have found that local utilities are appropriate comparators and that damages can be modeled based on differences between a defendant's rates and utility rates.  *See, e.g., Bell v. Gateway Energy Services Corp*, Index No. 31168/2018, NYSCEF Doc. No. 153 at 14 (N.Y. Sup. Ct., Rockland County Jan. 8, 2021) (attached as Garber Decl. Ex. 15) (denying defendant's motion for summary judgment and accepting damages model of Plaintiff's expert Dr. Frank Felder); *Mirkin v. XOOM Energy LLC*, 931 F.3d 173, 178 (2d Cir. 2019) (endorsing use of local utility as a comparator); *Stanley*, 466 F. Supp. 3d at 426 (holding *Richards*, 915 F.3d 88, does not stand for proposition that local utilities cannot be used as comparators, citing to later decided *XOOM* decision, and endorsing use of local utilities as comparators); *Chen*, 2014 WL 7389011, at *5 (using local utility as comparator).

        Defendant argues its rates were competitive with other ESCOs.  Def. SJ Mem. at 24-25. However, Defendant cannot meet its burden to show there is no material dispute as to whether its rates are competitive because they are substantially higher than utilities who are primary competitors in the electricity market.  And Defendant only compares its rates with other ESCOs also engaged in price gouging.  PSAMF ¶ 69.  Indeed, the PSC subsequently banned those ESCOs from providing electricity at such inflated prices because they were not competitive with utility pricing.  PSAMF ¶ 69.  If Defendant's rates were in line with those ESCOs variable rates, based on the PSC's findings, Defendant's rates were not competitive, commercially reasonable, or based

on electricity market pricing.[5]

Defendant's argument that Agway is competitive with other New York ESCOs relies on Dr. Debra J. Aron's conclusions that Agway's rates are not "the highest" among ESCOs' variable rates, and are "consistent" with or "within the range of variable rates."  Def. SJ Mem. 24-25. However, Dr. Felder conclusively refutes Dr. Aron's conclusions.  PSAMF ¶ 70 (citing Felder Rebuttal ¶¶ 70-82).

First, Dr. Felder highlights Dr. Aron's glaring failure to implement a proper scientific analysis, with defined criteria and a methodology, to determine whether Agway's rates are in fact "competitive."  PSAMF ¶ 71.  Instead of attempting to determine whether Agway's rates were "competitive," Dr. Aron asserts that Agway's rates are "consistent" and "within the range of variable rates," without ever defining those terms or what it would mean for rates to be "inconsistent" or "not within the range of variable rates."  PSAMF ¶ 71.  Moreover, Dr. Aron fails to explain how her findings of "consistent" or "within the range" are relevant to the facts of the case or the language in Agway's Customer Agreement.  PSAMF ¶ 71.

Second, Dr. Aron does not quantify the extent of rate differentials for the ESCOs that offered lower rates than Agway.  PSAMF ¶ 72.  As Dr. Felder explains, a careful look at the data reveals that, even when Agway was not offering EnergyGuard, there is virtually always "one or more ESCOs offering rates substantially lower than Agway's, on the order of $0.05/kWh[.]"  *Id.*

Third, Dr. Aron's analysis conveniently omits rates from her dataset that would undermine Agway's position, thereby heavily skewing her data sample.  Despite agreement among consumers, the PSC, Agway, and Dr. Aron's report that utilities rates compete with Agway's rates,

---

[5] Moreover, it does not matter what other ESCOs may have charged.  Defendant was also obligated to set rates based on its costs.  The fact that other ESCOs may have also gouged customers is not relevant to Plaintiff's claims.

Dr. Aron fails to include utility rates in her comparisons. PSAMF ¶ 73. Dr. Aron likewise excludes ESCOs' fixed rates from her analysis without explaining why comparisons to fixed rates would not be informative in determining whether Agway's rates were competitive and market cost-based. PSAMF ¶ 73. Of course, both utility rates and ESCOs' fixed rates irrefutably represent market alternatives to Agway's rates. PSAMF ¶ 73. It is thus unsurprising that Dr. Aron does not purport to assess a representative sampling of competitors' rates in her analysis. PSAMF ¶ 73. As the PSC acknowledges, fixed rates are a significant part of the competitive market for retail electricity. PSAMF ¶ 74 ("ESCOs in New York offer products and services that are not obtainable from the utilities, including . . . fixed-rate commodity products . . ."); *id*. ("By Staff's estimation, between 13% and 30% of mass-market ESCO customers in New York currently are served on a fixed-rate plan.").

Finally, even Dr. Aron's cherry-picked data demonstrates that Agway's rates are not competitive. For example, Dr. Aron's Exhibit 6 shows that Agway's rates are higher than other ESCOs' median variable rates 37% of the time. PSAMF ¶ 75. The same table mysteriously does not provide data to determine how often Agway's rates were among the lowest, if ever. *Id.* Dr. Aron's Exhibit 7 shows that between 5 to 26 ESCOs (14.4 ESCOs, on average) offered lower variable rates than Agway even when Agway did not offer EnergyGuard. *Id.* Similarly, Dr. Aron's Exhibit 8 shows that between 7 and at least 22 ESCOs (11.3 ESCOs, on average), offered lower variable rates than Agway when Agway included EnergyGuard. *Id.* Dr. Aron fails to provide any justification for Agway's positioning among competitors' variable rates. *Id.*

Dr. Aron's deeply flawed comparisons thus fail to show that there is no material dispute regarding whether Agway's rates are competitive.

**D.      Representations That Savings Are Not**
**        Guaranteed Do Not Cure Agway's Breaches.**

Defendant argues that its representation that "[p]articipation in this program is not a guarantee of future savings" and "[s]avings are NOT guaranteed" somehow cure its breaches of contracts and deceptive actions. But Plaintiff has never argued that its rates had to be lower than the utilities; rather, Plaintiff argues that Agway's rates are exorbitantly higher than utility rates and its own costs which proves they are not competitive or based on actual costs and other market factors. And, of course, this Court has already rejected this argument when it denied Defendant's motion to dismiss. *See Gonzales*, 2018 WL 5118509, at *4 ("Defendant argues that it has not been misleading because it never represented that savings were guaranteed. But this is inapposite to whether Defendant in fact charged rates to Plaintiff and putative class members that were based only upon those factors explicitly enumerated in the contract, as required by the contract.") (internal citation omitted).

