UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTONIO MARTINEZ, | : |
| Plaintiff, | : |
| -against- | : Case No. 5:18-cv-00235-MAD-ATB |
| AGWAY ENERGY SERVICES, LLC, | : |
| Defendant. | : |

**PLAINTIFF'S RESPONSES TO DEFENDANT'S
STATEMENT OF UNDISPUTED FACTS**

1. The New York Public Service Commission ("PSC") is the New York regulatory agency with supervisory authority over all Energy Supply Companies ("ESCOs") in the state of New York and was established in 1907. *Matter of Nat'l Energy Marketers Ass'n v. N.Y. State Pub. Serv. Comm'n*, 33 N.Y.3d 336, 341 (2019); *People ex. rel. N.Y. Edison Co. v. Willcox*, 207 N.Y. 86, 91 (1912).

   **Plaintiff's Response**: Admit that the PSC is a regulatory agency with certain authority over ESCOs, but deny knowledge or information regarding the date of its establishment.

2. The Uniform Business Practices ("UBPs") were promulgated by the PSC in 1999 to set forth the criteria that ESCOs must satisfy to become eligible to sell electricity or natural gas in New York. (Declaration of John D. Coyle ("Coyle Decl."), Ex. A, p. 14).

   **Plaintiff's Response**: Admit that the UBPs were promulgated by the PSC and that they, *inter alia*, set out eligibility requirements for ESCOs to sell electricity or natural gas.

3. Starting in 2016, the PSC began a four-year process to evaluate the state of the secondary energy market in New York and to strengthen consumer protections to remedy "unfair business practices that have been used by various retail energy market participants and adopting limitations on the types of products that may be offered to mass market energy services companies (ESCOs)." (Coyle Decl., Ex. C ("Reset Order 2"), p.1).

**Plaintiff's Response**: Admit that, in 2016, the PSC initiated a proceeding regarding the ESCO industry.

4. On December 2, 2016, the PSC issued a Notice of Evidentiary and Collaborative Tracks and Deadlines for Initial Testimony and Exhibits in the PSC dockets, 15-M-0127, 12-M-0476, and 98-M-1343 (the "PSC Proceedings"). (Coyle Decl., Ex. C, p.2, n.2).

**Plaintiff's Response**: Admit.

5. The PSC Proceedings were initiated in part because the PSC determined that the retail markets serving mass market customers are not providing sufficient competition or innovation to properly serve consumers. (Coyle Decl., Ex. C, p.3).

**Plaintiff's Response**: Admit only that the PSC initiated this proceeding for numerous reasons referenced in the PSC's December 12, 2019 order. This PSC order actually states that "[t]he December [2016] Notice stated that 'the Commission has determined that the retail markets serving mass-market [residential and small commercial] customers are not providing sufficient competition or innovation to properly serve consumers.'" PSC Order Adopting

Changes to the Retail Access Energy Market and Establishing Further Process dated December 12, 2019 ("PSC Order") (Garber Decl. Ex. 5) at 3. This is double-hearsay. FRE 801, 802.

6. The PSC Proceedings were also initiated because the PSC "had specific concerns about reports of consumer abuses in the retail access market, including 'overcharging,' as well as the lack of innovation with respect to energy efficiency and energy management services. (Coyle Decl., Ex. C, p.3).

    **Plaintiff's Response**: Admit only that the cited PSC order actually states that "[t]he [December 2016] notice informed parties that the Commission had specific concerns about reports of customer abuses in the retail access market, including 'overcharging,' as well as the lack of innovation with respect to energy efficiency and energy management services." PSC Order (Garber Decl. Ex. 5) at 3. This is double-hearsay. FRE 801, 802.

7. The PSC Proceedings commended with an "evidentiary track" to consider "whether: the regulatory regime applicable to ESCOs requires modification; new ESCO rules and products could be developed that would provide the desired benefits to residential and small commercial customers; or the retail access market should be closed entirely." (Coyle Decl., Ex. C, p.3).

