UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTONIO MARTINEZ, | : |
| Plaintiff, | : |
| -against- | : Case No. 5:18-cv-00235-MAD-ATB |
| AGWAY ENERGY SERVICES, LLC, | : |
| Defendant. | : |

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

1. Defendant is an energy services company or "ESCO" that provides electricity to its customers. Expert Report of Frank Felder, Ph.D. ("Felder Report") (Garber Decl. Ex. 1) at 4-5; Expert Rebuttal Report of Frank Felder, Ph.D. ("Felder Rebuttal") (Garber Decl. Ex. 2) ¶ 31.

2. Defendant competes with local utilities. Transcript of Deposition of Patricia Robinson ("Robinson Tr.") (Garber Decl. Ex. 3) at 127:21-132:22; Felder Report (Garber Decl. Ex. 1) at 4-5.

3. Customers buy the same electricity from ESCOs that they could buy from utilities. Transcript of Deposition of Debra Aron ("Aron Tr.") (Garber Decl. Ex. 4) at 60:24-61:3

4. Indeed, when the energy market was deregulated, ESCOs were expected to compete with utilities by taking advantage of opportunities that utilities could not. As the New York Public Service Commission ("PSC") noted, "[o]ne of the purposes of allowing ESCOs to participate in the retail energy market was to offer customers the option to choose among energy providers, with the understanding that '[c]ustomers acting in their own self-interest, when presented with a variety of market choices, will arrange their consumption to maximize their welfare and save costs.'" New

1

York Public Service Commission Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process dated December 12, 2019 ("PSC Order") (Garber Decl. Ex. 5) at 32-33 (citations omitted).

5. Ms. Gonzales spoke with a customer service representative who represented to her that she would be charged an introductory rate of 4.4 cents per kilowatt hour (kWh). Declaration of John D. Coyle ("Coyle Decl.") Ex. G.

6. Defendant's representative further represented that Ms. Gonzales "will then continue to receive Agway's *competitive market based monthly variable rate* until you notify Agway of your wish to cancel." Coyle Decl. Ex. G (emphasis added).

7. The representative also represented to Ms. Gonzales that she would receive the EnergyGuard service at no additional cost. Coyle Decl. Ex. G ("Along with this program, you will also automatically receive the Agway Energy Guard Repair Program that provides coverage for your center air conditioning unit and electric wiring in your home.").

8. The "EnergyGuard" service is a limited warranty against potential damage to air conditioners and home wiring caused by electrical surges. Welcome Package (Garber Decl. Ex. 6) (EnergyGuard brochure).

9. Defendant sent Ms. Gonzales a cover letter, a contract, and a brochure pertaining to the EnergyGuard service (collectively, the "Welcome Package"). (Garber Decl. Ex. 6).

10. The contract provides that: "The Agreement also includes the Cover letter and any approved addenda." It does not reference the brochure. Welcome Package (Garber Decl. Ex. 6) § 1.

11. The cover letter stated, in bold letters: "**We're excited to be providing you with this special offer, you will receive a competitive monthly variable price starting with your**

next scheduled meter reading." Welcome Package (Garber Decl. Ex. 6).

12. The cover letter further stated, in bold letters: "**For being an Agway electricity customer, we also include the peace of mind and added value of Agway Energy Services *EnergyGuard* Repair Program.**" Welcome Package (Garber Decl. Ex. 6).

13. Ms. Gonzales's contract provided that:

> Unless otherwise agreed to in writing, the price for all electricity sold under this Agreement shall be a variable rate which shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins.

Welcome Package (Garber Decl. Ex. 6) § 3.

14. The contract says nothing about the EnergyGuard service and does not provide that Defendant may charge any amounts for this service. Welcome Package (Garber Decl. Ex. 6).

15. Neither the EnergyGuard brochure nor the cover letter disclose that this service will be provided at an additional cost or what that cost would be. Welcome Package (Garber Decl. Ex. 6).

16. Defendant charged uncompetitive rates not justified by its costs, market related factors, or its profit margin. Instead, it charged exorbitant rates and overcharged its customers by at least $36 million. Felder Report (Garber Decl. Ex. 1) at 17.

