# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTONIO MARTINEZ, as Administrator for the Estate of Naomi Gonzales, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>AGWAY ENERGY SERVICES, LLC,<br><br>Defendant. | Case No. 5:18-cv-00235 MAD-ATB |

---

## REPLY BRIEF IN FURTHER SUPPORT OF:

1. **MOTION FOR SUMMARY JUDGMENT PURSUANT TO F.R.C.P. 56; AND**
2. **IN THE ALTERNATIVE, TO STRIKE PLAINTIFF'S PROPOSED EXPERT FRANK A. FELDER, PH.D., PURSUANT TO F.R.E. 702**

---

**COYLE LAW GROUP LLP**
John D. Coyle, Esq. (700112)
55 Madison Avenue, Suite 400
Morristown, NJ 07960
Tel. 973.370.0592
jcoyle@coylelawgroup.com

**BOND, SCHOENECK & KING, PLLC**
Sharon M. Porcellio, Esq. (102382)
Brendan H. Sheehan, Esq. (517403)
Avant Building—Suite 900
200 Delaware Avenue
Buffalo, NY 14202-2107
Tel. (716) 416-7044
Fax (716) 416-7344
porcels@bsk.com

*Attorneys for Agway Energy Services, LLC*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ......................................................................................................... 4

    I.      THE COURT MUST STRIKE PLAINTIFF'S STATEMENT OF
           ADDITIONAL MATERIAL FACTS FOR VIOLATING L.R. 56.1(a) ................4

    II.     SUMMARY JUDGMENT IS APPROPRIATE AS A MATTER OF LAW ..........7

    III.    THIS COURT SHOULD FOLLOW THE NEW YORK PUBLIC
           SERVICE COMMISSION PURSUANT TO THE *SKIDMORE*
           ADMINISTRATIVE DEFERENCE DOCTRINE ................................................12

    IV.    PLAINTIFF FAILED TO SHOW THAT ITS EXPERT MEETS THE
           DAUBERT STANDARD ......................................................................................15

           A.     Plaintiff Has Not Rescued Dr. Felder's Methodologically
                    Unreliable Opinions ..................................................................................15

           B.     Because Dr. Felder's Opinion Lacks a Sound Methodology, It Will
                    Only Confuse the Jury ..............................................................................18

CONCLUSION......................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**<u>CASES</u>**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ...........................................8

*Bell v. Gateway Energy Services Corp.*, Index No. 31168/2018, NYSCEF Doc. No. 153,
    2021 N.Y. Misc. LEXIS 1278 (N.Y. Sup. Ct., Rockland Cty Jan. 8, 2021)........2, 9, 10, 12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................................................8

*Brown v. Agway Energy Servs., LLC*, 822 Fed. App'x 100 (3d Cir 2020).......................10, 11, 15

*Brown v. Agway Energy Servs., LLC*, 328 F. Supp. 3d 464 (W.D. Pa. 2018) .........................10, 11

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ......................................4, 15, 17, 19

*Egri v. Conn. Yankee Power Co.*, 270 F. Supp. 2d 285 (D. Conn. 2002).......................................5

*G.E. v. Joiner,* 522 U.S. 136 (1997) .............................................................................................16

*Gonzales v. Agway Energy Servs., LLC*, No. 5:18-cv-235 (MAD/ATB), 2018 WL
    5118509, 2018 U.S. Dist. LEXIS 180307 (N.D.N.Y. Oct. 22, 2018) ................................8

*Matter of Nat'l Energy Marketers Assn. v. N.Y. State Pub. Serv. Comm'n*, 33 N.Y.3d 336
    (2019).................................................................................................................................12

*Osier v. Broome County,* 47 F. Supp. 2d 311 (N.D.N.Y. 1999) .....................................................4

*Pike v. Caldera*, 188 F.R.D. 519 (S.D. Ind. 1999)..........................................................................5

*Richards v. Direct Energy Services, LLC*, 915 F.3d 88 (2d Cir. 2019) ........................9, 10, 11, 12

*Santoro v. Donnelly*, 340 F. Supp. 2d 464 (S.D.N.Y. 2004) ........................................................16

*Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610 (7th Cir. 2019)......................................9, 10

*Sheppard v. Beerman*, 190 F. Supp. 2d 361 (E.D.N.Y. 2002), *aff'd*, 317 F.3d 351 (2d Cir.
    2003) ....................................................................................................................................5

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .................................................................2, 12, 14

*Union Carbide v. Montell N.V.*, 179 F.R.D. 425 (S.D.N.Y. 1998).............................................4, 5

**<u>STATUTES AND RULES</u>**

Fed. R. Evid. 702 .....................................................................................................................6, 19

N.D.N.Y. Local Rule 56.1(a)..................................................................................................4, 6, 7

S.D.N.Y. Local Rule 56.1(a)..........................................................................................................4

## PRELIMINARY STATEMENT

Defendant Agway Energy Services, LLC ("Agway") hereby submits this reply brief in further support of its motion for summary judgment pursuant to Rule 56. This entire lawsuit has been based on the flawed premise that an ESCO that charges a variable rate that exceeds the incumbent utility price is guilty of breaching its customer contract and of violating General Business Law. As these are issues of contract interpretations, they are properly before the Court on this motion for summary judgment.

