**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ANTONIO MARTINEZ, in his capacity as**
**executor of Naomi Gonzales' estate,**

                              **Plaintiff,**

      **vs.**                                   **5:18-CV-00235**
                                              **(MAD/ATB)**

**AGWAY ENERGY SERVICES, LLC,**

                              **Defendant.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **FINKELSTEIN, BLANKINSHIP,** | **TODD S. GARBER, ESQ.** |
| **FREI-PEARSON & GARBER, LLP** | **CHANTAL KHALIL, ESQ.** |
| One North Broadway, Suite 900 | **DOUGLAS G. BLANKINSHIP, ESQ.** |
| White Plains, New York 10601 | |
| Attorneys for Plaintiff | |
| | |
| **BOND SCHOENECK & KING, PLLC** | **BRENDAN M. SHEEHAN, ESQ.** |
| One Lincoln Center | **SHARON M. PORCELLIO, ESQ.** |
| Syracuse, New York 13202 | |
| Attorneys for Defendant | |
| | |
| **COYLE LAW GROUP LLP** | **JOHN D. COYLE, ESQ.** |
| 55 Madison Avenue - Suite 400 | |
| Morristown, New Jersey 07960 | |
| Attorney for Defendant | |

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

    Naomi Gonzales ("Decedent") commenced this putative class action against Defendant

Agway Energy Services, LLC, on December 6, 2017, in the United States District Court for the

District of Delaware.  *See* Dkt. No. 1.  Decedent purported to bring this action on her own behalf

and on behalf of (1) a class consisting of Defendant's New York and Pennsylvania customers

charged a variable rate for residential electricity services from November 2011 to the present (the "New York/Pennsylvania Class"); and (2) a sub-class of Defendant's New York customers charged a variable rate for residential electricity services from November 2011 to the present (the "New York Sub-Class"). *See id.* at 13. Plaintiff asserted five claims against Defendant: (1) violations of New York General Business Law ("GBL") § 349 on behalf of the New York Sub-Class; (2) violations GBL § 349-d on behalf of the New York Sub-Class; (3) breach of contract on behalf of the New York/Pennsylvania Class; (4) breach of implied covenant of good faith and fair dealing on behalf of the New York/Pennsylvania Class; and (5) unjust enrichment on behalf of the New York/Pennsylvania Class. *See id.* at 15-21.

On January 29, 2018, Defendant filed a motion to dismiss and the case was transferred to the United States District Court for the Northern District of New York by stipulation of the parties. On October 22, 2018, this Court granted Defendant's motion to dismiss in part and denied it in part, dismissing Plaintiff's breach of implied covenant of good faith and fair dealing and unjust enrichment claims. *See* Dkt. No. 81. Decedent subsequently passed away and, on April 1, 2021, U.S. Magistrate Judge Andrew T. Baxter granted a motion to substitute Antonio Martinez, in his capacity as the executor of Decedent's estate, as Plaintiff. *See* Dkt. No. 125.

Currently before the Court is (1) Plaintiff's motion for class certification, *see* Dkt. No. 136; (2) Defendant's motion for summary judgment or, in the alternative, to strike Plaintiff's proposed expert, *see* Dkt. No. 137; (3) Defendant's motion to deny class certification, *see* Dkt. No. 138; (4) Plaintiff's motion to strike Defendant's motion to deny class certification, *see* Dkt. No. 139; and (5) Defendant's motion to strike Plaintiff's statement of additional material facts, *see* Dkt. No. 156. For the reasons that follow, Plaintiff's motion for class certification is granted in part and denied in part and Defendant's motion to deny class certification is granted in part and denied in part;

2

Plaintiff's motion to strike Defendant's motion to deny class certification is denied; Defendant's motion for summary judgment is granted in part and denied in part; Defendant's motion to strike Plaintiff's proposed expert is granted; and Defendant's motion to strike Plaintiff's statement of additional material facts is denied.

## II. BACKGROUND

In the electricity industry, traditionally, local incumbent utilities maintained monopoly control over electricity distribution systems within set geographic zones.  However, in the late 1990s, regulators in New York and Pennsylvania deregulated the electricity market and allowed Energy Supply Companies ("ESCOs") to buy or generate electricity wholesale for resale or sale to customers by, for example, owning electricity production facilities, purchasing electricity from wholesale brokers, or purchasing futures contracts for the delivery of electricity at a predetermined price.  Many ESCOs offer variable prices, promotional rates, guarantees that energy will come from renewables, and incentives like cash rebates and gift cards.  Utilities are still delivered to customers using the incumbent utilities' transmission or distribution systems, but customers pay the cost of the utility to the ESCO.  Defendant is a limited liability Delaware corporation and an ESCO eligible to sell electricity to residential and commercial customers in New York and Pennsylvania.

Decedent was a resident of New York and received electricity from her local utility, Central Hudson.  In December 2015, Decedent decided to switch her electricity provider to Defendant, who confirmed her enrollment via a recorded Third-Party Verification ("TPV") call. *See* Dkt. No. 152-6 at ¶ 29.  During the TPV call, Defendant's representative informed Decedent that she would "be placed on [Defendant's] monthly variable rate Electricity Program with [her] first month introductory price being 4.4 cents per kilowatt hour."  Dkt. No. 137-9 at 7.

Defendant's representative explained that she would "continue to receive [Defendant's]

competitive market based monthly variable rate until [she] notif[ied] [Defendant] of [her] wish to

cancel" and that, as part of the electricity program, she would "also automatically receive the ...

Energy Guard Repair Program that provides coverage for [the] [central] air conditioning unit and

electric wiring in [her] home." *Id.* Finally, the representative informed her that participation in

Defendant's electricity program was "not a guarantee of future savings." *Id.*

After completing the TPV call, Defendant mailed Decedent a Customer Disclosure

Statement, Welcome Letter, and EnergyGuard brochure. *See* Dkt. No. 152-6 at ¶ 30. The

Customer Disclosure Statement stated that

> the price for all electricity sold under this Agreement shall be a
> variable rate which shall each month reflect the cost of electricity
> acquired by [Defendant] from all sources (including energy,
> capacity, settlement, ancillaries), related transmission and
> distribution charges and other market-related factors, plus all
> applicable taxes, fees, charges or other assessments and
> [Defendant's] costs, expenses and margins.