**E.      Neither EnergyGuard's Cost**
**        Nor Its Value Justify Agway's Exorbitant Variable Rates.**

To prevail on this motion, Defendant must show that there is no material dispute that its variable rates were not higher than allowed under the Customer Agreement or in contravention of its promises to charge a competitive rate. It seeks to do so by pointing to the costs it incurs to provide EnergyGuard to consumers. Aside from the fact that the Customer Agreement does not allow for the inclusion of EnergyGuard costs, Defendant is wrong. Dr. Felder estimates that EnergyGuard cost Agway only $583,900 for the entire class period, but Agway overcharged consumers by more than $36 million. PSAMF ¶ 51. Defendant cannot meet its burden to show that EnergyGuard costs preclude a finding that its variable rates were too high.

Nor can Defendant meet that burden by showing that EnergyGuard has value independent

of its actual costs.  Agway relies on Dr. Aron for that proposition, but Dr. Felder definitively refutes her analysis.  Indeed, as Dr. Felder notes, "neither Agway nor Dr. Aron's Report has been able to quantify [EnergyGuard's] value."  PSAMF ¶ 44.  Dr. Aron's contention that EnergyGuard has value is based on a consumer survey that Agway conducted of customers after they used the EnergyGuard service.  PSAMF ¶ 52.  However, Dr. Felder identifies a number of methodological errors that render it "fatally flawed due to its statistical bias."  PSAMF ¶ 52.

First, the survey contains both a leading question about the value of EnergyGuard and sampling error.  As Dr Felder explains:

> The survey only asks Agway customers who use EnergyGuard, i.e., have their broken equipment repaired, does not ask the vast majority of customers who never need to use the warranty service, and does so without ever disclosing the amount customers were charged for EnergyGuard, making it impossible for consumers to assess the service's value . . . the Agway's EnergyGuard Survey [is] fatally flawed due to its biased question, sampling error, and not being transparent about its costs to Agway's customers . . .

PSAMF ¶ 53.

Second, the Agway survey is not based on a representative randomized sample, which in this case should have been all of Agway's customers, not just those who used EnergyGuard.  As Dr. Felder explains, this renders the Agway survey unreliable owing to a faulty methodology: "[R]epresentative sample is fundamental to statistics and is taught at the start of the semester in introductory statistics classes.  If the sample is not representative, that is, it is biased due to sampling error, the sample, in this case Agway's survey, should not be used to make any generalizations."  PSAMF ¶ 54.   In fact, 99.7% of Agway's Customers do not use EnergyGuard (PSAMF ¶ 43), and by "ignoring non-users of EnergyGuard, the resulting sampling error biases the results making them unusable to generalize from regarding the 'value' of EnergyGuard."  PSAMF ¶ 54.

Dr. Felder also definitively demonstrates that EnergyGuard's actual economic value is *de*

*minimus*, particularly in comparison to its outrageous margins and resulting exorbitant variable rates. Based on Agway's average actual annual EnergyGuard cost per customer ($2.13) and average cost for repairs, Dr. Felder concludes that the probability that any customer will use the EnergyGuard service is 0.29%. PSAMF ¶ 45 ("[I]f EnergyGuard costs on average $2.13 per customer and the average total cost of repairs is $740, then 0.29% of customers, 2.9 customers per 1000 customers, called for repairs.").

> As Dr. Felder explains:
>
> Assume an extremely risk averse customer is concerned that she may have to pay $2,000 in repairs and would have to borrow money at an extremely high interest rate to do so. There is a 0.29% chance that this would occur . . . Assume the customer would have to borrow money at 29.99% annual percentage penalty rate (APR), that is the interest rate if you miss a monthly payment . . . this hypothetical consumer, extremely risk averse who may have to borrow money for repairs at almost twice the typical credit card rate of 16%, has a 0.29% chance of paying $2,600 ($2,000 x1.2999) in a year without EnergyGuard. The expected cost per year to this extremely risk averse customer is $7.48 ($2,600*0.0029). As noted above, Agway's EnergyGuard's cost per customer per year is $2.13. Assuming . . . that all of Agway's consumers valued EnergyGuard at $7.48 then the total value of Agway's EnergyGuard service is 3.51 ($7.48/2.13) times its EnergyGuard's cost. The cost of EnergyGuard over the time period of my overcharge calculations in my Expert Report is $583,900.84. **This cost would translate into a total value, again using extremely favorable assumptions, to $2,051,283** . . . this would adjust my overcharge calculations . . . downward from $56.6 million to $54.6 million a 3.7% decrease.

PSAMF ¶ 46 (emphasis added). Defendant cannot show that there is no material dispute that it did not overcharge customers owing to EnergyGuard.

## F.   <u>Case Law Cited By Defendant Is Inapposite.</u>

Defendant relies on *Richards v. Direct Energy*. In *Richards*, the contract at issue -- unlike in the present case -- did not require rates based on market costs. Rather, the contract at issue there gave the defendant far greater discretion, providing that, "the rate for electricity will be variable each month at Direct Energy's discretion. The rate may be higher or lower each month based upon *business and market conditions*." *Richards*, 915 F.3d at 94 (emphasis added). The majority

opinion interpreted "business conditions" broadly. *Id.* at 98-99.[6]  The contract at issue here does not have such expansive language.

Tellingly, Defendant does not mention a more recent Second Circuit decision that distinguishes *Richards* for this very reason.  In *Mirkin v. XOOM Energy*, the Second Circuit reversed the dismissal of a contract claim similar to the one alleged in the present case.  In *Mirkin*, where the contract did require market-based rates, the court held:

> While the consumer-plaintiff's breach of contract theory in *Richards* was identical, or at least nearly identical, to the one the Mirkins now advance, the relevant contractual provisions are critically different.  The Agreement required XOOM to base its variable rates on its supply costs.  In contrast, the contract in *Richards*, by its plain terms, imposed no such requirement; the relevant provision there made no mention of procurement costs.  In light of this crucial difference, *Richards* does not control the outcome of this appeal.

*Mirkin*, 931 F.3d at 178 n.3.  Like *Mirkin*, in cases where ESCOs are required to charge market-based rates, claims survive.  In *Stanley*, which concerned nearly identical allegations to the ones here, Judge Karas addressed the interplay of *Richards* and *XOOM*, and denied the defendant's motion to dismiss a breach of contract and GBL § 349 claim.  *Stanley*, 466 F. Supp. 3d at 425-29 (sustaining breach of contract and GBL § 349 claims).  *See also Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 219 n.4 (E.D.N.Y. 2018) (same); *Chen*, 2014 WL 7389011, at *6 (same).