    **Plaintiff's Response**: Admit only that the cited PSC order contains the quoted language.

8. The evidentiary track of the PSC Proceedings consisted of, "initial testimony, rebuttal testimony, cross-examination testimony and exhibits, initial briefs, reply briefs, and public comments. The evidentiary hearing took place before two Administrative Law Judges (ALJs) over ten days in Albany, beginning on Wednesday, November 29, 2017 and continuing through

Tuesday, December 12, 2017. The transcript of the hearing consists of 4,233 pages of testimony and cross-examination of 22 witnesses and panels of witnesses." (Coyle Decl., Ex. C, pp.3-4).

**Plaintiff's Response**: Admit only that the cited PSC order contains the quoted language and otherwise deny knowledge or information sufficient to respond. This statement is hearsay. FRE 801-802.

9. The PSC issued a Notice of Proposed Rule Making as part of this process, pursuant to the State Administrative Procedure Act (SAPA) §202(1). (Coyle Decl., Ex. C, p.5; SAPA No. 15-M-0127SP8).

**Plaintiff's Response**: Admit only that a notice was issued by the PSC and that the PSC purports that it was issued pursuant to the State Administrative Procedure Act. Defendant does not provide a copy of the cited SAPA No. 15-M-0127SP8.

10. After the conclusion of the evidentiary track the PSC issued an "Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process" on December 12, 2019. ("Reset Order 2").

**Plaintiff's Response**: Admit.

11. "The most commonly offered ESCO product" is "a commodity-only, variable-rate product, that frequently is provided at a higher price than charged by the utilities." (Coyle Decl., Ex. C, p.11).

**Plaintiff's Response**: Admit that the cited PSC order contains the quoted language.

12. Some ESCOs offer "value-added products and services," which are "typically products that are more accurately described as marketing devices or one-time offers intended to induce customers to enroll with the ESCO." (Coyle Decl., Ex. C, p.11).

    **Plaintiff's Response**: Admit that the cited PSC order contains the quoted language.

13. "The items - such as frequent flyer miles, gift cards, sports tickets, LED light bulbs, and 'smart' thermostats - frequently have a market value that is much lower than the amount customers ultimately pay to the ESCO over the course of the contract in excess of what they would have paid to the utilities." (Coyle Decl., Ex. C, p.11).

    **Plaintiff's Response**: Admit that the cited PSC order contains the quoted language.

14. The PSC determined that "many of the aforementioned items have nothing to do with providing energy services and therefore serve none of the goals of the energy retail market." (Coyle Decl., Ex. C, p.11).

    **Plaintiff's Response**: Admit that the cited PSC order contains the quoted language.

15. According to the PSC, between 2014 and 2016, the PSC's Office of Consumer Services received more than 11,000 initial complaints about ESCOs, with "about half" of these complaints alleging deceptive marketing practices." (Coyle Decl., Ex. C, p.11).

    **Plaintiff's Response**: Admit that the cited PSC order contains the quoted language.

16. Despite these problems, the PSC determined that the regulated energy market would be allowed to continue, contingent on participants' strict compliance with the reforms from Reset

Order 2, which will "ensure that only the products and services that truly benefit the customers of the State will be offered, at just and reasonable rates." (Coyle Decl., Ex. C, p.13).

    **Plaintiff's Response**: Deny. The PSC Order contains the following language:

> Because certain ESCO products and services have the potential to provide some benefits to customers and help the State advance its clean energy goals, the Commission determines that, at this time, the regulated retail energy market will continue. However, the continuation of the markets is contingent on the participants' unconditional commitment to, and strict compliance with, the reforms adopted herein, which are intended to enhance transparency for customers, provide greater customer protection from bad-acting ESCOs, and ensure that only the products and services that truly benefit the customers and the State will be offered, at just and reasonable rates.

PSC Order (Garber Decl. Ex. 5) at 13. The PSC order provided that certain ESCO activity would be allowed to continue for a limited period of time while the PSC conducts "Track II" of its proceedings. *Id*.