17. New York utilities purchase electricity on the open market at competitive rate, and therefore utility rates are a reflection of market costs and factors. Felder Rebuttal (Garber Decl. Ex. 2) at ¶ 130 ("ESCOs are purchasing wholesale electricity from the same wholesale markets as the utilities. Agway, or its supplier Direct Energy, can register with each of the wholesale market operators in New York and Pennsylvania (i.e., NYISO and PJM), and purchase the requisite energy, capacity, ancillary services, and other services. Both in New York and Pennsylvania, the

utilities purchase electricity from the wholesale market, either directly from the NYISO or through a request for proposal process. There are not quantity or purchaser discounts offered by either NYISO or PJM despite the claim in Dr. Aron's Report. As I point out in my original report, the major motivations for retail electricity competition is to encourage ESCOs to procure electricity more cost competitively than the utility."); *id*. ¶ 66 n.52 ("When utilities are the default providers, that is purchasing electricity on behalf of their customers who choose not to purchase from an ESCO, how they purchase electricity is regulated but the price is not since it based upon wholesale market conditions.").

18. Yet Defendant charged consumers more than $50 million in comparison to local utility rates. Felder Report (Garber Decl. Ex. 1) at Ex. 3.

19. ███████████████████████████████████████████████████████████ Transcript of Deposition of Michael A. Schueler ("Schueler I Tr.") (Garber Decl. Ex. 7) at 169:19-170:1.

20. ███████████████████████████████████████████████████████████ Robinson Tr. (Garber Decl. Ex. 3) at 130:15-131:24.

21. ███████████████████████████████████████████████████████████ Robinson Tr. (Garber Decl. Ex. 3) at 180:16-20.

22. In the rare instances where Defendant responded to a customer complaint relating to the charging of its exorbitant rates, Agway used the utilities prices in determining how much to refund to the consumer. Transcript of Deposition of Debra Kiser ("Kiser Tr.") (Garber Decl. Ex. 8) at 41:16-43:18.

23. In a submission to the PSC, Defendant admitted that: "*If a customer wants that*

*absolute lowest price, then Agway is the wrong provider for that customer*." Post Hearing Brief submitted In the Matter of Eligibility Criteria for Energy Service Companies (PSC Case 15-M-0127) (Garber Decl. Ex. 9 ) at 18 (emphasis added).

24. ███████████████████████████████████████ Schueler I Tr. (Garber Decl. Ex. 7) at 212:1-215:12; Robinson Tr. (Garber Decl. Ex. 3) at 85:12-20 (███████████████████████████████████████████████████████████████████); 98:23-99:9 (same).

25. EnergyGuard cost Defendant only $583,900 for the entire class period, but Agway overcharged consumers by more than $36 million. Felder Report (Garber Decl. Ex. 1) at 17.

26. Neither Ms. Gonzales's bills nor any other communications from Defendant disclosed that she was being charged extra for the EnergyGuard service. Gonzales Bill (Garber Decl. Ex. 10).

27. Defendant misrepresented, not just to consumers, *but to the PSC*, that EnergyGuard was being provided with electricity at no additional cost. In the course of the PSC's proceedings Defendant produced a proposed script for its customer service representatives that states:

> [B]y purchasing your electricity from Agway Energy instead of your Utility Company you'll *automatically receive* Agway's Energy Guard Repair Program. Some companies charge up to $50 a month for the same program and *we're automatically including it when you choose Agway us your supplier*. The program covers up to $1000 each year in repairs and parts on your central air conditioning unit, as well as another $1000 each year in repairs to the electric lines inside your home.

*See* Defendant's Response to Interrogatory/Document Request (Garber Decl. Ex. 11) (emphasis added).

28. In its December 12, 2019 order, the PSC found that: "[V]ariable-rate, commodity-only service is obtainable from the utility, most often at a lower price than from an ESCO and

without any termination fee. We find that there is no demonstrated customer benefit to allowing ESCOs to offer this service to mass-market customers." PSC Order (Garber Decl. Ex. 5) at 37. "Because customers receive no value when they pay a premium for variable-rate commodity-only service from ESCOs, ESCOs will be prohibited from offering variable-rate, commodity-only service except where the offering includes guaranteed savings." *Id*. at 39. "[S]uch offerings will be permitted only if the ESCO guarantees to serve the customer at a price below the price charged by the utility on an annually reconciled basis." *Id*. at 40.