The questions before this Court for this motion are (a) what the actual terms of the contract with Plaintiff are, and (b) whether Agway breached these actual terms. Plaintiff's opposition cites a number of cases involving other ESCOs who used different contracts. The Federal Appellate Courts, including the *Richardson* decision from this Circuit, were all determined based on the language used in the relevant contracts. It is really a black and white question: does the customer's contract provide the ESCO with discretion when setting their price? If so, the ESCO must exercise that discretion reasonably. These are questions of law for the Court to decide. In addition, it is undisputed that Agway provided all its customers, including Ms. Gonzales, with EnergyGuard home warranty protection, something that no other ESCO, or any incumbent utility, provided.

Plaintiff fundamentally misunderstands how every Circuit has interpreted this reasonableness standard by arguing that Agway can be liable simply because it was not always the lowest-priced ESCO in the market during every month, or that the calculations are flawed because they did not include fixed price contracts. Plaintiff flatly ignores the terms of Ms. Gonzalez's contract with Agway, which are all that matter. Agway never represented that their rates would be the cheapest, just competitive. As set forth in the initial moving papers, it is Plaintiff's burden to establish that Agway's price was not competitive. As a matter of law, Agway did not abuse its pricing discretion when it was lower than the median ESCO price for energy 99.2% of the time

1

while still including its EnergyGuard product that no other ESCO offered.

We recognize that Plaintiff's counsel is eager to cite the unpublished decision from their own case *Bell v. Gateway Energy Services Corp.*[1] in which an ESCO's motion for summary judgment was denied, but that case actually establishes why summary judgment should be granted here. Plaintiff conspicuously fails to mention the language of the contract in *Bell,* which did <u>not</u> give the ESCO, Gateway Energy, pricing discretion. Further, the *Bell* Court compared Bell's price to the incumbent utility because <u>Gateway's contract</u> said it compared its price to the utility price, "rate we set each month based on our evaluation of … among other items: … the prevailing rates offered by your utility and other competitors."

Plaintiff also states that the *Bell* Court accepted the calculation from their same expert, Frank Felder, Ph.D., who compared the price Gateway charged to the utility price. However, Plaintiff again fails to mention that this was because the *Bell* Court took judicial notice of the PSC's Reset Order 2 as establishing that an ESCO cannot charge more than the incumbent utility. As set forth in the initial motion, this is the same Reset Order 2 that carved out an exception from that requirement for one and only one ESCO in the state of New York: <u>Agway</u>. We have finally found common legal ground with counsel for Plaintiff: this Court should follow Reset Order 2 because of the extensive and thorough examination of the ESCO market conducted by the PSC. Although it helped counsel for Plaintiff to cite that standard in *Bell*, because Gateway was one of the 170 ESCOs prohibited from exceeding the utility price to compare, Plaintiff cannot avoid the converse here because Agway was the single exception.

Plaintiff's breach of contract and GBL claims must be dismissed under the *Skidmore*

---

[1] Index No. 31168/2018, NYSCEF Doc. No. 153, 2021 N.Y. Misc. LEXIS 1278 (N.Y. Sup. Ct., Rockland County Jan. 8, 2021).

doctrine. Plaintiff's entire argument against the PSC's Reset Order 2 (contrary to the *Bell* case in which the same counsel relied on it to show damages) presents misleading sentences out of content to misrepresent what the Order said. Counsel "accurately" selectively quotes parts of Reset Order 2 while conveniently omitting the next parts to twist the meaning. That's the equivalent of arguing that Congress has no legislative authority by citing to the First Amendment, "Congress shall make no law." Without the rest of the sentence, "respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech," the first part is deliberately misleading. This is exactly what Plaintiff does here when, ironically, Plaintiff's counsel relied on Reset Order 2, which the Court applied in the *Bell* decision to deny Gateway Energy's motion for summary judgment where Gateway charged more than the incumbent utility and explicitly based its variable rate price on the utility price.

Reset Order 2 is more than simple sentences that can be taken out of context. It is the result of a four-year investigation into ESCO variable-rate pricing, which followed court decisions on challenges to the earlier Reset Order I. The New York Court of Appeals upheld the PSC's power to limit the variable rate an ESCO could charge, holding that the PSC could condition market access on terms that it found to be "just and reasonable." The subsequently issued Reset Order 2 found that it was "unjust and unreasonable" for an ESCO to charge a variable rate higher than the incumbent utility. This is where the PSC allowed for the "sole exception" in the entire ESCO market: Agway. Because Agway has demonstrated that the benefit to customers from its bundled EnergyGuard product that was commensurate to its costs, Agway's variable price was just and reasonable. Thus, as a matter of law, Plaintiff cannot meet their requirement to establish that Agway's variable rate price damaged Ms. Gonzalez.