Dkt. No. 137-10 at 3. The Customer Disclosure Statement further provided that "Savings are

NOT guaranteed." *Id.* Decedent's Welcome Letter stated as follows:

> For being an ... electricity customer, [Defendant] also include[s] the
> peace of mind and added value of [the] Energy Services
> EnergyGuard Repair Program. ... EnergyGuard provides you with
> protection in the event of a breakdown of your residential central air
> conditioning unit or a problem with the electrical wiring in your
> home. It provides up to a maximum of $1000 for parts and labor
> per each service plan every calendar year that you're a customer.

*Id.* at 2. The EnergyGuard brochure stated that, "[a]s an ... Energy Services electricity customer[,]

you automatically receive all the benefits of our ... EnergyGuard repair program" and provided

further specifics on the program. *Id.* at 5. Decedent's enrollment in Defendant's electricity

program commenced in February 2016 and continued until October 2017, when Decedent

cancelled her contract.  *See* Dkt. No. 152-6 at ¶ 31; Dkt. No. 137-12 at ¶ 26.  Decedent had been

provided an introductory rate of $0.044 per kilowatt hour for her first two months in the electricity

program, and then she was switched to Defendant's variable rate for the remainder of her time.

     The New York Public Service Commission ("NYPSC") is the New York regulatory

agency with supervisory authority over all ESCOs in New York.  In December 2019, the NYPSC

issued an "Order Adopting Changes to the Retail Access Energy Market and Establishing Further

Process" ("NYPSC order") to "strengthen[] protections for residential and small commercial

customers (mass-market customers) in the retail energy market."  Dkt. No. 137-5 at 2, 3.  The

NYPSC order was the result of a ten-day evidentiary hearing before two administrative law judges

and involved the testimony and cross-examination of twenty-two witnesses and panels of

witnesses.  *See id.* at 5-6.  The NYPSC ultimately determined that:

> any product marketed by an ESCO after the effective date of ... this
> Order must meet at least one of three criteria, with one exception
> noted below: (a) it must include guaranteed savings; (b) it must be a
> fixed-rate product compliant with a price limit; or, (c) it must be a
> renewably sourced product compliant with rules regarding content,
> sourcing, and transparency.

*Id.* at 17.  The single exception to this rule was Defendant, who was provided with "a limited

opportunity to continue to offer its EnergyGuard service" because it was the only ESCO to

provide "detailed evidence" demonstrating that its value-added and energy related product or

service "provide[d] a unique benefit that may be reasonably comparable to its costs."  *Id.* at 21.

As an ESCO validly offering an value-added energy related product or service, Defendant was

"permitted to charge prices higher than the utility default supply rate."  *Id.* at 22.  Other ESCOs

had a "limited opportunity" to apply for a similar exception.  *Id.* at 19.

     Plaintiff now argues that his motion for class certification should be granted because he

has satisfied all of the requirements under Rule 23(a) of the Federal Rules of Civil Procedure, as well as the requirements of Rule 23(b)(2) and 23(b)(3).  *See* Dkt. Nos. 136, 149, 155.  Defendant opposes class certification, arguing that Plaintiff cannot show by a preponderance of the evidence that the commonality, typicality, or adequacy requirements of Rule 23(a), or the requirements of Rule 23(b)(2) and 23(b)(3), have been met.  *See* Dkt. Nos. 138, 150, 154.[1]  Defendant also argues that its motion for summary judgment should be granted against Plaintiff because (1) Plaintiff cannot establish that it breached its contract with Decedent as a matter of law because it complied with the actual terms of that contract; (2) Plaintiff's GBL claims must be dismissed because they are duplicative of the breach of contract claim and the NYSPC orders definitively determined that Defendant's variable rates are reasonable.  *See* Dkt. Nos. 137, 156.  Defendant further argues that the opinion of Plaintiff's proposed expert, Dr. Felder, must be struck because his proffered testimony is unsupported and without a reliable foundation and therefore inadmissible under Rule 702 of the Federal Rules of Evidence, *see id.*, and that Plaintiff's Statement of Additional Material Facts should be struck for failure to comply with Local Rule 56.1, *see* Dkt. No. 156.  Plaintiff opposes these motions.  *See* Dkt. Nos. 151, 157.

### III. DISCUSSION

#### A.      Class Certification[2]

---

[1]  Plaintiff argues that Defendant's separate motion to deny class certification should be struck and the contents instead be included in Defendant's opposition to Plaintiffs motion for class certification.  *See* Dkt. No. 139.  The Court does not perceive Defendant's motion to deny certification to be a pretext to circumvent the page limit or gain the last word through a *de facto* sur-reply, or to be otherwise unduly burdensome or impermissible.  Accordingly, Plaintiff's motion to strike is denied.

[2]  As addressed more fully in the summary judgment section below, the Court is granting Defendant's motion for summery judgment on the breach of contract claim.  This leaves the New York/Pennsylvania Class without any surviving claims.  Accordingly, Plaintiff's motion for class certification is denied with respect to the New York/Pennsylvania Class, and this section will only

### *1. Standard*

"In evaluating a motion for class certification, the district court is required to make a 'definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues,' and must resolve material factual disputes relevant to each Rule 23 requirement." *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010) (quoting *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006)).  "A district court enjoys broad discretion when it comes to resolving questions of class certification because it 'is often in the best position to assess the propriety of the class and has the ability ... to alter or modify the class, create subclasses, and decertify the class whenever warranted.'" *V.W. by and through Williams v. Conway*, 236 F. Supp. 3d 554, 572 (N.D.N.Y. 2017) (quoting *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001)).

Rule 23(a) sets forth four threshold requirements for class certification:

> (1) the class is so numerous that joinder of all members is impracticable, (2) questions of law and fact are common to the class, (3) the claims or defenses of the representative parties are typical of the claims of defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  After the threshold requirements in Rule 23(a), "[t]he district court must also determine whether the action can be maintained under Rule 23(b)(1), (2), or (3)." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 238 (2d Cir. 2012).  Additionally, "courts have written a third, 'implied requirement' into the Rule: a party seeking certification must demonstrate that the proposed class is 'ascertainable.'" *V.W.*, 236 F. Supp. 3d at 573 (quotation omitted).

"A party seeking class certification must affirmatively demonstrate [its] compliance with

---

address the New York Sub-Class.

the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) ("Rule 23 does not set forth

a mere pleading standard").  "The party seeking class certification bears the burden of establishing

by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v.

Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (citations omitted).  Although "a court's

class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the

plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits

inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans and Tr. Funds*, 568 U.S.

455, 465-66 (2013) (citations omitted).  "Merits questions may be considered to the extent—but

only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for

class certification are satisfied." *Id.* at 466.

      "In sum, '[c]lass certification is appropriate where the proposed class meets, by a

preponderance of the evidence following a court's "rigorous analysis," the requirements of Rule

23(a) and the proposed class constitutes one of the types of classes enumerated in Rule 23(b).'"

*V.W.*, 236 F. Supp. 3d at 573 (quoting *Stinson*, 282 F.R.D. at 367).

      ***2. Numerosity***

      The first element of certification under Rule 23 requires a plaintiff to demonstrate that "the

class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  As

"the bearer[] of the burden to show joinder is impracticable," a plaintiff need only "'show some

evidence of or reasonably estimate the number of class members'" and "'need not show the exact

number.'" *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993) (quotation omitted).

      The Court concludes that Plaintiff has satisfied the numerosity requirement.  Plaintiff

asserts—and Defendant does not dispute—that Defendant "had many thousands of residential

electricity customers on a variable rate during the relevant class period."  Dkt. No. 136-1 at 26;

*see also Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (holding that "numerosity is presumed" where a putative class has forty or more members).

### 3. Commonality

The second element of certification under Rule 23 requires Plaintiff to demonstrate that there "are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This element "does not require all questions of law or fact to be common"; indeed, "even a single common question will suffice." *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 286 (S.D.N.Y. 2012), *aff'd* 780 F.3d 70 (2d Cir. 2015) (citing *Wal-Mart*, 564 U.S. at 359). However, the mere "existence of a 'common contention' is not sufficient; rather, '[t]hat common contention, ... must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Callari v. Blackman Plumbing Supply, Inc.*, 307 F.R.D. 67, 75 (E.D.N.Y. 2015) (quoting *Wal-Mart*, 564 U.S. at 350). "Therefore, what matters is 'the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Sykes*, 285 F.R.D. at 286 (quoting *Wal-Mart*, 564 U.S. at 350). "Plaintiffs may satisfy the commonality requirement with 'significant proof' that a general policy or practice caused the alleged violations of class members' rights." *J.B. v. Onondaga Cnty.*, 401 F. Supp. 3d 320, 331 (N.D.N.Y. 2019) (quoting *Wal-Mart*, 564 U.S. at 353).

Plaintiff has met his burden with respect to the commonality requirement. The entire New York Sub-Class shares the claim that Defendant made deceptive representations, statements, and omissions about its variable rate in violation of GBL §§ 349 and 349-d. This common contention rests on facts that are consistent across the entire class—Plaintiff has provided significant proof that the contracts and documentation given to Defendant's customers were substantially uniform

across the whole class, *see* Dkt. No. 151-4 at 5; and that the variable rate set by Defendant was similarly consistent, *see id.* at 5-6.  Accordingly, a classwide proceeding should generate common answers apt to drive the resolution of the GBL claims.  In opposition, Defendant makes a number of arguments concerning the ultimate merits of Plaintiff's claims, *see* Dkt. No. 150 at 8-13, but does not directly address whether this proceeding would generate common answers, *see Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*, 222 F.3d 52, 58 (2d Cir. 2000) ("'Nothing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action'") (quotation omitted).

### 4. Typicality

Rule 23(a)(3) requires plaintiffs to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  "To establish typicality[,] ... the party seeking certification must show that 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)).  "Typicality requires that 'the disputed issue[s] of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class.'" *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (quoting *Caridad v. Metro-N. Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999)).  "One purpose of the typicality requirement is 'to ensure that ... the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Id.* at 272 (quoting *Marisol A. ex rel. Forbes v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)).  Thus, the typicality requirement is met (1) if the "claims of [the] representative

plaintiffs arise from [the] same course of conduct that gives rise to claims of the other class members," (2) "where the claims are based on the same legal theory," and (3) "where the class members have allegedly been injured by the same course of conduct as that which allegedly injured the proposed representative." *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000) (citing *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

Here, Plaintiff's GBL claims are typical of the claims of the New York Sub-Class. Plaintiff's GBL claims arise from the same representations and contractual agreements as the class claims, depend on the same legal theories as the class claims, and request the same relief as the class claims. Defendant argues that Plaintiff cannot show typicality because Plaintiff was never personally a customer of Defendant, and has no actual knowledge the facts underlying Decedent's individual claim. *See* Dkt. No. 150 at 13-17. However, Plaintiff is not bringing this claim in his individual capacity; he was substituted into the action as executor of Decedent's estate, and accordingly occupies the same position as Decedent did. *See Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 248 n.7 (3d Cir. 2002) ("When an executor or administrator continues with a decedent's claim, she 'stands in the shoes of the decedent'") (quotation omitted). His individual knowledge and experiences with Defendant are therefore irrelevant to the determination of whether Decedent's "claims or defenses ... are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).[3] Defendant does not address the typicality of Decedent's claims generally. Thus, the Court finds that Plaintiff has met his burden under Rule 23(a)(3).

_____

[3] Defendant's arguments concerning Plaintiff's position as the executor of Decedent's estate are discussed more throughly in the "Adequacy" section below, which deals more directly with the ability of the representative party to fairly and adequately protect the interests of the class.

### 5. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "Under Rule 23(a)(4), adequacy of representation is measured by two standards. First, class counsel must be 'qualified, experienced and generally able' to conduct the litigation. Second, the class members must not have interests that are 'antagonistic' to one another." *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992), *cert. dismissed* 506 U.S. 1088 (1993) (quotation omitted). When determining whether the proposed class representative's interests are antagonistic to the interests of other class members,[4] "[a] conflict or potential conflict alone will not ... necessarily defeat class certification—the conflict must be 'fundamental.'" *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) (quotation omitted). Furthermore, although class representatives cannot satisfy Rule 23(a)(4)'s adequacy requirement if they have "'so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys,'" *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000) (quotation omitted), "'it is well established that "in complex litigations ... a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected,"'" *In re NTL, Inc. Securities Litig.*, No. 02-CIV-3013, 2006 WL 330113, *11 (S.D.N.Y. Feb. 14, 2006) (quotation omitted).