The contract in *Nieves v. Just Energy New York Corp*, No. 17-561, 2020 WL 6803056, at *4 (W.D.N.Y. Nov. 19, 2020), like that in *Richards*, made rates subject to broad "business conditions."  Defendant tellingly fails to cite the companion case to *Nieves* decided by the same judge two weeks later: *Jordet v. Just Energy Sols., Inc.*, 505 F. Supp. 3d 214, 233 (W.D.N.Y. 2020).  The court actually titled a section of the decision "How This Case Differs from *Nieves v.*

---

[6] Notably, *Richards* did recognize that, even where a contract grants an ESCO some discretion, the ESCO "was obliged to 'exercise that discretion in good faith.'"  *Richards*, 915 F.3d at 99 (quoting 23 *Williston on Contracts* § 63:22 (4th ed. 2018)).

*Just Energy New York Corp*." *Id.* The court held, "[t]he crucial difference between *Nieves* and this case is the variable terms in the supply contracts. Defendant here listed some (but not all) elements toward establishing business and market conditions in variable pricing, whereas the defendant ESCO in *Nieves* has more open concept of that phrase 'business and market conditions.'" *Id.* The same is true here except the distinction is even more stark. The Just Energy contract in *Jordet*, unlike Defendant's contract, included the "business conditions" provision, and even then, the *Jordet* court recognized that, by including the additional factors, the defendant ESCO limited its own discretion.

This Court also recognized that *Richards* is inapposite when it denied Defendant's motion for reconsideration of the denial of its motion to dismiss. *See Gonzales v. Agway Energy Services, LLC*, 2019 WL 910669, at *3 (N.D.N.Y. Feb. 25, 2019). Defendant also cites another case brought against it, *Brown v. Agway Energy Servs., LLC*, 822 Fed. App'x 100 (3d Cir. 2020). This Court already addressed and rejected Defendant's argument based on *Brown* when it denied Defendant's motion for reconsideration. *See Gonzalez*, 2019 WL 910669, at *3 (noting that "the *Brown* action is not binding upon this Court"). *Brown* is also inconsistent with *Mirkin*, which is binding.[7]

## IV.    **PLAINTIFF'S GBL CLAIMS SHOULD NOT BE DISMISSED.**

Under GBL § 349(a), "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." GBL

---

[7] Other cases cited by Defendant are also inapposite. *Sevugan v. Direct Energy Serv.*, LLC, 931 F.3d 610, 617 (7th Cir. 2019), which relies upon *Richards*, involved a contract that also provided significantly greater discretion to set rates independent of market costs. *Sevugan*, 931 F.3d at 617. *Sevugan* is further distinguishable because, there, unlike in the present case, the plaintiff argued that the defendant was obligated to charge rates *below* wholesale costs and utility prices. *Id.* at 615. In *Orange v. Starion Energy PA, Inc.*, 711 Fed. Appx. 681, 684 (3d Cir. 2017), the complaint was dismissed because Plaintiff's allegations were entirely conclusory and based solely on the fact that the defendant's rates were higher that a utility.

§ 349-d, which specifically applies to ESCOs, provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."   This Court already held that Plaintiff has adequately alleged violations of GBL §§ 349 and 349-d.  *Gonzalez*, 2018 WL 5118509, at *4.

Nevertheless, Defendant now erroneously argues that a plaintiff may not allege a claim under GBL §§ 349 and 349-d where the loss is "duplicative of the loss alleged by a breach of contract."  Def. SJ Mem. at 26.  In so doing, Defendant misreads *Spagnola v. Chubb*, 574 F3d 64, 66 (2d Cir. 2009), making an erroneous legal argument that ignores the facts of this case.

First, controlling Second Circuit decisions make clear that *Spagnola* does not stand for the proposition for which Defendant cites.  *See Orlander v. Staples, Inc*., 802 F.3d 289, 301-02 (2d Cir. 2015) (distinguishing *Spagnola*, in which the court "declined to find Section 349 injuries where the plaintiffs alleged damages in the amount of the purchase price of their contracts, *but failed to allege* that defendants had denied them the services for which they contracted," and noting that *Spagnola* was limited to cases involving consumable goods cases where "a plaintiff must allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase.") (emphasis in original); *see also Nick's Garage*, 875 F.3d at 125 (reversing dismissal of GBL claims where district court erroneously relied upon *Spagnola*, holding that "Insurer argues that the § 349 claims of First-Party Assignors fail because they do not allege an injury independent of their contract damages. The cases on which Insurer relies [including *Spagnola*], however, do not establish such a requirement.  Rather, those cases found no GBL injury 'where the plaintiffs alleged damages in the amount of the purchase price of their contracts, but failed to allege that defendants had denied them the services for which they

23

contracted.'") (quoting *Orlander*, 802 F.3d at 302).[8]  As this Court held, "electricity . . . is a service [and thus not a good] under New York law."  *Gonzales*, 2019 WL 910669, at *1.

In *Donnenfeld*, 333 F. Supp. 3d at 214, 224, a case directly on point involving similar claims against an energy provider, the court distinguished *Spagnola*, finding that, "[b]ased on this most-recent guidance from the Second Circuit" in *Orlander* and *Nick's Garage*, the plaintiff sufficiently stated a GBL claim where he alleged that "as a result of [defendant's] allegedly deceptive billing conduct, he repeatedly overpaid for home heating oil" where the defendant failed to adjust prices based on market costs.  *See also Lussoro v. Ocean Fin. Fed. Credit Unio*n, 456 F. Supp. 3d 474, 491-92 (E.D.N.Y. 2020) (rejecting argument that plaintiff's GBL claim must be dismissed where "any loss she suffered as a result of Defendant's allegedly deceptive conduct is not independent of the loss she suffered as a result of Defendant's alleged breach of the Contract.") (citing *Nick's Garage* and *Donnenfeld*).[9]

Numerous courts have permitted similar GBL claims to be brought against ESCOs, highlighting the shortcoming in Defendant's argument. *Stanley*, 466 F. Supp. 3d at 428, 437 (sustaining breach of contract, GBL § 349, and GBL § 349-d claims) ((citing *Mirkin v. Viridian*

---

[8] *See also Carias v. Monsanto Co*., No. 15-3677, 2016 WL 6803780, at *11 (E.D.N.Y. Sept. 30, 2016) ("Defendant contends that these cases stand for the proposition that GBL §§ 349 and 350 were not intended to provide duplicative recoveries for injuries recoverable under other existing legal doctrines. The Court is hesitant to read *Spagnola* as broadly as defendant suggests. First, the Second Circuit's cursory discussion of this issue in *Spagnola* does not even mention the purported policy rationale that defendant claims animates this line of authority. Second, in *Orlander v. Staples, Inc*., 802 F.3d 289 (2d Cir. 2015), the Second Circuit read *Spagnola* narrowly and appears to have limited the scope of *Spagnola*'s sweeping conclusion that 'loss [under GBL § 349] must be independent of the loss caused by the alleged breach of contract.'  In light of the above, the Court does not find *Spagnola* and it progeny to be persuasive on the issue before this Court.").