17. Reset Order 2 accomplishes three goals: it (1) "increases ESCO accountability by enhancing eligibility criteria and implementing other changes in the eligibility process; (2) empowers customers by improving transparency of ESCO product and pricing information, primarily through an on-bill comparison of ESCO to utility commodity prices and through required itemizing of ESCO charges; and (3) prohibits ESCO product offerings that lack energy-service-based value by adopting restrictions on the types of products and services ESCOs are allowed to offer mass-market customers." (Coyle Decl., Ex. C, p.2).

    **Plaintiff's Response**: Deny. While the quoted language is contained within the cited PSC order, this language is a forward-looking aspirational statement and is not evidence that these goals were actually accomplished.

6

18. Accordingly, the PSC amended the UBPs consistent with the provisions of Reset Order 2. (Coyle Decl., Ex. C, p.14, 22).

**Plaintiff's Response**: Admit only that the cited PSC order stated that, "[u]nless otherwise set forth herein, requirements adopted in this Order governing ESCO terms of service are implemented as of the effective date of the amended Uniform Business Practices (UBP), 60 days from the effective date of this Order." PSC Order (Garber Decl. Ex. 5) at 14. Defendant also cites to an incomplete copy of the PSC's December 12, 2019 order, which does not contain the cited page 22.

19. After four years of proceedings and 4,223 pages of testimony, through Reset Order 2, the PSC made a final determination: as of the effective date of Reset Order 2, no ESCOs other than Agway is permitted to offer a non-green energy variable rate product that exceeds the utility price to compare. (Coyle Decl., Ex. C, p.23).

**Plaintiff's Response**: Admit only that the PSC issued an order. Deny knowledge or information sufficient to respond regarding the length of testimony. The cited evidence is hearsay. FRE 801, 802. Otherwise deny.

20. Additionally, no ESCO other than Agway is permitted to offer a "value-added" product to any New York Consumers. (Coyle Decl., Ex. C, p.23).

**Plaintiff's Response**: Deny. This is an inaccurate representation of the PSC's determinations, which leave open the possibility for other ESCOs to market similar products.

21. Agway is the one exception to those rules in Reset Order 2: Agway is permitted to provide its variable-rate electricity commodity with EnergyGuard as a value-added product. (Coyle Decl., Ex. C, p.23).

**Plaintiff's Response**: Deny.  This is an inaccurate representation of the PSC's determinations, which leave open the possibility for other ESCOs to market similar products.

22. The PSC explained why Agway was the sole exception: "The Commission provides one exception to these three criteria and allows Agway a limited opportunity to continue to offer its EnergyGuard service, due to the specific, credible evidence Agway submitted regarding the energy-related value of this product."  (Coyle Decl., Ex. C, p.23).

**Plaintiff's Response**: Admit only that the quoted PSC order contains the quoted language.  The representation that Defendant offered specific, credible evidence regarding the energy-related value of this product is hearsay and Defendant has not provided any such evidence to this Court.  FRE 801, 802.  Further, it appears that the PSC may have been acting on inaccurate information provided by Defendant, including the misrepresentation that its EnergyGuard service would be provided to customers at no additional cost.  Defendant's Response to Interrogatory/Document Request (Garber Decl. Ex. 11) (proposed scripts for customer representatives)

23. The PSC further added, "Because, with the exception of Agway's EnergyGuard product, no meaningful evidence was provided to demonstrate that any energy-related value-added product or service currently offered provides benefits to customers comparable to its costs, the provision

of such a product or service is not sufficient at this time to demonstrate that an ESCO offering benefits customers and should be permitted." (Coyle Decl., Ex. C, p.53).

    **Plaintiff's Response**: Admit only that the quoted PSC order contains the quoted language.  This is hearsay.  FRE 801, 802.

24. The PSC stated that "with the exception of Agway's EnergyGuard product," no other variable rate products may be offered for sale above the utility price on the basis that the ESCO also includes an "energy-related value-added product or service" (Coyle Decl., Ex. C, p.53-54).