29. Defendant admits that it charged rates in line with these ESCOs that were found to be overcharging their customers. Expert Report of Dr. Debra J. Aron ("Aron Report") (Coyle Decl. Ex. J) ¶¶ 100, 108-121.

30. The PSC has temporarily continued to allow Defendant to offer its variable rate plans bundled with the EnergyGuard service to customers because it may provide additional "value to customers beyond plans that just provide electricity. PSC Order (Garber Decl. Ex. 5) at 52 ("Agway claims that this service, which it describes as '[s]imilar to a pre-paid maintenance contract,' provides its customers with 'valuable and essential peace of mind.'").

31. The PSC merely found that "Agway provided detailed evidence demonstrating that EnergyGuard provides a unique benefit that *may* be reasonably comparable to its costs, [and] Agway may continue to offer EnergyGuard during this interim period." PSC Order (Garber Decl. Ex. 5) at 54 (emphasis added).

32. The PSC Order explicitly provides that "[a]ny company, ESCO or not, may currently provide such services separately from energy supply service so long as they comply with established rules for those service, including the Uniform Business Practices for Distributed Energy Resources where applicable." PSC Order (Garber Decl. Ex. 5) at 53.

6

33. The PSC explicitly stated that:

> It is both notable and troubling that *no ESCO party could or would produce objective evidence* regarding: the specific value-added products or services that are currently offered in New York; how many ESCO customers elect to receive those products and services; the level of premium ESCO customers are charged for the value-added product or service; and what type and level of benefit is obtained by customers who receive the products or services offered. We recognize that the ESCO parties could have produced highly detailed information about their actual products and services, but, instead, they generally chose to present information around purported products and services that ESCOs might offer or that they do offer in unspecified numbers or circumstances.

PSC Order (Garber Decl. Ex. 5) at 51.

34. While, the PSC says that "Agway provided detailed evidence demonstrating that EnergyGuard provides a unique benefit that may be reasonably comparable to its costs," the PSC Order notably omits stating that Agway provided any "objective" evidence; rather, it merely states that Agway provided detailed evidence that EnergyGuard "*may* be reasonably comparable to its costs." PSC Order (Garber Decl. Ex. 5) at 54.

35. Indeed, the PSC specially noted that "[w]hile certain ESCO products may justifiably cost the customer more, it is troubling that, after the extensive process associated with this track, neither ESCOs nor any other party have shown, to any meaningful degree of certainty, that ESCO charges above utility rates were generally – or in any specific instances – justified." PSC Order (Garber Decl. Ex. 5) at 30.

36. The PSC explicitly noted that the track reflected in the PSC Order did not encompass an examination of the reasonableness of Defendant or other ESCOs' rates in relation to the costs of value added services: "Staff recommends that the potential development of appropriate energy-related, value-added products be reviewed in a collaborative process in Track II, only after more immediate measures to protect mass-market customers are implemented." PSC Order (Garber Decl. Ex. 5) at 46.

7

37. While the PSC continues to study the issue during the pendency of its "Track II" portion of its proceedings regarding ESCO offerings, Defendant is permitted to continue to provide its bundled plans to customers and "to charge prices higher than the utility default supply rate." PSC Order (Garber Decl. Ex. 5) at 52-55.

38. The PSC limited its authorization regarding Defendant's variable rates to "this interim period." PSC Order (Garber Decl. Ex. 5) at 54. *See also id.* at 23 (allowing Defendant "a limited opportunity to continue to offer its EnergyGuard service . . .").

39. The PSC Order does not permit Defendant to charge any rate it wants, no matter how exorbitant. PSC Order (Garber Decl. Ex. 5).

40. The PSC Order does not permit Defendant to violate the terms of its contracts with customers. PSC Order (Garber Decl. Ex. 5).