Finally, to the extent any claims might otherwise survive summary judgment, Plaintiff's

proposed expert fails to meet the requirements for admissibility under Federal Rule of Evidence 702 and the *Daubert* standard.   As such, summary judgment should be granted dismissing Plaintiff's complaint with prejudice.

## ARGUMENT

### POINT I

**THE COURT MUST STRIKE PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS FOR VIOLATING L.R. 56.1(a)**

The purpose of L.R. 56.1(a) is to assist the Court deciding a motion for summary judgment by requiring the parties to "set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue."   The Local Rules are "clear mandates of Local Rules of the Northern District of New York" and Local Rule 56.1 is "[p]erhaps the most abused Rule." *Osier v. Broome County,* 47 F. Supp. 2d 311, 317 (N.D.N.Y. 1999).   The Court in *Osier* explained that this "is not a complex procedural requirement with which to comply, but a simple, straightforward requirement designed 'to force litigants to focus sharply on the specific factual issues in dispute,' and to enable the Court to 'move immediately to the gravamen of the case.'" *Id.* (quoting *Riley* v. *Town of Bethlehem*, 5 F. Supp. 2d 92, 93 (N.D.N.Y. 1998) (the statement of material facts "is particularly crucial to the disposition" of a summary judgment motion).

Citing the parallel S.D.N.Y. L.R. 56.1(a),[2] the Court in *Union Carbide v. Montell N.V.*, 179 F.R.D. 425, 438 (S.D.N.Y. 1998) struck Plaintiff's Statement of Additional Material Facts because it was "basically a compendium of the arguments plaintiff plans to make at trial, rather than a short and concise statement of facts."   The Court also noted that by improperly including extended

---

[2] Requiring "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."

argument instead of the required "concise statements of fact," the party violated the page limit requirements many times over.  *Id.* at 426; *see also Egri v. Conn. Yankee Power Co.*, 270 F. Supp. 2d 285, 291 (D. Conn. 2002) ("The submission of legal argument and conclusions of law, rather than a 'separate, short and concise statement of material facts'… is the equivalent of no filing at all."); *Sheppard v. Beerman*, 190 F. Supp. 2d 361, 363 n.1 (E.D.N.Y. 2002) ("Sheppard's so-called Rule 56.1 Statement, apart from the fact that it ignores the Rule's requirement that a statement be 'short and concise,' is problematic for the simple reason that it is not limited to facts as to which it is contended that no genuine triable issue exists, but is instead rife with opinions, legal arguments, and blatant conjectures that clearly are disputed in this litigation."), *aff'd*, 317 F.3d 351 (2d Cir. 2003); *Pike v. Caldera*, 188 F.R.D. 519, 525 (S.D. Ind. 1999) ("If a party seeks to present a narrative version of the facts, that should be done in the brief.  But it is improper to do so in a L.R. 56.1(f) submission. Submissions consisting of numbered paragraphs, rather than sentences, provide an immediate indication that the litigant has, in all likelihood, incorrectly applied the rule.").

Nearly all of Plaintiff's Additional Statements violate these requirements, including some that so completely disregard the mandatory Local Rules to the point that they cannot remotely be considered good faith compliance.  For example, Additional Statement 16 states:

> Defendant charged uncompetitive rates not justified by its costs, market related factors, or its profit margin.  Instead, it charged exorbitant rates and overcharged its customers by at least $36 million.

This is the exact form of prohibited argument that cannot in good faith be said to be an "undisputed" statement of fact.  Similarly, Additional Statement 34:

> While, the PSC says that "Agway provided detailed evidence demonstrating that EnergyGuard provides a unique benefit that may be reasonably comparable to its costs," the PSC Order notably omits stating that Agway provided any "objective" evidence; rather, it

merely states that Agway provided detailed evidence that EnergyGuard "may be reasonably comparable to its costs."

And Additional Statement 45:

> EnergyGuard's actual economic value is *de minimus* [sic], particularly in comparison to its outrageous margins and resulting exorbitant variable rates.  Based on Defendant's average actual annual EnergyGuard cost per customer ($2.13) and average cost for repairs, the probability that any customer will use the EnergyGuard service is 0.29

Had Plaintiff not attempted to circumvent the page limitations for his brief (already increased from 25 to 40 pages by the Court), these statements would have been appropriate argument for the brief. But they violate the L.R. 56.1(a) and should be stricken.