"There is no *per se* rule that an estate administrator cannot be a class representative, and courts have found estate administrators to be adequate class representatives notwithstanding the

---

[4] Defendant does not challenge the competency of Plaintiff's attorneys to represent the interests of the class members.

possible evidentiary and discovery challenges this might cause." *Allen v. Holiday Universal*, 249 F.R.D. 166, 186 (E.D. Pa. 2008) (citations omitted); *see also Jie Zhang v. Wen Mei, Inc.*, No. CV14-1647, 2015 WL 6442545,*6 (E.D.N.Y. Oct. 23, 2015); *Kamerman v. Ockap Corp.*, 112 F.R.D. 195, 196 (S.D.N.Y. 1986).  However, "a proposed class representative may not satisfy the adequacy prong if his or her case involves problems that 'could become the focus of cross-examination and unique defenses at trial, to the detriment of the class.'" *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 177 (S.D.N.Y. 2008) (quotation omitted).

Plaintiff will fairly and adequately protect the interests of the New York Sub-Class. Initially, Plaintiff has demonstrated sufficient knowledge of this case to vigorously represent the interests of the class and protect those interests against any competing interests of his attorneys. Plaintiff petitioned the Surrogate's Court for limited letters of administration for the sole purpose of taking over the instant action on behalf of Decedent's estate, "regularly engaged with counsel," sat for a deposition, and "understands that [he is] to remain engaged in each part of litigation, consider any settlement offers, and have knowledge of the case."  Dkt. No. 149-1 at ¶¶ 4, 8.[5] Defendant, however, argues that Plaintiff cannot adequately protect the interests of the class due to his lack of personal knowledge about the facts underlying Decedent's individual claim.  *See* Dkt. No. 138-1 at 17.  Defendant identifies a number of alleged deficiencies in Plaintiff's knowledge, including: (1) the details of Decedent's enrollment with Defendant, including the phone call and the various contract documents; (2) what Decedent's state of mind and expectations were when she enrolled with and subsequently left Defendant's energy program; (3) Decedent's understanding of the contract terms; and (4) Plaintiff's personal knowledge and

---

[5] This Court may rely on Plaintiff's affidavit to establish Rule 23(a)(4)'s adequacy requirement. *City of Westland Police and Fire Ret. System v. MetLife, Inc.*, No. 12-CIV-0256, 2017 WL 3608298, *9 (S.D.N.Y. Aug. 22, 2017) (collecting cases).

experience in enrolling with Defendant's energy program.  *See* Dkt. No. 138-1 at 13-14.

The Court finds that this alleged lack of knowledge will not become a material issue at trial to the detriment of the class as a whole.  The Court notes that the critical evidence in Plaintiff's claims—such as the contents of the key documents and the transcript of the phone call with Decedent—are uncontroverted.  Plaintiff's lack of personal experience enrolling with Defendant's energy program or switching energy providers is wholly irrelevant given that Plaintiff is here in his capacity as the executor of Decedent's estate, not in an individual capacity.  As to Decedent's state of mind and her subjective expectations, Defendant fails to explain why testimony on these issues would be necessary at trial.  Indeed, as Plaintiff argues, the surviving GBL claims do not require an individualized examination of the Decedent's subjective state of mind or expectations; instead, they depend on generalized, objective evidence.  *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015) ("Materiality under Section 349 of the GBL is an objective inquiry; a deceptive act is defined as one 'likely to mislead a reasonable consumer acting reasonably under the circumstances.' ... Plaintiffs' GBL claims thus depend on generalized evidence") (quoting *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)).

Defendant also argues that Plaintiff cannot adequately represent the class because his personal interests as executor and someone who never individually received Defendant's services "directly contradict[s] those of every class member who deliberately chose [Defendant] in order to receive EnergyGuard." Dkt. No. 138-1 at 17.  Specifically, Defendant argues that, due to his position as "an executor for a former customer," Plaintiff is "uninterested" in the continued viability of the EnergyGuard service, *id.* at 16, and "cannot perceive [EnergyGuard-specific] avenues for relief because he does not stand in the shoes of a present customer." Dkt. No. 154 at 10.  However, the Court finds that even though Plaintiff—as the representative of a former

customer's estate—might not personally care about the future financial viability of the

EnergyGuard service, this speculative conflict does not rise to the level of a "fundamental"

conflict that would preclude the formation of a class. *Denny*, 443 F.3d at 268; *see also Vogt v.*

*State Farm Life Ins. Co.*, 963 F.3d 753, 767 (8th Cir. 2020), *cert. denied* 141 S. Ct. 2551 (2021)

("[The defendant's] purported conflict is entirely speculative and is insufficient to render class

certification inappropriate because it relies on nothing more than conjecture about how this

lawsuit will affect [the defendant]'s future dealings with current policyholders"); *Allen v. Holiday*

*Universal*, 249 F.R.D. 166, 181-82 (E.D. Pa. 2008) (holding that a purported conflict between

former health club members, who seek only to recover damages, and current members, who

potentially have an interest in maintaining their memberships, was "not substantial and [was]

overly speculative and, thus, [did] not preclude a finding of the Plaintiffs' adequacy to represent

the class"); *Becher v. Long Island Lighting Co.*, 164 F.R.D. 144, 152 (E.D.N.Y. 1996) ("While

active and retired employees may have some divergent interests ... [a]ll participants seek the same

'make-whole' relief claimed by the named plaintiffs").

### *6. Rule 23(b)(2)*

Under Rule 23(b)(2), certification is appropriate where "the party opposing the class has

acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P.

23(b)(2). "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory

remedy warranted—the notion that the conduct is such that it can be enjoined or declared

unlawful only as to all of the class members or as to none of them.'" *Wal-Mart Stores, Inc. v.*

*Dukes*, 564 U.S. 338, 360 (2011) (quotation omitted). "In other words, Rule 23(b)(2) applies only

when a single injunction or declaratory judgment would provide relief to each member of the

class." *Id.*

Here, certification of a New York Sub-Class for injunctive relief is appropriate.  The

injunctive relief sought by Plaintiff—an order enjoining Defendant from undertaking any further

unlawful conduct under GBL §§ 349 and 349-d with respect to its variable rate—would apply to

all or none of the New York Sub-Class.  *See* Dkt. No. 1 at ¶¶ 57, 65.  However, Defendant

correctly notes that Rule 23(b)(2) "does not authorize class certification when each class member

would be entitled to an individualized award of monetary damages." *Wal-Mart Stores, Inc.*, 564

U.S. at 360-61.  Here, the GBL claims seek trebled compensatory damages, trebled statutory

damages, and punitive damages, *see* Dkt. No. 1 at ¶¶ 56, 58, 64, which are far from "incidental to

a final injunctive or declaratory remedy." *Amara v. CIGNA Corp.*, 775 F.3d 510, 520 (2d Cir.