[9] Defendant's reliance on *Perks v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 642 (S.D.N.Y. 2020) is misplaced because it similarly recognizes that a GBL § 349 claim is not duplicative of a breach of contract claim when it alleges the defendant's conduct "concealed or misrepresented any contractual terms."

*Energy, Inc.*, No. 15-1057, 2016 WL 3661106 (D. Conn. July 5, 2016) (sustaining breach of

contract, GBL § 349, and GBL § 349-d claims)); *Claridge v. N. Am. Power & Gas, LLC*, No. 15-

1261, 2015 WL 5155934, at \*3-\*6 (S.D.N.Y. Sept. 2, 2015) (sustaining breach of contract, GBL

§ 349, and GBL § 349-d claims); *Chen*, 2014 WL 7389011, at \*3-\*7 (sustaining breach of contract,

GBL § 349, and GBL § 349-d claims)*.*

## V.     PLAINTIFF'S EXPERT DR. FRANK FELDER SATISFIES
##          <u>FEDERAL RULE OF EVIDENCE 702 REGARDING ADMISSIBILITY</u>

Pursuant to Rule 702 of the Federal Rules of Evidence, which governs the admissibility of

expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the
> case.

"'[T]he Supreme Court has made clear that the district court has a gatekeeping function

under Rule 702 -- it is charged with the task of ensuring that an expert's testimony both rests on a

reliable foundation and is relevant to the task at hand.'" *Guardino v. Alutiiq Diversified Servs.,*

*LLC*, 457 F. Supp. 3d 158, 161 (N.D.N.Y. 2020) (D'Agostino, J.) (denying motion to preclude

expert and quoting *Amorgianos v. Nat'l R.R. Passenger*, 303 F.3d 256, 265 (2d Cir. 2002)); *accord*

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

First, "[i]n reviewing the admissibility of expert testimony, courts must determine whether

the expert is qualified to testify. 'Qualification may be based on a broad range of knowledge, skills,

and training.'" *Guardino*, 457 F. Supp. 3d at 161 (quoting *In re Mirena IUD Prod. Liab. Litig.*,

169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016)).   "'Courts within the Second Circuit have liberally

construed expert qualification requirements.'" *Id.* (quoting *Mirena*, 169 F. Supp. 3d at 412).

Second, the district court must examine whether the expert testimony is reliable. As the Second Circuit has explained:

> [T]he district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case. In short, the district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Guardino*, 457 F. Supp. 3d at 161 (quoting *Amorgianos*, 303 F.3d at 265). Although the Supreme Court's decision in *Daubert* identified factors with which the district court may evaluate the reliability of expert methods, the district court's "inquiry is necessarily a 'flexible one,' [] and the types of factors that are appropriate to consider will 'depend[] upon the particular circumstances of the particular case at issue[.]'" *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (holding that the lower court abused its discretion when precluding the plaintiffs' expert) (quoting *Daubert*, 509 U.S. at 594, and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)); *accord Guardino*, 457 F. Supp. 3d at 162 ("'In all cases, the test of reliability is flexible, and a district court has 'the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.'") (quoting *Mirena*, 169 F. Supp. 3d at 413).

"'In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'" *Guardino*, 457 F. Supp. 3d at 162 (quoting *Amorgianos*, 303 F.3d at 267). "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will

not render an expert's opinion *per se* inadmissible . . . The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* (quoting *Amorgianos*, 303 F.3d at 267); *accord Cruz v. Kumho Tire Co.*, No. 10-219, 2015 WL 2193796, at *5 (N.D.N.Y. May 11, 2015) (D'Agostino, J.) (denying motion to preclude expert and quoting *Amorgianos*, 303 F.3d at 266). "Disputes regarding the nature and strength of an expert's credentials, an expert's use or application of her methodology, or the existence or number of supporting authorities for an expert's opinion, go to the weight, not the admissibility of her testimony." *Id.* (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

"As the courts and Advisory Committee have made clear, 'the rejection of expert testimony is the exception rather than the rule.'" *Guardino*, 457 F. Supp. 3d at 161 (quoting Fed. R. Evid. 702, Advisory Committee's Note); *see also U.S. v. Mack*, 13-54, No. 2014 WL 7404763, at *2 (D. Conn. Nov. 7, 2014) (*Daubert* "does not change the 'liberal admissibility standards of the federal rules,' and […] the proper tool for challenging 'reliable, albeit debatable, expert testimony' is still the adversary system.") (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)); *Makinen v. City of N.Y.*, 53 F. Supp. 3d 676, 697 (S.D.N.Y. 2014) (the Federal Rules "favor admissibility" of expert testimony).

A.    **Dr. Felder Readily Satisfies The**
       **Qualification Requirements To Serve As An Expert.**

Defendant argues that, despite his extensive industry-specific knowledge and experience, Dr. Felder is not qualified because he does not have an economics degree.  *See* Def. SJ Mem. at. 30, 31, 33, 39.  But Dr. Felder need not have formal training as an economist to opine on the energy industry and to conduct relatively straightforward arithmetic.[10]  As is evident from Dr. Felder's

---

[10] "[Expert testimony regarding calculating damages would assist the jury even if the underlying arithmetic is not complex.  [The expert's] methodology . . . incorporates a substantial amount of

report and *curriculum vitae*, Dr. Felder has both industry-specific educational training and extensive experience conducting research, consulting, and teaching in the areas of energy markets and policy.  PSAMF ¶¶ 47-49.  He also publishes and consults extensively on almost all aspects of wholesale and retail energy markets in the United States and internationally.  PSAMF ¶ 50. Accordingly, Dr. Felder's testimony falls squarely within his specialized knowledge, and Dr. Felder readily satisfies Rule 702's liberal expert qualification standards.