    **Plaintiff's Response**: Admit only that the quoted PSC order contains the quoted language.

25. The PSC explained its reasoning why Agway was permitted to exceed the utility price for a variable rate product: "Because Agway provided detailed evidence demonstrating that EnergyGuard provides a unique benefit that may be reasonably comparable to its costs, Agway may continue to offer EnergyGuard during this interim period."  (Coyle Decl., Ex. C, p.54).

    **Plaintiff's Response**: Admit only that the quoted PSC order contains the quoted language.  The representation that Defendant provided detailed evidence demonstrating that EnergyGuard provides a unique benefit that may be reasonably comparable to its costs is hearsay and Defendant has not provided any such evidence to this Court.  FRE 801, 802.  Further, it appears that the PSC may have been acting on inaccurate information provided by Defendant, including the misrepresentation that the its EnergyGuard service would be provided to customers at no additional cost.  Garber Decl. Ex. 11  (proposed scripts for customer representatives).

26. On September 18, 2020, the PSC followed up Reset Order 2 with an Order on Rehearing, Reconsideration, and Providing Clarification ("Reconsideration Order") after petitions from multiple ESCOs requesting an opportunity to reply to the proposed rule. (Coyle Decl., Ex. E).

    **Plaintiff's Response**: Admit.

27. The Reconsideration Order stated: "In contrast to the vast majority of ESCOs, Agway made use of the administrative process to demonstrate that its EnergyGuard product provided unique value. The fact that Agway provided a clear record basis regarding product value explains why the Commission was able to immediately allow it to continue offering that product." (Coyle Decl., Ex. E, p.41).

    **Plaintiff's Response**: Admit only that the quoted PSC order contains the quoted language. The representation that Defendant Agway made use of the administrative process to demonstrate that its EnergyGuard product provided unique value and that it provided a clear record basis regarding product value is hearsay and Defendant has not provided any such evidence of that record to this Court. FRE 801, 802. Further, it appears that the PSC may have been acting on inaccurate information provided by Defendant, including the misrepresentation that the its EnergyGuard service would be provided to customers at no additional cost. (Garber Decl. Ex. 11) (proposed scripts for customer representatives).

28. Starting in the late 1990s, customers of ESCOs like Agway were exempt from sales taxes on the transportation and distribution of energy to incentivize them to enroll with ESCOs. (Coyle Decl., Ex. D (Dep. of Dr. Felder), 106:10-16).

    **Plaintiff's Response**: Admit.

29. On December 14, 2017, Naomi Gonzales completed a recorded Third-Party Verification ("TPV") call to confirm her enrollment with Agway. (Coyle Decl., Ex. G).

    **Plaintiff's Response**: Admit only that Ms. Gonzales spoke with a representative of Defendant.

30. After completing the TPV call, Agway mailed Ms. Gonzales a Customer Disclosure Statement, Welcome Letter, and EnergyGuard brochure. (Coyle Decl., Ex. I, Deposition of Michael Scheuler, dated June 22, 2020 ("Schueler Dep. II"), p. 84:19-85:4); Coyle Decl., Ex. H).

    **Plaintiff's Response**: Admit.

31. Ms. Gonzales enrolled with Agway in February 2016 and received electricity, as well as the EnergyGuard warranty service, which covered up to $1,000 annually for residential central air conditioning unit repairs and an additional $1,000 annually for home electrical wiring repairs. (Coyle Decl., Ex. H).

    **Plaintiff's Response**: Deny, except admit that that Ms. Gonzales enrolled with Defendant in February 2016 and received electricity. It was represented to her that the EnergyGuard service would be provided to her at no additional cost, but she never utilized the service. Welcome Package (Garber Decl. Ex. 6); (Coyle Decl. Ex. G). With respect to what the EnergyGuard service included, the cited evidence is hearsay. FRE 801, 802.

32. Ms. Gonzales's Welcome Letter stated: "**For being an Agway electricity customer, we also include the peace of mind and added value of Agway Energy Services EnergyGuard Repair**

11

**Program.  Agway EnergyGuard provides you with protection in the event of a breakdown of your residential central air conditioning unit or a problem with the electrical wiring in your home.  It provides up to a maximum of $1000 for parts and labor each year per service plan every calendar year that you're a customer**." (Coyle Decl., Ex. H (emphasis in original)).