41. The PSC Order does not permit Defendant to market and sell its products to customers in a deceptive manner. PSC Order (Garber Decl. Ex. 5).

42. The PSC Order does not exclude Defendant from the requirements of GBL § 349-d, to which all ESCOs are subject. PSC Order (Garber Decl. Ex. 5).

43. 99.7% of Defendant's customers do not use EnergyGuard. Felder Rebuttal (Garber Decl. Ex. 2) ¶ 96.

44. Neither Defendant, nor Dr. Aron's Report, has been able to quantify EnergyGuard's value. Felder Rebuttal (Garber Decl. Ex. 2) ¶ 27.

45. EnergyGuard's actual economic value is *de minimus*, particularly in comparison to its outrageous margins and resulting exorbitant variable rates. Based on Defendant's average actual annual EnergyGuard cost per customer ($2.13) and average cost for repairs, the probability that any customer will use the EnergyGuard service is 0.29%. Felder Rebuttal (Garber Decl. Ex.

2) ¶¶ 106-107 ("[I]f EnergyGuard costs on average $2.13 per customer and the average total cost of repairs is $740, then 0.29% of customers, 2.9 customers per 1000 customers, called for repairs.").

    46.    As Dr. Felder explains:

> Assume an extremely risk averse customer is concerned that she may have to pay $2,000 in repairs and would have to borrow money at an extremely high interest rate to do so. There is a 0.29% chance that this would occur . . . Assume the customer would have to borrow money at 29.99% annual percentage penalty rate (APR), that is the interest rate if you miss a monthly payment . . . this hypothetical consumer, extremely risk averse who may have to borrow money for repairs at almost twice the typical credit card rate of 16%, has a 0.29% chance of paying $2,600 ($2,000 x1.2999) in a year without EnergyGuard. The expected cost per year to this extremely risk averse customer is $7.48 ($2,600*0.0029). As noted above, Agway's EnergyGuard's cost per customer per year is $2.13. Assuming . . . that all of Agway's consumers valued EnergyGuard at $7.48 then the total value of Agway's EnergyGuard service is 3.51 ($7.48/2.13) times its EnergyGuard's cost. The cost of EnergyGuard over the time period of my overcharge calculations in my Expert Report is $583,900.84 This cost would translate into a total value, again using extremely favorable assumptions, to $2,051,283 . . . this would adjust my overcharge calculations . . . downward from $56.6 million to $54.6 million a 3.7% decrease.

Felder Rebuttal (Garber Decl. Ex. 2) ¶¶ 109-11.

    47.    Dr. Felder holds doctorate and master's degrees from the Massachusetts Institute of Technology where his studies focused on electricity markets and power systems. Felder Report (Garber Decl. Ex. 1) at 2. Prior to his graduate studies, Dr. Felder served as a nuclear engineer and submarine officer in the United States Navy. *Id.* Dr. Felder's undergraduate degrees are in applied mathematics from Columbia College and the School of Engineering and Applied Sciences at Columbia University. *Id.* At the time that Dr. Felder drafted and submitted his reports, he was the Director of the Center for Energy, Economic and Environmental Policy of the Rutgers University Energy Institute, and Research Professor at the Edward J. Bloustein School of Planning and Public Policy, Rutgers University. *Id.* at 1. He was also the Principal of Independent Electricity Consultants, LLC. *Id.*

48. Since the implementation of electricity markets in the United States in the early 1990s, Dr. Felder has been involved as a researcher and consultant working on market design and policy, especially in the Northeast and mid-Atlantic regions. Felder Report (Garber Decl. Ex. 1) at 2. He has advised utilities, independent generation owners, generation and transmission developers, wholesale market administrators, public agencies, ESCOs such as Agway, and other industry participants. *Id.* For nearly two decades, Dr. Felder delivered a two-day course on electricity markets attended by approximately 2,000 professionals representing a cross section of the industry including electric and natural gas utilities, independent power producers, ESCOs, federal and state regulators, wholesale market operators, and others. *Id.*

49. Dr. Felder served on the Board of Directors of an ESCO that operated in New York in addition to providing consulting and training to ESCO employees. Felder Report (Garber Decl. Ex. 1) at 2. During 2011-2013, Dr. Felder co-chaired the New York Independent System Operator's (NYISO) Consumer Advisory Council, which advised the NYISO Board of Directors and senior management of the New York's wholesale electricity market operator and market administrator on retail consumer issues. *Id.* Dr. Felder also consulted for market participants that buy and sell power within the NYISO and mid-Atlantic regions.