Further, Agway's motion alternatively seeks to strike Plaintiff's proffered expert, Dr. Frank A. Felder, in accordance with F.R.E. 702.  Plaintiff opposes this relief in pages 25-40 of his brief. Already at the 40-page limit (increased from 25 for this motion), Plaintiff then impermissibly uses 10 pages of his Additional Statement to further opposes the 702 motion.  Pages 9-19 of the Additional Statement—paragraphs 46-76—is nothing more than additional argument in favor of Dr. Felder.  Paragraph 47 is a ten-line recitation of Dr. Felder's education and 48-50 are improper bolstering of his resume. ("50: Dr. Felder publishes and consults extensively on almost all aspects of wholesale and retail energy markets in the United States and internationally").  Not to be outdone, some paragraphs also violate L.R. 56.1(a) because they are not undisputed facts, in addition to being improper argument. ("51: Dr. Felder conclusively demonstrates that EnergyGuard costs do not in fact justify Agway's exorbitant rates.  Agway's costs and expenses related to providing its customers with EnergyGuard amounted to $583,900, but the total overcharges versus utility supply charges were at least $36 million.").

Within the same 10 pages of impermissible argument, Plaintiff also argues in favor of Dr. Felder's opinions and against the weight that should be given to Agway's economist expert Debra

6

J. Aron, Ph.D.:

> 70. Dr. Felder conclusively refutes Dr. Aron's conclusions regarding the competitiveness of Defendant's rates.
>
> 71. First, Dr. Felder highlights Dr. Aron's glaring failure to implement a proper scientific analysis, with defined criteria and a methodology, to determine whether Agway's rates are in fact "competitive." Instead of attempting to determine whether Agway's rates were "competitive," Dr. Aron asserts that Agway's rates are "consistent" and "within the range of variable rates," without ever defining those terms or what it would mean for rates to be "inconsistent" or "not within the range of variable rates." *Id.* Moreover, Dr. Aron fails to explain how her findings of "consistent" or "within the range" are relevant to the facts of the case or the language in Agway's Customer Agreement. *Id.*

A single Rule 56.1(a) statement that straddles the boundary between pure fact and advocacy might be understandable. <u>Thirty</u> such paragraphs, over ten additional briefing pages is not simply advocacy; it is a flagrant disregard of the Local Rules with a twofold purpose: to improperly gain more than ten pages of briefing (to more than <u>double</u> the 25-page standard limit) <u>and</u> to make counsel for Agway waste reply briefing pages—right here—addressing this knowing violation.

Accordingly, we respectfully request that the Court strike Plaintiff's Statements of Additional Facts 16, 17, and 45-76.

## POINT II

### SUMMARY JUDGMENT IS APPROPRIATE AS A MATTER OF LAW

This entire lawsuit has been based on the flawed premise that an ESCO that charges a variable rate exceeding the incumbent utility's price is guilty of breaching its customer contract and of violating New York's General Business Law. As established in Agway's initial moving papers, Agway complied with its contract as a matter of law and summary judgment must be granted dismissing Plaintiff's complaint with prejudice.

Plaintiff's opposition to this motion confusingly cites this Court's decision denying a pre-answer Rule 12 motion to dismiss as well as other cases where an initial motion to dismiss was denied. The standard for the initial motion to dismiss is that the "court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Under the standard set forth by the Supreme Court in *Bell Atl. Corp. v. Twombly*, the complaint's "[f]actual allegations must be enough to raise a right of relief above the speculative level," and present claims that are "plausible on [their] face." 550 U.S. 544, 555, 570 (2007). Accordingly, this Court in this matter denied Agway's motion, holding that "Plaintiff has plausibly alleged that Agway's rates were 'not in fact competitive market rates based on the wholesale costs of electricity' or the factors set forth in the agreement. *Gonzales*, 2018 WL 5118509, at *4, 2018 U.S. Dist. LEXIS 180307, at *11 (Doc. No. 81).

But this is not a motion to dismiss. While the Court initially had only Plaintiff's allegations and Agway's contract before it, the parties have now spent four years engaged in discovery on this issue. Agway produced over a million pages of emails and documents, and tens of thousands of large spreadsheets showing the detailed data for sales to every single Agway customer for nearly a decade. Mere empty statements that Agway's price is not competitive is no longer sufficient. But empty conclusory references are all Plaintiff has.

The fundamental difference between a customer receiving their electricity from Agway instead of <u>any other NY ESCO</u> is that the Agway customer also is protected by Agway's EnergyGuard home warranty. The PSC has explicitly revised the entire secondary energy market to divide the ESCO market into two categories: A) Agway; and B) every single other ESCO in New York.

> The Commission provides one exception to these three criteria and allows Agway a limited opportunity to continue to offer its EnergyGuard service, due to the specific, credible evidence Agway submitted regarding the energy-related value of this product.