2014).  Nevertheless, "'[w]here a plaintiff seeks both declaratory and monetary relief, the court

may separately certify a damages-seeking class under Rule 23(b)(3), and an injunction-seeking

class under Rule 23(b)(2).'" *Tomassini v. FCA US LLC*, 326 F.R.D. 375, 387 (N.D.N.Y. 2018)

(quotation omitted).  Accordingly, the Court certifies a New York Sub-Class solely for injunctive

relief under Rule 23(b)(2), and will address a separate New York Sub-Class for damages under

Rule 23(b)(3), below.

### 7. *Rule 23(b)(3)*

A Rule 23(b)(3) class may be certified if "the questions of law or fact common to class

members predominate over any questions affecting only individual members."  Fed. R. Civ. P.

23(b)(3).  "This 'predominance' requirement is satisfied if: (1) resolution of any material 'legal or

factual questions ... can be achieved through generalized proof,' and (2) 'these [common] issues

are more substantial than the issues subject only to individualized proof.'" *In re Petrobras Secs.*,

862 F.3d 250, 270 (2d Cir. 2017) (quoting *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir.

2016)).  The presence of individualized damage issues cannot, by itself, defeat class certification

under Rule 23(b)(3).  *Sykes v. Mel S. Harris and Associates LLC*, 780 F.3d 70, 81 (2d Cir. 2015).

Once predominance is established, the Court must determine whether "a class action is superior to

other available methods for fairly and efficiently adjudicating" the claims at issue.  Fed. R. Civ. P.

23(b)(3).  Rule 23(b)(3) lists four factors pertinent to a court's consideration:

> (A) the class members' interests in individually controlling the
> prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the
> controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation
> of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  "[M]anageability 'is, by the far, the most critical concern in determining

whether a class action is a superior means of adjudication.'"  *Sykes*, 780 F.3d at 82 (quotation

omitted).

Here, common questions of law and fact predominate in the New York Sub-Class for

Damages.  As discussed above, the GBL claims depend on generalized, objective evidence (*e.g.*,

the standardized customer agreements and representations made to Defendant's customers), and

depend on common questions of law (*e.g.*, whether Defendant's representations were likely to

mislead a reasonable consumer acting reasonably under the circumstances).  Although some

individualized issues may arise with respect to calculating damages, they do not predominate over

the issues of law and fact that are common across the class.  The Court also finds that a class

action is a superior means of adjudication for these claims.  Due to the predominating common

questions of law and fact, the Court will foster economies of time, effort, and expense by

prosecuting this action as a class, and avoid the risk of inconsistent or varying adjudications. *See Zhang v. Ichiban Group, LLC*, No. 1:17-CV-148, 2021 WL 3030052, *8 (N.D.N.Y. May 21, 2021) ("[A]lthough the damages may differ depending on the class member, the claims all involve the same policies and practices.  Forcing the proposed class members to litigate nearly identical grievances in individual actions 'would risk disparate results among those seeking redress, ... would exponentially increase the costs of litigation for all, and would be a particularly inefficient use of judicial resources'") (quotation omitted).

### 8. Ascertainability

Under the implied element of ascertainability, "'[a]n identifiable class exists if its members can be ascertained by reference to objective criteria.'"  *Id.* at *2 (quoting *Stinson v. City of N.Y.*, 282 F.R.D. 360, 367 (S.D.N.Y. 2012)).  Plaintiff has satisfied this requirement.  The members of the class are readily identifiable pursuant to objective criteria, including, but not limited to, the records maintained by Defendants.

Accordingly, Plaintiff's motion for class certification is granted to the extent it sought class certification for a New York Sub-Class, and the New York Sub-Class is divided into the New York Sub-Class for Damages and a New York Sub-Class for Injunctive Relief.  Plaintiff's motion for class certification is otherwise denied.  Defendant's motion to deny class certification is accordingly granted in part and denied in part.

**B.**     **Defendant's Motion to Strike Plaintiff's Statement of Additional Material Facts**

In its reply brief, Defendant asks the Court to strike portions of Plaintiff's Statement of Additional Material Facts because those portions "completely disregard [Local Rule 56.1] to the point that they cannot remotely be considered good faith compliance."  Dkt. No. 156 at 8.  Local Rule 56.1 states that the "Statement of Material Facts shall set forth, in numbered paragraphs, a

short and concise statement of each material fact about which the moving party contends there exists no genuine issue."

Although Plaintiff's lengthy Statement of Additional Material Facts does contain some disputed opinions and legal arguments, the Court does not believe that the drastic measure sought by Defendant is warranted in this case. Instead, the Court will disregard any improper assertions and consider the statements in Plaintiff's Statement of Additional Material Facts only to the extent they are supported by the record. *See ScentSational Techs., LLC v. PepsiCo, Inc.*, No. 13-CV-8645, 2017 WL 4403308, *7 (S.D.N.Y. Oct. 2, 2017) ("The Court will consider the facts contained in Plaintiff's Rule 56.1 Statement to the extent that they are not conclusory and are supported by the record"); *Ross U. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09-CV-1410, 2012 WL 6091570, *6 (E.D.N.Y. Dec. 7, 2012) ("[C]ourts in this Circuit frequently deny motions to strike paragraphs in Rule 56.1 statements, and simply disregard any improper assertions"), *report and recommendation adopted in part*, 2013 WL 1334271 (E.D.N.Y. Mar. 28, 2013); *Mihalik v. Credit Agricole Cheuvreux N.A., Inc.*, No. 09 CIV. 1251, 2011 WL 3586060, *4 (S.D.N.Y. July 29, 2011) ("[F]ollowing the practice of several other courts in the district, this Court will disregard any statements that lack support or are otherwise inadmissible"), *vacated and remanded on other grounds*, 715 F.3d 102 (2d Cir. 2013).

Accordingly, Defendant's motion to strike Plaintiff's Statement of Additional Material Facts is denied.