"'[A]ssuming that the proffered expert has the requisite minimal education and experience in a relevant field, courts have not barred an expert from testifying merely because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit.'"  *Cruz*, 2015 WL 2193796, at *6 (quoting *Canino v. HRP, Inc.,* 105 F. Supp. 2d 21, 27 (N.D.N.Y. 2000)).  "'[W]here . . . well-trained people with somewhat more general qualifications are available, it is error to exclude them.'"  *Id.* (quoting *Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 82 (2d Cir. 1997)). Similarly, and contrary to Defendant's position that Dr. Felder's lack of formal training as an economist is decisive, Rule 702 contemplates that an expert may be qualified on the basis of experience and, "'[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.'"  *LaBarre v. Werner Enterprises, Inc.*, No. 12-1316, 2015 WL 4649285, at *7 (N.D.N.Y. Aug. 5, 2015) (D'Agostino, J.) (quoting Fed. R. Evid. 702, Advisory Committee's Note) (denying motion to preclude expert testimony); *Varga v. Rent-A-Ctr. E., Inc.*, No. 10-559, 2012 WL 2178866, at *3 (N.D.N.Y. June 13, 2012) (same; denying motion to preclude expert testimony).

Defendant's qualms with Dr. Felder's "qualifications constitute the type of 'quibble over

disparately-sourced data in a way that would assist the jury."  *Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*, 441 F. Supp. 3d 745, 759 (S.D. Iowa 2019).  The accuracy of Dr. Felder's methodologies ultimately "go[es] to weight, not admissibility" of his testimony.  *Id.*

an expert's experience, academic training, and other alleged shortcomings' that the Second Circuit has held 'go to the weight and credibility of an expert's testimony instead of the admissibility of his opinions.'"  *Cruz*, 2015 WL 2193796, at *6 (quoting *Milliman v. Mitsubishi Caterpillar Forklift Am., Inc.*, 594 F. Supp. 2d 230, 237 (N.D.N.Y. 2009)); *accord McCullock*, 61 F.3d at 1043 ("Fuller's quibble with Woolley's academic training in fume dispersal and air quality studies, and his other alleged shortcomings (lack of knowledge regarding the chemical constituents of the fumes or the glue vapor's concentration level), were properly explored on cross-examination and went to his testimony's weight and credibility -- not its admissibility") (citation omitted).

Dr. Felder holds doctorate and master's degrees from the Massachusetts Institute of Technology where his studies focused on electricity markets and power systems.  PSAMF ¶ 47. Prior to his graduate studies, Dr. Felder served as a nuclear engineer and submarine officer in the United States Navy.  PSAMF ¶ 47.  Dr. Felder's undergraduate degrees are in applied mathematics from Columbia College and the School of Engineering and Applied Sciences at Columbia University.  PSAMF ¶ 47.  At the time that Dr. Felder drafted and submitted his reports, he was the Director of the Center for Energy, Economic and Environmental Policy of the Rutgers University Energy Institute, and Research Professor at the Edward J. Bloustein School of Planning and Public Policy, Rutgers University.  PSAMF ¶ 47.  He was also the Principal of Independent Electricity Consultants, LLC.  PSAMF ¶ 47.

Since the implementation of electricity markets in the United States in the early 1990s, Dr. Felder has been involved as a researcher and consultant working on market design and policy, especially in the Northeast and mid-Atlantic regions.  PSAMF ¶ 48.  He has advised utilities, independent generation owners, generation and transmission developers, wholesale market administrators, public agencies, ESCOs such as Agway, and other industry participants.  PSAMF ¶ 48.  For nearly two decades, Dr. Felder delivered a two-day course on electricity markets attended

29

by approximately 2,000 professionals representing a cross section of the industry including electric and natural gas utilities, independent power producers, ESCOs, federal and state regulators, wholesale market operators, and others.  PSAMF ¶ 48.

Dr. Felder served on the Board of Directors of an ESCO that operated in New York in addition to providing consulting and training to ESCO employees.  PSAMF ¶ 49.  During 2011-2013, Dr. Felder co-chaired the New York Independent System Operator's (NYISO) Consumer Advisory Council, which advised the NYISO Board of Directors and senior management of the New York's wholesale electricity market operator and market administrator on retail consumer issues.  PSAMF ¶ 49.  Dr. Felder also consulted for market participants that buy and sell power within the NYISO and mid-Atlantic regions.  PSAMF ¶ 49.

Not surprisingly, Dr. Felder's opinions have assisted courts in assessing summary judgment motions and certifying classes using the methodologies set forth in Dr. Felder's report and rebuttal report.  *See, e.g.*, *Bell v. Gateway Energy*, NYSCEF Doc. No. 153 (Garber Decl. Ex. 15) (granting the plaintiff's partial summary judgment as to liability and citing report from Dr. Felder); *Claridge v. N. Am. Power & Gas, LLC*, No. 15-1261, 2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016) (certifying class and citing report from Dr. Felder).

In light of Dr. Felder's extensive energy industry-specific training and experience, including but not limited to electricity markets, deregulation, and electricity pricing, it is beyond cavil that he is sufficiently qualified to provide testimony in this action.  *See, e.g.*, *Mahaska*, 441 F. Supp. 3d at 761-62 ("Plaintiffs' argument that Bellas as a non-economist cannot testify regarding economic topics is unpersuasive because Bellas does not attempt to create an economic model beyond his expertise but rather focuses his testimony on historical information and trends regarding the beverage industry, a topic on which he is qualified.  For these reasons, Plaintiffs' motion to exclude Bellas' testimony is denied.").  Accordingly, Defendant's cursory contentions

regarding Dr. Felder's qualifications are insufficient to preclude his testimony and, at best, may be raised with the jury to challenge the weight and credibility of Dr. Felder's testimony.