      **Plaintiff's Response**: Admit.

33. Per Agway's contract with Ms. Gonzales, "The first month of the Initial Term will be at an Introductory Rate of …$.044 per kWh for electricity; thereafter a monthly variable rate, to be determined at Agway's discretion will apply." It goes on to say that "The Electric Variable Rate shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins." (Coyle Decl., Ex. H).

      **Plaintiff's Response**: Admit that the documents provided to Ms. Gonzales contained the quoted language.

34. The EnergyGuard brochure Ms. Gonzales received stipulated the following:

> **CENTRAL AIR CONDITIONING**
>
> **Covered Parts/Service:** The Program covers the following parts for one electric central air conditioner up to a maximum of $1,000 for parts and labor per calendar year: compressors, condenser and evaporator coils, reversing valves, refrigerant replacement, solenoid valves, bearings/shafts, belts and pulleys, blower assembly, blower motor, blower pulleys, capacitors, circuit boards, condenser motor/fans, contactor switches, delay timers, fan belt, fan controls, fan relays, fuses (internal), limit controls, motors, line set, operating relays, service valves, schrader valves, thermostats (standard/regular), transformers, and energy-saving thermostats.

**Exclusions & Limitations:** Exclusions include, but are not limited to: cleaning, maintenance or balancing of system, or auxiliary equipment such as air ducts, air filters, electronic air cleaners, room air conditioners, and humidifiers. Program does not cover repair of drywall as a result of repairs and/or service.

**ELECTRIC LINE REPAIR**

**Covered Parts/Service:** The Program covers repairs to electrical wiring inside the home up to a maximum of $1,000 for parts and labor per calendar year. The Program covers standard interior copper wiring, clock or energy-saving thermostat, circuit breakers, breaker panels, doorbells, standard wall outlets (including GFCI), standard wall switches, and dimmers. The Program is only available for households with electrical service rated at or below 400 Amps.

**Exclusions & Limitations:** Exclusions include, but are not limited to: maintenance of electrical lines, service entry cables or any appliances connected to the electrical system such as but not limited to refrigerators, stoves, cooktops, washers, dryers, lighting fixtures, ceiling fans, or security systems, and the cost of replacing incorrectly sized wiring systems. Also, the Program will not cover the cost of moving or updating an electrical line to meet code, law, ordinance, or because the repair, move or update was recommended by the municipal inspector, manufacturer, or electric company. Program does not cover repair of drywall as a result of repairs and/or service. (Coyle Decl., Ex. H).

**Plaintiff's Response**: Admit only that the brochure contained the quoted language, which is otherwise hearsay.  FRE 801, 802.


35. Both Ms. Gonzales's contract and the TVP call state that participating in Agway's program does not guarantee savings. (Coyle Decl., Exs. G, H).

**Plaintiff's Response**: Admit that the cited transcript of the call stated that "[p]articipation in this program is not a guarantee of future savings" and the cited contract says "**Savings are NOT guaranteed**."  Coyle Decl. Exs. H and G at 6:9-10 (emphasis in the original).


36. Agway calculates a customer's price by adding together "two key components": the amount charged to Agway for the electricity needed by its customers, and a "fixed adder rate."

13


(Coyle Decl., Ex. F (Deposition of Michael Scheuler dated Aug. 30, 2018 ("Schueler Dep. I")), 162:10-21; Ex. I, "Schueler Dep. II", 94:22-95:2).

**Plaintiff's Response**: Deny.  Transcript of Deposition of Michael Scheuler ("Schueler I Dep. Tr.") (Garber Decl. Ex. 7) at 161:22-23. *Id*. at 166-67.

37. The fixed adder rate is comprised of Agway's expenses plus a profit margin. (Coyle Decl., Ex. I (Schueler Dep. II), 133:20-134:21).