50. Dr. Felder publishes and consults extensively on almost all aspects of wholesale and retail energy markets in the United States and internationally. Felder Report (Garber Decl. Ex. 1) at 1-3 and Exhibit A; Felder Rebuttal ¶ 3.

51. Dr. Felder conclusively demonstrates that EnergyGuard costs do not in fact justify Agway's exorbitant rates. Felder Report (Garber Decl. Ex. 1) at 17. Agway's costs and expenses related to providing its customers with EnergyGuard amounted to $583,900, but the total overcharges versus utility supply charges were at least $36 million. *Id.*

52. Dr. Aron's contention that EnergyGuard has value is based on a consumer survey that Defendant conducted of customers after they used the EnergyGuard service. Aron Report ¶¶ 143-52. However, Dr. Felder identifies a number of methodological errors that render it fatally flawed due to its statistical bias. Felder Rebuttal (Garber Decl. Ex. 2) ¶ 27.

53. First, the survey contains both a leading question about the value of EnergyGuard and sampling error. As Dr Felder explains:

> The survey only asks Agway customers who use EnergyGuard, i.e., have their broken equipment repaired, does not ask the vast majority of customers who never need to use the warranty service, and does so without ever disclosing the amount customers were charged for EnergyGuard, making it impossible for consumers to assess the service's value . . . the Agway's EnergyGuard Survey [is] fatally flawed due to its biased question, sampling error, and not being transparent about its costs to Agway's customers . . .

Felder Rebuttal (Garber Decl. Ex. 2) ¶¶ 27, 93-94.

54. Second, the Agway survey is not based on a representative randomized sample, which in this case should have been all of Agway's customers, not just those who used EnergyGuard. As Dr. Felder explains, this renders the Agway survey unreliable owing to a faulty methodology: "[R]epresentative sample is fundamental to statistics and is taught at the start of the semester in introductory statistics classes. If the sample is not representative, that is, it is biased due to sampling error, the sample, in this case Agway's survey, should not be used to make any generalizations."  Felder Rebuttal (Garber Decl. Ex. 2) ¶ 95. By "ignoring non-users of EnergyGuard, the resulting sampling error biases the results making them unusable to generalize from regarding the 'value' of EnergyGuard." *Id*. ¶ 96.

55. Dr. Felder conducts all of his analyses "without and with [Defendant's EnergyGuard] costs in case they are determined to be appropriate," as is explicit in Tables 4 and 6 of his report. Felder Report (Garber Decl. Ex. 1) at 13, Tables 4 and 6; *accord* Felder Rebuttal

11

(Garber Decl. Ex. 2) at Exhibit 3.

56. Defendant asserts that two *de minimis* discrepancies in Dr. Felder's opening report are fatal to Dr. Felder's reliability, notwithstanding that Dr. Felder's rebuttal report addressed all such discrepancies after they were raised in Defendant's expert's report. Defendant suggests that (1) Dr. Felder should have deducted negative overcharges from his overcharge calculations, and (2) Dr. Felder should have considered the tax benefits applicable to all ESCO customers. Both of these points were addressed in Dr. Felder's rebuttal report and, ultimately, the discrepancies noted by Defendant's expert resulted in higher damages figures than Dr. Felder calculated in the opening report. *See, e.g.*, Felder Rebuttal (Garber Decl. Ex. 2) ¶ 128.