(MF ¶¶ 21-22).  Because of this fundamental legal distinction, Plaintiff's attempts to compare Agway's rates to any other ESCO fail as a matter of law.  Nor would that comparison be helpful for Plaintiff: Agway's economic expert Debra J. Aron, Ph.D., for the period from Q2 (second quarter) 2014 through Q4 (fourth quarter) in 2019, compared Agway's prices to those from 1,137 other ESCOs, over 125 quarters across these utility territories.  Agway never had the highest price for any of the 125 quarters.  (*Id.*; MF ¶ 38).  Further, in 124 of the 125 quarters, Agway's price was below the median price for ESCOs in that territory.  (*Id.*).  In Orange & Rockland's service territory, in Q3 of 2014, the highest ESCO price was $0.148 per kWh, the median price was $0.111, and Agway's price was $0.115.  (*Id.*).

Plaintiff's feeble attempt to rebut these facts was merely to cite a statement by their expert, Dr. Felder, that "Agway was not competitive."   Apparently misunderstanding *Richards*,[3] *Sevugan*,[4] and every other ESCO case, Plaintiff states "it does not matter what other ESCOs may have charged." (Pl. Br. 16, n.5).  Plaintiff's counsel attempts to cite to their own case, *Bell v. Gateway Energy*, as support for the court rejecting defendant's summary judgment motion and allegedly "accepting Dr. Felder's" damages methodology.  The distinctions between the contract in *Bell* and this contract are so significant that *Bell* completely undercuts Plaintiff's case here.

The question before the Court in *Bell*, as here, was whether the ESCO complied with the terms of their customer contracts.  The Court compared Gateway Energy's rates to those from the local utility because the contract with Ms. Bell explicitly stated the price should be so compared:

---

[3] *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88 (2d Cir. 2019).
[4] *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610 (7th Cir. 2019).

> In relation to Gateway's variable pricing for electricity and natural gas, the Terms and Conditions provided as follows:
>
> "***Variable-Rate Plan.*** The price you will pay for all natural gas and/or electricity under our Variable-Rate Plan is a rate we set each month based on our evaluation of market conditions. Market conditions that we might consider include, among other items: the prevailing price of natural gas or electricity on the market, costs involved in moving the gas or electricity from the producer to your utility, our total acquisition costs for the electricity or natural gas (including, where applicable, transmission costs, storage costs, transportation costs and line losses) and the prevailing rates offered by your utility and other competitors"

(Slip Op. at 3 n.1, 2021 N.Y. Misc. LEXIS 1278 at *3 n.1). Ironically, the Court in *Bell* accepted the PSC Reset Order—*presented by Plaintiff through the same law firm here*—as establishing the damages due to a consumer as the difference between the utility price and the ESCO price because Gateway was one of the 170 ESCOs other than Agway that were prohibited from charging more than the utility price to compare. Plaintiff claims that the *Bell* decision is a "validation" of Dr. Felder's damages methodology. That could potentially be true, but not for the only 1 of the 171 ESCOs that was permitted to exceed the utility price, Agway.

Plaintiff argues here that Agway breached its contract with Ms. Gonzalez because nowhere in the Agreement does it say that Agway will charge Ms. Gonzalez for EnergyGuard. That is nothing more than a red herring. Agway's Agreement also did not say that it would charge Ms. Gonzalez for the legal expenses that Agway incurred to purchase mandatory renewable energy credits. However, unlike the Agreement in *Bell*, and exactly as was the case with the Agreements in *Richards, Sevugan,* and *Brown v. Agway*, Agway's Agreement with Ms. Gonzalez allowed Agway discretion to set its price taking into account its "costs, expenses and margins."

From the recorded Third Party Verification ("TPV") call: "Participation in this program is not a *guarantee* of future savings." (MF ¶ 35). From the Customer Disclosure Statement:

10

- "thereafter a monthly variable rate, to be determined at Agway's discretion, will apply."

- "The Electric Variable Rate shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins."

- "Conditions under which savings to the customer are guaranteed." "**Savings are NOT guaranteed**." (emphasis in original).

- "plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins."

(Coyle Decl., Ex. H ).

The Third Circuit cited the exact same contract terms that are at issue here and held: "The contract in this case is replete with language giving Agway discretion to set prices based on factors other than the rates charged by traditional electric utility companies. The contract states that the price charged to customers is set each month 'at Agway's discretion' and 'reflect[s] multiple enumerated factors.'" *Brown v. Agway Energy Servs., LLC*, 822 Fed. App'x 100, 103 (3d Cir. 2020) (*affirming Brown v. Agway Energy Servs., LLC*, 328 F. Supp. 3d 464 (W.D. Pa. 2018)). The Court further held:

> Several words in this contractual provision make clear that Agway can base its prices on factors other than its cost of acquiring electricity, including the open-ended phrase "market-related charges." Further, the provision makes clear that Agway can consider its own "costs, expenses, and margins" in setting prices. One obvious cost is Agway's EnergyGuard service. The fact that Agway provides that service to Brown undermines his comparison of Agway's prices to that of a traditional electric utility supplier, which may not provide such a service.