**C.    Defendant's Motion for Summary Judgment**

*1. Standard of Review*

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue

warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43

F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the

court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Id.* at

36-37 (quotation and other citation omitted).  Substantive law determines which facts are

material; that is, which facts might affect the outcome of the suit under the governing law.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986).  In assessing the record to determine

whether any such issues of material fact exist, the court is required to resolve all ambiguities and

draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36

(citing *Anderson*, 477 U.S. at 255) (other citations omitted).  Irrelevant or unnecessary facts do not

preclude summary judgment, even when they are in dispute.  *See Anderson*, 477 U.S. at 258.

The moving party bears the initial burden of establishing that there is no genuine issue of

material fact to be decided.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect

to any issue on which the moving party does not bear the burden of proof, it may meet its burden

on summary judgment by showing that there is an absence of evidence to support the nonmoving

party's case.  *See id.* at 325.  Once the movant meets this initial burden, the nonmoving party must

demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  A

genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### 2. Plaintiff's Breach of Contract Claim

Defendant argues that it is entitled to summary judgment on Plaintiff's breach of contract

claim because Plaintiff cannot, as a matter of law, show that there is a triable issue of fact.  *See*

Dkt. No. 137-15 at 18-30.  Specifically, Defendant argues that it complied with the plain and

unambiguous language of its contract when it set the variable rate, *see id.* at 24-25, and that

Plaintiff cannot establish that Defendant abused its discretion when setting the variable rate, *see id.* at 29.  In opposition, Plaintiff argues that there are questions of fact concerning whether Defendant (1) breached the contract's promise to "charge 'competitive' rates that reflect market costs" when it set the variable rates "substantially higher than [the] utilities[,] who are [the] primary competitors in the electricity market," Dkt. No. 152 at 19, 22; and (2) violated "the terms of the contract" by charging "additional amounts to customers for the EnergyGuard service" when "[n]othing in the contract permits Defendant to charge extra for the EnergyGuard service," *id.* at 20-21.

"To prevail on a breach-of-contract claim in New York, a plaintiff must prove: '(1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach.'" *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) (quotation omitted).  "'[T]he initial interpretation of a contract "is a matter of law for the court to decide."'" *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (quotations omitted).  It is well accepted that courts should construe contracts according to the parties' intent as derived from the contracts' unambiguous terms.  "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 162 (citation omitted).  "When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citing *South Rd. Assocs., LLC v. IBM*, 4 N.Y.3d 272 (2005)).  The parties' intent is derived "'from the plain meaning of the language employed' in the agreements," *Crane Co. v. Coltec Indus., Inc.*, 171 F.3d 733, 737 (2d Cir. 1999) (quotation omitted), when the agreements are "read as a whole," *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 162.  Courts must avoid "interpretations that render contract provisions meaningless or superfluous."

*Manley v. AmBase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003) (citations omitted).

Here, after drawing all reasonable inferences in Plaintiff's favor as the nonmoving party, the Court concludes that there is no genuine issue of material fact as to whether Defendant breached the contract when setting the variable rate. Initially, nothing in the contract precludes Defendant from including the cost of the EnergyGuard Program in the variable rate. The contract explicitly states that the variable rate would reflect multiple factors, including Defendant's costs, expenses and margins. Dkt. No. 137-10 at 3. The EnergyGuard Program is part of the services provided to Plaintiff under the contract, and the expense of running it would clearly fall within Defendant's "costs [and] expenses." *Id.* Plaintiff nevertheless argues that certain statements in the contract *required* Defendant to offer its EnergyGuard service at no extra cost and that any additional charges for that service would constitute a breach of the contract. *See* Dkt. No. 151 at 20-21. The specific language that Plaintiff relies on is (1) a statement in the Welcome Letter that, "[f]or being [Defendant's] electricity customer," Defendant would "include" the EnergyGuard program, Dkt. No. 137-10 at 2, and (2) a statement made during the TPV call that Plaintiff would "automatically receive" the EnergyGuard program, Dkt. No. 137-9 at 7. However, a plain reading of this language reveals only that Defendant automatically includes EnergyGuard with its electricity services—not that it would do so free of charge.

Furthermore, Plaintiff cannot create a triable issue of fact by showing that Defendant's rates are not "competitive" compared solely against those of the incumbent utilities. Although Defendant was obligated to provide a "competitive market based monthly variable rate," Dkt. No. 137-9 at 7, and to "exercise [its] discretion in good faith" when doing so, *Richards v. Direct Energy Services, LLC*, 915 F.3d 88, 99 (2d Cir. 2019), the contract here is "replete with language giving [Defendant] discretion to set prices based on factors other than the rates charged by

traditional electric utility companies," *Brown v. Agway Energy Services, LLC*, 822 Fed. Appx. 100, 103 (3d Cir. 2020).  To allow Plaintiff to measure the competitiveness of Defendant's rates solely against the regulated rates of the incumbent utilities would, "in effect," make the utility's rates "binding on private electricity suppliers"—an outcome in direct conflict with "the entire point of electricity deregulation," which was "to allow the market, rather than [a Public Utilities Regulatory Authority], to determine rates." *Richards*, 915 F.3d at 99;[6] *see also Brown*, 822 Fed. Appx. at 103 (holding that "[t]he fact that [Defendant] provides [EnergyGuard] to [the plaintiff] undermines [the] comparison of [Defendant]'s prices to that of a traditional electric utility supplier, which may not provide such a service").  Thus, to determine whether Defendant's rates were competitive, the proper comparison must be against the rates charged by Defendant's ESCO competitors.

Here, Defendant has met its initial burden of establishing that there is no genuine issue of material fact to be decided.  Defendant submits the report of its expert, Dr. Aron, comparing Defendant's rates to the rates charged by other New York ESCO participants in the market using publicly available "historical pricing data reported quarterly by ESCOs that offer no energy-related value-added services." Dkt. No. 137-12 at ¶ 109.  In certain utility territories from January 2013 through February 2015—where Defendant was not offering EnergyGuard as part of its energy service—Dr. Aron found that Defendant's "variable rate [wa]s never the highest variable rate charged" and, sixty-three percent of the time, Defendant's variable rate "was below the median rate" offered by other ESCOs. *Id.* at ¶ 114.  For the remainder of utility territories

---

[6] Indeed, in *Richards*, the Second Circuit characterized the plaintiff's breach of contract claim—which asserted that a private electricity supplier "must have abused its discretion because [its] variable rate was higher" than the public utility rate—as "near-frivolous." *Richards*, 915 F.3d at 99.

during the relevant time period, where Defendant was offering EnergyGuard, Dr. Aron again concluded that Defendant's variable rate was "never the highest rate in any utility territory in any quarter" and, ninety-eight percent of the time, Defendant's variable rate was "below the median rate" offered by other ESCOs.  Dkt. No. 137-12 at ¶ 120.  It is worth stressing that, for the latter comparison, Defendant's service included an energy-related value-added service, and its variable rates were *still* below the median rates offered by ESCOs that offer no such value-added service *ninety-eight percent* of the time.