**B.**   **Dr. Felder's Opinions Are Reliable.**

Defendant's contentions that Dr. Felder's opinions are "completely unsupported" and "suffer[] from an 'analytical gap' between the opinions and the supposed support he relied on" likewise lack meritless.  *See* Def. SJ Mem. at 30.  To the extent that Defendant's arguments are not contrary to this Court's prior rulings, they were all addressed in Dr. Felder's rebuttal report.  *GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 331 (N.D.N.Y. 2013) (D'Agostino, J.) ("[R]ebuttal evidence from an expert is acceptable on a motion for summary judgment.").  Moreover, Defendant does not explain how any of the issues it raises would materially affect Dr. Felder's findings.  Even if there were merit to any of Defendant's contentions, they would constitute "[d]isputes regarding . . . an expert's use or application of [his] methodology" and would accordingly "go to the weight, not the admissibility of [Dr. Felder's] testimony."  *Cruz*, 2015 WL 2193796, at *5 (citing *McCulloch*, 61 F.3d at 1044).

First, Defendant attempts to attack Dr. Felder's Court-endorsed use of utilities' contemporaneous rates as a comparator.  Def. SJ Mem. at 30.  As noted above, that attack fails.  Moreover, Defendant expressly only takes issue with Dr. Felder's use of the utilities' rates as an overcharge metric as a consequence of the PSC's Reset Order 2.  *Id*.  However, in order to make this distinction, Defendant erroneously conflates the PSC's decision to allow Defendant to sell electricity at a variable rate with the requirement in the Customer Agreement that Defendant's rates must be competitive and based on its costs and market factors.

Second, Defendant contends that Dr. Felder fails to account for EnergyGuard when making his damages calculation.  Def. SJ Mem. at 30, 36.  Not so.  Dr. Felder conducts all of his analyses

"without and with [Defendant's EnergyGuard] costs in case they are determined to be appropriate," as is explicit in Tables 4 and 6 of his report.  PSAMF ¶ 55;  *see also* R. Evid. 702, Advisory Committee's Note (noting that experts may testify on the basis of conditional or hypothetical facts).[11]

Third, Defendant asserts that two *de minimis* discrepancies in Dr. Felder's opening report are fatal to Dr. Felder's reliability, notwithstanding that Dr. Felder's rebuttal report addressed all such discrepancies after they were raised in Defendant's expert's report.  Defendant suggests that (1) Dr. Felder should have deducted negative overcharges from his overcharge calculations, and (2) Dr. Felder should have considered the tax benefits applicable to all ESCO customers.  Def. SJ Mem. at 32-34.  Both of these points were addressed in Dr. Felder's rebuttal report and, ultimately, the discrepancies noted by Defendant's expert resulted in higher damages figures than Dr. Felder calculated in the opening report.  PSAMF ¶ 56.

With respect to negative overcharges, *i.e.*, the rare months during which the variable rate was lower than the contemporaneous utility rate, Dr. Felder explains his rationale: "Variable Rate customers are monthly and for each month should receive the value of their agreement, as in the case of the Plaintiff who was promised a '**competitive monthly variable price**', and not have one month affect another month.  . . . Consumers, if promised the benefit of a '**competitively monthly variable price,**' would expect to receive the benefits of that promise and not weight positive months against negative ones."  PSAMF ¶ 57 (emphasis in the original).  Notwithstanding the lack

---

[11] *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.* has no bearing on this case.  *See* Def. SJ Mem. at 30-31.  Unlike the instant action, the expert in *Johnson Elec.* based "his computations . . . on highly questionable assumptions," which appears to be a generous description since the court precedes to describe the expert's extrapolations as having no basis in fact whatsoever.  103 F. Supp. 2d 268, 283-284 (S.D.N.Y. 2000).  Indeed, the court goes on to state that, "[u]nder *Daubert* and the Federal Rules of Evidence, experts are not required to base their opinions on empirical data alone."  *Id.*

of foundation for Defendant's contention, Dr. Felder conducted his first methodology to account for months where the variable rates were lower than prices to compare and found that the original $30,497,574 overcharges figure was reduced to $30,657, 890, "a difference of $160,316 or 0.52% of my original reported overcharge for this set of assumptions.  PSAMF ¶ 57.

Similarly, Defendant's assertion that Dr. Felder should have considered a former New York State sales tax exemption applicable to all ESCO customers is likewise unavailing.[12]  As Defendant concedes, *the tax exemption only applies to the delivery portion* -- not the supply portion -- of consumers' bills.  *See* Def. SJ Mem. at 32-33.  As the Court is aware, *this action solely concerns the supply portion* of consumers' bills.  PSAMF ¶ 58.  In terms of liability, the incidental delivery tax discount offered by the State has no bearing on whether Defendant complied with its supply pricing methodology since Defendant has no authority over delivery taxes.  For the same reason, there is no basis to consider the State's incidental discount in Dr. Felder's damages calculations -- which is precisely why delivery sales taxes are not incorporated in utilities' prices to compare.  *See* N.Y. Tax Law § 1105-C(a).  Even if the Court finds that Dr. Felder should have considered the *de minimis* discrepancies Defendant raises, "errors or omissions in the witness's report . . . go to the weight of the evidence, not its admissibility."  *Encompass Advisors, Ltd. v. Unapen, Inc.*, No. 09-1949, 2013 WL 6331157, at *3 (D. Conn. Dec. 5, 2013).  And Dr. Felder explained that he can easily account for the tax if asked to do so.  PSAMF ¶ 59.

Fourth, Defendant takes issue with Dr. Felder's margin analyses.  Def. SJ Mem. at 31.  Unable to properly challenge the premises underlying Dr. Felder's analyses, Defendant resorts to fabricating testimony, suggesting that it is Dr. Felder's "premise" "that an accounting profit margin

---

[12] The tax exemption was no longer in effect as of June 1, 2019.  N.Y. Tax Law § 1105-C (repealed April 1, 2019).

of zero is reasonable[.]"  *Id.*[13]  Of course, nowhere in Dr. Felder's reports or testimony did Dr.

Felder state or insinuate that Defendant is not entitled to profit margins.  Rather, in his report, Dr.

Felder conducted analyses using four different sample margins: no margin, Agway's introductory

rate margin, a 5% margin, and a 10% margin.  PSAMF ¶ 60.  Contrary to Defendant's assertions,

and as Dr. Felder repeatedly made clear, Dr. Felder used zero margin as one of his many metrics

to serve as a baseline.  PSAMF ¶ 60.  ("If neither Dr. Aron's Report nor Agway can quantify what

the numerical margin should be per Agway's Customer Agreement, it is reasonable to use a

numerical value of zero as a baseline.").