**Plaintiff's Response**: Deny.  Deposition of Transcript of Debra Kiser ("Kiser Tr.") (Garber Decl. Ex. 8) at 66:13. Deposition of Transcript of Douglas Brinkworth ("Brinkworth Tr.") (Garber Decl. Ex. 14) at 36:20-25. The expense of EnergyGuard is actually *de minimis*. Expert Report of Frank Felder, Ph.D. ("Felder Report") (Garber Decl. Ex. 1) at 17.

38. For the period from Q2 (second quarter) 2014 through Q4 (fourth quarter) in 2019, Dr. Aron compared Agway's price to the posted prices for 147 other ESCOs in the servicing utility territories where Agway had customers: Central Hudson, Con Edison, National Grid, NY State Electric & Gas, Orange & Rockland, and Rochester Gas & Electric. In every single quarter, in

every single service territory, Agway was never the highest posted price. And in all but one of the 125 comparisons made, Agway was below the median posted price. Thus, with the single exception of Orange & Rockland's service territory in Q3 2014, Agway's price for energy was below the median price. (Coyle Decl., Ex. J (Dr. Aron Report), Ex. 12, pp. 233-35).

**Plaintiff's Response**: Deny. Expert Rebuttal Report of Frank Felder, Ph.D. ("Felder Rebuttal") (Garber Decl. Ex. 3) ¶¶ 70-82.

39. Ms. Gonzales began her enrollment with Agway in February of 2016 (i.e., Q1 16). During that quarter, Agway charged Ms. Gonzales a lower price per kWh for electricity than every other ESCO that serviced Central Hudson's customers. (Coyle Decl., Ex. J, p.243).

**Plaintiff's Response**: Deny. Welcome Package (Garber Decl. Ex. 6); Felder Rebuttal Report (Garber Decl. Ex. 2) ¶¶ 70-82.

40. Similarly, for Q2 2016, Agway again charged Ms. Gonzales a lower per-kWh price than every other ESCO that serviced Central Hudson. (Id., p.244).

**Plaintiff's Response**: Deny. Felder Rebuttal (Garber Decl. Ex. 2) ¶¶ 70-82.

41. For Q3 of 2016, Agway's variable rate plus EnergyGuard was more than one ESCO, but still below the median price (Id., p. 245).

**Plaintiff's Response**: Deny. Felder Rebuttal (Garber Decl. Ex. 2) ¶¶ 70-82.

42. By Q4 of 2016, the price Agway charged Ms. Gonzales was once again lower than any other ESCO's posted price. (Id., p.246).

**Plaintiff's Response**: Deny. Felder Rebuttal (Garber Decl. Ex. 2) ¶¶ 70-82.

43. The same pattern continued in 2017 with Agway's price exceeding only one ESCO in Q1 and Q3, matching the lowest other price in Q2 and being the lowest price in Q4 of 2017, when Ms. Gonzales switched back to utility service. (Id., pp.247-50).

**Plaintiff's Response**: Deny. Felder Rebuttal (Garber Decl. Ex. 2) ¶¶ 70-82.

44. In the Central Hudson Zone from Q2 2016 through Q4 of 2017, the average highest posted price for any ESCO was $0.138, the average median posted price for any ESCO (other than Agway) was $0.111 per kWh, and Agway's price was $0.0876 per kWh. (Id., p.233).

**Plaintiff's Response**: Deny. Felder Rebuttal (Garber Decl. Ex. 2) ¶¶ 70-82.

45. As of December of 2019, Agway serviced 24,245 customers in New York. (Coyle Decl., Ex. J (Dr. Aron Report), Ex. 3, p 163 AGWAY 762719).

**Plaintiff's Response**: Admit.

46. On October 16, 2020, Plaintiff Naomi Gonzales passed away and on November 6, 2020, the Court was notified of Ms. Gonzales's death. (Coyle Decl., ¶10).

**Plaintiff's Response**: Admit.

47. On February 3, 2021, Plaintiff's counsel filed a motion to substitute plaintiff, replacing Ms. Gonzales with her son Antonio Martinez, Administrator of Ms. Gonzales's estate. On April 1,

2021, Plaintiff's motion was granted and the caption for the Complaint was thusly amended. (Coyle Decl., ¶11).