57. With respect to negative overcharges, *i.e.*, the rare months during which the variable rate was lower than the contemporaneous utility rate, Dr. Felder explains his rationale: "Variable Rate customers are monthly and for each month should receive the value of their agreement, as in the case of the Plaintiff who was promised a '**competitive monthly variable price**', and not have one month affect another month. . . . Consumers, if promised the benefit of a '**competitively monthly variable price,**' would expect to receive the benefits of that promise and not weight positive months against negative ones." Felder Rebuttal ¶¶ 85-88 (emphasis in the original). Dr. Felder conducted his first methodology to account for months where the variable rates were lower than prices to compare and found that the original $30,497,574 overcharges figure was reduced to $30,657,890, "a difference of $160,316 or 0.52% of [his] original reported overcharge for this set of assumptions." Felder Rebuttal (Garber Decl. Ex. 2) ¶ 92.

58. Defendant concedes, *the tax exemption only applies to the delivery portion* -- not the supply portion -- of consumers' bills. *See* Def. SJ Mem. at 32-33. As the Court is well aware, *this action solely concerns the supply portion* of consumers' bills. Aron Report (Coyle Decl. Ex.

12

J) ¶ 36.

59. While Defendant asserts that Dr. Felder should have considered a former New York State sales tax exemption applicable to all ESCO customers, Dr. Felder explained that he can easily account for the tax if asked to do so. Transcript of Deposition of Dr. Frank Felder ("Felder Tr.") (Garber Decl. Ex. 12) at 230:2-5.

60. Nowhere in Dr. Felder's reports or testimony did Dr. Felder state or insinuate that Agway is not entitled to profit margins. Rather, in his report, Dr. Felder conducted analyses using four different sample margins: no margin, Agway's introductory rate margin, a 5% margin, and a 10% margin. Felder Report (Garber Decl. Ex. 1) 13-14. Contrary to Defendant's assertions, and as Dr. Felder repeatedly made clear, Dr. Felder used zero margin as one of his many metrics to serve as a baseline. Felder Rebuttal (Garber Decl. Ex. 2) ¶ 119 ("If neither Dr. Aron's Report nor Agway can quantify what the numerical margin should be per Agway's Customer Agreement, it is reasonable to use a numerical value of zero as a baseline.").

61. Dr. Felder explained the basis for using 5% and 10% margins during his deposition: "Both my experience in the industry when I was working for an ESCO, what I have seen in other cases and also based on my price to compare analysis, which [] also informed the cost of goods analysis, [*i.e.*,] Agway's total cost analysis." Felder Tr. at 166:16-20 (Garber Decl. Ex. 12) (cleaned up); *accord id.* at 170:25-171:7 ("[T]he basis is my experience in the industry, as a consultant, as part of litigation, as being involved in the energy service industry, that's the basis for using a margin of both 5 and 10 percent and the fact that even with those margins, if Agway would have been able to procure electricity at a much lower cost commensurate with the price to compare, they would have made a substantial amount of money."); *see also* Felder Rebuttal (Garber Decl. Ex. 2) ¶ 32 ("In my experience as an industry analyst and participant, ESCOs

margins can be small."). "The fact that both Agway and its economic expert cannot quantify the margins that should be used in the Variable Rate pricing language, language Agway wrote, is revealing." *Id*. ¶ 117.

62. Dr. Felder further recognized that the jury or finder of fact will ultimately decide what constitutes a reasonable margin, and that Dr. Felder will implement that amount in his formulas. *See, e.g.*, Felder Report (Garber Decl. Ex. 1) at 18 ("Assuming that a jury or finder of fact concludes that Agway should have been selling electricity under its variable rate based on its COGS [cost of goods sold] and the other expenses that I just described and perhaps escalated to recover some lower margin than it charged, I can calculate the relevant overcharges."); *id.* ("I have calculated the overcharges Agway charged its customers assuming different margins . . . If asked and provided the appropriate margin parameters, I could calculate the overcharges for each member of the class.").

63. Defendant argues that Dr. Felder's testimony should be precluded because he relied upon Defendant's utility price to compare data -- but this data had been authenticated by Defendant as reliable, accurate, and prepared and maintained by Defendant in the routine course of its business. Robinson Tr. (Garber Decl. Ex. 3) at 128:1-131:24 (explaining that prices to compare are systematically collected each month to set Agway's introductory rates); Defendant's Response to First Set of Requests for Admission (Garber Decl. Ex. 13) at Response Nos. 7-9 (authenticating spreadsheets containing prices to compare).  Dr. Felder did testify that he "checked the reasonableness of them[.]" Felder Tr. (Garber Decl. Ex. 12) at 78:10.