*Id.*

Under the controlling legal standard from *Richards*, Plaintiff has a burden to show that Agway abused its discretion in setting its variable price. *Richards v. Direct Energy Servs., LLC*,

11

915 F.3d 88, 99 (2d Cir. 2019). Over the period of Ms. Gonzalez's enrollment with Agway, the average highest posted price for any ESCO servicing Central Hudson customers was $0.138, the average median posted price for any ESCO (other than Agway) was $0.111 per kWh, and Agway's price was $0.0876 per kWh. (MF ¶ 44). Thus, Agway's price with Energy Guard was 21% lower than the median price and 37% lower than the highest price. Therefore, Plaintiff cannot meet his burden of establishing that Agway abused its discretion in pricing and summary judgment should be entered dismissing Plaintiff's breach of contract claims as a matter of law.

**POINT III**

**THIS COURT SHOULD FOLLOW THE NEW YORK
PUBLIC SERVICE COMMISSION PURSUANT TO THE
*SKIDMORE* ADMINISTRATIVE DEFERENCE DOCTRINE**

The *Skidmore* Doctrine is based on the premise that an administrative agency has superior specific industry knowledge and the ability to evaluate issues within their statutory area. *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944). The New York Court of Appeals explicitly held that the New York Public Service Law gives the PSC the legal right to condition ESCO access on terms that are "just and reasonable." *Matter of Nat'l Energy Marketers Assn. v. N.Y. State Pub. Serv. Comm'n*, 33 N.Y.3d 336, 351 (2019). The Court of Appeals further affirmed that the PSC can make a legal determination that the term "just and reasonable" means that an ESCO cannot exceed the incumbent utility price to compare. *Id.* It is undisputed that pursuant to this statutory authority, as affirmed by the New York Court of Appeals, the PSC issued Reset Order 2 as the definitive determination as to whether ESCO variable rates are "just and reasonable."

Despite relying on Reset Order 2 in the *Bell* matter, counsel for Plaintiff here attempts to dismiss the PSC's Order by taking isolated sentences out of context, especially where the next page unequivocally refutes Plaintiff's contention. Plaintiff cites the sentence from Reset Order

12

2 that said "no ESCO party could or would produce objective evidence" (Pl. Br. at 7).

This is the equivalent of citing the Eleventh Amendment to the United States Constitution as saying "The Judicial power of the United States shall not be construed to extend to any suit in law or equity." That is the opening clause of the amendment, and under Plaintiff's misleading reasoning here, this Amendment would mean that this Court has no jurisdiction to hear any dispute. But there is a second clause, "commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Plaintiff gets on a soap box again and again to accurately quote—but intentionally distort—Reset Order 2: "neither ESCOs nor any other party have shown," "the PSC found that *no* ESCO in *any* specific instance actually justified their high rates." Counsel further distorts reality by claiming "the PSC explicitly noted that the track reflected in the PSC Order did not encompass an examination of the reasonableness of Defendant or other ESCO's rates in relation to the costs of value-added services."

The next portions from Reset Order 2, omitted by Plaintiff, are clear:

> The Commission provides one exception to these three criteria and allows Agway a limited opportunity to continue to offer its EnergyGuard service, **due to the specific, credible evidence Agway submitted regarding the energy-related value** of this product.

(MF ¶¶ 21-22).

> Because, **with the exception of Agway's EnergyGuard product**, no meaningful evidence was provided to demonstrate that any **energy-related value-added product or service currently offered provides benefits to customers comparable to its costs**, the provision of such a product or service is not sufficient at this time to demonstrate that an ESCO offering benefits customers and should be permitted.

(MF ¶ 23). The PSC then expanded on this on reconsideration:

> **Agway made use of the administrative process to demonstrate**

13

> **that its EnergyGuard product provided unique value**. The fact
> that Agway provided a clear record basis regarding product value
> explains why the Commission was able to immediately allow it to
> continue offering that product.

(MF ¶¶ 26-27).  Much like stopping the Fifth Constitutional Amendment after "No person shall be held to answer for a capital, or otherwise infamous crime," Plaintiff is presenting accurate text, but omitting the remainder, in an attempt to mislead the Court.

The fact remains that by specifically carving out the single exception for Agway in Reset Order 2, the PSC made an explicit finding that Agway's variable rate, considering the benefit provided to customers, is "just and reasonable."  Ms. Gonzalez was an Agway customer from February 2016 through October 2017.  The evidentiary hearing that led to Reset Order 2 began in November of 2017.  The PSC reviewed years of data prior to issuing Reset Order 2 in 2019.  This means that the PSC directly considered the amount that had been billed to Ms. Gonzalez when making a finding as a matter of law that Agway's variable rate price was just and reasonable.