Plaintiff's expert, Dr. Felder, does not attempt to make his own comparison between Defendant's variable rates and the variable rates of other ESCOs.  Instead, Dr. Felder argues that Dr. Aron has not established Defendant's rates were "competitive" because "it defies common sense to claim that a particular vendor ... is competitive if there are on average numerous competitors with lower prices."  Dkt. No. 151-3 at ¶ 80.  Dr. Felder, however, offers no support for this strained interpretation of "competitive"—especially in light of the wide discretion afforded to Defendant in setting the variable rate—nor does Dr. Felder account for Defendant's unique position, in comparison to other ESCOs, as a provider of an additional energy-related value-added service.  Thus, Dr. Felder has not demonstrated that there is a genuine issue of material fact concerning the competitiveness of Defendant's variable rates.

Accordingly, Defendant's motion for summary judgment on Plaintiff's breach of contract claim is granted.

### 3. Plaintiff's N.Y. General Business Law §§ 349 and 349-d Claims

#### a. Skidmore Deference

Defendant argues that, under the *Skidmore* Doctrine, this Court should defer to the NYSPC's "definitive determination [that] ESCO variable rates are 'just and reasonable,'" Dkt. No.

156 at 15, and dismiss Plaintiff's General Business Law §§ 349 and 349-d claims as a matter of law because "[b]oth counts are based on the false premise that [Defendant] misrepresented its pricing components and did not comply with the disclosure provisions ... for ESCO contracts." Dkt. No. 137-1 at 18.  In opposition, Plaintiff argues that *Skidmore* "deference only applies to the interpretation of a statute the agency in question is authorized to administer."  Dkt. No. 152 at 11. Plaintiff asserts that the NYSPC order did not interpret or apply General Business Law §§ 349 or 349-d with respect to Plaintiff's claims and that "[t]here is no dispute here regarding the meaning of any statutes."  *Id.*  Plaintiff also argues that, in any event, the NYSPC order "did *not* find that Defendant's rates are in fact reasonable in relation to EnergyGuard's costs" and "never held that Defendant could not be sued for charging variable rates in violation of its Customer Agreement and in contravention of its representations that it would charge competitive rates that reflect its actual costs."  *Id.* at 11, 12.

In *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), the Supreme Court held that "an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires."  *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (internal citation omitted) (quoting *Skidmore*, 323 U.S. at 139).  "*Skidmore* deference is a 'more limited standard of deference' than *Chevron* deference," *In re Bernard L. Madoff Inv. Securities LLC*, 779 F.3d 74, 82 (2d Cir. 2015) (quoting *In re New Times Securities Services, Inc.*, 371 F.3d 68, 83 (2d Cir. 2004)), that generally applies to agency interpretations such as "policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000).  Such interpretations "are 'entitled to respect' under [the] decision in *Skidmore ...* but only to the extent

that those interpretations have the 'power to persuade.'" *Christensen*, 529 U.S. at 587 (quoting *Skidmore*, 323 U.S. at 140).

In determining whether to defer to an agency's interpretation under *Skidmore*, courts generally first determine whether the statutory language at issue is ambiguous and, where the statute is unambiguous, a court may conclude "that *Skidmore* deference is inappropriate or unnecessary." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Protec. Agency*, 846 F.3d 492, 509 (2d Cir. 2017).[7] *Skidmore* then "requires consideration of an agency's 'thoroughness, ... the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *Chao v. Russell P. Le Frois Builder, Inc.*, 291 F.3d 219, 227-28 (2d Cir. 2002) (quoting *Skidmore*, 323 U.S. at 140).

The Court declines to apply *Skidmore* deference to the NYSPC order.  Not only does Defendant fail to identify an ambiguity in the meaning of a statute, the NYSPC orders themselves are not relevant to Plaintiff's GBL §§ 349 and 349-d claims.  Indeed, those orders—to the extent they were provided by the parties—did not "unequivocal[ly] endorse[]" Defendant's "business model," Dkt. No. 137-15 at 7; nor did they determine Defendant could never engage in deceptive acts or practices in the marketing of its EnergyGuard service.  Rather, the NYSPC orders merely held out Defendant's EnergyGuard service as an example of an energy-related value-added product or service that an ESCO could permissibly offer at a price above the utility default supply rate, "without the requirement of being paired with a compliant guaranteed savings, fixed-rate, or renewably sourced product." Dkt. No. 137-5 at 21.  Such a determination does not preclude a

---

[7] Alternatively, a court may choose to "engage in *Skidmore* analysis without answering this threshold question by considering the statutory text as one of several factors relevant to determining whether the agency interpretation has the 'power to persuade.'" *Catskill Mountains*, 846 F.3d at 509 (quoting *Skidmore*, 323 U.S. at 140).

material question of fact as to whether Defendant engaged in deceptive acts or practices in the marketing of its energy service by "charg[ing] an unconscionably high rate" and making "misrepresentations ... with regard to the rate being market based ... for the purpose of inducing consumers to sign up."  Dkt. No. 1 at ¶ 58.[8]

### b. Are Plaintiff's GBL Claims Duplicative

Defendant argues that Plaintiff's GBL claims must be dismissed as duplicative of Plaintiff's breach of contract claim because the loss alleged under the GBL claims is indistinguishable from the loss alleged under the breach of contract claim.  Dkt. No. 137-1 at 30. Defendant relies on *Spagnola v. Chubb Corp.*, 574 F.3d 64 (2d Cir. 2009), which dismissed a GBL § 349 claim where the plaintiff alleged damages in the amount of the purchase price of his contract, but failed to allege that the defendants had denied him the services for which he had contracted.  *See Spagnola*, 574 F.3d at 74.