Dr. Felder explained the basis for using 5% and 10% margins during his deposition: "Both

my experience in the industry when I was working for an ESCO, what I have seen in other cases

and also based on my price to compare analysis, which [] also informed the cost of goods analysis,

[*i.e.*,] Agway's total cost analysis."  PSAMF ¶ 61.  ("[T]he basis is my experience in the industry,

as a consultant, as part of litigation, as being involved in the energy service industry, that's the

basis for using a margin of both 5 and 10 percent and the fact that even with those margins, if

Agway would have been able to procure electricity at a much lower cost commensurate with the

price to compare, they would have made a substantial amount of money."); *see also id*. ("In my

experience as an industry analyst and participant, ESCOs margins can be small.").  "The fact that

both Agway and its economic expert cannot quantify the margins that should be used in the

Variable Rate pricing language, language Agway wrote, is revealing."  PSAMF ¶ 61.

Dr. Felder further recognized that the jury or finder of fact will ultimately decide what

constitutes a reasonable margin, and that Dr. Felder will implement that amount in his formulas.

PSAMF ¶ 62 ("Assuming that a jury or finder of fact concludes that Agway should have been

---

[13] Defendant does not bother to provide a citation for this fantastical characterization of Dr. Felder's testimony (because it cannot).

selling electricity under its variable rate based on its COGS [cost of goods sold] and the other expenses that I just described and perhaps escalated to recover some lower margin than it charged, I can calculate the relevant overcharges."); *id.* ("I have calculated the overcharges Agway charged its customers assuming different margins . . . If asked and provided the appropriate margin parameters, I could calculate the overcharges for each member of the class.").

Fifth, Defendant argues that Dr. Felder's testimony should be precluded because he relied upon Defendant's utility price to compare data -- but this data had been authenticated by Defendant as reliable, accurate, and prepared and maintained by Defendant in the routine course of its business. PSAMF ¶ 63. Notably, neither Defendant, nor its expert, provided any reason to believe that this data is inaccurate, conducted any analysis to indicate any flaws in Defendant's price to compare data collection, or demonstrated that any differences in rates or classifications are material. *See* Def. SJ Mem. at 32, 34-35; PSAMF ¶ 64. ("Dr. Aron's Report does not conduct any analysis to indicate that these differences are material or that my level of aggregation is inappropriate.") (citing Dr. Aron's Report ¶¶ 192-193); *see also Cummings v. Standard Reg. Co.*, 265 F.3d 56, 65 (1st Cir. 2001) (affirming decision to let testimony stand where, "importantly, [the movant] has failed to show how the information [the expert] did use was incorrect.").

In addition to being entirely speculative, Defendant's position objects to factual inputs, not Dr. Felder's methodology itself, and is therefore not a basis for exclusion. *See SourceOne Dental, Inc. v. Patterson Companies, Inc.*, No. 15-5440, 2018 WL 2172667, at *6 (E.D.N.Y. May 10, 2018) (denying motion to exclude expert testimony, holding, "objections to [an expert's] damages model [that] focus almost entirely on his factual inputs and assumptions rather than his methodology . . . go to the probative value of [the expert's] testimony, not its admissibility, and the jury will decide how probative it is.") (citing *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir. 1995)); *Hartle v. FirstEnergy Generation Corp.*, No. 08-1019, 2014 WL

1317702 (W.D. Pa. Mar. 31, 2014) ("[E]ven if the data relied on by the expert is 'imperfect, and more (or different) data might have resulted in a better or more accurate estimate in the absolute sense, it is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony.'") (holding that, despite using imperfect data, the expert's testimony met the threshold for admissibility) (citation omitted); *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 74 F. Supp. 3d 639, 657 (S.D.N.Y. 2015) ("[T]he actual presence or likelihood of errors in this data goes to the testimony's weight, not its admissibility") (denying motions to exclude expert testimony) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)); *U.S. v. Romano*, 859 F. Supp. 2d 445, 459 (E.D.N.Y. 2012), *aff'd*, 794 F.3d 317 (2d Cir. 2015) ("'Defendants are free to challenge the basis and source for [the proposed expert's] numbers, but a challenge to the facts or data relied upon by [the proposed expert] does not go to the admissibility of his testimony, but only to the weight of his testimony.'") (denying motions to preclude expert testimony) (quoting *Aventis Envtl. Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005)); *Cummings v. Standard Reg. Co.*, 265 F.3d 56, 65 (1st Cir. 2001) ("[T]he failure to include particular variables could diminish the testimony's probativeness, but would not render it 'unacceptable'") (affirming lower court's decision to admit expert testimony) (citation omitted).

Defendant's reliance on *Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21 (2d Cir. 2017) and *Munoz v. Orr*, 200 F.3d 291 (5th Cir. 2000) undercuts Defendant's own argument. Def. SJ Mem. at 32. In *Forte*, an employment discrimination action, the District Court excluded the expert's testimony because, *inter alia*, the expert did not account for confounding variables commonly considered when evaluating salaries in discrimination cases. *Forte*, 2015 WL 5820976, at *7 (S.D.N.Y. Sept. 30, 2015) ("Erath's analysis fails to control for any possible confounding variables that could potentially provide a nondiscriminatory explanation for the observed compensation discrepancies, including tenure, position, or organizational level" and "he neither

36

knew how compensation was set at Liquidnet nor inquired into the subject beyond understanding that compensation was composed of remuneration in the form of salary, bonus, commission, and equity payments."). Similarly, the *Munoz* court excluded the plaintiffs' expert's testimony for a variety of reasons which, "[t]aken cumulatively," indicated unreliability. 200 F.3d at 300-02 ("The facts showing the insufficiency of Dr. Benz' evidence range from particular miscalculations to his general approach to the analysis."). Conversely, the price to compare is a straightforward metric put forth by utilities to facilitate supply rate comparisons. PSAMF ¶ 65. ("[T]he utility Price to Compare, and in fact its public policy purpose, is to provide a price for customers to compare or benchmark against ESCO prices.").