**Plaintiff's Response**: Admit.

48. Dr. Frank Felder, expert witness for Plaintiff, used Reset Order 2 as one of the bases of his findings because "it is consistent with the history of deregulation in the United States, which I reference in my report, it's consistent with my experience and background, it's consistent with the reports, similar reports of other agencies, government agencies, some are public service commissions will be analogue in other states and it's consistent with my findings in this matter." (Coyle Decl., Ex. D, Felder Dep. 83:20 to 84:2).

**Plaintiff's Response**: Admit that Dr. Felder stated the quoted language at his deposition, regarding the December 2019 PSC order.

49. Dr. Felder quotes Reset Order 2 in his report to discuss the breadth and scope of the evaluation, as well how thoroughly researched it is. (Coyle Decl., Ex. B, Felder Report, p. 7, Coyle Decl., Ex. C, Reset Order 2, p. 2-4).

**Plaintiff's Response**: Admit that Dr. Felder quotes the December 2019 PSC order to discuss the PSC proceedings. Dr. Felder's report does not describe these proceedings as "thoroughly researched." Felder Report (Garber Decl. Ex. 1) at 7.

50. Dr. Felder, expert witness for the Plaintiff, earned his doctorate in Technology, Management, and Policy, and, by his own admission, is not an economist. (Coyle Decl., Ex. D, Felder Dep., 96:21-23; Ex. B, Curriculum Vitae).

**Plaintiff's Response**: Admit that Dr. Felder, *inter alia*, has a Ph.D. from the Massachusetts Institute of Technology in Technology, Management and Policy (Engineering Systems Division) and that he is not an economist. Felder Report (Garber Decl. Ex. 1) at Ex. A.

51. Dr. Felder's methodology does not calculate Agway's costs to individuals and instead uses aggregate data, despite the differences in rate classes, usage, and other factors. (Coyle Decl., Ex. D, Felder Dep. 140:9 to 141:2).

**Plaintiff's Response**: Deny. Dr. Felder's aggregate damages amount is determined by combining each Agway's customer's data. Felder Report (Garber Decl. Ex. 1) at 8 note 10. Dr. Felder also explains that he can do his calculations for any particular class member. *See id*. at 17; Transcript of Deposition of Dr. Frank Felder ("Felder Tr.") (Garber Decl. Ex. 12) at 138:11-139:15. For the price to compare (the utility rate) Dr. Felder used the price that varied by month and utility for each related group of customers. *Id*. at 74:18-75:11. Dr. Felder's methodology also accounted for differences in zones and rate classes, and any such differences were small in any event. *Id*. at 88:3-89:11; 140:17-22.

52. Dr. Felder did not read any other contract than Ms. Gonzales's in either New York or Pennsylvania. (Coyle Decl., Ex. D, Felder Dep. 26:5-24).

**Plaintiff's Response**: Deny. The cited testimony does not support this statement and only involves welcome letters and brochures. This "fact" is also irrelevant because Defendant's witnesses conceded that there are no material differences between Ms. Gonzalez' contract and those of other class members.

53. Dr. Felder admitted that he did not assess what the cost would be to Agway for offering EnergyGuard to their customers, what its market value is, or if there are comparable products on the market. (Coyle Decl., Ex. D, 55:8-21).

**Plaintiff's Response**: Deny.  Dr. Felder does account for the costs of EnergyGuard ($583,900).  Felder Report (Garber Decl. Ex. 1) at 17.  Dr. Felder also calculates the value of EnergyGuard ($2,051,283); Felder Rebuttal (Garber Decl. Ex. 2) at ¶ 106-113. The cited testimony also does not involve Defendants' costs for offering EnergyGuard to their customers or the service's value.

Dated: White Plains, New York
September 27, 2021

By: *s/ Todd S. Garber*
Todd S. Garber
D. Greg Blankinship
Chantal Khalil
**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, NY 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
tgarber@fbfglaw.com
gblankinship@fbfglaw.com
ckhalil@fbfglaw.com

*Attorneys for Plaintiff
and the Putative Class*