64. Neither Defendant, nor its expert, provided any reason to believe that Defendant's utility price to compare data is inaccurate, conducted any analysis to indicate any flaws in Defendant's price to compare data collection, or demonstrated that any differences in rates or

classifications are material. *See* Def. SJ Mem. at 32, 34-35; Felder Rebuttal (Garber Decl. Ex. 2) ¶ 137 ("Dr. Aron's Report does not conduct any analysis to indicate that these differences are material or that my level of aggregation is inappropriate.") (citing Aron Report ¶¶ 192-193).

65. The price to compare is a straightforward metric put forth by utilities to facilitate supply rate comparisons. Felder Rebuttal (Garber Decl. Ex. 2) ¶ 136 ("[T]he utility Price to Compare, and in fact its public policy purpose, is to provide a price for customers to compare or benchmark against ESCO prices.").

66. As Dr. Felder explained in his reports and deposition, "if necessary, the utilities provide the Price to Compare adjusted for rate class, zone, etc. The weblinks in Exhibit 6 show that utility Price to Compare data is available and, as applicable, broken down by rate class and zone." Felder Rebuttal (Garber Decl. Ex. 2) ¶ 137; *accord* Felder Tr. (Garber Decl. Ex. 12) at 77:4-7 (explaining that, using "the methodology that I described in my report, I can account for different price to compares for the same utility in different zones and I've done that in the past"), *id*. at 141:3-18 (using ConEd's website as an example). Accordingly, Dr. Felder can easily update his algorithms to incorporate historical prices to compare collected directly from the utilities.

67. Nowhere in Dr. Felder's analysis does Dr. Felder purport to have read and analyzed each iteration of Agway's contracts. Felder Report (Garber Decl. Ex. 1) at 1 (summarizing the scope of Dr. Felder's opinions).

68. All of Defendant's customer agreements contain uniform substantive representations and have been consistent over time. Robinson Tr. (Garber Decl. Ex. 3) at 49:21-24 (affirming that the variable rate descriptions and rescissionary periods are "standard terms," irrespective of customer enrollment method) ("Q: And the way that Agway describes its variable rate [] has been consistent over time? A: Are you asking how it was described in the contract?

Q: Yes. A: There may have been some tweaks to the wording over time but, in essence, yes, it's the same."); *id.* at 41:9-43:1 (The Welcome Packages that customers receive are standardized, generated using the same template, and "are printed based on a mail-merge file that's exported from NirvanaSoft [the customer database][.]").

69. Defendant compares its rates with other ESCOs engaged in price gouging. Aron Report (Coyle Decl. Ex. J) ¶¶ 106-16. Indeed, the PSC subsequently banned those ESCOs from providing electricity at such inflated prices, which were not competitive with utility pricing. PSC Order (Garber Decl. Ex. 5) at 39-40.

70. Dr. Felder conclusively refutes Dr. Aron's conclusions regarding the competitiveness of Defendant's rates. Felder Rebuttal (Garber Decl. Ex. 2) ¶¶ 70-82.

71. First, Dr. Felder highlights Dr. Aron's glaring failure to implement a proper scientific analysis, with defined criteria and a methodology, to determine whether Agway's rates are in fact "competitive." Felder Rebuttal (Garber Decl. Ex. 2) ¶ 74. Instead of attempting to determine whether Agway's rates were "competitive," Dr. Aron asserts that Agway's rates are "consistent" and "within the range of variable rates," without ever defining those terms or what it would mean for rates to be "inconsistent" or "not within the range of variable rates." *Id.* Moreover, Dr. Aron fails to explain how her findings of "consistent" or "within the range" are relevant to the facts of the case or the language in Agway's Customer Agreement. *Id.*