Plaintiff then grasps at straws by alleging that this approval and endorsement of Agway is "temporary."  It is again a true, and inaccurate, quote.  As quoted above, the PSC applied this finding for Agway "during the pendency of Track II of these proceedings."  (MF ¶ 24).  As Plaintiff's counsel is undoubtedly aware (since they cited Reset Order 2 in the *Bell* matter), we are now twenty-two months after the PSC issued Reset Order 2, and the Track II proceedings just began in August of 2021 and are expected to continue for years.  (*See* Track II Stakeholder Meeting presentation from PSC, August 19, 2021).

Pursuant to the *Skidmore* doctrine, this Court should defer to the four-year NYPSC proceeding, Reset Order 2, and the Reconsideration Order, and grant summary judgment to Agway.  As set forth above, the NYPSC held after extensive deliberation that the only ESCO in New York that demonstrated a sound basis for selling a variable-rate product to consumers at a

price above the utility is Agway.  Further, the NYPSC ruled that the only permitted energy-related value-added product in the entire New York energy market is Agway's EnergyGuard warranty product.  Therefore, as a matter of law, Agway did not commit consumer fraud on Ms. Gonzalez through either its contractual representations of its pricing, or how it charged Ms. Gonzalez.

<u>**POINT IV**</u>

**PLAINTIFF FAILED TO SHOW THAT ITS EXPERT MEETS THE *DAUBERT* STANDARD**

**A.    Plaintiff Has Not Rescued Dr. Felder's Methodologically Unreliable Opinions**

Plaintiff has failed to rebut the reasons why the proposed expert, Dr. Felder, should be disqualified for his glaringly erroneous methodologies and opinions formed without basis in fact and in willful ignorance of the actual facts of this case.

First, and most obviously, Dr. Felder's report expressly relies on the PSC's Reset Order 2, failing to acknowledge that while the Order generally prohibits New York ESCOs from charging more than the utility price to compare, it provided for one and only one exception: <u>Agway</u>.  (MF ¶ 19-20).  This is the result of Plaintiff's counsel's insistence on treating this lawsuit as a cookie-cutter copy of its other lawsuits against ESCOs.  But Agway is different, a conclusion reached not only by the PSC but the Third Circuit Court of Appeals as well. *Brown*, 822 F. App'x at 103 (finding that Agway's customer contract is "replete with language giving Agway discretion to set prices **based on factors other than the rates charged by traditional electric utility companies**," that "Agway can consider its own 'costs, expenses, and margins' in setting prices," and that "[o]ne obvious cost is **Agway's EnergyGuard service**") (emphases added).  Because Dr. Felder, like Plaintiff's counsel, treats this matter as just another clone of every other ESCO case, with no connection to the actual facts at issue here, his methodology lacks a reliable foundation as required by *Daubert*.

Second, Plaintiff's opposition brief fails to defend Dr. Felder's net opinion as to what constitutes a "reasonable margin" to be earned by Agway in providing its services.  (See Pl. Br. at 34).  This determination is critical because Dr. Felder's opinion purports to determine liability and damages by comparing Agway's rate with a rate "that reflected its costs *plus a reasonable margin*."  (Felder Report at p.1).  But Dr. Felder cannot simply declare what that reasonable margin is; the purpose of an expert is to present opinions that are grounded in actual data.  *GE v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").  Experts "must still explain how and why they could have extrapolated their opinions from the data." *Santoro v. Donnelly*, 340 F. Supp. 2d 464, 475 (S.D.N.Y. 2004).  In *Santoro*, an expert had opined as to where a warning label would need to be placed on a product in order to be effective.  *Id.*  But the expert "did not cite to any specific research for his opinion on the proper location of the warning, but rather relied only on his general experience in the field of communications."  *Id.* The Court concluded that an expert's mere reliance on his or her "experience" was insufficient under *Daubert*, and barred the testimony.  *Id.* at 476.

Thus, when Dr. Felder opined that a 5% or 10% margin is reasonable, his reliance on his "experience," with no reference to facts or data, fails to meet the requirements for admissibility. (*See* Felder Dep. 170:25-171:7 ("the basis is my experience in the industry, as a consultant, as part of litigation, as being involved in the energy service industry, that's the basis for using a margin of both 5 and 10 percent"); Felder Rebuttal (Garber Decl. Ex. 2) ¶ 32 ("In my experience as an industry analyst and participant, ESCOs margins can be small.")).  Plaintiff concedes that this is the extent of the support for Dr. Felder's opinion.  (*See* Pl. Br. at 34 and quoted language therein). Dr. Felder references no other ESCO's margins, no data, nothing to explain why 5% and 10%

margins are reasonable. Moreover, he never explains what margins would be unreasonable: 11%? 20%? Because he offers no facts or data to support his opinion, the "reasonable margins" are merely the expert's *ipse dixit*, and are therefore inadmissible under *Daubert*.