However, as Plaintiff argues, this case is distinguishable from *Spagnola*.  Here, Plaintiff has alleged that, "[a]s a direct and proximate result of Defendant's unlawful deceptive acts and practices," Plaintiff and the proposed class "suffered and continue[d] to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Defendant charged a rate based on market conditions and the factors specified in the [contract]."  Dkt. No. 1 at 16-17.  Plaintiff's allegation of injury in the "form of an overpayment or 'price premium,' whereby [he] pays more than she would have but for the

---

[8]  The Court notes that Defendant does not claim that the NYSPC orders are entitled to *Chevron* deference.  *See United States v. Mead Corp.*, 533 U.S. 218, 229-31 (2001) (holding that *Chevron* deference generally applies to interpretations issued pursuant to the agency's exercise of its formal rule-making authority).  To the extent *Chevron* deference might be more appropriate for the NYPSC order—which was issued according to the NYSPC's formal rule-making authority under the New York Public Service Law and involved a formal adjudication—the application of such deference would be inappropriate for the same reasons as *Skidmore* deference.

deceptive practice," is sufficient to establish he suffered injury under the GBL.  *Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 223 (E.D.N.Y. 2018); *see also Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015).  It is not a requirement under New York law that "any monetary GBL injury must be independent of alleged breach of contract damages."  *Donnenfeld*, 333 F. Supp. 3d at 224; *see also Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*, 875 F.3d 107, 125 (2d Cir. 2017).

Accordingly, Defendant's motion for summary judgment on Plaintiff's GBL §§ 349 and 349-d claims is denied.

**D.      Defendant's Motion to Strike Plaintiff's Proposed Expert**

Defendant argues that the opinion of Plaintiff's expert, Dr. Felder, should be deemed inadmissible under Rule 702 of the Federal Rules of Evidence.  *See* Dkt. No. 137-15 at 31-43; Dkt. No. 156 at 18-22.  Broadly stated, Defendant asserts that Dr. Felder's report "presents numerous opinions that are completely unsupported" and, therefore, his methodology lacks a reliable foundation.  Dkt. No. 137-15 at 34.  In opposition, Plaintiff argues that Dr. Felder's opinions are reliable and, "[e]ven if there were merit to any of Defendant's contentions, they would constitute '[d]isputes regarding ... an expert's use or application of [his] methodology' and would accordingly 'go to the weight, not the admissibility of [Dr. Felder's] testimony.'" Dkt. No. 152 at 38 (quotation omitted).

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  That Rule provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based

> on sufficient facts or data; (c) the testimony is the product of
> reliable principles and methods; and (d) the expert has reliably
> applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In reviewing the admissibility of expert testimony, "the district court has a 'gatekeeping' function under Rule 702—it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)).  The rule set forth in *Daubert* applies to scientific knowledge, as well as technical or other specialized knowledge.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  As the Second Circuit has explained:

> In fulfilling this gatekeeping role, the trial court should look to the
> standards of Rule 401 in analyzing whether proffered expert
> testimony is relevant, i.e., whether it has any tendency to make the
> existence of any fact that is of consequence to the determination of
> the action more probable or less probable than it would be without
> the evidence.  Next, the district court must determine whether the
> proffered testimony has a sufficiently reliable foundation to permit
> it to be considered.  In this inquiry, the district court should consider
> the indicia of reliability identified in Rule 702, namely, (1) that the
> testimony is grounded on sufficient facts or data; (2) that the
> testimony is the product of reliable principles and methods; and (3)
> that the witness has applied the principles and methods reliably to
> the facts of the case.  In short, the district court must make certain
> that an expert, whether basing testimony upon professional studies
> or personal experience, employs in the courtroom the same level of
> intellectual rigor that characterizes the practice of an expert in the
> relevant field.

*Amorgianos*, 303 F.3d at 265-66 (internal alterations, quotations, and citations omitted).

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266 (citation omitted).  "In deciding whether a step in an expert's analysis is unreliable, the district

court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* at 267. "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." *Id.* "The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Id.* (quotation and other citation omitted). Accordingly, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note; *see also E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F. Supp. 2d 213, 226 (S.D.N.Y. 2004). "This principle is based on the recognition that 'our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'" *Melini v. 71st Lexington Corp.*, No. 07-CV-701, 2009 WL 413608, *5 (S.D.N.Y. Feb. 3, 2009) (quoting *Amorgianos*, 303 F.3d at 267).

Here, Dr. Felder's opinion is inadmissible under Rule 702 because its conclusions are not the product of reliable principles or grounded in sufficient data. Dr. Felder's report primarily consists of a calculation of the amount of money Defendant is alleged to have overcharged its customers, based on a comparison between Defendant's revenues and the cost to Defendant from purchasing electricity from the relevant public utilities. *See* Dkt. No. 137-4 at 10-18. The soundness of this calculation rests on Plaintiff's and Dr. Felder's argument that the proper comparison for Defendant's variable rate is solely the rates of the incumbent utilities. However, as addressed in the breach of contract section above, allowing Plaintiff to make this comparison would be in direct conflict with "the entire point of electricity deregulation." *Richards*, 915 F.3d at 99. Dr. Felder's report does not attempt to make any comparison against the rates charged by

Defendant's ESCO competitors.  Thus, Dr. Felder's opinion and report—which rests upon an unreliable methodology and insufficient data—is "simply inadequate to support the conclusions reached." *Amorgianos*, 303 F.3d at 266.

Accordingly, Defendant's motion to strike Plaintiff's proposed expert, Dr. Felder, is granted.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for class certification (Dkt. No. 136) is **GRANTED in part** and **DENIED in part**;[9] and the Court further

**ORDERS** that the New York Sub-Class is divided into a New York Sub-Class for Damages and a New York Sub-Class for Injunctive Relief; and the Court further

**ORDERS** that Plaintiff's motion to strike Defendant's motion to deny class certification (Dkt. No. 139) is **DENIED**; and the Court further

**ORDERS** that Defendant's motion to deny class certification (Dkt. No. 138) is **GRANTED in part** and **DENIED in part**; and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 137) is **GRANTED in part** and **DENIED in part**; and the Court further

**ORDERS** that Defendant's motion to strike Plaintiff's proposed expert (Dkt. No. 137) is **GRANTED**; and the Court further

**ORDERS** that Defendant's motion to strike Plaintiff's Statement of Additional Material

---

[9]  Plaintiff's motion is granted as to the New York Sub-Class.

Facts (Dkt. No. 156) is **DENIED**; and the Court further

      **ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  February 2, 2022
        Albany, New York

Mae A. D'Agostino
U.S. District Judge