Indeed, both courts explicitly noted that the failure to adequately examine the underlying data was problematic because the data came from the same party that retained the expert. *Munoz*, 200 F.3d at 301 ("Dr. Benz [*i.e.*, the plaintiffs' expert] *relied on the plaintiffs' compilations of data, which gives rise* to a 'common-sense skepticism' regarding the expert's evaluation") (emphasis added). *Forte*, 675 F. App'x at 23-24 ("[A]s Dr. Erath admitted, he did not independently verify any of the data he used in the report -- he simply input the numbers *he was given by Forte* and used them to calculate pay discrepancies. A failure to validate data by itself can constitute grounds for excluding an expert report.") (emphasis added). Because the underlying data here came from Defendant, not Plaintiff, Dr. Felder was not obligated to independently verify Defendant's data. *See, e.g.*, *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 38 (D.D.C. 2004) (collecting cases); *cf. Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000) ("[A]n expert may rely on data that she did not personally collect."); *Mirena*, 169 F. Supp. 3d at 412 ("Experts need not have actually collected the data on which they base their conclusions in order to be credible.") (quoting *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 284 (S.D.N.Y. 2011)).

37

Notwithstanding Defendant's sudden reversal regarding the accuracy of its data and its speculative arguments, Dr. Felder's methodology remains reliable and the price to compare inputs may be readily modified to address Defendant's concerns.  As Dr. Felder explained in his reports and deposition, "if necessary, the utilities provide the Price to Compare adjusted for rate class, zone, etc.  The weblinks in Exhibit 6 show that utility Price to Compare data is available and, as applicable, broken down by rate class and zone."  PSAMF ¶ 66 (explaining that, using "the methodology that I described in my report, I can account for different price to compares for the same utility in different zones and I've done that in the past"); *id*. (using ConEd's website as an example).[14]   Accordingly, Dr. Felder can easily update his algorithms to incorporate historical prices to compare collected directly from the utilities.

Finally, Defendant asserts that Dr. Felder's analysis is "unsound" because he did not read and analyze every iteration of Agway's correspondence with its customers.  Def. SJ Mem. at 35-36.  Nowhere in Dr. Felder's analysis does Dr. Felder purport to have read and analyzed each iteration of Agway's contracts.  PSAMF ¶ 67.  Indeed, it is not an expert's responsibility to interpret the facts; rather, contract interpretation is within the jury's province.  *Stanley*, 466 F. Supp. 3d at 430 (explaining that the factfinder will be responsible for interpreting the energy contract's ambiguous terms); *Sigmon for Hindin v. Goldman Sachs Mortg. Co.*, No. 12-3367, 2018 WL 1517189, at *4 n.4 (S.D.N.Y. Mar. 26, 2018), *aff'd*, 800 F. App'x 25 (2d Cir. 2020) ([I]t is

---

[14] *Cf. GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 345 (N.D.N.Y. 2013) (D'Agostino, J.) (permitting expert to submit affidavit supplementing prior testimony after close of expert discovery) ("'Pursuant to Rule 26 [], courts will not admit supplemental expert evidence following the close of discovery when it expound[s] a wholly new and complex approach designed to fill a significant and logical gap in the first report,' as doing so 'would eviscerate the purpose of the expert disclosure rules. [] [T]o the extent that an expert affidavit is within the scope of the initial expert report, it is properly submitted in conjunction with dispositive motions even outside the time frame for expert discovery.'") (quoting *Cedar Petrochemicals*, 769 F. Supp. 2d at 279).

well-settled that contract interpretation is not a proper subject of expert testimony.") (quoting *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) ("The question of interpretation of the contract is for the jury and the question of legal effect is for the judge.  In neither case do we permit expert testimony.")).

Such an examination is also unnecessary given that Defendant's corporate representative repeatedly testified under oath that all of Defendant's customer agreements contain uniform substantive representations and have been consistent over time.  PSAMF ¶ 68.  Ultimately, "Defendant['s] contentions that [Dr. Felder] failed to consider certain relevant documents . . . go to the weight of his testimony."  *Cruz*, 2015 WL 2193796, at *8 (rejecting the defendants' assertion that failing to consider relevant documents and data renders an expert's testimony unreliable) (citing *McCullock*, 61 F.3d at 1044).

## C.   Dr. Felder's Testimony Will Help The Trier Of Fact.

Dr. Felder's testimony will assist the trier of fact because it is directly tied to the facts underlying this action, theories of liability, and damages calculations.  Dr. Felder will use his expertise to assist the jury in understanding and assessing the following overarching topics: (1) retail energy deregulation and how ESCOs, such as Agway, procure electricity for their customers; (2) how much Defendant's variable rate customers were overcharged relative to rates that reflected Defendant's costs plus a reasonable margin; and (3) how much Defendant's variable rate customers were overcharged relative to their respective utilities' contemporaneous default electricity supply rates.  *See* Felder Report at 1 (summarizing the report's scope).[15]  This testimony

---

[15] Numerous courts, including this Court, have endorsed Dr. Felder's methodologies to demonstrate liability and damages, which necessarily renders Dr. Felder's testimony regarding those methodologies relevant.  *See, e.g.*, *Gonzales*, 2018 WL 5118509, at *4 ("On a breach of contract theory, Plaintiff would have been damaged in an amount equal to the difference between the rate charged and the rate that would have been charged had Agway based its rates on the factors

will help the jury determine whether Agway complied with its customer agreements and the extent

of damages.  Accordingly, Dr. Felder's testimony is "fits" with the issues to be resolved in this

case and will assist the jury in understanding and determining issues of fact.

## <u>CONCLUSION</u>

For all the aforementioned reasons, Plaintiff respectfully requests that the Court deny this

motion in its entirety.

Dated:  White Plains, New York
    September 27, 2021

         By:    <u>*s/ Todd S. Garber*</u>
            Todd S. Garber
            D. Greg Blankinship
            Chantal Khalil
            **FINKELSTEIN, BLANKINSHIP,**
            **FREI-PEARSON & GARBER, LLP**
            One North Broadway, Suite 900
            White Plains, NY 10601
            Tel: (914) 298-3283
            Fax: (914) 824-1561
            tgarber@fbfglaw.com
            gblankinship@fbfglaw.com
            ckhalil@fbfglaw.com

            *Attorneys for Plaintiff*
            *and the Putative Class*

---

represented in the agreement."); *id.* at *2, *4 (holding that Plaintiff plausibly alleged violations of GBL §§ 349 and 349-d based on comparisons to contemporaneous utility rates); *Chen*, 2014 WL 7389011, at *5 ("[U]nder a breach of contract theory, plaintiffs' loss would be . . . the difference between the amount defendant actually charged plaintiffs and the amount defendant should have charged them had it based its prices on the factors identified in plaintiffs' contracts."); *id.* ("Under [the GBL] theory, plaintiffs' loss would be the difference between the amount defendant charged them and the amount they would have been charged by [the incumbent utility].")