72. Second, Dr. Aron does not quantify the extent of rate differentials for the ESCOs that offered lower rates than Agway. Felder Rebuttal (Garber Decl. Ex. 2) ¶ 79. As Dr. Felder explains, a careful look at the data reveals that, even when Agway was not offering EnergyGuard, there is virtually always "one or more ESCOs offering rates substantially lower than Agway's, on the order of $0.05/kWh[.]" *Id.*

73. Third, Dr. Aron's analysis conveniently omits rates from her dataset that would undermine Agway's position, thereby heavily skewing her data sample. Despite agreement among consumers, the NYPSC, Agway, and Dr. Aron's report that utilities rates compete with Agway's rates, Dr. Aron fails to include utility rates in her comparisons. Felder Rebuttal (Garber Decl. Ex. 2) ¶ 75. Dr. Aron likewise excludes ESCOs' fixed rates from her analysis without explaining why comparisons to fixed rates would not be informative in determining whether Agway's rates were competitive and market cost-based. *Id.* ¶ 78. Of course, both utility rates and ESCOs' fixed rates irrefutably represent market alternatives to Agway's rates. It is thus unsurprising that Dr. Aron does not purport to assess a representative sampling of competitors' rates in her analysis. *See id.* ¶ 81.

74. As the PSC acknowledges, fixed rates are a significant part of the competitive market for retail electricity. PSC Order (Garber Decl. Ex. 5) at 44 ("ESCOs in New York offer products and services that are not obtainable from the utilities, including . . . fixed-rate commodity products . . ."); *id*. 56: ("By Staff's estimation, between 13% and 30% of mass-market ESCO customers in New York currently are served on a fixed-rate plan.").

75. Finally, even Dr. Aron's cherry-picked data demonstrates that Agway's rates are not competitive. For example, Dr. Aron's Exhibit 6 shows that Agway's rates are higher than other ESCOs' median variable rates 37% of the time. Felder Rebuttal (Garber Decl. Ex. 2) ¶ 76. The same table mysteriously does not provide data to determine how often Agway's rates were among the lowest. *Id.* Dr. Aron's Exhibit 7 shows that between 5 to 26 ESCOs (14.4 ESCOs, on average) offered lower variable rates than Agway even when Agway did not offer EnergyGuard. *Id.* Similarly, Dr. Aron's Exhibit 8 shows that between 7 and at least 22 ESCOs (11.3 ESCOs, on average), offered lower variable rates than Agway when Agway included EnergyGuard. *Id.* ¶ 77.

Dr. Aron fails to provide any justification for Agway's positioning among competitors' variable rates. *Id.* ¶ 76.

76. As Dr. Felder stated, the findings of the PSC are "irrelevant given the language of Agway's Customer Agreement . . . Even if EnergyGuard has value and its value were part of Agway's Variable Rate methodology per the Customer Agreement (which it is not), it does not follow that Agway can charge whatever it wants." Felder Rebuttal (Garber Decl. Ex. 2) at 29-30. "The fact that the NYPSC permits Agway to sell EnergyGuard with its Variable Rate product does not permit Agway to charge whatever it wants; it is still bound by reasonableness." *Id*. at 51. "The fact that the NYPSC permits Agway to sell EnergyGuard does not mean that Agway complied with its Customer Agreement. The NYPSC Order (issued on December 12, 2019), which as I pointed out in my deposition is not dispositive, does not override or supersede Agway's Customer Agreement. The Plaintiff's Customer Agreement does not use the term *value* when discussing Variable Rates; instead it uses the term *cost*. Per Agway's Customer Agreement, its Variable Rates must be based on cost not value. Moreover, even if the NYPSC overrides Agway's Customer Agreement, which it does not, it would not apply before December 12, 2019." *Id*. at 52 (emphasis in the original).

Dated: White Plains, New York
September 27, 2021

By: *s/ Todd S. Garber*
Todd S. Garber
D. Greg Blankinship
Chantal Khalil
**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, NY 10601
Tel: (914) 298-3281
Fax: (914) 824-1561

tgarber@fbfglaw.com
gblankinship@fbfglaw.com
ckhalil@fbfglaw.com

*Attorneys for Plaintiff
and the Putative Class*