In addition to drawing net opinions without facts, Dr. Felder also patently ignores facts directly relevant to both liability and damages: he purposefully failed to include in his calculations any data proving that Agway charged less than the utility (Felder Report at 12 ("if overcharges were negative for a particular month, I treated that month's overcharges as zero")), and additional data showing that Agway's customers received tax-related savings. The tax savings, which are mentioned nowhere in Dr. Felder's report or rebuttal report, were a bargained-for benefit. (MF ¶ 35; Coyle Decl., Ex. G (quoting the Third-Party Verification call informing that the customer "will no longer have to pay the New York State sales tax on the delivery charges from your utility")).

Plaintiff admits as much, mischaracterizing the omissions as mere "*de minimis* discrepancies." (Pl. Br. at 32). These omissions are separate from and in addition to Dr. Felder's failure to include the added value of EnergyGuard. Again, experts must "explain how and why they could have extrapolated their opinions from the data." *Santoro*, 340 F. Supp. at 475. Plaintiff's counsel does not and cannot show where Dr. Felder explains his omissions, despite insisting otherwise. They declare: "Both of these points were addressed in Dr. Felder's rebuttal report and, ultimately, the discrepancies noted by Defendant's expert resulted in higher damages figures than Dr. Felder calculated in the opening report," citing to "PSAMF ¶ 56" in their Statement of Additional Material Facts. A surprising claim, but it was pulled out of thin air. Turning to PSAMF ¶ 56, it repeats that same statement, supported only with a citation to Felder's Rebuttal Report at ¶ 128. How could it be that correcting the omissions and accounting for additional

savings result in "higher damages figures"? We never find out. Felder's Rebuttal at ¶ 128 *does not address any of it*.[5]

These omissions exemplify the lack of Dr. Felder's methodology. They cut directly against the PSC's methodology, despite Dr. Felder's supposed reliance on Reset Order 2. (*See* Felder Report at, e.g., pp.6-8). The PSC does not require guaranteed savings each month because market fluctuations and other effects could cause an ESCO to inadvertently exceed the utility price in a single month despite being at or below the utility price when annualized. (Arun Report ¶¶ 132-135). Nowhere does Dr. Felder present any methodological reason for disputing the commonsense view taken by the PSC.

### B. Because Dr. Felder's Opinion Lacks a Sound Methodology, It Will Only Confuse the Jury

These are drastic methodological flaws considering what is at stake: Plaintiff intends to have Dr. Felder invent liability and inflate damages by telling a jury, based on nothing, that classwide damages should be awarded for every month in which Agway's rate exceeded the utility rate *even if Agway's customers saved money on an annual basis*. And he will insist that the jury award damages even if the customers were not harmed due to tax savings that exceed any apparent overcharge. Preventing unsubstantiated opinions like these go to the very purpose of the *Daubert* standard. Given the size of the putative class, Dr. Felder's unsupported, undefended, methodologically unsound testimony would have enormously unjust consequences. His inability and/or unwillingness to explain substantial material flaws in his methodology cannot be waved off by Plaintiff's counsel as "*de minimis* discrepancies."

---

[5] It is possible that Plaintiff's counsel intended to cite ¶ 127, which at least seems on-topic, but that paragraph hardly does better. It does not explain how the inclusion of all of Agway's rates, including those that come under the utility price, could possibly *increase* classwide damages, and it makes no mention the tax savings applicable to Agway's customers.

And these are not issues of mere "factual inputs." (Pl. Br. at 35). Rather, it is a failure of Dr. Felder to connect the facts to his opinion. This goes to the heart of liability and damages in this case. There is no way for Dr. Felder to explain to a jury why ignoring the facts at issue, while applying facts that may have pertained to another ESCO case, is an acceptable way to make a finding of liability and inflate damages. He cannot account for the cost or benefit of EnergyGuard, he cannot account for his proposed 5%-to-10% "reasonable" margins, and he cannot account for his decisions to ignore all data demonstrating the actual prices paid by Agway's customers. When Dr. Felder's only explanation is because it is "in his experience," he has produced an inadmissible net opinion. Neither of Dr. Felder's reports nor the arguments of Plaintiff's counsel rescue Dr. Felder from this conclusion. His testimony should be denied.

Thus, should summary judgment not be granted as to all claims, Dr. Felder's proposed expert opinions should be stricken because they fail to meet the standard for admissibility under F.R.E. 702 and *Daubert* and progeny.

## CONCLUSION

For the reasons set forth above, we respectfully request that this Court grant summary judgment, dismissing Plaintiff's Complaint with prejudice.

**COYLE LAW GROUP LLP**
*Attorneys for Agway Energy Services, LLC*

By: _____*s/ John D. Coyle*_____
John D. Coyle

Dated: October 18, 2021

19